No. 23-12160

# In the United States Court of Appeals for the Eleventh Circuit

HM FLORIDA-ORL, LLC,

*Plaintiff-Appellee,*

v.

MELANIE GRIFFIN, Secretary, Department of Business
and Professional Regulation, State of Florida,

*Defendant-Appellant.*

## DEFENDANT-APPELLANT'S INITIAL BRIEF

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 6:23-cv-950-GAP-LHP

ASHLEY MOODY
  *Attorney General*

HENRY C. WHITAKER
  *Solicitor General*
JEFFREY PAUL DESOUSA
  *Chief Deputy Solicitor General*
NATHAN A. FORRESTER
  *Senior Deputy Solicitor General*
BRIDGET O'HICKEY
  *Assistant Solicitor General*
WILLIAM H. STAFFORD III
  *Special Counsel*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300 (phone)
(850) 414-2672 (fax)
nathan.forrester@myfloridalegal.com

November 24, 2023

*Counsel for Defendant-Appellant*

*HM Florida-ORL, LLC v. Melanie Griffin, Secretary, Dep't of*
*Business & Professional Regulation, State of Florida*
*Eleventh Circuit Case No. 23-12160*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendant-Appellant certifies that, to the best of her knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5:

1. America First Legal Foundation

2. Department of Business and Professional Regulation, State of Florida

3. DeSantis, Ron

4. Edgington, Craig A.

5. Forrester, Nathan A.

6. Griffin, Melanie

7. HM Florida-ORL, LLC

8. Israel, Gary S.

9. Mitchell, Jonathan F.

10. Moody, Ashley

11. DeSousa, Jeffrey Paul

12. Presnell, Hon. Gregory A.

C-1

*HM Florida-ORL, LLC v. Melanie Griffin, Secretary, Dep't of*
*Business & Professional Regulation, State of Florida*
*Eleventh Circuit Case No. 23-12160*

13.   Price, Hon. Leslie Hoffman

14.   Stafford, William H.

15.   Stewart, Melissa

16.   Timmons, Brice M.

17.   Whitaker, Henry Charles

## ORAL ARGUMENT STATEMENT

Appellants respectfully submit that oral argument would aid the Court in resolving this appeal. The case concerns the constitutionality of a Florida statute designed to protect children from exposure to age-inappropriate, sexually explicit live performances, by using a variable-obscenity standard derived from ones approved in *Ginsberg v. New York*, 390 U.S. 629 (1968), and *American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990). The district court ruled that the statute was (1) a content-based regulation not narrowly tailored to the State's compelling interest in protecting the physical and psychological well-being of minors and (2) void for vagueness. The case thus presents important questions concerning the application of the First Amendment and the Fourteenth Amendment Due Process Clause, the resolution of which would benefit from oral argument.

# TABLE OF CONTENTS

ORAL ARGUMENT STATEMENT ........................................................... i

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF JURISDICTION ..................................................... xiii

INTRODUCTION ................................................................................... 1

STATEMENT OF THE ISSUES .............................................................. 3

STATEMENT OF THE CASE .................................................................. 3

I.     Legal Background ............................................................................ 3

II.    Procedural History ......................................................................... 6

STANDARD OF REVIEW ....................................................................... 9

SUMMARY OF ARGUMENT ................................................................ 10

ARGUMENT ........................................................................................ 14

I.     Hamburger Mary's does not have Article III standing. ................ 14

II.    The Protection of Children Act does not violate the First
Amendment. ................................................................................. 20

        A.    Because the Protection of Children Act prevents
children from viewing live performances that for them
are not protected by the First Amendment, it is not
subject to heightened scrutiny. ........................................... 21

        B.    The Protection of Children Act would survive
heightened scrutiny in any event. ....................................... 28

        C.    The district court erred in deeming the Protection of
Children Act overbroad on its face. ..................................... 38

III.   The Protection of Children Act is not void for vagueness. ........... 39

IV.    Even if Hamburger Mary's were entitled to a preliminary injunction, this Court should limit that relief to Hamburger Mary's and not enjoin the Protection of Children Act universally. .................................................................. 43

    A.    The district court exceeded its equitable powers in issuing a universal injunction ............................................. 44

    B.    Neither facial invalidity nor overbreadth standing entitles Hamburger Mary's to universal relief. .................... 49

CONCLUSION ........................................................................ 55

CERTIFICATE OF COMPLIANCE ......................................... 56

CERTIFICATE OF SERVICE ................................................. 57

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003) .......................... 24, 25, 33

*Am. Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990)
.....................................................i, 1, 5, 8, 11, 12, 23, 24, 26, 30, 34, 35

*Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382 (1950) .............................. 42

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*,
717 F.3d 851 (11th Cir. 2013) ............................................................ 43

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) ................................ 30, 31, 32, 33

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ........................................... 24, 33

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289
(1979) ................................................................................................. 15

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) ............... 48

*Boyle v. Zacharie & Turner*, 31 U.S. (6 Pet.) 648 (1832) ....................... 44

*Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987) ................................... 49

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................. 39, 42, 50

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985) ........................ 51

*Brown v. Entmt. Merchants Ass'n*, 564 U.S. 786 (2011) ....... 22, 25, 28, 31

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ................................ 45, 49, 50

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257
(11th Cir. 2006) ............................................................................ 15, 17

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) .............................. 26

*Chesebrough v. State*, 255 So. 2d 675 (Fla. 1971) ............................... 9, 40

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018)...........................................................48

*City of South Miami v. Governor of Fla.*, 65 F.4th 631 (11th Cir. 2023)...........................................................17

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2011) ...............17, 20

*Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) ........................................17

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)............................43

*Dermer v. Miami-Dade County*, 599 F.3d 1217 (11th Cir. 2010)...........................................................18

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) .................................52, 53

*FCC v. Pacifica Found.*, 438 U.S. 726 (1978) ............................28, 32, 34

*Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022)...........................................................13, 44, 45, 46

*Gill v. Whitford*, 138 S. Ct. 1916, 1921 (2018) ......................................43

*Ginsberg v. New York*, 390 U.S. 629 (1968) .... i, 1, 5, 8, 11, 12, 22, 23, 24, 25, 28, 29, 30, 32, 34, 35, 37, 39

*Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596 (1982).......................28

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................42

*Green Leaf Nursery v. E.I. Dupont De Nemours & Co.*, 341 F.3d 1292 (11th Cir. 2003)...................................................17

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999)..........................................................44

*Hansberry v. Lee*, 311 U.S. 32 (1940) .....................................................46

*Harrell v. Fla. Bar*, 608 F.3d 1241 (11th Cir. 2010)..............................19

*HM Florida-ORL, Inc. v. Governor of Fla.*, No. 23-12160,
    2023 WL 6785071 (11th Cir. Oct. 11, 2023) ................................. 50, 52

*HM Florida-ORL, LLC*, 601 U.S. \_\_, No. 23A366, slip op.
    (Nov. 16, 2023) ................................................................... 45

*Int'l Soc. for Krishna Consciousness of Atl. v. Eaves*, 601 F.2d
    809 (5th Cir. 1979) ............................................................. 20

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir.
    2020) ...................................................................... 14, 49

*Joy v. Wirtz*, 13 F. Cas. 1172 (Washington, Circuit Justice,
    C.C.D. Pa. 1806) (No. 7,554) ................................................. 45

*Lewis v. Casey*, 518 U.S. 343 (1996) ........................................ 43

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................... 14

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ................... 45

*Memoirs v. Att'y Gen. of Mass.*, 383 U.S. 413 (1966) ....................... 37

*Miller v. California*, 413 U.S. 15 (1973)
    .................................... 1, 5, 11, 12, 23, 25, 28, 29, 30, 31, 35, 36, 37, 41

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ............ 15, 43

*New York v. Ferber*, 458 U.S. 747 (1982) ................................... 28

*Noble Prestige Ltd. v. Galle*, 83 F.4th 1366 (11th Cir. 2023) ............... 10

*People for the Ethical Treatment of Animals, Inc. v. N.C.*
    *Farm Bureau Fed'n, Inc.*, 60 F.4th 815 (4th Cir. 2023) .................... 55

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ......................... 27, 28

*Renne v. Geary*, 501 U.S. 312 (1991) ...................................... 51

*Reno v. ACLU*, 521 U.S. 844 (1997) ................... 26, 29, 30, 32, 33, 34, 36

*Rodgers v. Bryant*, 942 F.3d 451 (8th Cir. 2019) ................................... 46

*Roth v. United States*, 354 U.S. 476 (1957) ............................................ 39

*Sabetti v. Dipaolo*, 16 F.3d 16 (1st Cir. 1994) ....................................... 42

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989) .............. 26, 31

*Scott v. Donald*, 165 U.S. 107 (1897) ...................................................... 47

*Scott v. Donald*, 165 U.S. 58 (1897) ................................................. 47, 48

*Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ................................................................................................. 15, 48

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .......................................... 12

*Smith v. Swormstedt*, 57 U.S. (16 How.) 288 (1853) ............................. 45

*Steffel v. Thompson*, 415 U.S. 452 (1974) .............................................. 16

*Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356 (1921) ................... 45

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ..... 10, 16, 18, 19

*Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020) .................................... 9

*Thornhill v. Alabama*, 310 U.S. 88, 91 (1940) ....................................... 53

*Towne v. Eisner*, 245 U.S. 418 (1918) .................................................... 12

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ........................................ 44, 49

*United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123 (1973) .................................................................................... 41

*United States v. Hansen*, 599 U.S. 762, 770 (2023) ...................... 2, 38, 39

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ................................................................................................. 43, 48

*United States v. Sepulveda*, 115 F.3d 882 (11th Cir. 1997).................... 40

*United States v. Stevens*, 533 F.3d 218 (3d Cir. 2008) (en banc) ........................................................................................54

*United States v. Stevens*, 559 U.S. 460, 464 (2010) ...............................54

*United States v. Williams*, 553 U.S. 285 (2008)................................ 38, 43

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988)..........................26

*Virginia v. Black*, 538 U.S. 343 (2003)...............................................27, 28

*W. Run Student Housing Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165 (3d Cir. 2013)........................................................ 17

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................... 43

*Warth v. Seldin*, 422 U.S. 490 (1975)...............................................15, 52

*Younger v. Harris*, 401 U.S. 37 (1971) ..................................................... 19

**Statutes**

15 U.S.C. § 9009a ........................................................................................37

18 Pa. Cons. Stat. § 5901............................................................................41

18 U.S.C. § 1384 .........................................................................................41

18 U.S.C. § 1461 .........................................................................................41

18 U.S.C. § 1462 .........................................................................................41

18 U.S.C. § 1463 .........................................................................................41

18 U.S.C. § 1464 .........................................................................................33

18 U.S.C. § 1465 .........................................................................................41

20 U.S.C. § 7131 .........................................................................................41

28 U.S.C. § 1292 ......................................................................xiii

42 U.S.C. § 1331 ......................................................................xiii

42 U.S.C. § 1343 ......................................................................xiii

42 U.S.C. § 1983 ..................................................................xiii, 6

42 U.S.C. § 1988 ..................................................................xiii, 6

47 U.S.C. § 941 .........................................................................41

5 U.S.C. § 706 ...........................................................................45

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ...........................45

Cal. Civ. Code § 1746.1................................................................31

Cal. Penal Code § 288..................................................................41

Child Online Protection Act, 47 U.S.C. § 231 ........................................25

Communications Decency Act, Pub. L. No. 104-104, tit. V,
110 Stat. 56 (1996) ........................................... 32, 34, 35, 36

Coronavirus Aid, Relief, and Economic Security (CARES)
Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ...................................37

Fla Stat. § 787.01 ....................................................................41

Fla Stat. § 787.02 ....................................................................41

Fla Stat. § 794.011 ...................................................................41

Fla Stat. § 794.051 ...................................................................41

Fla Stat. § 794.053 ...................................................................41

Fla Stat. § 796.07 ....................................................................41

Fla Stat. § 798.02 ....................................................................41

Fla Stat. § 800.04 ....................................................................41

Fla Stat. § 800.09 ....................................................................41

Fla Stat. § 825.1025..................................................................41

Fla Stat. § 827.071 ...................................................................41

Fla Stat. § 847.0135..................................................................41

Fla. Stat. § 120.60 .....................................................................5

Fla. Stat. § 509.261 .................................................................4, 5

Fla. Stat. § 561.29 ...................................................................4, 5

Fla. Stat. § 800.04 .......................................................................4

Fla. Stat. § 827.01 ..................................................................5, 37

Fla. Stat. § 827.11 ....................................... 1, 5, 6, 21, 23, 24, 36

Fla. Stat. § 847.001 ..................................... 5, 21, 23, 36

Fla. Stat. § 847.012 ..................................................................22

Fla. Stat. § 847.013 ................................................................4, 22

Fla. Stat. ch 1014 .....................................................................33

Fla. Stat. ch. 827 ......................................................................37

Ga. Code Ann. § 16-12-103.......................................................30

Haw. Rev. Stat. § 712-1217........................................................41

Idaho Code § 52-104 .................................................................41

Kan. Stat. Ann. § 21-5513 .........................................................41

La. Stat. Ann. § 14:281..............................................................41

Mass. Gen. Law ch. 272, § 16 ................................................................ 41

Miss. Code Ann. § 97-29-31 ................................................................. 41

N.C. Gen. Stat. § 19-1.2 ....................................................................... 41

N.J. Rev. Stat. § 2C:14-4 ...................................................................... 41

N.Y. Penal Law § 245.00 (McKinney) ...................................................... 41

Nev. Rev. Stat. § 201.210 ..................................................................... 41

Okla. Stat. tit. I, § 1123 ........................................................................ 41

Protection of Children Act, 2023 Fla. Laws ch. 94 (May 17,
    2023) (SB 1438)
    ....1, 2, 3, 4, 5, 6, 8, 10, 11, 12, 14, 16, 17, 20, 23, 24, 25, 26, 27, 28, 29,
    31, 32, 34, 35, 36, 37, 38, 39, 40, 42, 43

S.C. Code Ann. § 16-15-365 .................................................................. 41

Utah Code Ann. § 76-9-702 .................................................................. 41

Vt. Stat. Ann. tit. 13, § 2601 ............................................................... 41

Wash. Rev. Code § 7.48A.020 ............................................................... 41

## Constitutional Provisions

U.S. Const. amend. I ...........i, xiii, 2, 3, 6, 8, 11, 20, 23, 25, 26, 31, 38, 43

U.S. Const. amend. XIV ................................................i, xiii, 3, 6, 8, 11

U.S. Const. art. III................................................................xiii, 3, 20

## Rules

Fed. R. Civ. P. 23 ...................................................................... 14, 46, 47

**Treatises and Compilations**

Frederic Calvert, *A Treatise upon the Law Respecting Parties to Suits in Equity* (2d ed. 1847) .......................................................... 46

Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* (2d ed. 1839)....................... 47

Joseph Story, *Commentaries on Equity Pleadings* (4th ed. 1848)................................................................................................... 46

**Law Review Articles**

Henry P. Monaghan, *Overbreadth*, 1981 Sup. Ct. Rev. 1 (1982).................................................................................................. 52

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) ...................................................................... 45, 50

Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853 (1991) .................................................................. 52, 54

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017)........................... 45

**Other Sources**

Fla. Bar, Criminal Jury Instructions § 11.10(d).................................... 41

## STATEMENT OF JURISDICTION

Plaintiff-Appellee HM Florida-ORL, LLC—which operates a restaurant in Orlando called "Hamburger Mary's" and will be referred to by that name in this brief—has challenged a Florida statute on First and Fourteenth Amendment grounds. DE1 at 1. Hamburger Mary's presented claims under 42 U.S.C. §§ 1983 and 1988 and invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1343. DE1 at 1. The district court did not, however, have jurisdiction. In its verified complaint, Hamburger Mary's denied that it had, or ever would, come close to violating the statute. DE1 at 6. Hamburger Mary's has thus disclaimed any basis for injury in fact, as required for Article III standing.

On June 23, 2023, the district court entered a preliminary injunction preventing enforcement of the statute against anybody in the State of Florida. DE29. A day later, it amended the order. DE30. Defendant-Appellant Melanie Griffin, Secretary of Florida's Department of Business and Professional Regulation, filed a timely notice of appeal on June 27, 2023. DE31. Apart from lack of Article III standing, this Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

## INTRODUCTION

On May 17, 2023, the Florida legislature enacted the Protection of Children Act, Fla. Laws ch. 2023-94 (SB 1438) (DE21-1), which makes it a misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4). The Act defines an "adult live performance" as "any show, exhibition, or other presentation in front of a live audience" which depicts certain kinds of explicit sexual activity and which would be considered obscene "for the age of the child present." *Id*. § 827.11(1)(a). This standard tracks the statutes approved in *Ginsberg v. New York*, 390 U.S. 629 (1968), *Miller v. California*, 413 U.S. 15 (1973), and *American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990), with the additional refinement that obscenity is measured according to the age of the child admitted to the "adult live performance" and not according to what might be considered obscene for children as an entire group.

The Act is constitutional. It is content-based only in the sense that any statute regulating a category of unprotected speech—here, obscenity—is content-based. The Act does not prevent any "adult live performances" from taking place and it does not prevent any adults from attending them. Even older children for whom the performance would not

be obscene need not be excluded. The Act simply reflects Florida's policy of preventing the admission of a child to live entertainment so explicit it is obscene *for that child*. As a result, it does not infringe on anybody's First Amendment rights and is not subject to heightened scrutiny. And even if some level of scrutiny were the correct analytical frame, the statute would easily survive that review, because it is difficult to imagine a statute more precisely tailored to the State's unquestioned interest in protecting children from exposure to obscenity.

At minimum, any relief in this case should be limited to the plaintiff—Hamburger Mary's. The district court exceeded its equitable authority in preliminarily enjoining enforcement of the Protection of Children Act against anybody, anywhere in the State. The court reasoned, erroneously, that facial overbreadth is a special exception that allows courts to enter relief in favor of non-parties. Both the premise and the conclusion are false. The statute is not overbroad—which occurs only when a statute "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (cleaned up). Overbreadth, moreover, does not expand the range of remedies available to a court. It merely expands the substantive grounds on

which a plaintiff to whom a statute may be applied constitutionally may nevertheless obtain party-specific relief from operation of the statute. It does not justify departure from traditional principles of equity.

## STATEMENT OF THE ISSUES

1.      Whether Hamburger Mary's has Article III standing to challenge the Protection of Children Act.

2.      Whether the Protection of Children Act violates the First Amendment on its face.

3.      Whether the Protection of Children Act is void for vagueness on its face under the Fourteenth Amendment Due Process Clause.

4.      Whether the district court had authority to award relief to non-parties by enjoining application of the Protection of Children Act anywhere in the State.

## STATEMENT OF THE CASE

## I.    Legal Background

At the time the Florida legislature enacted the Protection of Children Act, several Florida statutes protected children from certain sexually explicit performances deemed harmful to minors. Each, however, was limited in scope. For instance, it is a felony to engage in a "lewd and lascivious exhibition" in the presence of a child under 16, but the

definition of "lewd and lascivious exhibition" is limited to certain live or simulated sex acts, such as masturbation or bestiality. Fla. Stat. § 800.04(7). It is also a misdemeanor to admit a minor to "premises whereon there is exhibited a motion picture, exhibition, show, representation, or other presentation which, in whole or in part, depicts nudity, sexual conduct, sexual excitement, sexual battery, bestiality, or sadomasochistic abuse and which is harmful to minors." Fla. Stat. § 847.013(3)(a). But the admission must have been "for a monetary consideration," *id*., and a minor could still be admitted if accompanied by a parent, *id*. § 847.013(3)(c).

The Protection of Children Act established a comprehensive prohibition on exposing children to age-inappropriate, sexually explicit live performances, irrespective of any exchange of consideration and irrespective of parental consent. It furthermore gauged the propriety of the exposure precisely to the age of the child present. The Act also clarified the enforcement authority of Florida's Department of Business and Professional Regulation ("DBPR"). It afforded DBPR the power to levy fines and to revoke the licenses of establishments that violate the Act. Fla. Stat. §§ 509.261(10), 561.29 (1). By deeming a violation of the Act to be "an

immediate, serious danger to the public health, safety, or welfare for the purposes of s. 120.60(6)," the Act afforded the Department emergency powers to revoke, suspend, or limit licenses not clearly available under other statutes. Fla. Stat. §§ 509.261(10)(b), 561.29(1)(*l*)1.

Substantively, the Act made it a first-degree misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4).[1] As defined by the Act, an "adult live performance" has two components. First, the performance must be a "show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts." Fla. Stat. § 827.11(1)(a). Second, the performance must satisfy a variable-obscenity standard derived from the Supreme Court's decisions in *Ginsberg* and *Miller*, and this Court's decision in *Webb*. Under that standard, the performance must "[p]redominantly appeal[] to a prurient, shameful, or morbid interest"; be "patently offensive to prevailing standards in the

_____

[1] A "child" is defined as a person under 18 years of age. Fla. Stat. § 827.01(2).

adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present"; and "[t]aken as a whole," be "without serious literary, artistic, political, or scientific value for the age of the child present." Fla. Stat. § 827.11(1)(a)1.–3.

## II.   Procedural History

Plaintiff-Appellee HM Florida-ORL, LLC operates a restaurant and bar with a liquor license in Orlando called "Hamburger Mary's." DE1 at 2, 6. On May 22, 2023, five days after the Protection of Children Act was signed into law, Hamburger Mary's sued the Secretary under 42 U.S.C. §§ 1983 and 1988. DE1 at 1, 3. In a single count, Hamburger Mary's challenged the Act on First Amendment free-speech and Fourteenth Amendment void-for-vagueness grounds. DE1 at 9–20. As relief, Hamburger Mary's sought to enjoin, preliminarily and permanently, most of the operative provisions of the Act. DE1 at 20; DE6.

In its verified complaint, Hamburger Mary's stated that it offered "family friendly" drag performances on Sundays to which children are invited to attend. DE1 at 6. Hamburger Mary's insisted that "[t]here [wa]s no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to

see." DE1 at 6. But when its performances were "not suitable for children," Hamburger Mary's averred that "children [we]re not allowed to attend and the venue announce[d] this in advance on their website and in their advertising." DE1 at 19. Hamburger Mary's did not state that it was subject to any pending or past enforcement action.

Hamburger Mary's said it had "advised its customers that children would not be permitted to attend any drag shows." DE1 at 18. It based this approach on an expansive interpretation of the Act. It read the term "adult live performances" to include any show featuring "female impersonators," covering classics like "I Love Lucy" and "Some Like It Hot." DE1 at 17. While acknowledging that the Act "does not mention 'drag' by name," Hamburger Mary's nevertheless asserted that the Act "targets drag queens." DE1 at 11, 16.

On June 23, 2023, the district court granted the preliminary injunction and denied the Secretary's motion to dismiss. DE29. A day later it amended that order to include additional analysis. DE30. The court first found that Hamburger Mary's had standing and rejected the Secretary's contention that Hamburger Mary's complaint was a shotgun pleading. DE30 at 9–14. The court then ruled that Hamburger Mary's was likely to

succeed on both its First Amendment free-speech claim and its Fourteenth Amendment void-for-vagueness claim. On the free-speech claim, the court ruled that the Protection of Children Act was content-based and could not withstand the resulting strict scrutiny, because it was not the least restrictive means of achieving a compelling interest. DE30 at 15–16. The court acknowledged the connection between the variable-obscenity standard used in the Act and the variable-obscenity standard approved in *Ginsberg*, but purported to distinguish that decision on several grounds, including that the Act applied to more than just commercial speech and did not provide an exception for parental consent. DE30 at 17–20. The court ignored that the statute upheld by this Court in *Webb* also did not include an exception for parental consent.

The court further ruled that the Protection of Children Act was unconstitutionally vague. It located this "vagueness" in the failure to define phrases such as "live performance," "child," "lewd conduct," and "lewd exposure of prosthetic or imitation genitals or breasts." DE30 at 18. It conceded that the term "lewd" was present in other Florida criminal statutes and had been upheld against a vagueness challenge more than fifty years ago. DE30 at 22–23. But it concluded that the meaning of the term had

somehow been lost to time and "would do very little inform a 'person of ordinary understanding [today] . . . what conduct on his part is condemned.'" DE30 at 23 (quoting *Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971)).

On June 27, 2023, the Secretary appealed. DE31. Over the Secretary's objection, the district court then granted Hamburger Mary's leave to amend its complaint notwithstanding the pending appeal, which Hamburger Mary's did. DE51. The initial verified complaint (DE1) and the exhibits attached to the Secretary's response to the preliminary-injunction motion (DE21-1 through DE21-5) thus remain the only cognizable evidence in the record before this Court.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a litigant must establish each of the following four elements: "that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020) (citation

omitted). This Court reviews the decision to enter a preliminary injunction for abuse of discretion but reviews the underlying legal conclusions de novo. *Noble Prestige Ltd. v. Galle*, 83 F.4th 1366, 1374 (11th Cir. 2023).

## SUMMARY OF ARGUMENT

The district court universally enjoined Florida's Protection of Children Act. That injunction should be reversed because Hamburger Mary's has not met any of the requirements for a preliminary injunction, chiefly, likelihood of success on the merits.

Hamburger Mary's is unlikely to succeed on the merits for two reasons. First, Hamburger Mary's does not have standing. In its verified complaint, Hamburger Mary's stated flatly that "[t]here is no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see," when children are present at the live performances it hosts. DE1 at 6. Hamburger Mary's conduct is thus not even "arguably proscribed" by the Protection of Children Act. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014). Hamburger Mary's therefore cannot show injury in fact, which should have precluded the district court's exercise of jurisdiction under Article III.

10

Second, Hamburger Mary's First and Fourteenth Amendment claims are groundless. The district court held that the Act was an impermissible content-based restriction on speech and was void for vagueness. But the relevant consideration is that obscenity is not protected by the First Amendment, as long as it is defined according to the familiar three-part test laid out in the family of cases led by *Miller*. Two important cases in that family are *Ginsberg* and *Webb*, which both upheld statutes denying children access to materials that might not be obscene for adults but would be obscene for children.

Florida's Protection of Children Act tracks the variable-obscenity statutes approved in *Ginsberg* and *Webb*, with an additional tweak that serves only to enhance its constitutionality. The Act does not prevent establishments from continuing to stage "adult live performances" or prevent adults from attending those performances. It merely requires the exclusion of children for whom those performances would be obscene under the *Miller* test. The difference between the Act and the statutes upheld in *Ginsberg* and *Webb* is that the Act gears obscenity to the age of the child, not to children as an undifferentiated group. In other words, an establishment hosting an "adult live performance" that is obscene for a

five-year-old but not for a sixteen-year-old would be required to exclude only the five-year-old, not the sixteen-year-old—and never any adults. This difference tailors the proscriptive effect of the Act even more precisely than the statutes upheld in *Ginsberg* and *Webb*. Thus, even if some form of heightened scrutiny were to apply, the Protection of Children Act would easily survive it.

The Act is also not void for vagueness. If phrases like "live performance," "child," "lewd conduct," and "lewd exposure of prosthetic or imitation genitals or breasts" are not sufficiently meaningful to guarantee that "ordinary people have 'fair notice' of the conduct a statute proscribes," *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citations omitted), it is difficult to imagine any statutory text in this area of law that would not also be vague. Human language rarely partakes of the crystalline precision of a mathematical equation. *See Towne v. Eisner*, 245 U.S. 418, 425 (1918) (Holmes, J.). The *Miller* test itself measures obscenity by a multi-factored test that includes consideration of whether the material in question "appeals to the prurient interest" and depicts sexual conduct "in a patently offensive way." 413 U.S. at 24. It is all too easy to pick at the inevitably blurred edges of any textual representation of a legal

concept and use vagueness doctrine as a vehicle for effectuating judicial hostility to the policy behind a law. That is not an appropriate exercise of judicial review.

Finally, even if the district court were correct in its constitutional analysis, it erred in not limiting the injunction to Hamburger Mary's. District courts generally lack the power to grant relief to non-parties to the case. An injunction in favor of a plaintiff might incidentally benefit third parties, such as when a court orders the abatement of a public nuisance, but that is only because the court could not have prevented the harm for which the plaintiff was entitled to relief without also benefiting others. Here, an injunction limited to Hamburger Mary's would afford Hamburger Mary's full relief from its alleged injury, which consists of alleged loss of business resulting from excluding children from its drag shows.

The district court nevertheless declared that a broader injunction was necessary to protect non-parties. DE41 at 5. But "[r]eviewing courts should . . . be skeptical of [universal] injunctions premised on the need to protect nonparties." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1306 (11th Cir. 2022). The Federal Rules authorize many "procedural devices"

that "allow nonparties with similar interests to seek the protection of in-junctive relief—class certification under Rule 23 [of the Federal Rules of Civil Procedure], joinder and intervention in an existing lawsuit, or even filing a new lawsuit of their own." *Id.* "A district court cannot circumvent these mechanisms in the name of providing injunctive relief only for non-parties' benefit." *Id.* As a result, even if this Court disagrees that the Pro-tection of Children Act is likely to be held constitutional, it should still limit any injunctive relief to Hamburger Mary's.

## ARGUMENT

### I. Hamburger Mary's does not have Article III standing.

To have standing, Hamburger Mary's must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Hamburger Mary's has not stated facts sufficient to show injury in fact, let alone traceability or re-dressability.

It does not matter that Hamburger Mary's has attempted to invoke overbreadth standing. "The overbreadth doctrine does not relieve a

plaintiff of the burden to prove constitutional standing[.]" *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1270 (11th Cir. 2006). It is merely "an exception to the prudential standing prohibition against *jus tertii* claims"—i.e., claims based on the rights of third parties. *Id.* (citing *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984)). Hamburger Mary's therefore still must show that it "has suffered some threatened or actual injury resulting from the putatively illegal action." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

To establish injury in fact, Hamburger Mary's must show injury that is "concrete, particularized, and actual or imminent." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Here, Hamburger Mary's does not claim that it is the subject of any enforcement action or that it has been the subject of one in the past. It instead brings a pre-enforcement challenge to prevent an enforcement action from happening. To do so, Hamburger Mary's must show both "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and a "credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Hamburger Mary's need not "confess that [it] will in fact violate

15

that law," *Driehaus*, 573 U.S. at 163, nor must it "first expose [itself] to actual arrest or prosecution to be entitled to challenge a statute that [it] claims deters the exercise of [its] constitutional rights," *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). It must, however, at least show an intent to engage in conduct "arguably proscribed" by that law. *Driehaus*, 573 U.S. at 162.

Hamburger Mary's states no such intention. Rather, Hamburger Mary's represented in its verified complaint that the performances it hosts at its establishment feature "no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." DE1 at 6. If "the entertainment is not suitable for children, children are not allowed to attend and the venue announces this in advance on their website and in their advertising." DE1 at 19. Nothing Hamburger Mary's describes in its verified complaint even arguably contravenes the Protection of Children Act or suggests that enforcement action is imminent.[2]

---

[2] After the Secretary appealed, Hamburger Mary's amended its complaint, but deleted these allegations from it. DE51. That amended complaint, however, was not verified and did not contradict these verified factual assertions, which still are the only record evidence on the matter.

The district court (DE30 at 11–12) credited Hamburger Mary's claim that it has already suffered injury based on the alleged chilling effect of the Protection of Children Act, in particular its claim that it now bars children from attending its performances because it fears prosecution (DE1 at 9, 18). But the district court based this determination on nothing more that the conclusory assertion that the Act was "standardless," DE30 at 11 (quoting *CAMP*, 451 F.3d at 1275), and Hamburger Mary's unilateral decision to take prophylactic measures based on an implausibly expansive reading of the statute. A plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *see also City of South Miami v. Governor of Fla.*, 65 F.4th 631, 638 (11th Cir. 2023) ("[W]e have rejected the argument that plaintiffs have standing based on their

---

*See W. Run Student Housing Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172–73 (3d Cir. 2013). In all events, a district court may not grant leave to amend when the proposed amendment would "alter[] the status of the case" on appeal, *Green Leaf Nursery v. E.I. Dupont De Nemours & Co.*, 341 F.3d 1292, 1309 (11th Cir. 2003), under the rule that an interlocutory appeal "divests the district court of its control over those aspects of the case involved in the appeal," *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (cleaned up).

subjective fear of harm and its chilling effect." (cleaned up)). Like the plaintiff in *Dermer v. Miami-Dade County*, 599 F.3d 1217, 1220 (11th Cir. 2010), Hamburger Mary's "failed to provide the court with anything more than generalizations" about its performances, from which the district court could reasonably determine that those performances even arguably fall within the Protection of Children Act.

Hamburger Mary's has additionally suggested that enforcement proceedings against other establishments have deterred it from allowing children at its events. DE1 at 2–3. In *Driehaus*, the Supreme Court afforded standing to a plaintiff who had been inhibited from making certain political statements because of a prior enforcement proceeding against another individual, but only because the plaintiff had "alleged an intent to engage *in the same speech* that was the subject of [the] prior enforcement proceeding." 573 U.S. at 166 (emphasis added). The enforcement proceedings against others upon which Hamburger Mary's relies, by contrast, involve different statutes and different performances. *See* DE21-2 through DE21-5 (declaration of DBPR deputy general counsel and three administrative complaints, attached as exhibits to Secretary's response to motion for preliminary injunction). Based on Hamburger Mary's own

complaint, its performances are unlike the ones at issue in these other proceedings and do not permit an inference like one the Court drew in *Driehaus*.

Hamburger Mary's is thus more like the plaintiffs in *Younger v. Harris*, 401 U.S. 37 (1971), who sought to intervene in the prosecution of an individual under a California leafletting statute, contending that the prosecution inhibited their own leafletting activity. The putative intervenors did not have standing, the Supreme Court held, because they did "not claim that they ha[d] ever been threatened with prosecution, that a prosecution [was] likely, or even that a prosecution [was] remotely possible." *Id*. at 42. They claimed instead that the prosecution made them "feel inhibited." *Id*. This did not establish a "genuine controversy" as to these plaintiffs or entitle them to enjoin the prosecution. *Id*.

For the same reasons, Hamburger Mary's injuries are neither traceable to nor redressable by an injunction against the Secretary. Contrary to the district court's ruling, these "actions of self-censorship" do not "represent a reasonable attempt to 'steer wide of any possible violation lest [Hamburger Mary's] be unwittingly ensnared.'" DE30 at 14 (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1255 (11th Cir. 2010) (quoting *Int'l Soc.*

19

*for Krishna Consciousness of Atl. v. Eaves*, 601 F.2d 809, 820 (5th Cir. 1979))). "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Clapper*, 568 U.S. at 416. The Secretary cannot be expected to account for Hamburger Mary's unreasonable fear that she will apply the Act indiscriminately to Hamburger Mary's purportedly "family-friendly" drag shows, in defiance of the manifest limitations in the Act to conduct that is truly obscene for children. Standing must hang on more than just bootstraps.

## II.     The Protection of Children Act does not violate the First Amendment.

The Protection of Children Act restricts conduct unprotected by the First Amendment: admission of a child to a sexually explicit performance that is obscene for the age of that child. It is therefore not subject to heightened scrutiny. Even if it were, the tailoring of the statute is precise: it forbids not a single "adult live performance" from occurring and it requires the exclusion only of children so young that the performance is obscene as to them. The Act thus cannot violate the First Amendment.

**A.    Because the Protection of Children Act prevents children from viewing live performances that for them are not protected by the First Amendment, it is not subject to heightened scrutiny.**

The Protection of Children Act makes it a misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4). "Adult live performance" means:

> [A]ny show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:
>
> 1. Predominantly appeals to a prurient, shameful, or morbid interest;
>
> 2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and
>
> 3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

Fla. Stat. § 827.11(1)(a). In other words, the Act protects children from exposure to age-inappropriate sexually explicit live performances, no matter the identity of the performer, the nature of the performance, or what viewpoint the performance seeks to convey. It is similar in this regard to Florida statutes that were on the books when this law was

21

created, such as §§ 847.012 and 847.013, which restrict the exposure of minors to sexually explicit materials, images, and films.

Because of its limited scope, the Act regulates only unprotected speech: "*sexual* material that would be obscene from the perspective of a child." *Brown v. Entmt. Merchants Ass'n*, 564 U.S. 786, 793 (2011) (citing *Ginsberg*). In *Ginsberg*, the Supreme Court upheld a New York statute's use of what the Court termed a "variable" obscenity standard for minors. 390 U.S. at 635 n.4, 637. The statute prohibited the sale to minors of materials deemed "harmful to minors," which it defined as "that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse," when the representation

> (i) predominantly appeals to the prurient, shameful or morbid interest of minors, and

> (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and

> (iii) is utterly without redeeming social importance for minors.

*Id.* at 646. The Court declined to apply heightened First Amendment scrutiny to this statute because "obscenity is not protected expression." *Id.* at 641. The Supreme Court thus held that a statute of the same form

22

as the Protection of Children Act does not regulate protected First Amendment speech at all.

Florida's law also faithfully combines the *Ginsberg* variable-obscenity standard with the additional refinements to that test announced by *Miller*. In *Miller*, the Supreme Court clarified the definition of obscenity: whether the speech in question "appeals to the prurient interest"; whether it "depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"; and whether "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id*. at 24. Florida's law tracks this definition. It "specifically define[s]," *id*., the relevant conduct: performances that feature or simulate "nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001." Fla. Stat. § 827.11(1)(a). And it requires these performances to satisfy all three factors, with the additional refinement that, consistent with *Ginsberg*, the conduct must be obscene for the age of the child present.

In *Webb*, this Court followed the lead of *Ginsberg* and *Miller* in upholding a Georgia statute that criminalized providing minors with material "harmful" to them. Similar to the Protection of Children Act, the

statute in *Webb* defined "harmful to minors" as "that quality of description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse," which

> (A) Taken as a whole, predominantly appeals to the prurient, shameful, or morbid interest of minors;

> (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

> (C) Is, when taken as a whole, lacking in serious literary, artistic, political, or scientific value for minors.

919 F.2d at 1513. The Protection of Children Act uses this model.

The only material difference between the Protection of Children Act and the statutes upheld in *Ginsberg* and *Webb* is that the scope of the Protection of Children Act is even more carefully defined. It uses a variable-obscenity standard to tie what is considered obscene—for the child and no one else—to the actual age of the child at the "adult live performance." It does so by measuring what is "patently offensive," and what lacks "serious literary, artistic, political, or scientific value," by "the age of the child present." Fla. Stat. § 827.11(1)(a)2., 3. That refinement resolves a constitutional concern the Third Circuit identified in *ACLU v. Ashcroft* ("*Ashcroft II*"), 322 F.3d 240 (3d Cir. 2003), *aff'd*, *Ashcroft v. ACLU* ("*Ashcroft III*"), 542 U.S. 656 (2004); *see also Brown*, 564 U.S. at

24

812 (Alito, J., joined by Roberts, C.J., concurring) (faulting California proscription of sale of "violent video games" to minors for "draw[ing] no distinction between young children and adolescents who are nearing the age of majority"). In *Ashcroft II*, the Third Circuit invalidated the part of the Child Online Protection Act ("COPA"), 47 U.S.C. § 231, that provided civil and criminal penalties for anyone who knowingly made commercial communications to minors that included "material that is harmful to minors." 322 F.3d at 245 (emphasis omitted) (quoting 47 U.S.C. § 231(a)(1)). COPA's definition of what was "harmful to minors" employed a three-part obscenity test derived from *Ginsberg* and *Miller* that did not calibrate what was considered "harmful" to the age of the particular child. *Id.* at 246. The Third Circuit was thus concerned that what is obscene for a "five-year-old" might not be obscene for "a person just shy of age seventeen" and that COPA could violate the First Amendment rights of older children. *Id.* at 254.

The Protection of Children Act allays any such concern by gearing application of the Act to the age of the actual child in question. Because of this feature, the Act does not unnecessarily deny or impede access of adults to communications that are constitutionally protected for them.

*See, e.g.*, *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989); *Reno v. ACLU*, 521 U.S. 844, 879–81 (1997). The Act proscribes only the knowing exposure of a child to unprotected speech—speech that is obscene for children of that age. It is therefore entirely consistent with the First Amendment. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 389 (1988); *Webb*, 919 F.2d at 1500–09.

Instead of meaningfully addressing the age-adjusted, variable-obscenity feature of the Protection of Children Act, the district court summarily declared the Act a presumptively invalid "content-based" regulation, because the statute did "not restrict the attendance of children from all live performances, only those engaged in the portrayal of a specific, enumerated subset of content." DE30 at 15–16. That misses the point. Unprotected speech—i.e., speech "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)—is of course defined by content, but that does not mean regulation of that speech is subject to strict scrutiny. It is by definition beyond the protection of the First Amendment. The district court's wooden reasoning would require applying strict scrutiny

to all regulations of obscenity—a position that has long been rejected by the Supreme Court.

It is also immaterial that the Protection of Children Act proscribes only a limited portion of unprotected speech—the exposure of a children to live performances that are obscene as to them. Content discrimination within a category of unprotected speech does not trigger strict scrutiny if that "discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). For instance, "a State might choose to prohibit only that obscenity . . . which involves the most lascivious displays of sexual activity" without triggering strict scrutiny." *Id.*; *see also Virginia v. Black*, 538 U.S. 343, 361–62 (2003). Or, as it has done here, the State can choose to protect a vulnerable class from exposure to unprotected speech that is harmful specifically to them. Indeed, the very feature of the statute the district court said would require strict scrutiny—its definition of a class of sexually explicit performances—is a constitutionally required element

27

of any obscenity regulation. *See Miller*, 413 U.S. at 24 (requiring the "sexual conduct to be specifically defined by the applicable state law").[3]

## B.    The Protection of Children Act would survive heightened scrutiny in any event.

In short, the Protection of Children Act regulates only obscenity, and so does not trigger heightened scrutiny. But even if the statute were subject to some form of heightened scrutiny, it would pass any such test with flying colors—even strict scrutiny. "It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *New York v. Ferber*, 458 U.S. 747, 756 (1982) (quoting *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 607 (1982)); *see also Brown*, 564 U.S. at 794; *FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978); *Ginsberg*, 390 U.S. at 640. Florida's law is precisely tailored to protecting that interest, accounting even for the age of the particular child whom an establishment might be required to exclude from an "adult live performance," so that a seventeen-year-old might be

---

[3] The district court stated that the "absence of any argument to the contrary" by the Secretary "bolsters the conclusion that this is plainly a facially content-based regulation." DE 30 at 15. In fact, the Secretary argued that there was no impermissible content discrimination here because this is an obscenity regulation. *See* DE21 at 8 (citing *R.A.V.* and *Black*).

allowed to view what a five-year-old could not. The Act does not prevent the live performances from taking place and it does not prevent any adults from viewing them. It is difficult to imagine how the State could have better crafted a statute to protect young children from the harm of witnessing an obscene live performance without intruding on the rights of adults and older children.

Along the way to erroneously invalidating the Act on its face under strict scrutiny, DE30 at 16–20, the district court attempted to distinguish *Ginsberg* and *Miller* on three grounds. Each purported ground of distinction is illusory.

### 1.   Speech obscene for children does not cease to be so just because parents consent to it.

The district court said first that the New York statute in *Ginsberg* "d[id] not bar parents who so desire[d] from purchasing [obscene] magazines for their children." DE30 at 17 (quoting *Reno*, 521 U.S. at 865). But *Ginsberg* did not suggest that this possibility was an absolute prerequisite to applying its variable-obscenity standard, which is why it relied upon the State's "independent interest in the well-being of its youth" quite apart from parental wishes. 390 U.S. at 640. Here, moreover, the State's interest is even greater because it is not regulating the exposure

of children to mere obscene "magazines," DE30 at 17 (quoting *Reno*, 521 U.S. at 865), but to *live* adult performances.

The district court also overlooked that the display prohibition this Court upheld in *Webb* likewise had no exception for parental consent. The Georgia statute in *Webb* barred display, in public places where minors might be present, of materials deemed "harmful to minors" under the *Ginsberg/Miller* test. 919 F.2d at 1514 (quoting Ga. Code Ann. § 16-12-103(e)). It did not allow such displays if parents gave their consent. Nowhere in this Court's thorough analysis of why the display prohibition was sufficiently tailored to Georgia's interest in protecting children from exposure to obscene materials, *see id*. at 1500–02, did this Court indicate that a parental-consent exception was required.

That makes sense. Whether material is in fact obscene for a child does not depend on parental consent. It instead is tied to the standards of the whole community: "[w]hether *the average person*, applying contemporary *community* standards[,] would find that the work, taken as a whole, appeals to the prurient interest." *Ashcroft v. ACLU* ("*Ashcroft I*"), 535 U.S. 564, 574 (2002) (emphasis added and removed; further quotations omitted) (quoting *Miller*, 413 U.S. at 24). "The primary concern" of

30

the community-standards yardstick "is to be certain that material will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one." *Id.* at 575 (cleaned up) (quoting *Miller*, 413 U.S. at 33). Nor does the State's "interest in protecting the physical and psychological well-being of minors," *Sable*, 492 U.S. at 126 (citations omitted), depend on the disparate views of individual parents.

Indeed, including a parental-consent exception could have invited a claim that the Protection of Children Act was *under*inclusive, "rais[ing] serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. In *Brown*, the Supreme Court struck down a California statute that prohibited the sale or rental of "violent video games" to minors. Among other reasons for ruling that the statute violated the First Amendment, the Supreme Court criticized the California legislature for its willingness "to leave this dangerous, mind-altering material in the hands of children so long as one parent (or even an aunt or uncle) says it's OK." *Id.*; *see* Cal. Civ. Code § 1746.1(c). "That," the Court scolded, "is not how one addresses a serious social problem." *Id.*

The absence of that same feature cannot be something that dooms Florida's law.

Certainly nothing in *Reno* makes parental consent an absolute prerequisite to the application of a variable-obscenity regulation to children. The statute in that case—the Communications Decency Act, Pub. L. No. 104-104, tit. V, 110 Stat. 56 (1996)—inordinately constrained the access of adults to material that would not be obscene for them. In invalidating those parts of the Act, the Court observed that the Act achieved its legitimate aim of denying minors access to potentially harmful speech only by "effectively suppress[ing] a large amount of speech that adults have a constitutional right to receive and to address to one another." 521 U.S. at 874; *see also Ashcroft I*, 535 U.S. at 568 (confirming this understanding of *Reno*). The Court did not retreat from its "repeated[] recogni[tion]" of "the governmental interest in protecting children from harmful materials." *Reno*, 521 U.S. at 875 (citing *Ginsberg* and *Pacifica*). It simply found that that interest "d[id] not justify an unnecessarily broad suppression of speech addressed to adults." *Id*.

By contrast, the Protection of Children Act poses no threat to adult access. Like the New York law in *Ginsberg*, it "create[s] a constitutionally

32

adequate adult zone" that "on its face . . . denie[s] access only to minors." *Reno*, 521 U.S. at 889 (O'Connor, J., concurring in the judgment in part and dissenting in part, joined by Rehnquist, C.J.). The key difference from the statutes in *Reno* and the *Ashcroft* cases is that the Florida statute "operate[s] in the physical world" of the adult live performance, and not in the "fundamentally different" electronic world, where it is difficult to permit adult access while still screening out minors. *Id*. In the physical world, "the twin characteristics of geography and identity enable the establishment's proprietor to prevent children from entering the establishment, but to let adults inside." *Id*.[4]

The Supreme Court has long upheld laws whose practical effect, if not central design, is to protect children from exposure to harmful materials over and above what individual parents might be willing to permit—e.g., the prohibition on "obscene, indecent, or profane language by means of radio communications," 18 U.S.C. § 1464 (1976), which was upheld in

---

[4] The district court advanced the curious, *sua sponte* suggestion that, without a parental-consent exception, Florida's law "inevitabl[y] clash[ed] with the Florida 'Parents' Bill of Rights'" (Fla. Stat. ch 1014). DE30 at 18. Even if that were true—and it is not—that feature of state law would have nothing to do with the federal Constitution.

*Pacifica.* "Bookstores and motion picture theaters, for example, may be prohibited from making indecent material available to children," *Pacifica*, 438 U.S. at 749, or from allowing "minors unfettered physical access to offensive material," *Webb*, 919 F.2d at 1507. The Protection of Children Act lies comfortably within this longstanding constitutional practice.

### 2. Speech obscene for children does not cease to be so just because nobody pays for it.

The district court also distinguished *Ginsberg* on the ground that the Protection of Children Act applies to "anyone, anywhere," whereas the New York statute in *Ginsberg* "only applied to commercial transactions." DE30 at 18. But the district court did not explain why the determination that material is obscene for a child should turn on whether consideration is given for the material in question.

It is true that in *Reno*, the Supreme Court pointed out the New York statute in *Ginsberg* "applied only to commercial transactions, whereas the [Communications Decency Act] contain[ed] no such limitation." 521 U.S. at 865 (citation omitted). But the Court mentioned that feature only among several that differentiated the Communications Decency Act, with no indication that this feature was dispositive of the question whether

that Act was sufficiently tailored to withstand strict scrutiny. As this Court observed in *Webb*, "[w]hile the statute in *Ginsberg* banned only the *sale* or *distribution* of this material to minors, . . . it is clear from our reading of *Ginsberg* that a state may, absent an impermissible burden on adults, deny minors *all access in any form* to materials obscene as to them." 919 F.2d at 1501 (emphasis added). "Minors have no right to view or in any way consume this material—even if they do not purchase or otherwise take control of it." *Id*.

Sexually explicit live performances that are obscene for a particular child's viewing are no less so when the parent or the child does not have to pay for it. If anything, free obscenity is of greater concern, because it poses one less barrier to the child's access. The constitutionality of the Protection of Children Act should not turn on this factor.

### 3. The Protection of Children Act defines "adult live performance" in sufficiently discrete terms so as to avoid capturing speech that would not be obscene for the child present.

The district court asserted finally that the Protection of Children Act "depart[s] from the established obscenity outline set forth in *Miller*." DE30 at 18. This is wrong. As required by *Miller*, 413 U.S. at 24, the Act contains two components. First, it defines "adult live performance" as

"any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts." Fla. Stat. § 827.11(1)(a). Second, it filters the restricted conduct through the familiar three-part *Miller* test, with the additional benefit of gauging that test to the age of the "child present." *Id*. § 827.11(1)(a)1.–3. Together, these two requirements serve to narrow the application of the Act to performances that are truly obscene for the child in question.

The district court deemed the Act defective for not further defining certain terms *within* this formulation, such as "live performance," "child," "lewd conduct," and "lewd exposure of prosthetic or imitation genitals or breasts." DE30 at 18. It compared these terms to the undefined term "indecent" in the Communications Decency Act in *Reno*, 521 U.S. at 865. DE30 at 18. In contrast to "indecent," however, "live performance," "child," and "lewd" each has a meaning that is plain by reference to other statutes, the common law, or ordinary common sense.

36

For instance, the Protection of Children Act amended chapter 827 of the Florida Statutes, Abuse of Children, which includes a definition of "child" as "any person under the age of 18 years." Fla. Stat. § 827.01(2). And there is no mystery about what constitutes a "live performance," apart from edge cases that inevitably attend the application of even the plainest of language. Indeed, the Coronavirus Aid, Relief, and Economic Security (CARES) Act excludes entities that present "live performances of a prurient sexual nature" from those eligible for grants if shuttered during the COVID-19 pandemic, without further defining "live performance." 15 U.S.C. § 9009a(a)(1)(B)(i). Finally, what constitutes "lewd" behavior acquires meaning from long usage in Florida common law and statutes, as will be discussed next. "Lewd" is at least as definite as terms like "prurient," "shameful," or "morbid," which appear in statutes that the Supreme Court sustained in *Ginsberg*, 390 U.S. at 646, and *Miller*, 413 U.S. at 16 n.1, or the term "patently offensive," which is part of the "basic guidelines" the Supreme Court has long endorsed as a safe harbor for states to use in defining obscenity, *id*. at 24–25; *see also Memoirs v. Att'y Gen. of Mass.*, 383 U.S. 413, 418 (1966) (plurality op.).

**C.    The district court erred in deeming the Protection of Children Act overbroad on its face.**

In the part of its opinion erroneously deeming the Act to be void for vagueness, *see infra* Part III, the court declared in passing that the statute was also "overbroad" on its face. DE30 at 20, 23. It did not explain this assertion, however, nor did it apply the correct standard for assessing facial overbreadth. To be overbroad, a statute must "prohibit a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (cleaned up) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008). Here, even if the statute deterred some amount of protected speech, there is no question that, in the main, it regulates unprotected speech: live performances that are obscene for children.

None of the district court's quibbles with the statute suggest otherwise. Although the district court complained that the Act lacked a parental-consent requirement, DE30 at 17, the court again did not explain why parental consent would make an "adult live performance" any less obscene for the child present—such that the Act would ever infringe upon Hamburger Mary's or the child's First Amendment rights. Nor did the court attempt to establish that the existence of a parental-consent

requirement would materially alter the practical application of the statute in any, let alone a large number, of its applications.

Similarly, even if, as the district court apparently thought, DE30 at 18, an "adult live performance" becomes less obscene if it is not part of a commercial transaction, the court did not explain how that fact would make the statute overbroad. Most such performances—including presumably at Hamburger Mary's—surely come as part of an exchange of consideration. In short, "[e]ven assuming that [the Protection of Children Act] reaches some protected speech, and even assuming that its application to all of that speech is unconstitutional, the ratio of unlawful-to-lawful applications is not lopsided enough to justify the 'strong medicine' of facial invalidation for overbreadth." *Hansen*, 599 U.S. at 784 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

## III.  The Protection of Children Act is not void for vagueness.

Contrary to the ruling of the district court, the Protection of Children Act gives "adequate notice of what is prohibited," as required by due process. *Ginsberg*, 390 U.S. at 643 (quoting *Roth v. United States*, 354 U.S. 476, 492 (1957)). It is not void for vagueness.

The district court deemed the Act vague because it defined "adult live performance" to include "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts," without separately defining "lewd conduct" or "lewd exposure." DE30 at 20–21. But "a statute is not ambiguous merely because it contains a term without a statutory definition." *United States v. Sepulveda*, 115 F.3d 882, 886 n.9 (11th Cir. 1997). And here the term—"lewd"—is one of long-standing usage in criminal law. *See, e.g.*, *Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971) ("'Lewd' and 'lascivious' are words in common use, and the definitions indicate with reasonable certainty the character of acts and conduct which the Legislature intended to prohibit and punish, so that a person of ordinary understanding may know what conduct on his part is condemned."); *id.* at 678 ("Lewdness, or open and public indecency, were offenses even at common law."). The Florida Supreme Court has stated that "when used in a statute to define an offense," "lewd" and "lascivious" each means "an unlawful indulgence in lust, eager for sexual indulgence." *Id.* at 677.

Consistent with *Chesebrough*, the Florida Supreme Court's jury instructions define "lewd" and "lascivious" to mean "a wicked, lustful, unchaste, licentious, or sensual intent on the part of the person doing an

act." Fla. Bar, Criminal Jury Instructions § 11.10(d), https://tinyurl.com/3pu2tcvv (last accessed Nov. 24, 2023). And the word "lewd" appears throughout the Florida criminal code.[5] It appears in numerous federal[6] and state[7] statutes as well and has been held appropriate to define the kind of conduct that could be considered obscene if it meets the three-part *Miller* test.[8] It would be surprising, to say the least, if after all these years of usage all these various statutes were suddenly discovered to be unconstitutionally vague.

---

[5] *See, e.g.*, Fla Stat. §§ 800.04(4), 800.09(2)(a)2., 787.01(3)(a)3., 798.02, 794.053, 825.1025(2)(a), 787.02(3)(a)3., 794.051(1), 796.07(1)–(2), 794.011(4)(d)1., 847.0135(5), 827.071 (1)(l).

[6] *See, e.g.*, 18 U.S.C. §§ 1384, 1461, 1462, 1463, 1465; 47 U.S.C. § 941(j)(1)(B); 20 U.S.C. § 7131(e)(6)(B).

[7] *See, e.g.*, Nev. Rev. Stat. § 201.210; N.J. Rev. Stat. § 2C:14-4; Utah Code Ann. § 76-9-702; Vt. Stat. Ann. tit. 13, § 2601; Idaho Code § 52-104; Cal. Penal Code § 288; 18 Pa. Cons. Stat. § 5901; Wash. Rev. Code § 7.48A.020; Okla. Stat. tit. 21, § 1123; Haw. Rev. Stat. § 712-1217; La. Stat. Ann. § 14:281; N.Y. Penal Law § 245.00 (McKinney); N.C. Gen. Stat. § 19-1.2; Kan. Stat. Ann. § 21-5513; Mass. Gen. Law ch. 272, § 16; S.C. Code Ann. § 16-15-365; Miss. Code Ann. § 97-29-31.

[8] *See, e.g.*, *United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123, 130 n.7 (1973) ("If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral,' . . . we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller*" (citations omitted)).

Widespread statutory use of the term "lewd" and its variants shows that "the ordinary person exercising ordinary common sense can sufficiently understand" the conduct proscribed by the Protection of Children Act. *Broadrick*, 413 U.S. at 608. Any ambiguity in the term, therefore, results not from a failure to define it in the statute but from the fact that "[w]ords inevitably contain germs of uncertainty." *Id*. It is "always . . . true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" *Grayned v. City of Rockford*, 408 U.S. 104, 110 n.15 (1972) (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950)). But "[i]f run-of-the-mill statutory ambiguities were enough to violate the Constitution, no court could ever clarify statutes through judicial interpretation, for the first person against whom the clarified version applied (and likely others as well) could argue that he was unfairly surprised and thus his due process rights were violated." *Sabetti v. Dipaolo*, 16 F.3d 16, 18 (1st Cir. 1994) (Breyer, J.). "Courts, of course, clarify textual ambiguities all the time," *id*., and "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Williams*,

553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). The Protection of Children Act is hardly unique in this regard.

## IV. Even if Hamburger Mary's were entitled to a preliminary injunction, this Court should limit that relief to Hamburger Mary's and not enjoin the Protection of Children Act universally.

Even if the district court was correct to rule that the Protection of Children Act is likely to violate the First Amendment, it erred in entering a universal injunction prohibiting the state from enforcing the statute against anyone statewide. It is "well-settled that a district court abuses its discretion when it grants relief that is improperly or even unnecessarily broad." *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 870 (11th Cir. 2013). The Supreme Court has made clear that equitable remedies should be "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1921 (2018) (same). The Supreme Court and this Court have therefore reminded lower courts repeatedly that an injunction should apply only to the parties before the court. *See Monsanto*, 561 U.S. at 163; *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 477–78 (1995);

43

*Georgia*, 46 F.4th at 1304–08. The circumstances justifying universal relief are "rare" and should be limited to cases where there is no other way to afford a plaintiff complete relief. *Georgia*, 46 F.4th at 1304 (quotation omitted). Here, a universal injunction is unnecessary to provide complete relief, because Hamburger Mary's would be fully protected from whatever injury it postulates by a preliminary injunction that applies to it alone.

## A.    The district court exceeded its equitable powers in issuing a universal injunction.

Absent specific statutory authority, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring), federal courts may not issue equitable remedies that contravene "traditional remedial principles" or "historical practice." *Georgia*, 46 F.4th at 1303; *see also Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999); *Boyle v. Zacharie & Turner*, 31 U.S. (6 Pet.) 648, 658 (1832) (Story, J.) ("[T]he remedies in equity are to be administered . . . according to the practice of courts of equity in the parent country."). Universal injunctions "appear to conflict with several traditional rules of equity." *Hawaii*, 138

44

S. Ct. at 2426 (Thomas, J., concurring).[9] One is that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Georgia*, 46 F.4th at 1303. Another is to "'take care to make no decree [that would] affect' the rights of nonparties." Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 427 (2017) (quoting *Joy v. Wirtz*, 13 F. Cas. 1172, 1174 (Washington, Circuit Justice, C.C.D. Pa. 1806) (No. 7,554)); *see also Georgia*, 46 F.4th at 1303.

Equity did recognize an exception that "permit[ted] a portion of the parties in interest to represent the entire body." *Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356, 363 (1921) (quoting *Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 303 (1853)). This device—variously termed the

---

[9] This case involves the non-statutory remedial powers of the federal courts. "[T]hat issue is distinct from the issue of a court's setting aside a federal agency's rule under the Administrative Procedure Act," which "expressly authorizes a court to 'hold unlawful and set aside agency action' that violates the Act." *Griffin v. HM Florida-ORL, LLC*, 601 U.S. __, No. 23A366, slip op. at 3 n.1 (Nov. 16, 2023) (statement of Kavanaugh, J.) (quoting 5 U.S.C. § 706(2)); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012–16 (2018).

"representative suit" or "bill of peace"—was the precursor of the modern class action under Federal Rule of Civil Procedure 23. *See* Joseph Story, *Commentaries on Equity Pleadings* §§ 77–135, at 101–78 (4th ed. 1848); Frederic Calvert, *A Treatise upon the Law Respecting Parties to Suits in Equity* 30–34 (2d ed. 1847); *Hansberry v. Lee*, 311 U.S. 32, 41 (1940) ("The class suit was an invention of equity[.]"). But Hamburger Mary's did not bring a class action, nor did the district court certify one. Because Rule 23 has replaced the representative suit in modern equity jurisprudence, Hamburger Mary's cannot invoke these older exceptions to do an end-run around the requirements of Rule 23. *See Georgia*, 46 F.4th at 1306 ("Several procedural devices allow [those] with similar interests to seek the protection of injunctive relief—class certification under Rule 23, joinder and intervention in an existing lawsuit, or even filing a new lawsuit of their own. A district court cannot circumvent these mechanisms in the name of providing injunctive relief only for nonparties' benefit." (citation omitted)); *Rodgers v. Bryant*, 942 F.3d 451, 464 (8th Cir. 2019) (Stras, J., concurring in part and dissenting in part). If Hamburger Mary's intends to seek relief on behalf of other parties not before the Court, it should

follow the procedures set out in Rule 23 and not invite the Court to abuse its equitable authority.

The traditional equitable remedy most analogous to what Hamburger Mary's seeks here—the injunction to stay proceedings at law—was "directed only to the parties." 2 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 875, at 166 (2d ed. 1839). For example, in *Scott v. Donald*, the respondent had sued certain constables of South Carolina, arguing that they had confiscated his alcohol under a statute that was unconstitutional. 165 U.S. 58, 66, 78–86 (1897). The Supreme Court agreed that the statute was unconstitutional. *Id*. at 99–101. But in a separate opinion, it reversed the award of an injunction protecting everyone else subject to the statute. *See Scott v. Donald*, 165 U.S. 107, 115–17 (1897). As this Court explained, "[t]he theory of the decree is that the plaintiff is one of a class of persons whose rights are infringed and threatened, and that he so represents such class that he may pray an injunction on behalf of all persons that constitute it." *Id*. at 115. "It is, indeed, possible that there may be others in like case with the plaintiff, and that such persons may be numerous[.]"

*Id.* "[B]ut such a state of facts is too conjectural to furnish a safe basis upon which a court of equity ought to grant an injunction." *Id.*

Another example is *NTEU*, in which the Supreme Court held that a federal statute banning federal employees' receipt of honoraria violated the First Amendment. It reasoned that the prohibition went too far in extending to "employees below grade GS-16." *Id.* at 477. But it still ruled that an injunction preventing enforcement of the statute "should be limited to the parties before the Court." *Id.* "[A]lthough the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute," *id.* at 478 (citing *Munson*, 467 U.S. at 965–67 & n.13), "we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants," *id.* (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989)). "In this case," like in *NTEU*, "granting full relief to [Hamburger Mary's] does not require passing on the applicability of" the Protection of Children Act to other parties. *Id.*[10]

---

[10] When a plaintiff requires broad relief to get complete redress, the injunction may rightly be broad, but it is still party-specific. *See, e.g., City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) ("[A]n injunction is not necessarily made overbroad by extending benefit

### B.    Neither facial invalidity nor overbreadth standing entitles Hamburger Mary's to universal relief.

The district court did not grapple with any of these limits on its equity power. Instead, in its order denying the Secretary's request for a limited stay, the court posited that "[a] statute subject to facial attack is likewise susceptible to facial enjoinment," citing a class-action case. DE41 at 4 (citing *Yamasaki*, 442 U.S. at 702). This statement misses the point. When a district court concludes that a law is unconstitutional, facially or otherwise, it does not "eliminate[] the legal effect of the statute in all contexts." *Jacobson*, 974 F.3d at 1255. The power of judicial review "permits a court to decline to enforce a statute in a particular case or controversy," but the statute "continues to exist" and "remains a law until it is repealed by the legislature." Mitchell, *Writ-of-Erasure Fallacy*, 104

---

or protection to persons other than prevailing parties in the lawsuit . . . if such breadth is necessary to give prevailing parties the relief to which they are entitled." (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987)). "Injunctions barring public nuisances [a]re an example[:] While these injunctions benefit[] third parties, that benefit [i]s merely a consequence of providing relief to the plaintiff." *Hawaii*, 138 S. Ct. at 2427 (Thomas, J., concurring). This kind of injunction is not universal, at least not in the problematic sense of being broader than necessary to afford the plaintiffs complete relief. Such injunctions benefit nonparties in a way that is "merely incidental." *Id*. That is not true of the preliminary injunction in this case.

Va. L. Rev. at 936. Ruling that Hamburger Mary's was likely to succeed in its facial challenge did not relieve the district court of its duty to heed the admonition, acknowledged in the very case it cited, "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Yamasaki*, 442 U.S. at 702.

Citing *Broadrick*, the district court also reasoned that First Amendment facial overbreadth was somehow an exception to the rule of equity that relief be limited to the parties at hand. DE30 at 20; DE41 at 4–6. Two members of a motions panel of this Court subsequently agreed. *HM Florida-ORL, Inc. v. Governor of Fla.*, No. 23-12160, 2023 WL 6785071 (11th Cir. Oct. 11, 2023). But there are multiple flaws with this reasoning.

The first, of course, is that Hamburger Mary's lacks overbreadth standing for the reasons already discussed. It has not shown Article III injury in fact, a prerequisite of overbreadth standing, *see supra* Part I, and it has not shown that the statute is overbroad, *see supra* Part II.C.

Hamburger Mary's lacks overbreadth standing for another reason as well: the district court's conclusion that the Act was unconstitutional as applied to Hamburger Mary's. *See* DE30 at 15–20. Once the court

50

made that determination, erroneously or not, it should have stopped. The purpose of overbreadth doctrine is to allow a plaintiff to obtain a ruling that a statute is unconstitutional on its face, and to obtain relief from operation of that statute, *even though the statute is constitutional as applied to the plaintiff. See Fox*, 492 U.S. at 484–85; *Renne v. Geary*, 501 U.S. 312, 324 (1991). As the Supreme Court has repeatedly explained, "[i]t is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied. *Renne*, 501 U.S. at 324 (quoting *Fox*, 492 U.S. at 484–85). "Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws." *Id.*; *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501–04 (1985). The district court should not have countenanced a broadside offensive against Florida's law in all its legitimate applications when a narrower as-applied remedy for Hamburger Mary's was available.

Finally, in using overbreadth as a ground for universal relief, the district court "conflate[d] the merits of a legal claim with the scope of the remedy for that claim." *HM*, 2023 WL 6785071, at *5 (Brasher, J., dissenting from denial of partial stay). Again, facial overbreadth is not an exception to Article III standing; it is an exception to the rules of prudential standing—specifically, that a party "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. Facial overbreadth thus expands the range of substantive arguments that a plaintiff can raise on the merits. *See* Henry P. Monaghan, *Overbreadth*, 1981 Sup. Ct. Rev. 1, 3–4 (1982). But it says nothing about the relief to which a successful plaintiff is entitled. That relief is still limited to the plaintiff's injury in fact. *See* Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 853–54, 881 (1991).

The Supreme Court made this point clear in *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975). There, the Court affirmed the award of a preliminary injunction preventing a New York town from enforcing an ordinance banning topless dancing against two of the three respondent corporations in the case. The Court found that the two corporations were likely to succeed on their claims that the ordinance was overbroad in its

application both to establishments that served liquor and to establishments that did not. *Id*. at 932–33. But the Court reversed the award of a preliminary injunction preventing enforcement of the ordinance against the third respondent on grounds of *Younger* abstention, given that the third respondent was already being prosecuted in state court. *Id*. at 929. "Moreover," the Court said, "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute." *Id*. at 931.

Another example of this principle at work is *Thornhill v. Alabama*, in which the petitioner had been convicted of violating a statute that prohibited loitering and picketing. 310 U.S. 88, 91 (1940). The Supreme Court held that the statute was facially unconstitutional because it "swe[pt] within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Id*. at 97. But the Court did not issue an injunction barring all enforcement of the Alabama statute; it simply reversed the conviction. *Id*. at 106.

Finally, in *United States v. Stevens*, the Supreme Court asked whether a statute prohibiting commercial creation, sale, or possession of

depictions of animal cruelty was constitutional. 559 U.S. 460, 464 (2010). Relying on the overbreadth doctrine, the Court said no. *Id.* at 473, 481–82. But again, the relief the Court approved was not a universal injunction; it was that the respondent's conviction be vacated. *Id.* at 482; *see also United States v. Stevens*, 533 F.3d 218, 235 (3d Cir. 2008) (en banc) ("[W]e will vacate Robert Stevens' conviction.").

In short, when "a lower federal court pronounces a state statute void for overbreadth . . . the binding effect of the federal judgment extends no further than the parties to the lawsuit." Fallon, *Overbreadth*, 100 Yale L.J. at 853–54 (footnotes omitted). Even when one district court pronounces a statute overbroad, "the state remains free" to enforce "[a]gainst nonparties." *Id.* at 854; *see also id.* at 881 ("A lower federal court's declaration that a state statute is unenforceable because overbroad, however beneficial to the prevailing party, confers no protection on nonparties to the litigation."). "Because state courts and lower federal courts stand in a coordinate, not a hierarchical, relationship, the binding effect of the federal judgment extends no further than the parties to the lawsuit; against nonparties, civil and criminal actions can go forward." *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau*

*Fed'n, Inc.*, 60 F.4th 815, 834 (4th Cir. 2023). Any relief awarded in this case should therefore be limited to Hamburger Mary's.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and vacate the preliminary injunction.

Respectfully submitted,

ASHLEY MOODY
  *Attorney General*

HENRY C. WHITAKER
  *Solicitor General*
JEFFREY PAUL DESOUSA
  *Chief Deputy Solicitor General*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 414-2672 (fax)
nathan.forrester@
  myfloridalegal.com

  */s/ Nathan A. Forrester*
NATHAN A. FORRESTER
  *Senior Deputy Solicitor General*
WILLIAM H. STAFFORD III
  *Special Counsel*

November 24, 2023

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with Federal Rule of Appellate Procedure 27(d)(2)(A), because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 11,528 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27, Federal Rule of Appellate Procedure 32(a)(5), and Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font using Microsoft Word.

> */s/ Nathan A. Forrester*
> Senior Deputy Solicitor General

## CERTIFICATE OF SERVICE

I certify that on November 24, 2023, I electronically filed this Motion for Stay Pending Appeal with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Nathan A. Forrester*
Senior Deputy Solicitor General