No. 23-12160

# In the United States Court of Appeals for the Eleventh Circuit

HM FLORIDA-ORL, LLC,

*Plaintiff-Appellee,*

v.

MELANIE GRIFFIN, Secretary, Department of Business and Professional Regulation, State of Florida,

*Defendant-Appellant.*

## DEFENDANT-APPELLANT'S APPENDIX, VOLUME 2

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 6:23-cv-950-GAP-LHP

ASHLEY MOODY
*Attorney General*

HENRY C. WHITAKER
*Solicitor General*

December 1, 2023

JEFFREY PAUL DESOUSA
*Chief Deputy Solicitor General*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300 (phone)
(850) 414-2672 (fax)
nathan.forrester@myfloridalegal.com

NATHAN A. FORRESTER
*Senior Deputy Solicitor General*

BRIDGET O'HICKEY
*Assistant Solicitor General*

WILLIAM H. STAFFORD III
*Special Counsel*

*Counsel for Defendant-Appellant*

## INDEX

**VOLUME 1**                                                    **Docket/Tab Number**

District Court Docket Sheet ............................................................... A

Verified Complaint for Injunctive Relief (May 22, 2023) ...................... 1

Motion for a Temporary Restraining Order and Preliminary
 Injunction with Incorporated Memorandum of Law (May
 23, 2023) .......................................................................................... 6

Defendants' Motion to Dismiss and Opposition to Plaintiffs'
 Motion for Preliminary Injunction (June 2, 2023) .......................... 21

 Exhibit A (Protection of Children Act) ......................................... 21-1

 Exhibit B (Declaration of Daniel Brackett) .................................. 21-2

 Exhibit C (Administrative Complaint, R House) .......................... 21-3

 Exhibit D (Administrative Complaint, Hyatt Regency
  Miami) ...................................................................................... 21-4

 Exhibit E (Administrative Complaint, Orlando
  Philharmonic Plaza Foundation) ............................................. 21-5

i

# INDEX

**VOLUME 2**                                    **Docket/Tab Number**

Order (June 6, 2023) [dismissing the State of Florida and the
Governor as Defendants] ................................................................. 26

Plaintiff's Response to Defendants' Motion to Dismiss and
Plaintiff's Reply to Defendants' Response to Plaintiff's
Motion for Temporary Injunction (June 15, 2023) .......................... 28

Order (June 23, 2023) [granting preliminary
injunction] ....................................................................................... 29

Amended Order (June 24, 2023) [granting preliminary
injunction] ....................................................................................... 30

Notice of Appeal (June 27, 2023) ........................................................ 31

Defendant's Motion for a Partial Stay Pending Appeal of
Preliminary Injunction (June 28, 2023) .......................................... 33

Answer (July 7, 2023) ......................................................................... 35

Plaintiff's Response in Opposition to Defendant's Motion for
a Partial Stay Pending Appeal of Preliminary Injunction
(July 19, 2023) ................................................................................. 36

Order (July 19, 2023) [denying partial stay] ...................................... 41

Transcript of Motion Hearing (June 6, 2023) ..................................... 47

First Amended Complaint (Aug. 18, 2023) ......................................... 51

Answer to First Amended Complaint (Aug. 29, 2023) ........................ 52

# DE26

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

HM FLORIDA-ORL, LLC,

        Plaintiff,

v.                                  Case No:   6:23-cv-950-GAP-LHP

RON DESANTIS, MELANIE GRIFFIN
and STATE OF FLORIDA,

        Defendants

_____

## ORDER

      The matter came before the Court at a hearing held on June 6, 2023.   Based on stipulation of the parties, Defendants Ron Desantis and the State of Florida are hereby **DISMISSED** from this action.   The clerk is directed to term them as defendants.

      **DONE** and **ORDERED** in Chambers, Orlando, Florida on June 6, 2023.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

# DE28

United States District Court Middle District of Florida
Orlando Division

HM FLORIDA-ORL, LLC,

                  Plaintiff,                                 Case No. 6:23-cv-00950-GAP-LHP

v.

RON DESANTIS, et. al.,

                  Defendants.

---

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION

---

Plaintiff HM FLORIDA-ORL, LLC, (hereinafter "Plaintiff" or "Hamburger Mary's"), by and through its undersigned attorneys, and in response to Defendants' *Motion to Dismiss and Opposition to Plaintiff's Motion for Preliminary Injunction* (ECF 21) ("Motion to Dismiss"), states as follows:

### <u>LAW AND ARGUMENT</u>

**A.**        **Plaintiff has met the Iqbal-Twombly standard for stating a claim**

To survive a motion to dismiss, Plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Complaint need not provide "detailed factual allegations," as long as the factual allegations are sufficient to establish plaintiff's entitlement to relief. *Twombly*, 550 U.S. at 555. Plaintiff has met this standard.

Minor formatting errors do not make Plaintiff's Complaint a "shotgun pleading." ECF 21 at PageID 177.[1] While the Complaint inadvertently misnumbers several paragraphs contained within Count I, the Complaint is certainly not "calculated to confuse the 'enemy' and the court." *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021). Indeed, Defendant seems to have no trouble deducing or responding to Plaintiff's assertions that the Act is a content-based restriction on free speech; that the Act is not narrowly-tailored; that the Act is overbroad; that the Act was adopted for an impermissible purpose; that the Act is viewpoint discriminatory; and that the Act is unconstitutionally vague. ECF 21 at PageID 169-177. Defendant is able to identify each of Plaintiff's legal arguments, because Plaintiff clearly stated them in its Complaint.[2]

Plaintiff's Complaint also states specific facts that make its claims plausible:

1. Hamburger Mary's has hosted drag-centric performances, comedy sketches, bingo, trivia, and dancing since the establishment opened in 2008; ECF 1 at PageID 19.
2. These performances have been open to all ages; *Id.*
3. Some of these performances are arguably proscribed by the Act, which prohibits undefined "lewd conduct;" ECF 1 at PageID 12.
4. Since the Act took effect, Hamburger Mary's has been forced to self-censor and has placed age restrictions on nearly all of its drag shows; ECF 1 at PageID 19.

Accepting these facts as true, Plaintiff has alleged facts that make it plausible that the Act

---

[1] It is demonstrative of the weakness of Defendant's position that the State, with all of the resources available to it, resorts to claiming that typographical errors in Plaintiff's Complaint are a calculated strategy.

[2] *See* ECF 1 at PageID 10 ("The statute is not content-neutral, and is therefore subject to strict scrutiny;"); *Id.* at PageID 10 ("The statute, however, is not tailored narrowly enough to satisfy the First Amendment's requirements."); *Id.* at PageID 11 ("The language used in the statute is meant to be and is primarily vague and indistinct."); *Id.* at PageID 16 ("It is apparent that the law was enacted because of a disagreement with a particular message or messenger."); *Id.* at PageID 17 (The application of the statute as written is so broad as to have a chilling effect on protected speech.").

infringes on Plaintiff's First Amendment rights and impermissibly chills protected speech. There is no way for Plaintiff to be certain what "lewd conduct" is, or what the Act means when it prohibits "lewd exhibition" of "prosthetic breasts." Those terms are not defined in the Act. Thus, to protect its business and its employees, Plaintiff must censor its own speech or age-restrict its venue and in doing so has demonstrably lost business.[3]

### B. Plaintiff has Article III Standing, because Plaintiff Engages in Conduct that is Arguably Proscribed by the Act.

The State misunderstands Plaintiff's position when it claims Plaintiff has asserted that the performances it hosts include "no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." As Plaintiff has repeatedly stated, since 2008, Hamburger Mary's performance have "been open to all ages." ECF 1-1 at PageID 40. The establishment did not place age restrictions on admission, and trusted parents to decide whether or not a performance was appropriate for their children.

Only *after* the Act was signed into law did Hamburger Mary's place age restrictions on the majority of their drag performances – a decision which resulted in a 20% decrease in bookings. Children are currently only permitted to attend the Sunday brunch performances, which are censored to be appropriate for very young children, and often center around Disney movies and other child-centric entertainment. These Sunday performances, which Plaintiff states contain "no lewd activity," are the only performances Plaintiff feels it can now safely open to all ages without risking the future of the business.

---

[3] Plaintiff also notes that it is a restaurant, not primarily a drag performance venue. Compelling age restrictions deprives Plaintiff of customers with children who plan to simply eat for whom the performances are incidental.

Defendant's Motion to Dismiss puts the cart before the horse and argues that Plaintiff lacks standing because it cannot prove that it intends to violate the statute. However, Plaintiff's challenge to the Act is predicated on the fact that the Statute is so vague and overbroad that Plaintiff cannot know what precise conduct violates the Act and that its terms are so subjective that no one can be clear on precisely what they mean, thereby creating a chilling effect and enforcement risks that infringe on protected speech. The Act leaves terms such as "lewd conduct" and "lewd exhibition of prosthetic genitals or breasts" undefined. Plaintiff's understanding of "lewd" might be very different from what a police officer believes is "lewd." Is a Dolly Parton impersonator with prosthetic cleavage engaged in "lewd exhibition?" What about a drag performer dressed like an Orlando Magic cheerleader? Unable to discern what expression is prohibited by the Act, Plaintiff has no choice but to restrict its all-ages shows to "that which would be suitable for a sandbox." *Reno v. ACLU*, 521 U.S. 844, 875 (1997). If Plaintiff does not self-censor, it leaves the future of its business and the safety of its employees to the whims of law enforcement officers who have been given unilateral discretion to determine the meaning of "lewd." Awaiting a law enforcement officer's citation or proceedings to revoke their licensure "would lead to Plaintiff taking an enormous risk. It would have to eat the proverbial mushroom to find out whether it is poisonous." *Friends of Georges, Inc. v. Mulroy*, 2023 U.S. Dist. LEXIS 96766, *47, __ F.Supp.3d __ (W.D. Tenn. 2023) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)).

Defendant's reasoning is circular, arguing, in essence, that Plaintiff's standing turns on the Act's constitutionality. The standing question before the Court is not whether, under Defendant's preferred construction, Plaintiff will violate the statute. The question is whether Hamburger Mary's conduct is "arguably proscribed" by the Act. *Susan B. Anthony List v. Driehous*, 573 U.S.

149, 162 (2014). The answer is a resounding yes. Plaintiff has Article III standing to bring this case.

### C. The Act is Unconstitutional

####     1. The Act is Facially Content Based and is Presumptively Unconstitutional.

"A regulation of speech is facially content-based under the First Amendment if it 'targets speech based on its communicative content' - that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Adver. Of Austin, LLC.*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S.155, 163 (2015). Content-based restrictions are "presumptively unconstitutional, and "can stand only if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. at 163.

Fla. Stat. § 821.11 is facially a content-based restriction. It regulates speech and expression which "in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts[.]" The Act plainly "defin[es] regulated speech by subject matter," and is therefore subject to strict scrutiny. The prohibited conduct cannot be defined without referencing the content of the speech. and is thus presumptively unconstitutional.

Nor is the regulated speech and expression "unprotected by the First Amendment." ECF 21 at PageID 170. Speech that is truly obscene – that is, speech that fails under the three-prong test in *Miller v. California*, 43 U.S. 15, 24 (1973) – is unprotected by the First Amendment. But only a very narrow category of speech qualifies as legally obscene. *See Ashcroft v. Free Speech*

*Coalition*, 535 U.S. 234 (2002) (Holding that, while actual child pornography is obscene, virtual or simulated child pornography is protected under the First Amendment, and the government may not ban the latter in an effort to ban the former). Simply because a performance is inappropriate for children does not strip the performance of its protections under the First Amendment; that performance is still protected speech for adults. Any law that restricts protected speech based on its content must fail unless it can satisfy strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. at 163.

### 2. Alternatively, the Act was Enacted Specifically to Target Drag.

"Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed v. Town of Gilbert*, 576 U.S. at 167 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). If the Court finds that the Act is facially content-neutral, but that "an impermissible purpose or justification" underpins the law, then the law is still subject to strict scrutiny.

The text of the Act is "the best indicator of intent." *Nixon v. United States*, 506 U.S. 224, 232 (1993). The text of Fla. Stat. 827.11 demonstrates that the Act was "adopted by the government because of disagreement with the message the speech conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). While many terms in the Act appear elsewhere in the Florida code, "lewd exposure of prosthetic or imitation genitals or breasts" is unique to the Act. There are two primary categories of people who wear prosthetic breasts: people who have had mastectomies and drag performers. Since the Act specifically regulates "any show, exhibition, or other presentation in front of a live audience," the law is obviously targeted at the conduct of *performers* who wear prosthetic breasts. It targets drag performers.

Governor DeSantis, who signed the Act into law on May 17, 2023, stated just before signing the bill that the law was about "adult performances, like these drag shows" and described drag as "sexually explicit" and "adult entertainment." While Plaintiff maintains that the text of the Act is sufficient to demonstrate impermissible purpose, statements from the Governor and from legislators further support that the Act was adopted by the State to target drag, because the State disagrees with the message drag conveys. Thus, even if the law is facially neutral, it is still subject to strict scrutiny.

### 3. The Act is Not Narrowly Tailored.

The statute regulates, in part, "adult live performances." The definition of "adult live performances" is as follows:

Fla. Stat. 827.11

> (a) "Adult live performance" means any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:
>
> > 1. Predominantly appeals to the prurient, shameful, or morbid interest;
> >
> > 2. Is patently offensive to the prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and
> >
> > 3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

This definition pulls much of its language from *Miller v. California*, 43 U.S. 15, 24 (1973). In *Miller*, the Supreme Court set forth a test to determine whether speech is legally "obscene," and thus unprotected under the First Amendment. The three-prong test controls to this day:

> 1) Whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

2)  Whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

3)  Whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.

Crucially, the challenged Act does not regulate "obscenity" within the meaning of *Miller*. It regulates something more – content the government contends is indecent for children, but which is still protected speech for adults. Thus, the government bears the burden of proving that the law is narrowly tailored – that the government has chosen the least restrictive means to achieve its compelling interest in protecting children.

Here, the government has not chosen the least restrictive means of regulating inappropriate content for minors. For example, the Act contains no exception for parental consent, which the Supreme Court has repeatedly taken issue with. In *Ginsburg v. New York*, 390 U.S. 629 (1968), the Court upheld a law prohibiting the sale of "girlie magazines" to minors under the age of 17, in part because "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." *Id.* The Supreme Court specifically distinguished the contested statute in *Reno* from that in *Ginsburg*, finding that user-based software that parents could use to "prevent their children from accessing material which the *parents* believe is inappropriate" was a sufficient alternative to the criminal statute. *Reno v. ACLU*, 521 U.S. at 877 (emphasis original). This Statute provides no such affirmative defenses to performers. The State has stripped parents of the power to determine whether a live performance is appropriate for their child. If parental monitoring was a sufficient alternative to regulating internet pornography, it is certainly a sufficient alternative to regulating the far broader category of expression that falls under whatever the State arbitrarily interprets as "lewd conduct."

### 4.   The Act is Overbroad and Vague.

Finally, the Act is unconstitutionally overly-broad and vague.  The Supreme Court has "traditionally viewed vagueness and overbreadth as logically related and similar doctrines." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983).  Overly vague laws are unconstitutional for three reasons. First, due process requires that a law provide "persons of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Second, the law must provide "explicit standards" to law enforcement officials, judges, and juries so as to avoid "arbitrary and discriminatory application." Third, a vague statute can "inhibit the exercise" of First Amendment freedoms and may cause speakers to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 108-9 (1972).  This law fails on all three counts. A law is unconstitutionally overbroad if it sweeps in more speech than is necessary to satisfy the state's interest, regulating both protected and unprotected speech. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

The Act also does not provide Plaintiffs with a reasonable opportunity to know what conduct is prohibited. As previously discussed, the legislature left several terms undefined, including "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts." More disturbingly, this law does not provide the "precision and guidance necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Tv Stations, Inc.*, 567 U.S. 239, 253 (2012). This statute opens up any of Plaintiff's performances to police surveillance, sting operations, and raids, so that law enforcement can be certain that the performance is appropriate "for the age of the child[ren] present."

"The strictness of the vagueness scrutiny is proportionate to the burden that the law imposes on those whom it regulates. When speech is involved, rigorous adherence to the fair-

notice requirements is necessary to ensure that ambiguity does not chill protected speech." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 422 (6th Cir. 2014). This law has already chilled the protected speech of Plaintiff, a small business that has been forced to exclude minors from all of its weekly drag performances except one. Hamburger Mary's has no choice but to tailor its Sunday all-ages performances to only what is suitable for very small children. If Plaintiff does not self-censor, it risks losing its liquor license, and its employees could face criminal charges. For Plaintiff, this law imposes a heavy burden indeed.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss.

Respectfully submitted.

*/s/ Brice M. Timmons*
Brice M. Timmons, Esq. *Pro Hac Vice*
Melissa J. Stewart, Esq. *Pro Hac Vice*
DONATI LAW, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
brice@donatilaw.com
melissa@donatilaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been served upon all parties to this action via the court's ECF filing system this 15th day of June 2023.

*/s/ Brice M. Timmons*

# DE29

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

HM FLORIDA-ORL, LLC,

         Plaintiff,

v.                                   Case No:  6:23-cv-950-GAP-LHP

MELANIE GRIFFIN,

         Defendant

_____

## ORDER

This case addresses the constitutionality of Florida Statute § 827.11. The state claims that this statute seeks to protect children generally from obscene live performances. However, as explained *infra*, Florida already has statutes that provide such protection. Rather, this statute is specifically designed to suppress the speech of drag queen performers. In the words of the bill's sponsor in the House, State Representative Randy Fine: "…HB 1423…will protect our children by ending the gateway propaganda to this evil — 'Drag Queen Story Time.' "[1]

_____

[1] *See* State Representative Randy Fine, FACEBOOK (March 3, 2023), https://www.facebook.com/voterandyfine/posts/761831661970637?ref=embed_post.

This cause came before the Court for consideration on Plaintiff's Supplemental Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 6).[2] Defendant responded in opposition to the motion and simultaneously moved to dismiss (Doc. 21) Plaintiff's action. The Court conducted a non-evidentiary hearing on June 6, 2023, and subsequently considered Plaintiff's Response (Doc. 28) to Defendant's Motion to Dismiss.

## I.   Background

### A.  House Bill 1423/Senate Bill 1438

On May 17, 2023, Florida Governor Ron DeSantis signed Senate Bill 1438 (the "Act") into law.[3] *See* 2023 Fla. Laws ch. 2023-94. Along with amending three existing laws,[4] the Act created a new statute—Fla. Stat. § 827.11—which prohibits any person from knowingly admitting a child to an "adult live performance." *Id.* §§ 1-4. Violation of the statute authorizes the Florida Department of Business and Professional Regulation ("DBPR") to impose fines and revoke or suspend the operating and/or liquor license of any public lodging, food service establishment,

---

[2] Because notice was not impractical in this matter, the Court treats Plaintiff's Motion as one for Preliminary Injunction under Local Rule 6.02. *See* Doc. 7.

[3] The Act took effect upon being signed into law. 2023 Fla. Laws ch. 2023-94, § 5. Its companion bill in the House was HB 1423. THE FLORIDA SENATE, 2023 Session Bills, *SB 1438* (June 22, 2023), https://www.flsenate.gov/Session/Bill/2023/1438.

[4] *See* Fla. Stat. §§ 255.70(1)-(3), 509.261(10), and 561.29(1).

or other licensee.[5] Fla. Stat. §§ 509.261(10), 561.29(1). In addition, any person who violates § 827.11 may be prosecuted and subject to punishment as a misdemeanor of the first degree. *See* Fla. Stat. § 827.11(3)-(4); *see also id.* § 775.082(4)(a) & § 775.083(1)(d).

The statute defines an "adult live performance" as:

[A]ny show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 827.001, *lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:*

    1. Predominantly appeals to a prurient, shameful, or morbid interest;

    2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and

    3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

*Id.* § 827.11(1)(a) (emphasis added). It prohibits any defense based on "a person's ignorance of a child's age, a child's misrepresentation of his or her age, or a bona

---

[5] Fla. Stat. § 509.261 was amended to add subsection (10), authorizing the state to "fine, suspend, or revoke the license" of lodging and food services establishments that admit a child to an adult live performance. *Id.* § 509.261(10)(a). In addition to the ability to suspend or revoke a license, it provides that the state may issue a $5,000 fine for a first violation and a $10,000 fine for second or subsequent violations. *Id.* § 509.261(10)(c)-(d).

Fla. Stat. § 561.29 was amended to apply the same scheme to liquor licenses. *Id.* § 561.29(1).

fide belief of a child's consent." *Id*. § 827.11(2). The term "child" is not specifically defined by the new statute.[6] Neither are the terms "live performance," "lewd conduct,"[7] or "lewd exposure of prosthetic or imitation genitals or breasts" defined.

### B.  Posture

Plaintiff HM Florida-ORL, LLC ("Plaintiff"), is a Florida for-profit business operating Hamburger Mary's Restaurant and Bar in Orlando. Doc. 1, ¶ 4. Plaintiff frequently presents drag show performances, comedy sketches, and dancing, including "family friendly" drag performances on Sundays where children are invited to attend. *Id*. ¶¶ 4, 12. Plaintiff brought suit under 42 U.S.C. § 1983 on May 22, 2023, alleging that the Act "seeks to explicitly restrict, or chill speech and expression protected by the First Amendment based on its content, its message, and its messenger." Doc. 1, ¶ 50. Since the passage of the Act, Plaintiff has been forced

---

[6] Chapter 827 of the Florida Statutes pertains generally to the "abuse of children." Section 827.01 defines a "child" as "any person under the age of 18 years." Fla. Stat. § 827.01.

[7] The Court consulted Fla. Stat. § 800.04—which covers "lewd or lascivious offenses"—to obtain guidance on the meaning of "lewd conduct." Alas, such offenses are defined only by their own terms. *See, e.g.*, § 800.04(6) ("A person who…[i]ntentionally touches a person 16 years of age *in a lewd or lascivious manner*; or…[s]olicits a person under 16 years of age to commit a *lewd or lascivious act* …commits *lewd or lascivious conduct*."). The Florida Supreme Court's jury instructions offer an inkling into covered conduct, but likewise leave the reader with more questions than answers. *See* THE FLORIDA BAR, Criminal Jury Instructions Chapter 11, § 11.10(d) (accessed June 16, 2023), available at https://www.floridabar.org/rules/florida-standard-jury-instructions/criminal-jury-instructions-home/criminal-jury-instructions/sji-criminal-chapter-11/[hereinafter "Jury Instructions"]. According to these Instructions, "[t]he words 'lewd' and 'lascivious' mean the same thing: a wicked, lustful, unchaste, licentious, or sensual intent on the part of the person doing an act." *Id*.

to cancel its family drag shows, alleging that "[t]hey cannot take place if the law is allowed to stand." *Id.* ¶¶ 43, 49; *see also id.* ¶¶ 23-25, 37-39.

In support of its allegations, Plaintiff claims that the statute is not sufficiently narrowly tailored to achieve a compelling government interest and that it is unconstitutionally vague and overbroad. *Id.* ¶¶ 30-45. Plaintiff points to the ambiguity of terms like "lewd conduct" and "child," and the broad subjectivity that must necessarily be employed to enforce such language. *Id.* ¶ 30.c.3-4. What may be obscene for a child of four may not be obscene for a seventeen-year-old, *id.* ¶ 30.c.4, but Plaintiff alleges it cannot risk its business licenses or an arrest trying to guess how regulators will enforce the statute. *Id.* ¶ 43.

In justification of its self-censorship, Plaintiff also cites to recent efforts by Defendant Secretary of DBPR Melanie Griffin ("Defendant") to revoke the liquor license of Orlando's Plaza Live (the "Plaza Live") venue after it hosted an "A Drag Queen Christmas" show.[8] *Id.* ¶¶ 23-25. On December 28, 2022—the day of the show—Defendant sent the Plaza Live a letter stating that she "ha[d] reason to believe that th[e] drag show is of a sexual nature involving…the sexualization of

---

[8] *See* Amanda Rabines, *Florida moves to revoke Orlando event venue's liquor license after drag queen show*, TAMPA BAY TIMES (February 5, 2023), https://www.tampabay.com/news/florida-politics/2023/02/05/florida-moves-revoke-orlando-event-venues-liquor-license-after-drag-queen-show/; *see also* Doc. 21-5 (*Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco v. The Orlando Philharmonic Plaza Foundation Inc.,* Case No. 2022-061146 (filed Feb. 3, 2023)).

- 5 -

children's stories." Doc. 21-5 at 14. Defendant clearly stated that, "if you allow children to attend the…drag show at your facility, you are putting your license in jeopardy." *Id.* However, despite the fact that undercover state agents reportedly observed "no lewd acts such as exposure of genital organs,"[9] Defendant has continued to prosecute its administrative complaint under existing lewd and lascivious exhibition and other obscenity and nuisance statutes. *See* Doc. 21-5; *see also Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco v. The Orlando Philharmonic Plaza Foundation Inc.,* Case No. 2022-061146 (filed Feb. 3, 2023).

Plaintiff alleges that the Act was passed to stop children from attending drag shows by authorizing Defendant to suspend or revoke the licenses of businesses like theirs. Doc. 6, ¶¶ 25-27. Consequently, Plaintiff seeks a preliminary injunction to enjoin any further enforcement of the Act until a trial is held on its constitutionality. *See id.* at 26. Defendant counters that Plaintiff's motion should be denied and its Complaint should be dismissed because the statute is constitutional and furthers the compelling state interest of protecting children from exposure to "age-inappropriate, sexually explicit live performances." Doc. 21 at 3.

---

[9] *See* Nicholas Nehamas & Ana Ceballos, *Florida undercover agents reported no 'lewd acts' at drag show targeted by DeSantis,* TAMPA BAY TIMES (March 20, 2023), https://www.tampabay.com/news/florida-politics/2023/03/20/desantis-drag-show-lewd-liquor-license-complaint-lgbtq/.

App. 240

## II. Legal Standards

### A. Motion to Dismiss

In ruling on a motion to dismiss, the Court must view the complaint in the light most favorable to the plaintiff, *see, e.g., Jackson v. Okaloosa County*, 21 F.3d 1531, 1534 (11th Cir. 1994), and must limit its consideration to the pleadings and any exhibits attached thereto. *See* Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor. *See Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). However, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (citing Fed. R. Civ. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). However, a plaintiff's obligation to provide the grounds for his or her entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

App. 241

elements of a cause of action will not do. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). The complaint's factual allegations "must be enough to raise a right to relief above the speculative level," *id.* at 555, and cross "the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

### B. Preliminary Injunction

District courts are empowered to grant a preliminary injunction "only if the moving party establishes that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020) (citations omitted). The third and fourth factors "merge when the [g]overnment is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### III.   Analysis

### A. Defendant's Motion to Dismiss

In her Motion to Dismiss Plaintiff's Complaint, Defendant makes three principal arguments: (1) the Complaint should be dismissed as a "shotgun pleading"; (2) Plaintiff lacks Article III standing to bring this case; and (3) the State of Florida and Governor Ron DeSantis are protected from this suit by sovereign immunity and should be dismissed. *See* Doc. 21, 15-22. At the June 6, 2023, hearing,

however, the parties stipulated to the dismissal of Defendants Governor Ron DeSantis and the State of Florida, rendering Defendant's sovereign immunity arguments moot. [10] *See* Doc. 26. Consequently, the Court only addresses Defendant's shotgun pleading and standing arguments.

### 1. Shotgun Pleading

Complaints filed in violation of Rule 8(a)(2) or Rule (10)(b) of the Federal Rules of Civil Procedure are disparagingly referred to as "shotgun pleadings." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). The Eleventh Circuit has identified four principal varieties of shotgun pleadings, unified by their failure "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323. One such variety of shotgun pleading "commits the sin of not separating into a different count each cause of action or claim for relief." *Id.* Defendant argues that Plaintiff's Complaint "consists of a single Count 1 with a mish-mash of different, vaguely articulated constitutional theories presented in non-consecutively numbered paragraphs." Doc. 21 at 16. They further complain that "[s]ome paragraphs are not numbered at

---

[10] Likewise, there is no residual dispute that Defendant Melanie Griffin is a proper party. *See* Docs. 25-26.

all; some employing numbering systems that do not match the ones preceding it." *Id.*

Plaintiff's Complaint does not constitute a shotgun pleading. The Complaint, in Count I, clearly uses an outline format with subsections of descending alphanumeric delineation (*i.e.*, I, A, 1, a., i., etc.), as is ubiquitous in the legal profession. *See* Doc. 1 at 10-14. True, two paragraphs are not numbered at all; however, a cursory glance reveals those paragraphs to be quotations following a colon. *Id.* at 10-11. While Plaintiff's Complaint may leave room for improvement, its logical outline structure in no way equates to a "mish-mash" that leaves Defendant to "speculate as to which claims [she] should be defending against." *See* Doc. 21 at 16; *see also Weiland*, 792 F.3d at n. 12. Plaintiff plainly asserts one count under 42 U.S.C. § 1983—with several constitutional theories to support it—which requires no further demarcation. *See Weiland*, 792 F.3d at 1323.

## 2. Standing

To establish standing to bring its constitutional challenge, Plaintiff must show that: "(1) [it] has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the operation of the [Act]; and (3) a favorable judgment is likely to redress the injury." *Harrell v. The Florida Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010) (citing *Kelly v. Harris*, 331 F.3d 817, 819–20 (11th Cir. 2003)). The injury-in-fact requirement is applied "most loosely where First Amendment rights are involved,

lest free speech be chilled even before the law or regulation is enforced." *Id.* at 1254. Indeed, "it is well-established that an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Id.* (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (internal quotation marks omitted)).

First, Plaintiff alleges that the Act is written so broadly as to have a "chilling effect on the First Amendment rights of the citizens of Florida." Doc. 6, ¶ 51. Based upon the vagueness of the Act, Plaintiff asserts that "it has a reasonable fear of prosecution for conducting shows similar to those it has performed in the past, which may be punishable by the statute with criminal effect." *Id.* ¶ 54.a. Plaintiff alleges its family drag shows—despite not being obscene—could be construed to fall within the Act's purview of proscribed conduct as it is presently written. *See id.*; *see also supra* at note 7. Plaintiff argues that it "should not be required to eat the proverbial mushroom to find out whether it is poisonous." Doc. 6, ¶ 54.a. Longstanding precedent supports this contention. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("Where the alleged danger of legislation is one of self-censorship, harm can be realized even without an actual prosecution."). After all, "it is the existence, not the imposition, of standardless requirements that causes [the] injury." *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1275 (11th Cir. 2006).

In addition, Plaintiff has alleged it is already suffering significant injury-in-fact from its self-censorship. Doc. 1, ¶ 43. Upon passage of the bill, Plaintiff advised its customers that children would no longer be permitted to attend its drag shows. *Id.* This resulted in the immediate cancellation of "20% of their bookings…for the May 21, 2023, show and for future bookings." *Id.* Defendant contends that Plaintiff's intended conduct does not amount to conduct "arguably proscribed" by the Act, Doc. 21 at 18 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014)), dubiously proclaiming that if Plaintiff's performances are what they say they are, then they should have no fear of prosecution. *Id.* at 23.

However, as Plaintiff responds, because it cannot know what is encompassed by the terms "lewd conduct" or "lewd exhibition of prosthetic genitals or breasts," it cannot know with any confidence whether its shows will expose it to liability under the Act. *See* Doc. 28 at 4; *see also* Fla. Stat. § 827.11(1)(a). Plaintiff, informed by the vague statutory language and Defendant's enforcement activity against the Plaza Live, has been forced to chill its regular practice of opening many of its performances to all ages—at an economic loss. Doc. 28 at 4. Plaintiff has sufficiently "alleged an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution[.]" *Driehaus*, 573 U.S. at 160.[11]

Defendant argues that this case is more like *Younger v. Harris*, 401 U.S. 37 (1971), because the administrative actions it has taken against the Plaza Live (and others) involved distinct, *obscene* drag shows and those entities are not being prosecuted under the Act. Doc. 21 at 19-20. However, Plaintiff does not challenge the constitutionality of the statutes that those entities are being prosecuted under. *See generally* Doc. 1. Instead, it merely highlights those cases as indicative of Defendant's appetite for finding obscenity in drag performances, even where undercover state agents have reportedly concluded none exists. *See* Doc. 6, ¶ 55. Coupled with statements by lawmakers, including a statement made by one of the Act's sponsors that the Act was designed to target drag shows,[12] Plaintiff's fear of

---

[11] Defendant is authorized by the Florida Statutes to enforce the Act's amended language in §§ 509.261 and 561.29, which is governed by the creation of § 827.11. *See generally* Doc. 21 at I.D; *see also infra* at note 10. "If a challenged law or rule was recently enacted…an intent to enforce the rule may be inferred." *Harrell*, 608 F.3d at 1257 (citing *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir.1979) (explaining that a court can "assume that law enforcement agencies will not disregard…a recent expression of the legislature's will")).

[12] *See supra* at note 1. Additionally, on the day of a legislative subcommittee hearing on the bill, Representative Randy Fine—who sponsored the legislation—posted on Facebook that the Act would "ban the City of Melbourne from 'welcoming' drag queen adult entertainers from grooming our children! Promises made, promises kept!" State Representative Randy Fine, FACEBOOK (April 12, 2023), https://www.facebook.com/voterandyfine/posts/782903609863442.

- 13 -

prosecution based on the Act's alleged vague construction is not unfounded. At worst, Plaintiff certainly claims that "a prosecution is remotely possible" if it does not self-censor. *Younger*, 401 U.S. at 42.

Finally, it is clear that Plaintiff's injury is fairly traceable to the operation of the Act and would be redressed by a favorable judgment against the Defendant. *See Harrell*, 608 F.3d at 1253. Plaintiff has sufficiently alleged in its Complaint that the Act—particularly its use of the terms "live performance," "child," "lewd conduct," and "lewd exposure of prosthetic or imitation genitals or breasts"—at least arguably creates a substantial risk to its licenses due to its vague and overbroad language. Doc. 6, ¶¶ 46-49. Plaintiff's actions of self-censorship represent a reasonable attempt to "steer wide of any possible violation lest [it] be unwittingly ensnared." *Harrell*, 608 F.3d at 1255 (quoting *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 820 (5th Cir.1979)).[13] And, "[a]s for the redressability prong, if the challenged rules are stricken as unconstitutional, [Plaintiff] simply need not contend with them any longer." *Harrell*, 608 F.3d at 1257. Therefore, Plaintiff has Article III standing to pursue its claim. *See Harrell*, 608 F.3d at 1253.

Accordingly, Defendant's Motion to Dismiss will be **DENIED**.

---

[13] The Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered before the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

## B. *Plaintiff's Motion for Preliminary Injunction*

Having determined that Plaintiff has standing to bring its claim and that the Complaint is properly pled, the Court now analyzes Plaintiff's Motion for Preliminary Injunction as applied to the remaining Defendant.

### 1. Substantial Likelihood of Success on the Merits

#### a. *First Amendment Grounds*

##### i.   The Act is a Facially Content-Based Regulation

"A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Applied here, the Act criminalizes allowing children to attend performances based on the communicative content of "adult live performances." Only content that "depicts or simulates nudity, sexual content, sexual excitement…lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it…offends the prevailing standards in the adult community…with respect to what is suitable material…for the age of [a] child present" is prohibited by the Act. Fla. Stat. § 827.11(a).

The absence of any argument to the contrary by Defendant bolsters the conclusion that this is plainly a facially content-based regulation. *See City of Austin,*

142 S. Ct. at 1471. Like in *United States v. Playboy*, the "overriding justification for the regulation is concern for the effect of the *subject matter* on young viewers." 529 U.S. 803, 811 (2000) (emphasis added). The Act "focuses only on the content of the speech and the direct impact that speech has on its [viewers]." *Id.* at 811-12 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)). It does not restrict the attendance of children from all live performances, only those engaged in the portrayal of a specific, enumerated subset of content. *See* Fla. Stat. § 827.11(1)(a). Because the Act is content-based on its face, there is "no need to consider the government's justifications or purposes for enacting the [Act] to determine whether it is subject to strict scrutiny." *See Reed*, 576 U.S. at 164-65.

### ii.   The Act Does Not Survive Strict Scrutiny

Because the Act is facially content-based, it is subject to strict scrutiny, and the government must use the least restrictive means available to achieve a compelling purpose. *Reed*, 576 U.S. at 163 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.")). Obscenity has long been recognized as a limited category of unprotected speech. *See Miller v. California*, 413 U.S. 15, 23 (1973). Plaintiff likewise concedes that "there is a compelling interest in protecting the physical and

psychological well-being of minors." Doc. 1, ¶ 30.b. (quoting *Sable Comms. of Cal., Inc. v. FCC*, 482 U.S. 115, 126 (1989)). However, Plaintiff argues that the Act is not "narrowly tailored." *Id.* ¶ 30.c.; *see also R.A.V.*, 505 U.S. at 395.

In their Response, Defendants argue that the Act's language and restrictions track those upheld in *Ginsberg v. New York*, 390 U.S. 629, 639 (1968). There are several significant distinctions, however, between the narrowly tailored statute in *Ginsberg* and Fla. Stat. § 827.11. First, the Supreme Court in *Ginsberg* "relied not only on the State's independent interest in the well-being of its youth, but also on the consistent recognition of the principle that 'the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.' " *Reno v. ACLU*, 521 U.S. 844, 865 (1997). The prohibition against the sale to minors of material considered obscene for their age in the statute at issue in *Ginsberg* "d[id] not bar parents who so desire[d] from purchasing magazines for their children." *Id.* The Act does not allow for the exercise of parental discretion, stating plainly that "[a] person may not knowingly admit a child to an adult live performance," explicitly foreclosing any defense based on a "bona fide belief of a child's consent."[14] Fla. Stat. §§ 827.11(2)-(3).

---

[14] The Court assumes this language refers to *parental* consent, as it is unclear how, for instance, a sixteen-year-old could "legally" consent to viewing a show they are criminally prohibited from seeing until the age of eighteen.

Second, the statute in *Ginsberg* only applied to commercial transactions, as opposed to the apparent universal application of § 827.11 to anyone, anywhere—the statute does not define a "live performance," which could conceivably range from a sold-out burlesque show to a skit at a backyard family barbecue. *See id.*; *Reno*, 521 U.S. at 865. Third, and arguably most importantly, the Act here does not define several important terms: "live performance;" "child;"[15] "lewd conduct;" and "lewd exposure of prosthetic or imitation genitals or breasts." *See Reno*, 521 U.S. at 865 (distinguishing *Ginsberg* from a statute which included, without definition, the term "indecent"). These ambiguities, especially those pertaining to "lewd" conduct and exposure of prosthetics, represent a material departure from the established obscenity outline set forth in *Miller*. 43 U.S. at 24; *see also, e.g., Am. Booksellers v. Webb*, 919 F.2d 1493, 1496, 1513 (11th Cir. 1990).

Similarly indicative of the Florida Legislature's failure to narrowly tailor § 827.11 is its inevitable clash with the Florida "Parents' Bill of Rights" and other laws. *See* Fla. Stat. § 1014 (2023). In pertinent part, Fla. Stat. § 1014 states that: "All parental rights are reserved to the parent of a minor child in this

───────────────

[15] In *Ginsberg*, the statute at issue defined a minor as a person under seventeen, whereas here the Act presumably applies to all persons under eighteen. *Reno*, 521 U.S. at 865-66. Defendant argues that the flexibility inherent in § 827.11's reference to "suitable material or conduct *for the age of the child present*" allays concerns voiced by the Third Circuit in *ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003). Doc. 21 at 11 (emphasis added). On the contrary, this merely introduces an even more impossible standard for businesses and individuals to comprehend.

state…including…[t]he right to direct the upbringing and the moral or religious training of his or her minor child." *Id.* § 1014.04(1)(b). This comports with other laws in Florida, such as § 847.013, which governs the exposure of minors to "harmful motion pictures, *exhibitions, shows, presentations*, or representations." *Id.* (emphasis added). That law prohibits the kind of obscene material described in *Miller* and, indeed, the Act here, with the exception that it does not incorporate ambiguities like "lewd conduct" or "lewd exposure of prosthetic or imitation genitals or breasts." *Id.* § 847.013(3). Importantly, however, that law *does* include a limiting provision which allows for a minor accompanied by his or her parents to attend any such exhibitions, regardless of the minor's age. *Id.* § 847.013(3)(c).

Like the statute in *Reno*, "the many ambiguities concerning the scope of [§ 827.11's] coverage render it problematic for purposes of the First Amendment." 521 U.S. at 870. Unlike comparable statutes which target commercial activity and are more narrowly tailored in their scope to allow for parental discretion, specific age thresholds, and clearly defined terms, § 827.11 proscribes conduct universally and threatens to permit "a standardless sweep [which would] allow[] policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974). Including an exception for parental consent, as it did in § 847.013, is at least one less restrictive means through which the Legislature could have sought to further the state's compelling interest in protecting minors from

obscene performances. Following the logic of *Ginsberg* and *Reno*, where such a fundamental consideration is found lacking, § 827.11 is not sufficiently narrowly tailored to survive strict scrutiny. *See Reed*, 576 U.S. at 163; *Playboy*, 529 U.S. at 813. Plaintiff is therefore likely to succeed on its First Amendment claims.

### b. Vagueness and Overbreadth

Plaintiff's Complaint also alleges that § 827.11 is unconstitutionally vague and overbroad. Doc. 1, ¶¶ 37-41. The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Courts must primarily focus on "the requirement that legislatures establish minimal guidelines to govern law enforcement." *Id.* at 358. Additionally, "[t]he showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep'… suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.' " *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

As alluded to above, there are several aspects of § 827.11 that raise vagueness concerns. *See infra* at 16-17. Most relevant is the inclusion of "lewd conduct" and

"lewd exposure of prosthetic or imitation genitals or breasts." Fla. Stat. § 827.11(1)(a). Not only does the statute fail to define these terms, but one must resort to state jury instructions to find *any* definition of "lewd conduct." *See* Jury Instructions, *supra* at note 7. Once discovered, this definition serves only to further broaden the scope of what may be covered by using terms like "wicked," "lustful," and "unchaste"—all vulnerable to broad subjectivity which ultimately leaves an individual of common intelligence to "necessarily guess at [their] meaning." *See id.*; *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926).

A fully clothed drag queen with cleavage-displaying prosthetic breasts reading an age-appropriate story to children may be adjudged "wicked"—and thus "lewd"—by some,[16] but such a scenario would not constitute the kind of obscene conduct prohibited by the statutes in cases like *Miller*. Moreover, the Act's focus on "prosthetic or imitation genitals or breasts" raises a host of other concerns not simply answered—what are the implications for cancer survivors with prosthetic genitals or breasts? It is this vague language—dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected

---

[16] House Bill Sponsor Randy Fine stated that he introduced the bill to protect children from "Drag Queen Story Time." *See supra* at note 1.

speech—which distinguishes § 827.11 and renders Plaintiff's claim likely to succeed on the merits.

## 2. Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiff has alleged that the vague and overbroad language of the statute affords such wide enforcement discretion to DBPR that "[t]he reader is only made to guess what conduct is prohibited." Doc. 1, ¶ 30.c.9. Consequently, Plaintiff has had to prohibit children from attending their drag shows because "[t]hey simply cannot take the chance that their business or liquor licenses would be suspended for hosting a drag show where children attend." *Id.* ¶ 43. Plaintiff has adequately pled that it is suffering irreparable injury.

## 3. Harm and Public Interest

Defendant professes that a statewide preliminary injunction would "harm the public by exposing children to 'adult live performances.'" Doc. 21 at 24. This concern rings hollow, however, when accompanied by the knowledge that Florida state law, presently and independently of the instant statutory scheme, permits any minor to attend an R-rated film at a movie theater if accompanied by a parent or guardian. *See* Fla. Stat. § 847.013(3)(c). Such R-Rated films routinely convey content at least as objectionable as that covered by § 827.11.

Plaintiff contends that its fifteen years of incident-free, harmless drag shows demonstrates the absence of any substantial harm to Defendant or to the public interest. *See* Doc. 6, ¶ 57. Moreover, existing obscenity laws provide Defendant with the necessary authority to protect children from any constitutionally unprotected obscene exhibitions or shows. *See*, *e.g.*, § 847.013(3)(a). The harm to Plaintiff clearly outweighs any purported evils not covered by Florida law and a preliminary injunction would not be adverse to the public interest.

## IV.   Conclusion

Accordingly, it is **ORDERED** that Defendant's Motion to Dismiss (Doc. 21) is hereby **DENIED** and Plaintiff's Motion for Preliminary Injunction (Doc. 6) is **GRANTED.**

## V.     Preliminary Injunction

For the reasons stated above, Defendant Melanie Griffin, in her official capacity as Secretary of the Florida Department of Business and Professional Regulation, is hereby **ENJOINED** from instituting, maintaining, or prosecuting any enforcement proceedings under the Act[17] until further order of the Court following a trial on the merits of this case.

---

[17] This injunction shall apply to proceedings instituted, maintained, or prosecuted under the statutes amended and created by SB 1423. *See* Fla. Stats. §§ 255.70(1)-(3), 509.261(10), 561.29(1), and 827.11.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 23, 2023.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

# DE30

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

HM FLORIDA-ORL, LLC,

    Plaintiff,

v.             Case No:  6:23-cv-950-GAP-LHP

MELANIE GRIFFIN,

    Defendant

_____

## ORDER[1]

    This case addresses the constitutionality of Florida Statute § 827.11. The state claims that this statute seeks to protect children generally from obscene live performances. However, as explained *infra*, Florida already has statutes that provide such protection. Rather, this statute is specifically designed to suppress the speech of drag queen performers. In the words of the bill's sponsor in the House, State Representative Randy Fine: "…HB 1423…will protect our children by ending the gateway propaganda to this evil — 'Drag Queen Story Time.' "[2]

_____

   [1]  The Court has filed this Amended Order to include discussion in Sec. III.B.1.b. inadvertently omitted from the original filing.

   [2]  *See* State Representative Randy Fine, FACEBOOK (April 12, 2023), https://www.facebook.com/voterandyfine/posts/761831661970637?ref=embed_post.

This cause came before the Court for consideration on Plaintiff's Supplemental Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 6).[3] Defendant responded in opposition to the motion and simultaneously moved to dismiss (Doc. 21) Plaintiff's action. The Court conducted a non-evidentiary hearing on June 6, 2023, and subsequently considered Plaintiff's Response (Doc. 28) to Defendant's Motion to Dismiss.

## I.    Background

### A. House Bill 1423/Senate Bill 1438

On May 17, 2023, Florida Governor Ron DeSantis signed Senate Bill 1438 (the "Act") into law.[4] *See* 2023 Fla. Laws ch. 2023-94. Along with amending three existing laws,[5] the Act created a new statute—Fla. Stat. § 827.11—which prohibits any person from knowingly admitting a child to an "adult live performance." *Id.* §§ 1-4. Violation of the statute authorizes the Florida Department of Business and Professional Regulation ("DBPR") to impose fines and revoke or suspend the operating and/or liquor license of any public lodging, food service establishment,

---

[3] Because notice was not impractical in this matter, the Court treats Plaintiff's Motion as one for Preliminary Injunction under Local Rule 6.02. *See* Doc. 7.

[4] The Act took effect upon being signed into law. 2023 Fla. Laws ch. 2023-94, § 5. Its companion bill in the House was HB 1423. THE FLORIDA SENATE, 2023 Session Bills, *SB 1438* (June 22, 2023), https://www.flsenate.gov/Session/Bill/2023/1438.

[5] *See* Fla. Stat. §§ 255.70(1)-(3), 509.26(10), and 561.29(1).

or other licensee.[6] Fla. Stat. §§ 509.261(10), 561.29(1). In addition, any person who violates § 827.11 may be prosecuted and subject to punishment as a misdemeanor of the first degree. *See* Fla. Stat. § 827.11(3)-(4); *see also id.* § 775.082(4)(a) & § 775.083(1)(d).

The statute defines an "adult live performance" as:

[A]ny show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 827.001, *lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it*:

1. Predominantly appeals to a prurient, shameful, or morbid interest;

2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and

3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

*Id.* § 827.11(1)(a) (emphasis added). It prohibits any defense based on "a person's ignorance of a child's age, a child's misrepresentation of his or her age, or a bona

---

[6] Fla. Stat. § 509.261 was amended to add subsection (10), authorizing the state to "fine, suspend, or revoke the license" of lodging and food services establishments that admit a child to an adult live performance. *Id.* § 509.261(10)(a). In addition to the ability to suspend or revoke a license, it provides that the state may issue a $5,000 fine for a first violation and a $10,000 fine for second or subsequent violations. *Id.* § 509.261(10)(c)-(d).

Fla. Stat. § 561.29 was amended to apply the same scheme to liquor licenses. *Id.* § 561.29(1).

fide belief of a child's consent." *Id*. § 827.11(2). The term "child" is not specifically defined by the new statute.[7] Neither are the terms "live performance," "lewd conduct,"[8] or "lewd exposure of prosthetic or imitation genitals or breasts" defined.

### B. Posture

Plaintiff HM Florida-ORL, LLC ("Plaintiff"), is a Florida for-profit business operating Hamburger Mary's Restaurant and Bar in Orlando. Doc. 1, ¶ 4. Plaintiff frequently presents drag show performances, comedy sketches, and dancing, including "family friendly" drag performances on Sundays where children are invited to attend. *Id*. ¶¶ 4, 12. Plaintiff brought suit under 42 U.S.C. § 1983 on May 22, 2023, alleging that the Act "seeks to explicitly restrict, or chill speech and expression protected by the First Amendment based on its content, its message, and its messenger." Doc. 1, ¶ 50. Since the passage of the Act, Plaintiff has been forced

---

[7] Chapter 827 of the Florida Statutes pertains generally to the "abuse of children." Section 827.01 defines a "child" as "any person under the age of 18 years." Fla. Stat. § 827.01.

[8] The Court consulted Fla. Stat. § 800.04—which covers "lewd or lascivious offenses"—to obtain guidance on the meaning of "lewd conduct." Alas, such offenses are defined only by their own terms. *See, e.g.*, § 800.04(6) ("A person who…[i]ntentionally touches a person 16 years of age *in a lewd or lascivious manner*; or…[s]olicits a person under 16 years of age to commit a *lewd or lascivious act* …commits *lewd or lascivious conduct*."). The Florida Supreme Court's jury instructions offer an inkling into covered conduct, but likewise leave the reader with more questions than answers. *See* THE FLORIDA BAR, Criminal Jury Instructions Chapter 11, § 11.10(d) (accessed June 16, 2023), available at https://www.floridabar.org/rules/florida-standard-jury-instructions/criminal-jury-instructions-home/criminal-jury-instructions/sji-criminal-chapter-11/[hereinafter "Jury Instructions"]. According to these Instructions, "[t]he words 'lewd' and 'lascivious' mean the same thing: a wicked, lustful, unchaste, licentious, or sensual intent on the part of the person doing an act." *Id*.

to cancel its family drag shows, alleging that "[t]hey cannot take place if the law is allowed to stand." *Id.* ¶¶ 43, 49; *see also id.* ¶¶ 23-25, 37-39.

In support of its allegations, Plaintiff claims that the statute is not sufficiently narrowly tailored to achieve a compelling government interest and that it is unconstitutionally vague and overbroad. *Id.* ¶¶ 30-45. Plaintiff points to the ambiguity of terms like "lewd conduct" and "child," and the broad subjectivity that must necessarily be employed to enforce such language. *Id.* ¶ 30.c.3-4. What may be obscene for a child of four may not be obscene for a seventeen-year-old, *id.* ¶ 30.c.4, but Plaintiff alleges it cannot risk its business licenses or an arrest trying to guess how regulators will enforce the statute. *Id.* ¶ 43.

In justification of its self-censorship, Plaintiff also cites to recent efforts by Defendant Secretary of DBPR Melanie Griffin ("Defendant") to revoke the liquor license of Orlando's Plaza Live (the "Plaza Live") venue after it hosted an "A Drag Queen Christmas" show.[9] *Id.* ¶¶ 23-25. On December 28, 2022—the day of the show—Defendant sent the Plaza Live a letter stating that she "ha[d] reason to believe that th[e] drag show is of a sexual nature involving…the sexualization of

_____

[9] *See* Amanda Rabines, *Florida moves to revoke Orlando event venue's liquor license after drag queen show*, TAMPA BAY TIMES (February 5, 2023), https://www.tampabay.com/news/florida-politics/2023/02/05/florida-moves-revoke-orlando-event-venues-liquor-license-after-drag-queen-show/; *see also* Doc. 21-5 (*Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco v. The Orlando Philharmonic Plaza Foundation Inc.,* Case No. 2022-061146 (filed Feb. 3, 2023)).

App. 264

children's stories." Doc. 21-5 at 14. Defendant clearly stated that, "if you allow children to attend the…drag show at your facility, you are putting your license in jeopardy." *Id.* However, despite the fact that undercover state agents reportedly observed "no lewd acts such as exposure of genital organs,"[10] Defendant has continued to prosecute its administrative complaint under existing lewd and lascivious exhibition and other obscenity and nuisance statutes. *See* Doc. 21-5; *see also Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco v. The Orlando Philharmonic Plaza Foundation Inc.,* Case No. 2022-061146 (filed Feb. 3, 2023).

Plaintiff alleges that the Act was passed to stop children from attending drag shows by authorizing Defendant to suspend or revoke the licenses of businesses like theirs. Doc. 6, ¶¶ 25-27. Consequently, Plaintiff seeks a preliminary injunction to enjoin any further enforcement of the Act until a trial is held on its constitutionality. *See id.* at 26. Defendant counters that Plaintiff's motion should be denied and its Complaint should be dismissed because the statute is constitutional and furthers the compelling state interest of protecting children from exposure to "age-inappropriate, sexually explicit live performances." Doc. 21 at 3.

---

[10] *See* Nicholas Nehamas & Ana Ceballos, *Florida undercover agents reported no 'lewd acts' at drag show targeted by DeSantis*, Tampa Bay Times (March 20, 2023), https://www.tampabay.com/news/florida-politics/2023/03/20/desantis-drag-show-lewd-liquor-license-complaint-lgbtq/.

## II.     Legal Standards

### A. Motion to Dismiss

In ruling on a motion to dismiss, the Court must view the complaint in the light most favorable to the plaintiff, *see, e.g., Jackson v. Okaloosa County*, 21 F.3d 1531, 1534 (11th Cir. 1994), and must limit its consideration to the pleadings and any exhibits attached thereto. *See* Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor. *See Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). However, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (citing Fed. R. Civ. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). However, a plaintiff's obligation to provide the grounds for his or her entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

- 7 -

elements of a cause of action will not do. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). The complaint's factual allegations "must be enough to raise a right to relief above the speculative level," *id.* at 555, and cross "the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

### B. Preliminary Injunction

District courts are empowered to grant a preliminary injunction "only if the moving party establishes that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020) (citations omitted). The third and fourth factors "merge when the [g]overnment is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### III.   Analysis

### A. Defendant's Motion to Dismiss

In her Motion to Dismiss Plaintiff's Complaint, Defendant makes three principal arguments: (1) the Complaint should be dismissed as a "shotgun pleading"; (2) Plaintiff lacks Article III standing to bring this case; and (3) the State of Florida and Governor Ron DeSantis are protected from this suit by sovereign immunity and should be dismissed. *See* Doc. 21, 15-22. At the June 6, 2023, hearing,

however, the parties stipulated to the dismissal of Defendants Governor Ron DeSantis and the State of Florida, rendering Defendant's sovereign immunity arguments moot.[11] *See* Doc. 26. Consequently, the Court only addresses Defendant's shotgun pleading and standing arguments.

### 1. Shotgun Pleading

Complaints filed in violation of Rule 8(a)(2) or Rule (10)(b) of the Federal Rules of Civil Procedure are disparagingly referred to as "shotgun pleadings." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). The Eleventh Circuit has identified four principal varieties of shotgun pleadings, unified by their failure "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323. One such variety of shotgun pleading "commits the sin of not separating into a different count each cause of action or claim for relief." *Id.* Defendant argues that Plaintiff's Complaint "consists of a single Count 1 with a mish-mash of different, vaguely articulated constitutional theories presented in non-consecutively numbered paragraphs." Doc. 21 at 16. They further complain that "[s]ome paragraphs are not numbered at

---

[11] Likewise, there is no residual dispute that Defendant Melanie Griffin is a proper party. *See* Docs. 25-26.

all; some employing numbering systems that do not match the ones preceding it." *Id.*

Plaintiff's Complaint does not constitute a shotgun pleading. The Complaint, in Count I, clearly uses an outline format with subsections of descending alphanumeric delineation (*i.e.*, I, A, 1, a., i., etc.), as is ubiquitous in the legal profession. *See* Doc. 1 at 10-14. True, two paragraphs are not numbered at all; however, a cursory glance reveals those paragraphs to be quotations following a colon. *Id.* at 10-11. While Plaintiff's Complaint may leave room for improvement, its logical outline structure in no way equates to a "mish-mash" that leaves Defendant to "speculate as to which claims [she] should be defending against." *See* Doc. 21 at 16; *see also Weiland*, 792 F.3d at n. 12. Plaintiff plainly asserts one count under 42 U.S.C. § 1983—with several constitutional theories to support it—which requires no further demarcation. *See Weiland*, 792 F.3d at 1323.

## 2. Standing

To establish standing to bring its constitutional challenge, Plaintiff must show that: "(1) [it] has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the operation of the [Act]; and (3) a favorable judgment is likely to redress the injury." *Harrell v. The Florida Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010) (citing *Kelly v. Harris*, 331 F.3d 817, 819–20 (11th Cir. 2003)). The injury-in-fact requirement is applied "most loosely where First Amendment rights are involved,

- 10 -

lest free speech be chilled even before the law or regulation is enforced." *Id.* at 1254. Indeed, "it is well-established that an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Id.* (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (internal quotation marks omitted)).

First, Plaintiff alleges that the Act is written so broadly as to have a "chilling effect on the First Amendment rights of the citizens of Florida." Doc. 6, ¶ 51. Based upon the vagueness of the Act, Plaintiff asserts that "it has a reasonable fear of prosecution for conducting shows similar to those it has performed in the past, which may be punishable by the statute with criminal effect." *Id.* ¶ 54.a. Plaintiff alleges its family drag shows—despite not being obscene—could be construed to fall within the Act's purview of proscribed conduct as it is presently written. *See id.*; *see also supra* at note 8. Plaintiff argues that it "should not be required to eat the proverbial mushroom to find out whether it is poisonous." Doc. 6, ¶ 54.a. Longstanding precedent supports this contention. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("Where the alleged danger of legislation is one of self-censorship, harm can be realized even without an actual prosecution."). After all, "it is the existence, not the imposition, of standardless requirements that causes [the] injury." *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1275 (11th Cir. 2006).

In addition, Plaintiff has alleged it is already suffering significant injury-in-fact from its self-censorship. Doc. 1, ¶ 43. Upon passage of the bill, Plaintiff advised its customers that children would no longer be permitted to attend its drag shows. *Id.* This resulted in the immediate cancellation of "20% of their bookings…for the May 21, 2023, show and for future bookings." *Id.* Defendant contends that Plaintiff's intended conduct does not amount to conduct "arguably proscribed" by the Act, Doc. 21 at 18 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014)), dubiously proclaiming that if Plaintiff's performances are what they say they are, then they should have no fear of prosecution. *Id.* at 23.

However, as Plaintiff responds, because it cannot know what is encompassed by the terms "lewd conduct" or "lewd exhibition of prosthetic genitals or breasts," it cannot know with any confidence whether its shows will expose it to liability under the Act. *See* Doc. 28 at 4; *see also* Fla. Stat. § 827.11(1)(a). Plaintiff, informed by the vague statutory language and Defendant's enforcement activity against the Plaza Live, has been forced to chill its regular practice of opening many of its performances to all ages—at an economic loss. Doc. 28 at 4. Plaintiff has sufficiently "alleged an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution[.]" *Driehaus*, 573 U.S. at 160.[12]

Defendant argues that this case is more like *Younger v. Harris*, 401 U.S. 37 (1971), because the administrative actions it has taken against the Plaza Live (and others) involved distinct, *obscene* drag shows and those entities are not being prosecuted under the Act. Doc. 21 at 19-20. However, Plaintiff does not challenge the constitutionality of the statutes that those entities are being prosecuted under. *See generally* Doc. 1. Instead, it merely highlights those cases as indicative of Defendant's appetite for finding obscenity in drag performances, even where undercover state agents have reportedly concluded none exists. *See* Doc. 6, ¶ 55. Coupled with statements by lawmakers, including a statement made by one of the Act's sponsors that the Act was designed to target drag shows,[13] Plaintiff's fear of

---

[12] Defendant is authorized by the Florida Statutes to enforce the Act's amended language in §§ 509.261 and 561.29, which is governed by the creation of § 827.11. *See generally* Doc. 21 at I.D; *see also infra* at note 11. "If a challenged law or rule was recently enacted…an intent to enforce the rule may be inferred." *Harrell*, 608 F.3d at 1257 (citing *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir.1979) (explaining that a court can "assume that law enforcement agencies will not disregard…a recent expression of the legislature's will")).

[13] *See supra* at note 2. Additionally, on the day of a legislative subcommittee hearing on the bill, Representative Randy Fine—who sponsored the legislation—posted on Facebook that the Act would "ban the City of Melbourne from 'welcoming' drag queen adult entertainers from grooming our children! Promises made, promises kept!" State Representative Randy Fine, Facebook (April 12, 2023), https://www.facebook.com/voterandyfine/posts/782903609863442.

prosecution based on the Act's alleged vague construction is not unfounded. At worst, Plaintiff certainly claims that "a prosecution is remotely possible" if it does not self-censor. *Younger*, 401 U.S. at 42.

Finally, it is clear that Plaintiff's injury is fairly traceable to the operation of the Act and would be redressed by a favorable judgment against the Defendant. *See Harrell*, 608 F.3d at 1253. Plaintiff has sufficiently alleged in its Complaint that the Act—particularly its use of the terms "live performance," "child," "lewd conduct," and "lewd exposure of prosthetic or imitation genitals or breasts"—at least arguably creates a substantial risk to its licenses due to its vague and overbroad language. Doc. 6, ¶¶ 46-49. Plaintiff's actions of self-censorship represent a reasonable attempt to "steer wide of any possible violation lest [it] be unwittingly ensnared." *Harrell*, 608 F.3d at 1255 (quoting *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 820 (5th Cir.1979)).[14] And, "[a]s for the redressability prong, if the challenged rules are stricken as unconstitutional, [Plaintiff] simply need not contend with them any longer." *Harrell*, 608 F.3d at 1257. Therefore, Plaintiff has Article III standing to pursue its claim. *See Harrell*, 608 F.3d at 1253.

Accordingly, Defendant's Motion to Dismiss will be **DENIED**.

---

[14] The Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered before the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

*B. Plaintiff's Motion for Preliminary Injunction*

Having determined that Plaintiff has standing to bring its claim and that the Complaint is properly pled, the Court now analyzes Plaintiff's Motion for Preliminary Injunction as applied to the remaining Defendant.

**1. Substantial Likelihood of Success on the Merits**

*a. First Amendment Grounds*

**i.   The Act is a Facially Content-Based Regulation**

"A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Applied here, the Act criminalizes allowing children to attend performances based on the communicative content of "adult live performances." Only content that "depicts or simulates nudity, sexual content, sexual excitement…lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it…offends the prevailing standards in the adult community…with respect to what is suitable material…for the age of [a] child present" is prohibited by the Act. Fla. Stat. § 827.11(a).

The absence of any argument to the contrary by Defendant bolsters the conclusion that this is plainly a facially content-based regulation. *See City of Austin,*

App. 274

142 S. Ct. at 1471. Like in *United States v. Playboy*, the "overriding justification for the regulation is concern for the effect of the *subject matter* on young viewers." 529 U.S. 803, 811 (2000) (emphasis added). The Act "focuses only on the content of the speech and the direct impact that speech has on its [viewers]." *Id.* at 811-12 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)). It does not restrict the attendance of children from all live performances, only those engaged in the portrayal of a specific, enumerated subset of content. *See* Fla. Stat. § 827.11(1)(a). Because the Act is content-based on its face, there is "no need to consider the government's justifications or purposes for enacting the [Act] to determine whether it is subject to strict scrutiny." *See Reed*, 576 U.S. at 164-65.

### ii.    The Act Does Not Survive Strict Scrutiny

Because the Act is facially content-based, it is subject to strict scrutiny, and the government must use the least restrictive means available to achieve a compelling purpose. *Reed*, 576 U.S. at 163 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.")). Obscenity has long been recognized as a limited category of unprotected speech. *See Miller v. California*, 413 U.S. 15, 23 (1973). Plaintiff likewise concedes that "there is a compelling interest in protecting the physical and

psychological well-being of minors." Doc. 1, ¶ 30.b. (quoting *Sable Comms. of Cal., Inc. v. FCC*, 482 U.S. 115, 126 (1989)). However, Plaintiff argues that the Act is not "narrowly tailored." *Id.* ¶ 30.c.; *see also R.A.V.*, 505 U.S. at 395.

In their Response, Defendants argue that the Act's language and restrictions track those upheld in *Ginsberg v. New York*, 390 U.S. 629, 639 (1968). There are several significant distinctions, however, between the narrowly tailored statute in *Ginsberg* and Fla. Stat. § 827.11. First, the Supreme Court in *Ginsberg* "relied not only on the State's independent interest in the well-being of its youth, but also on the consistent recognition of the principle that 'the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.' " *Reno v. ACLU*, 521 U.S. 844, 865 (1997). The prohibition against the sale to minors of material considered obscene for their age in the statute at issue in *Ginsberg* "d[id] not bar parents who so desire[d] from purchasing magazines for their children." *Id.* The Act does not allow for the exercise of parental discretion, stating plainly that "[a] person may not knowingly admit a child to an adult live performance," explicitly foreclosing any defense based on a "bona fide belief of a child's consent."[15] Fla. Stat. §§ 827.11(2)-(3).

---

[15] The Court assumes this language refers to *parental* consent, as it is unclear how, for instance, a sixteen-year-old could "legally" consent to viewing a show they are criminally prohibited from seeing until the age of eighteen.

Second, the statute in *Ginsberg* only applied to commercial transactions, as opposed to the apparent universal application of § 827.11 to anyone, anywhere—the statute does not define a "live performance," which could conceivably range from a sold-out burlesque show to a skit at a backyard family barbecue. *See id.*; *Reno*, 521 U.S. at 865. Third, and arguably most importantly, the Act here does not define several important terms: "live performance;" "child;"[16] "lewd conduct;" and "lewd exposure of prosthetic or imitation genitals or breasts." *See Reno*, 521 U.S. at 865 (distinguishing *Ginsberg* from a statute which included, without definition, the term "indecent"). These ambiguities, especially those pertaining to "lewd" conduct and exposure of prosthetics, represent a material departure from the established obscenity outline set forth in *Miller*. 43 U.S. at 24; *see also, e.g., Am. Booksellers v. Webb*, 919 F.2d 1493, 1496, 1513 (11th Cir. 1990).

Similarly indicative of the Florida Legislature's failure to narrowly tailor § 827.11 is its inevitable clash with the Florida "Parents' Bill of Rights" and other laws. *See* Fla. Stat. § 1014 (2023). In pertinent part, Fla. Stat. § 1014 states that: "All parental   rights   are   reserved   to   the   parent   of   a   minor   child   in   this

---

[16] In *Ginsberg*, the statute at issue defined a minor as a person under seventeen, whereas here the Act presumably applies to all persons under eighteen. *Reno*, 521 U.S. at 865-66. Defendant argues that the flexibility inherent in § 827.11's reference to "suitable material or conduct *for the age of the child present*" allays concerns voiced by the Third Circuit in *ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003). Doc. 21 at 11 (emphasis added). On the contrary, this merely introduces an even more impossible standard for businesses and individuals to comprehend.

state…including…[t]he right to direct the upbringing and the moral or religious training of his or her minor child." *Id.* § 1014.04(1)(b). This comports with other laws in Florida, such as § 847.013, which governs the exposure of minors to "harmful motion pictures, *exhibitions, shows, presentations*, or representations." *Id.* (emphasis added). That law prohibits the kind of obscene material described in *Miller* and, indeed, the Act here, with the exception that it does not incorporate ambiguities like "lewd conduct" or "lewd exposure of prosthetic or imitation genitals or breasts." *Id.* § 847.013(3). Importantly, however, that law *does* include a limiting provision which allows for a minor accompanied by his or her parents to attend any such exhibitions, regardless of the minor's age. *Id.* § 847.013(3)(c).

Like the statute in *Reno*, "the many ambiguities concerning the scope of [§ 827.11's] coverage render it problematic for purposes of the First Amendment." 521 U.S. at 870. Unlike comparable statutes which target commercial activity and are more narrowly tailored in their scope to allow for parental discretion, specific age thresholds, and clearly defined terms, § 827.11 proscribes conduct universally and threatens to permit "a standardless sweep [which would] allow[] policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575 (1974). Including an exception for parental consent, as it did in § 847.013, is at least one less restrictive means through which the Legislature could have sought to further the state's compelling interest in protecting minors from

obscene performances. Following the logic of *Ginsberg* and *Reno*, where such a fundamental consideration is found lacking, § 827.11 is not sufficiently narrowly tailored to survive strict scrutiny. *See Reed*, 576 U.S. at 163; *Playboy*, 529 U.S. at 813. Plaintiff is therefore likely to succeed on its First Amendment claims.

b. *Vagueness and Overbreadth*

Plaintiff's Complaint also alleges that § 827.11 is unconstitutionally vague and overbroad. Doc. 1, ¶¶ 37-41. The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Courts must primarily focus on "the requirement that legislatures establish minimal guidelines to govern law enforcement." *Id.* at 358. Additionally, "[t]he showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep'… suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.' " *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

As alluded to above, there are several aspects of § 827.11 that raise vagueness concerns. *See infra* at 16-17. Most relevant is the inclusion of "lewd conduct" and

"lewd exposure of prosthetic or imitation genitals or breasts." Fla. Stat. § 827.11(1)(a). Not only does the statute fail to define these terms, but one must resort to state jury instructions to find *any* articulated definition of "lewd conduct." *See* Jury Instructions, *supra* at note 8. Once discovered, this definition serves only to further broaden the scope of what may be covered by using terms like "wicked," "lustful," and "unchaste"—all vulnerable to broad subjectivity which ultimately leaves an individual of common intelligence to "necessarily guess at [their] meaning." *See id.*; *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926).

Defendant limited its retort to this characterization of "lewd conduct" to a footnote in its Response. *See* Doc. 21 at note 3. Seeking support for a definition of "lewd conduct" that is not vague, Defendant cites to two cases. *Id*. In the first, which regarded the importation of obscene articles to the United States, the Supreme Court construed several terms—including "lewd"—in a footnote in anticipation of future challenges to their "vagueness…as used to describe regulated material in 19 U.S.C. § 1305(a) and 18 U.S.C. § 1462." [17]  *United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123, 130 n.7 (1973). The Supreme Court indicated that, in the context of those statutes, those terms should be interpreted in line with the "hard core

---

[17] 18 U.S.C. § 1462 governs the importation of obscene articles to the United States and sets criminal penalties. 19 U.S.C. § 1305(a) governs the importation of obscene articles to the United States in the context of customs duties.

sexual conduct given as examples in *Miller*" or any other definitions imparted by Congress. *Id.* (internal quotations omitted). But the terms in that case were interpreted—prospectively—in a markedly distinguishable context from Defendant's (and the public's) task in determining the application of the terms "lewd conduct" or "lewd exposure of prosthetic or imitation genitals or breasts" to describe an "adult live performance" under Fla. Stat. § 827.11. *See id.*

Defendant also cites to *Chesebrough v. State*, where the Florida Supreme Court addressed the vagueness of the terms "lewd" and "lascivious." 255 So. 2d 675, 677 (Fla. 1971). *Chesebrough* undertook a review of these definitions but succeeded only in creating further ambiguity by proclaiming words like "lewd" to be "in common use, and the[ir] definitions indicate with reasonable certainty the character of the acts and conduct" prohibited. *Id.* That calculation was understandably less opaque in a case which held that sexual intercourse exhibited to a fourteen-year-old was sufficient to constitute "a lewd and lascivious act". *Id.* at 679.

However, recognizing definitions of "lewd" to include conduct "connot[ing] wicked, lustful, unchaste, licentious, or sensual design on the part of the perpetrator" in an individual criminal context does not aide Defendant in her administrative determination of whether an "adult live performance" is covered by Fla. Stat. § 827.11. *See id.* at 677 (quoting *Boles v. State*, 158 Fla. 220, 27 So.2d 293 (1946)). Nor does it aid the public in its own efforts to avoid criminal prosecution.

*Chesebrough* chiefly serves to acknowledge the vagueness inherent in words like "lewd" by collecting the wide variety of definitions accorded to them by courts over the years. *Id.* at 677-79. Despite determining that such a morass was sufficient to pass constitutional muster, it primarily held that this particular egregious act sufficiently fell within the bounds of a "lewd and lascivious act." *Id.* at 679. While terms like "lewd and lascivious" may have been in common use fifty years ago, definitions like "an unlawful indulgence in lust, eager for sexual indulgence," do very little to inform a "person of ordinary understanding [today]…what conduct on his part is condemned" under Fla. Stat. § 827.11. *Id.* at 677.

A fully clothed drag queen with cleavage-displaying prosthetic breasts reading an age-appropriate story to children may be adjudged "wicked"—and thus "lewd"—by some,[18] but such a scenario would not constitute the kind of obscene conduct prohibited by the statutes in cases like *Miller*. Moreover, the Act's focus on "prosthetic or imitation genitals or breasts" raises a host of other concerns not simply answered—what are the implications for cancer survivors with prosthetic genitals or breasts? It is this vague language—dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected

---

[18]  House Bill Sponsor Randy Fine stated that he introduced the bill to protect children from "Drag Queen Story Time." *See supra* at note 2.

speech—which distinguishes § 827.11 and renders Plaintiff's claim likely to succeed on the merits.

### 2.  Irreparable Injury

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiff has alleged that the vague and overbroad language of the statute affords such wide enforcement discretion to DBPR that "[t]he reader is only made to guess what conduct is prohibited." Doc. 1, ¶ 30.c.9. Consequently, Plaintiff has had to prohibit children from attending their drag shows because "[t]hey simply cannot take the chance that their business or liquor licenses would be suspended for hosting a drag show where children attend." *Id.* ¶ 43. Plaintiff has adequately pled that it is suffering irreparable injury.

### 3.  Harm and Public Interest

Defendant professes that a statewide preliminary injunction would "harm the public by exposing children to 'adult live performances.' " Doc. 21 at 24. This concern rings hollow, however, when accompanied by the knowledge that Florida state law, presently and independently of the instant statutory scheme, permits any minor to attend an R-rated film at a movie theater if accompanied by a parent or guardian. *See* Fla. Stat. § 847.013(3)(c). Such R-Rated films routinely convey content at least as objectionable as that covered by § 827.11.

Plaintiff contends that its fifteen years of incident-free, harmless drag shows demonstrates the absence of any substantial harm to Defendant or to the public interest. *See* Doc. 6, ¶ 57. Moreover, existing obscenity laws provide Defendant with the necessary authority to protect children from any constitutionally unprotected obscene exhibitions or shows. *See*, *e.g.*, § 847.013(3)(a). The harm to Plaintiff clearly outweighs any purported evils not covered by Florida law and a preliminary injunction would not be adverse to the public interest.

## IV.    Conclusion

Accordingly, it is **ORDERED** that Defendant's Motion to Dismiss (Doc. 21) is hereby **DENIED** and Plaintiff's Motion for Preliminary Injunction (Doc. 6) is **GRANTED.**

## V.    Preliminary Injunction

For the reasons stated above, Defendant Melanie Griffin, in her official capacity as Secretary of the Florida Department of Business and Professional Regulation, is hereby **ENJOINED** from instituting, maintaining, or prosecuting any enforcement proceedings under the Act[19] until further order of the Court following a trial on the merits of this case.

---

[19] This injunction shall apply to proceedings instituted, maintained, or prosecuted under the statutes amended and created by SB 1423. *See* Fla. Stats. §§ 255.70(1)-(3), 509.26(10), 561.29(1), and 827.11.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 24, 2023.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

# DE31

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

HM FLORIDA-ORL, LLC,

     Plaintiff,

         v.

MELANIE GRIFFIN, in her official capacity
as Secretary of the Department of Business
and Professional Regulation, State of Florida,

     Defendant.

Case No. 6:23-cv-00950

**NOTICE OF APPEAL**

Notice is hereby given that the Defendant Melanie Griffin appeals to the
United States Court of Appeals for the Eleventh Circuit the amended order grant-
ing Plaintiffs Motion for Preliminary Injunction and denying Defendants' Motion
to Dismiss, ECF No. 30.

1

Respectfully submitted,

June 27, 2023

ASHLEY MOODY
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Nathan.Forrester@myfloridalegal.com

Jeffrey Paul DeSousa (FBN 110951)
CHIEF DEPUTY SOLICITOR GENERAL

*/s/ Nathan A. Forrester*
* Nathan A. Forrester (FBN 1045107)
SENIOR DEPUTY SOLICITOR GENERAL

*Counsel for Defendants*

*\* Lead Counsel*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of June, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Nathan A. Forrester*
Nathan A. Forrester

# DE33

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

HM FLORIDA-ORL, LLC,

      Plaintiff,

        v.

MELANIE GRIFFIN, in her official capacity
as Secretary of the Department of Business
and Professional Regulation, State of Florida,

      Defendant.

Case No. 6:23-cv-00950

## DEFENDANT'S MOTION FOR A PARTIAL STAY
## PENDING APPEAL OF PRELIMINARY INJUNCTION

On May 17, 2023, Governor Ron DeSantis signed the Protection of Children Act into law. *See* Fla. Laws ch. 2023-94 (SB 1438) (DE 21-1). The Act makes it a misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4). It defines an "adult live performance" as a sexually explicit show that the adult community of the state would consider patently offensive "for the age of the child present." *Id*. § 827.11(1)(a).

On June 23, 2023, this Court accepted Plaintiff's contention that statute violates the First Amendment and is unconstitutionally vague. The Court preliminarily enjoined the statute, not just as to Plaintiff, but also as to any other person or entity. DE 29 at 23. The following day, the Court amended its opinion, but left the injunction unchanged. DE 30 at 25. Defendant has appealed.  DE 31.

Defendant respectfully requests that the Court, pending appeal, stay that injunction to the extent it applies to parties other than Plaintiff. As Defendant argued

in opposition to the preliminary injunction, Plaintiff faces no credible threat of enforcement from the challenged statute, because the types of performances that they say they wish to present are not barred by it. DE 21 at 18–20. But the Court's injunction also sweeps beyond Plaintiff to nonparties who may wish to expose children to live obscene performances in violation of the statute. The portion of the injunction that applies to nonparties threatens Florida, and the children Florida enacted the law to protect, with irreparable harm, and is beyond the Court's remedial authority. The Court should therefore stay its injunction pending appeal to the extent it applies to anyone other than Plaintiff.

## ARGUMENT

The Court may stay its own injunction order pending appeal. Fed. R. Civ. P. 62(d); *see* Fed. R. App. P. 8(a)(1) (requiring parties "ordinarily" to "move first in the district court" for such relief). Whether to grant a stay pending appeal turns on four factors:

(1)   the likelihood the moving party will prevail on the merits;

(2)   the prospect of irreparable injury to the moving party if relief is withheld;

(3)   the possibility of harm to other parties if relief is granted; and

(4)   the public interest.

11th Cir. R. 27-1 (b)(2). Here, every factor favors a stay.

A.      **Defendants Are Likely to Succeed on Appeal in Narrowing the Injunction to Plaintiff.**

In granting a preliminary injunction, this Court rejected Defendant's arguments that Plaintiff lacks standing to sue and that the statute is constitutional. DE 30 at 15–24. Defendant disagrees with the Court on both scores and fully intends to renew those arguments in its briefing on appeal. But she does not now assert them as the basis for a stay pending appeal.

Instead, Defendant seeks only a limited stay pending appeal of the injunction to the extent it applies to nonparties. Defendant argued that any preliminary injunction the Court entered should be limited to Plaintiff. DE 21 at 24. The Court rejected that contention and enjoined enforcement of the statute against anyone. DE 30 at 25. The Eleventh Circuit is substantially likely to reverse that ruling on appeal.

The Eleventh Circuit is "both weary and wary" of the "drastic form of relief" that characterizes "universal" injunctions applicable "to plaintiffs and nonplaintiffs alike." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022).[1] Such injunctions "push against the boundaries of judicial power." *Id.* That power is "bounded by both historical practice and traditional remedial principles." *Id.* (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527

---

[1] The *Georgia* opinion was a fractured ruling, with Judge Grant writing only for herself as to parts I through IV of the opinion. But part V of the opinion, which addressed the scope of the injunction, was also joined by Judge Anderson. *See Georgia*, 46 F.4th at 1308 (Anderson, J., concurring in part and dissenting in part).

3

U.S. 308, 318 (1999)). And the traditional scope of injunctive relief under that power was limited to what is necessary "to protect the interests of the parties." *Id.* For that reason, equitable remedies are limited to those "sufficient to redress" a party's "injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010) (holding a nationwide injunction inappropriate on this basis).

Here, party-specific relief is sufficient to redress Plaintiff's asserted injury. That injury was the claimed "chilling effect" flowing from Plaintiff's alleged fear that the challenged statute could be enforced against it. DE 30 at 11. But now the injunction prevents Defendant from enforcing the statute against Plaintiff. Applying the injunction to nonparties is thus "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Kentucky v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) ("Because an injunction limited to the parties can adequately protect the plaintiffs' interests while the case is pending disposition on the merits, the district court abused its discretion in extending the preliminary injunction's protection to non-part[ies].").

That analysis is unaltered by the fact that this is a case in which Plaintiff asserts that the statute exerts a chilling effect on the speech of parties not before the Court. Plaintiff's substantive constitutional theory does not control the scope of the permissible remedy. That is why the Supreme Court routinely limits remedies to the parties even when it accepts a party's First Amendment overbreadth claim premised on the chilling effects of a statute as applied to the speech of

nonparties. *See United States v. Nat'l Treas. Emps. Union,* 513 U.S. 454, 472, 477–78 (1995) (limiting relief to "the parties before the Court" in a successful overbreadth challenge because "we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants"); *United States v. Stevens,* 559 U.S. 460, 482–84 (2010) (Alito, J., dissenting) (preferring to vacate defendant's criminal conviction, rather than hold the statute defendant violated to be facially invalid, based on an overbreadth claim).

The Eleventh Circuit recently relied on those principles to stay pending appeal a universal injunction entered on First Amendment overbreadth grounds. In that case, the district court had preliminarily enjoined as unconstitutionally overbroad a provision of the Florida Constitution that, in the district court's view, injured two plaintiffs by precluding them from engaging in lobbying activities during their time in public office. *See Garcia v. Stillman*, No. 22-cv-24156, 2023 WL 2263609, at *4, *6 (S.D. Fla. Feb. 28, 2023). The district court's injunction applied universally, not just to those two plaintiffs. *See id.* at *12. The district court had also refused to grant Florida a partial stay pending appeal of the injunction to the extent it applied beyond those plaintiffs, reasoning that "an exception exists" to the principle that injunctive relief should be limited to the parties in cases involving "the chilling effects of overbroad statutes." *Garcia v. Stillman*, No. 22-cv-24156, 2023 WL 3478450, at *2 (S.D. Fla. May 16, 2023). A unanimous panel of the Eleventh Circuit—consisting of Judges Jill Pryor, Grant, and Luck—disagreed. The Court stayed the preliminary injunction to the extent it applied beyond those two

plaintiffs, reasoning that "the need to protect third parties" did not justify nonparty relief. *Garcia v. Exec. Dir., Fla. Comm'n on Ethics*, No. 23-10872 (11th Cir. June 5, 2023) (DE 33 at 2). The Court should do the same here.

### B.    The Remaining Stay Factors Favor Defendant

Defendant will suffer irreparable harm without a stay. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (alteration accepted) (citation omitted).

The "balance of harms" and the "public interest" both favor a stay as well. *Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020). If the injunction were not stayed, the State would suffer the sovereign harm of having one of its laws enjoined, and its children would lack the protection of the challenged statute against obscene adult live performances. Meanwhile, Plaintiff will suffer no harm whatsoever because Defendant does not ask the injunction to be stayed as it applies to Plaintiff, only as to nonparties.

As for the public interest, any plaintiff who wants to challenge the statute has the tools to do so. *Georgia*, 46 F.4th at 1306–07. The public interest is served by demanding that non-parties avail themselves of those tools: It "encourages multiple judges . . . to weigh in only after careful deliberation," whereas "universal injunctions tend to force judges into making rushed, high-stakes, low-information decisions." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020)

(Gorsuch, J., concurring); *see also Feds for Med. Freedom v. Biden*, 25 F.4th 354, 360 (5th Cir. 2022) (Higginson, J., dissenting).

## CONCLUSION

The preliminary injunction should be stayed pending appeal to apply only to Plaintiff.

## LOCAL RULE 3.01(g) CERTIFICATION

Consistent with Local Rule 3.01(g), counsel for Defendant has conferred with counsel for Plaintiff by telephone in a good-faith effort to resolve the issues raised in the motion. Plaintiff opposes the motion.

|  |  |
|---|---|
|  | Respectfully submitted, |
| June 28, 2023 | ASHLEY MOODY<br>ATTORNEY GENERAL |
|  | Henry C. Whitaker (FBN 1031175)<br>SOLICITOR GENERAL |
| Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida 32399-1050<br>(850) 414-3300<br>(850) 410-2672 (fax)<br>Nathan.Forrester@myfloridalegal.com | Jeffrey Paul DeSousa (FBN 110951)<br>CHIEF DEPUTY SOLICITOR GENERAL<br><br>*/s/ Nathan A. Forrester*<br>* Nathan A. Forrester (FBN 1045107)<br>SENIOR DEPUTY SOLICITOR GENERAL |
| *Counsel for Defendant* | *\* Lead Counsel* |

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2023, a true and correct copy of the forego-

ing was filed with the Court's CM/ECF system, which will provide service to all

parties.

*/s/ Nathan A. Forrester*
Senior Deputy Solicitor General

8

# DE35

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| HM FLORIDA-ORL, LLC,<br><br>  Plaintiff,<br><br>    v.<br><br>THE STATE OF FLORIDA; RON DESANTIS, in his official and individual capacity as Governor of Florida; and MELANIE GRIFFIN, in her official capacity as Secretary of the Department of Business and Professional Regulation, State of Florida,<br><br>  Defendants. | Case No. 6:23-cv-00950 |

### ANSWER

Defendant Melanie Griffin, in her official capacity as Secretary of the Florida Department of Business and Professional Regulation ("DBPR"), hereby answers the Verified Complaint for Injunctive Relief ("Complaint") (Doc. 1) as follows:

### I. NATURE OF THE ACTION

1. Admitted that Plaintiff purports to bring this action pursuant to 42 U.S.C. § 1983 and Amendments 1 and 14 of the United States Constitution.

### II. SUBJECT MATTER AND JURISDICTION

2. Admitted.

3. Admitted that venue is proper pursuant to 28 U.S.C. § 1391.

### III. THE PARTIES AND PERSONAL JURISDICTION

4. Admitted.

5.    Defendant DeSantis has been dismissed from this action (Doc. 26).

6.    Admitted.

7.    Defendant State of Florida has been dismissed from this action (Doc. 26).

8.    Admitted that Plaintiff chose in its complaint to refer to the three Defendants collectively as "the State," but two of those Defendants, including the State of Florida itself, have since dismissed from this action (Doc. 26).

### IV. FACTUAL ALLEGATIONS

9.    Upon information and belief, Paragraph 9 refers to three administrative complaints:

(a)    *DBPR v. R House, Inc.*, Case No. 2022-35976;

(b)    *DBPR v. HRM Owner, LLC*, Case No. 2022-5693; and

(c)    *DBPR v. Orlando Philharmonic Plaza Found., Inc.*, Case No. 2022-61146.

The administrative complaints in those cases have been filed in this case as Docs. 21-4, 21-5, and 21-6, respectively. They speak for themselves.

10.    Senate Bill 1438, approved by the Governor of Florida on May 17, 2023, and enacted as chapter 2023-94, Laws of Florida (Doc. 21-1), speaks for itself.

11.    Without knowledge; therefore denied.

12.    Admitted.

13.    Admitted.

App. 301

14.    Admitted that drag is not a new art form and has long been present in western culture.  Denied as to remainder of paragraph 14.

15.    Admitted.

16.    Without knowledge; therefore denied.

17.    Without knowledge; therefore denied.

18.    Without knowledge; therefore denied.

19.    Without knowledge; therefore denied.

20.    Without knowledge; therefore denied.

21.    Without knowledge; therefore denied.

22.    Without knowledge; therefore denied.

23.    The referenced reports speak for themselves.  Denied that they tell the full, accurate story.  Denied as to the remainder of paragraph 23.

24.    The referenced reports speak for themselves.  Denied that they tell the full, accurate story.  Denied as to the remainder of paragraph 24.

25.    The bill analyses for SB 1438 speak for themselves.[1]  Denied as to the remainder of paragraph 25.

26.    The various provisions of chapter 847, Florida Statutes, speak for themselves.

---

[1] According to the website of the Florida Senate, there were four bill analyses of SB 1438.  It is unclear to which analysis Plaintiff refers in paragraph 25.

3

27.     Section 509.261(10)(a), Florida Statutes, speaks for itself.  Admitted that DBPR has a duty to protect the public and is authorized to enforce section 509.261(10)(a).

## V. CAUSES OF ACTION

### COUNT 1 — VIOLATION OF 42 U.S.C. SECTION 1983 UNDER THE FIRST AMENDMENT

28.     Defendant realleges her responses to paragraphs 1–27 above as if fully set forth herein.

29.     Denied.

30.     Denied.

    a.     The cited case speaks for itself.

    b.     The cited case speaks for itself.

    c.     The cited case speaks for itself.  Denied as to the remainder of subparagraph c.

        1.     Denied.

        2.     Denied.

        3.     Denied.

        4.     The cited cases speak for themselves.  Denied as to the remainder of sub-subparagraph 4.

        5.     The cited case speaks for itself.  Denied as the remainder of sub-subparagraph 5.

        6.     Section 827.11(l)(a)1. speaks for itself.  Denied as to the remainder of sub-subparagraph 6.

4

       7.     Section 827.11(l)(a)2. speaks for itself.  Denied as to the remainder of sub-subparagraph 7.

       8.     Section 827.11(l)(b) speaks for itself.  Denied as to the remainder of sub-subparagraph 8.

       9.     Section 827.11(l)(a)3. speaks for itself.  Denied as to the remainder of sub-subparagraph 9.

       d.     The cited cases speak for themselves.  Denied as to the remainder of subparagraph d.

31.    The cited case speaks for itself.

32.    The cited decision from the Western District of Tennessee speaks for itself.

33.    The cited cases speak for themselves.

34.    The cited case speaks for itself.

35.    The cited case speaks for itself.  Denied as to the remainder of paragraph 35.

36.    The cited cases speak for themselves.

37.    Sections 509.261 and 827.11, Florida Statutes, and the cited decision from the Western District of Tennessee speak for themselves.

38.    Denied.

39.    Denied.

40.    The cited case speaks for itself.

41.    Denied.

42.   Denied.

43.   Without knowledge; therefore denied.

44.   The cited case speaks for itself.

45.   Denied.

### This Law Will Violate the Constitutional Rights of Plaintiff, HM FLORIDA-ORL, LLC

46.   Without knowledge as to what precisely concerns Plaintiff in this case; therefore denied.

47.   Without knowledge; therefore denied.

48.   Without knowledge; therefore denied.

49.   Without knowledge as to the cancellation of family drag shows. Denied as to the remainder of Paragraph 49.

50.   Denied.

51.   Denied.

52.   Denied.

53.   Denied.

54.   Denied.

### VI. PRAYER FOR RELIEF

1-5.   Denied that Plaintiff is entitled to the relief it seeks in this action.


**WHEREFORE,** Defendant respectfully requests that the Court deny relief to Plaintiff and enter judgment in her favor.

Respectfully submitted,

July 7, 2023                                ASHLEY MOODY
                                             ATTORNEY GENERAL

                                           Henry C. Whitaker (FBN 1031175)
                                             SOLICITOR GENERAL

                                           Jeffrey Paul DeSousa (FBN 110951)
                                             CHIEF DEPUTY SOLICITOR GENERAL

Office of the Attorney General             */s/ Nathan A. Forrester*
The Capitol, PL-01                         * Nathan A. Forrester (FBN 1045107)
Tallahassee, Florida 32399-1050              SENIOR DEPUTY SOLICITOR GENERAL
(850) 414-3300
(850) 410-2672 (fax)                       William H. Stafford III (FBN 70394)
Nathan.Forrester@myfloridalegal.com          SPECIAL COUNSEL

*Counsel for Defendants*                   * *Lead Counsel*

7

App. 306

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ Nathan A. Forrester
Senior Deputy Solicitor General

App. 307

# DE36

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| HM FLORIDA-ORL, LLC, | ) | |
| Plaintiff | ) | |
| v. | ) | Case No. 6:23-cv-00950 |
| THE STATE OF FLORIDA, | ) | |
| MELANIE GRIFFIN, in her | ) | |
| Official capacity as Secretary of THE | ) | |
| STATE DEPARTMENT OF BUSINESS | ) | |
| AND PROFESSIONAL REGULATION, | ) | |
| STATE OF FLORIDA, | ) | |
| | ) | |
| Defendant. | ) | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A PARTIAL STAY PENDING APPEAL OF PRELIMINARY INJUNCTION**

---

The Plaintiff, HM FLORIDA-ORL, LLC, by and through counsel, files its Response to

Defendant's Motion for a Partial Stay Pending Appeal of Preliminary Injunction (ECF 33):

### I.    <u>INTRODUCTION</u>

Defendant has moved this Court for a partial stay seeking to limit the scope of this Court's

injunction against Defendant's enforcement of §§ 255.70(1)-(3), 509.26(10), 561.29(1), and

827.11 ("the Act") against non-parties to this litigation. Defendant's argument is, in essence, that

because Plaintiff is proceeding as an individual and not as a class action, that this Court must limit

injunctive relief to protect *only* the interests of the Plaintiff and not that of non-parties. This Court

1

should reject the argument that restrictions on the speech of non-parties have no impact on the speech of the litigants themselves. Speech, art, and other expressive conduct are a conversation within our society. An art professor discussing Degas' ballerinas and their relationship to evolving views on the sexualization of children is in conversation with artists, academics, and the world at large, as well as the past, present, and future. But such conversations need not be so high-minded to be of public value and to have intrinsic relationships to each other.

Politicians attacking each other on social media are in conversation with each other and the public. A comedian satirizing such politicians as engaging in performative politics and using drag performers as props in their campaign advertising is likewise part of that public conversation, as are journalists reporting on such things.[1] Drag performers are no different. They engage in competition and conversation with each other in ways that radically impact our culture.[2] Defendant's blindered view of speech imagines expression in its most base form, as a commodity to be sold rather than a "'a free marketplace of ideas, a marketplace that provides access to 'social, political, esthetic, moral, and other ideas and experiences.'" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 583 (2011).

On May 17, 2023 Senate Bill 1438 was signed into law by Governor DeSantis, thereby enshrining the Act's prior restraints on speech into law. (see FN2.) The Act is performative and superfluous. As recognized by this Court in its Amended Order, Florida already has statutes that provide protection for children from obscene live performances. This Court determined that The Act was "specifically designed to suppress the speech of drag queen performers. (ECF 30 at

---

[1] https://www.orlandosentinel.com/2023/07/06/desantis-support-of-anti-gay-video-called-bad-strategy-worse-message/

[2] https://www.nytimes.com/2018/01/24/magazine/is-rupauls-drag-race-the-most-radical-show-on-tv.html

App. 310

PageID 429.) This Court granted Plaintiff's motion and entered a preliminary injunction against Defendant Melanie Griffin, in her official capacity as Secretary of Florida Department of Business and Professional Regulation, and enjoined her "from instituting, maintaining, or prosecuting any enforcement proceedings" "under statutes amended and created by SB 1423, Sections 255.70(1)-(3), 509.25(10), 561.29(1), and 827.11." (ECF 30 at PageID 453.)  This Court found The Act is unconstitutionally vague and overbroad, fails to survive strict scrutiny, is ambiguous, fails to show how the government used the least restrictive means available to achieve a compelling purpose, and punishes a substantial amount of protected free speech.  The harm to Plaintiff was determined to be irreparable, while granting the preliminary injunction would not harm the public interest. (ECF 30 *supra*.)

Defendant appealed this Court's preliminary injunction to the Eleventh Circuit Court of Appeals and moves this Court for a stay as to the prohibition on enforcement against non-parties only.

## II.       LAW AND ARGUMENT

Defendant argues that the preliminary injunction should not apply to anyone other than the parties to this case.  As support, Defendant alleges that "Plaintiff faces no credible threat of enforcement from the challenged statute, . . " (an odd argument considering the Defendant is not seeking a stay as to Plaintiff). She alleges that the preliminary injunction, as written, would permit nonparties who "may wish to expose children to live obscene performances in violation of the statute." (ECF 33 at PageID 493.) She also alleges that extending the preliminary injunction beyond Plaintiff "is beyond the Court's remedial authority." (Id.) Defendant cites little legal authority to support this position. Defendant's leading case is *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022), which does not support Defendant's contentions. (Id.

at PageID 495.) In *Georgia v. POTUS,* the Court addressed a *nationwide* injunction on the enforcement of a COVID vaccine mandate for federal contractors and states, a shockingly broad measure with *immediate* public health impacts during a global pandemic and public health emergency. *Id.* at 1304. The nuances of a suit regarding the application and executive authority under the Procurement Act are vast, complex, and totally inapposite in this case, but one central point is clear: The Eleventh Circuit <u>upheld</u> the nationwide injunction barring the federal government from considering a bidder's compliance with a contract due to the incidental effects on the parties. *Id.* at 1308. Courts do have power to impose preliminary injunctions that impact third parties, and most certainly do where the law is an unconstitutional infringement on speech. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004) (upholding preliminary injunction barring enforcement of the Child Online Protection Act nationwide).

Defendant also ignores the special nature of First Amendment cases. The "overbreadth doctrine allows plaintiffs 'to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (internal citations omitted). Such statutes are "totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1300 (11th Cir. 2017). Defendant cites *United States v. Nat'l Treasury Empls. Union*, 513 U.S. 454 (1995) for the proposition that, as a general rule, even where courts apply the overbreadth and chilling effect doctrines that relief should be narrowed only to the parties before the court. This is an odd case to cite for this proposition to be sure. *Nat'l Treasury Empls.* addressed a preliminary injunction

App. 312

barring enforcement of a federal ban on all executive branch employees of any grade or rank from accepting payment for writing or speaking engagements regardless of whether there was a nexus with their actual employment. *Id.* at 477. The injunction on appeal applied to "all executive branch employees below GS-16," and the Plaintiff sought its expansion to include all federal employees including nonparty senior officials. The Court reasoned that those individuals' positions of authority might be justified by a purpose distinct from the sweeping prohibition on lower-level employees. (*Id.*) Those officials had also received a 25% pay increase to offset the ban. (*Id.*) Thus, the governmental interest in such a ban on nonparty senior officials receiving payments which could obviously be graft disguised as "honoraria" warranted the restriction of the injunction to "all executive branch employees below GS-16." Presumably, this case was the best authority Defendant could find in the First Amendment context since her only other citation to fully-reasoned authority is to Justice Alito's dissenting opinion in *United States v. Stevens*, 559 U.S. 460 (2010). When a party is reduced to citing dissents, their case is weak.

The Defendant then cites to the Eleventh Circuit's unpublished opinion in *Garcia v. Exec. Dir. Fla. Comm'n on Ethics*, No. 23-10872 (11th Cir. June 5, 2023). This order may have seemed mana from heaven to Defendant appearing, as it did, a mere twenty-three (23) days before the filing of Defendant's motion, but the Defendant cannot rely upon this order to sustain its position. Page citations are not necessary for the one-page order (excluding caption), and quoting it in its entirety may be instructive as it will fit on the balance of this page:

> Defendants-Appellants' motion to stay, in part, the district court's preliminary injunction is GRANTED. Neither the need to protect third parties, see Georgia v. President of the United States, 46 F.4th 1283, 1306 (11th Cir. 2022), nor the statewide as opposed to nationwide coverage of the injunction, see Wolf v. Cook County, Illinois, 140 S. Ct. 681 (2020), warrants its broad application to every "public officer," as that term is defined in article 2, section 8(f)(1) of the Florida Constitution, as amended. The district court ruled that Rene Garcia and Javier Fernandez were the only public officials in the lawsuit who had standing to

challenge the constitutionality of article 2, section 8(f)(2) of the Florida Constitution ("In-Office Restrictions"). Accordingly, we stay that part of the preliminary injunction barring enforcement of the In-Office Restrictions against public officials other than Garcia and Fernandez.

Other than a cursory concern about standing, there is no analysis from which this Court could determine whether yet another case involving a prohibition on public officials being paid for private sector services – in this case lobbying services – is  in any way analogous to this case about the freedom of the public at large to engage in free, artistic expression without discrimination based on their viewpoint or gender and without reasonable notice of what expressive conduct is even prohibited.

As this Court has determined that The Act is likely unconstitutional, it makes no sense that the statute should be enforced in other parts of Orange County, Florida. The same response applies to Defendant's argument about the "chilling effect" of the statute, but even more so because drag, as an art form, is frequently commentary on and a reflection of the broader social conversation, including other drag performances. In a related vein, it is hard to imagine how drag performers themselves would not feel compelled to Disneyfy their performances generally, being unsure where and how this law applied. Plaintiff is a Hamburger Mary's franchisee, and other franchises exist within Orange County and Florida more broadly that host drag performances. How is a performer to be sure whether they are performing at the *one* Hamburger Mary's that is protected from enforcement of the Act? Thus, the free expression of Plaintiff's performers and, thus, Plaintiff is chilled. Defendant essentially behaves as though Plaintiff is asserting its right not to lose its liquor license. It is not. Plaintiff is asserting its right to be free from prior restraints on speech, and muting every other party to the broader artistic conversation inherently limits Plaintiff's speech.

Defendant's argument that "applying the injunction to nonparties is 'more burdensome to the defendant than necessary to provide complete relief to the plaintiffs'" is unaccompanied by

any explanation of what this burden is. (ECF 33 at PageID 495.) Without any citation whatsoever, Defendant states that it will suffer "the sovereign harm of having one of its laws enjoined." "Sovereign harms" are infringements on a state's interest "in its 'exercise of sovereign power over individuals and entities within the relevant jurisdiction,' which "involves the power to create and enforce a legal code.'" *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 268 (4th Cir. 2011). But while such an interest may confer standing, it does not automatically demonstrate immediate and irreparable harm, and here Defendant has put forward no evidence or argument that it would suffer harm, merely an *ipse dixit*. Butas this Court noted, Florida already has laws that protect children from the types of harm that Defendant flippantly asserts that the Act abjures. (ECF 30 at PageID 453.)

Defendant then claims that by restricting injunctive relief that this Court will compel other plaintiffs to bring suit and "encourage multiple judges to weigh in" on the issue and that this is an inherent good. This is not so much a statement of actual public interest as it is a discussion fit for a law school seminar. For this proposition Defendant cites Justice Gorsuch's concurrence in a shadow docket opinion about administrative rulemaking in the immigration context and the dissenting opinion to a Fifth Circuit interlocutory order denying a stay in yet another COVID-19 vaccine litigation case. *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *Feds for Med. Freedom v. Biden*, 25 F.4th 354, 360 (5th Cir. 2022) (Higginson, J., dissenting). The Court need not take this argument seriously.

### III.   <u>CONCLUSION</u>

An attack on the fundamental right to free expression is an attack on society itself and implicates Plaintiff's interests beyond a mere liquor license. Defendant fails to articulate any way

App. 315

in which she or the State of Florida will be harmed by the injunctive relief presently in place. For

these reasons, this Court should DENY Defendant's motion.

Respectfully submitted,

*/s/ Brice M. Timmons*
Brice M. Timmons, Esq. *Pro Hac Vice*
Melissa J. Stewart, Esq. *Pro Hac Vice*
DONATI LAW, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
brice@donatilaw.com

Gary S. Israel, Esq. 270709
121 S. Orange Avenue, Suite 1500
Orlando, Florida 32801
407 210-3834
attorneyisrael@hotmail.com
gsi55@hotmail.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been
served upon all parties to this action via the court's ECF filing system this 10th day of June 2023.

*/s/ Brice M. Timmons*

8

App. 316

# DE41

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

HM FLORIDA-ORL, LLC,

          Plaintiff,

v.                                                    Case No:   6:23-cv-950-GAP-LHP

MELANIE GRIFFIN,

          Defendant

_____

## ORDER

This cause is before the Court for consideration without oral argument on Defendant's Motion for Partial Stay (Doc. 33) and Plaintiff's Response in Opposition thereto (Doc. 36).

## I.    Background

Florida Governor Ron DeSantis signed Senate Bill 1438 (the "Act") into law on May 17, 2023. *See* 2023 Fla. Laws ch. 2023-94. The Act created a new statute[1]—Fla. Stat. § 827.11—prohibiting any person from knowingly admitting a child to an "adult live performance." Plaintiff HM Florida-ORL, LLC ("Plaintiff"), which

_____

[1] The Act also amended three existing laws. *See* 2023 Fla. Laws ch. 2023-94; *see also* Fla. Stat. §§ 255.70(1)-(3), 509.26(10), and 561.29(1).

frequently presents drag show performances at its Hamburger Mary's Restaurant and Bar in Orlando, brought suit under 42 U.S.C. § 1983, alleging that the Act "seeks to explicitly restrict, or chill speech and expression protected by the First Amendment based on its content, its message, and its messenger." Doc. 1, ¶ 50.

On June 24, 2023, the Court entered its Amended Order granting Plaintiff's Motion for Preliminary Injunction, finding it likely that the Act could not survive strict scrutiny because it did not employ sufficient narrowly tailored means to further the state's compelling interest in protecting minors from obscene performances. Doc. 30 at 16-20. The Court also found it likely that the language of the Act, which included terms like "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts," was unconstitutionally vague and overbroad on its face. *Id.* at 20-24; *see also* Fla. Stat. § 827.11(1)(a). In its Order, the Court enjoined Defendant Melanie Griffin ("Defendant"), "in her official capacity as Secretary of the Florida Department of Business and Professional Regulation [("DBPR")]…from instituting, maintaining, or prosecuting any enforcement proceedings under the Act." Doc. 30 at 25. In other words, the Court temporarily enjoined Defendant's enforcement of a facially unconstitutional statute. *Id.*

By her motion, Defendant seeks to neuter the Court's injunction, restricting her enforcement only as to Plaintiff and leaving every other Floridian exposed to the chilling effect of this facially unconstitutional statute. *See* Doc. 33 at 1.

- 2 -

## II.   Legal Standard

The Court may stay an injunction pending appeal to secure the opposing party's rights. Fed R. Civ. P. 62(d).[2] "In the case of a non-money judgment, whether a stay is warranted under Rule 62(d) depends upon: (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Venus Lines Agency v. CVG Industria Venezolana de Aluminio, C.A.*, 210 F.3d 1309, 1313-14 (11th Cir. 2000) (internal quotations omitted). "Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal." *Honeyfund.com, Inc. v. DeSantis*, No. 4:22-cv-227-MW/MAF, 2022 WL 3486962, at *15 (N.D. Fla. 2022).

## III.   Analysis

### A.  Likelihood of Success[3]

---

[2] Appellate procedural rules ordinarily require parties to move for a stay in the district court before doing so in the appellate court. Fed. R. App. P. 8(a)(1).

[3] The Court notes at the outset that there is scant precedent addressing Defendant's argument seeking to limit the injunction only to her enforcement against the Plaintiff. The body of case law cited by Defendant primarily analyzes the appropriate scope of injunctive relief in the distinct contexts of nationwide injunctions, *see, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166 (2010), and those affecting private parties which do not involve facially unconstitutional violations of the First Amendment, *see, e.g.*, *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond*

First, the Court considers whether Defendant "has made a strong showing that [she] is likely to succeed on the merits" of her motion to stay the injunction as to non-parties. *Venus Lines Agency*, 210 F.3d at 1313. Injunctive relief is generally restricted to the "extent necessary to protect the interests of the parties" and "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (quoting *Kenner v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) and *Gill v. Whitford*, 138 S.Ct. 1916, 1931 (2018)). "The scope of injunctive relief is dictated by the extent of the violation established." *Georgia*, 46 F.4th at 1306 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

The Court has found that the Act likely "imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack." *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 967-68 (1984). A statute subject to facial attack is likewise susceptible to facial enjoinment. *See Califano*, 442 U.S. at 702. This is especially so in the First Amendment overbreadth context because plaintiffs "are

_____

*Fund, Inc.*, 527 U.S. 308, 318 (1999).

- 4 -

App. 321

permitted to challenge a statute not [only] because their own rights of free expression are violated, but because…the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

Defendant argues that the Court does not have the authority to protect the constitutional rights of non-parties to this suit. Doc. 33 at 2. Apart from a distinguishable unpublished decision, however, she does not point to any precedent where a court has restricted a preliminary injunction of such a broadly applicable, facially invalid restriction on First Amendment speech to only the plaintiff(s). *See id*. at 3-6. This Act, unlike those in most of the cases cited by Defendant, has not merely been adjudged likely unconstitutional in a limited range of applications, and therefore capable of mitigation. *See, e.g.*, *Secretary of State of Md.*, 467 U.S. at 964-65. Rather, it was found likely to be unconstitutional on its face. *See* Doc. 30 at 15-16.

Plaintiff is not the only party suffering injury as a result of the passage of the Act; it has a chilling effect on all members of society who fall within its reach. Therefore, enjoining Defendant's enforcement of the statute against any party is the appropriate remedy. *See Broadrick*, 413 U.S. at 613 ("The consequence of our departure from traditional rules of standing in the First Amendment area is that *any enforcement of a statute thus placed at issue is totally forbidden* until and unless a limiting

App. 322

construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.") (emphasis added).

In support of her argument to the contrary, Defendant contends that the Eleventh Circuit is "both weary and wary" of "universal" injunctions but cites primarily to cases invalidating nationwide injunctions on limited classes of persons. *See* Doc. 33 at 3; *see also, e.g., Georgia*, 46 F.4th at 1307-08. As the Court has previously explained, its injunction is neither nationwide, nor does it pertain only to a limited class of individuals. *See* Doc. 30 at 25. Defendant's citations to dicta in cases where the Eleventh Circuit discussed various district courts' perceived abuses of nationwide injunctions are simply inapposite. *See, e.g.*, Doc. 33 at 3 (citing *Georgia*, 46 F.4th at 1303 (focusing on the scope of the federal Procurement Act and how it pertained to a limited class of federal contractors) and *U.S. v. National Treasury Emp. Union*, 513 U.S. 454, 457 (1995) (analyzing a challenge to a federal ban on accepting compensation for public engagements brought by federal executive branch employees)). The parties and issues in the cases Defendant cites bear no resemblance to the instant dispute.

Defendant also cites to *Garcia et al v. Executive Dir., Fla. Comm'n on Ethics*, No. 23-10872, ECF No. 33 (11th Cir. June 5, 2023). However, *Garcia* is an unpublished decision and, as such, is not entitled to precedential effect. *Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016) ("In this Court, unpublished

decisions, with or without opinion, are not precedential and they bind no one.")
(citing 11th Cir. R. 36-2 and collecting cases). That proposition is especially acute in
*Garcia*, which contains no substantive analysis.[4] *Garcia,* slip op. at 1. Not only is
*Garcia* unentitled to precedential effect, but it, too, deals only with a limited universe
of potential plaintiffs: public officers. *Id.* The district court in that case had already
adjudged some plaintiffs to have standing while others did not, further
distinguishing the instant matter. *Id.* Although *Garcia* involved a First Amendment
challenge based on overbreadth, the ban on lobbying by elected officials does not
impact the vast majority of Floridians. *See* Complaint for Preliminary and
Permanent Injunctions and Declaratory Judgment at 2, *Garcia et al v. Stillman et al*,
No. 1:22-cv-24156-BB (S.D. Fla. December 21, 2022).

The Act here is not cabined to a limited, discrete class of people like the public
officials in *Garcia,* or the federal contractors in *Georgia*. *See id.*; *Georgia,* 46 F.4th at
1289. To limit Defendant's enforcement of the Act only to Plaintiff would subject
everyone else in Florida to the chilling effect of a facially unconstitutional statute.
Consequently, a statewide injunction which includes non-parties accords with "the

_____

[4] Like its own opinion, one of the two cases relied upon by the Eleventh Circuit contains
no analysis whatsoever from which this Court might extract any substantive guidance. *See Garcia*,
slip op. at 1 (citing *Wolf v. Cook Cnty., Ill.*, 140 S.Ct. 681(2020)).

extent of the violation established." *See Georgia*, 46 F.4th at 1303. Thus, Defendant is not likely to succeed on the merits of her Motion for Partial Stay.

   B. *Remaining Factors*

   **1. Irreparable Injury**

   The other factors also weigh against Defendant's motion. First, Defendant has presented no evidence or compelling argument that she will suffer irreparable harm. *See* Doc. 33 at 6. Instead, she baldly proclaims that Florida "suffers a form of irreparable injury" any time it is enjoined from enforcing one of its statutes. *See id.* (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)) (emphasis added). In *Maryland*, however, the Supreme Court's statement was supported by evidence of ongoing, concrete harm to law enforcement and public safety.[5] 567 U.S. at 1303. Defendant has presented no such support here. *See* Doc. 33 at 6. Her position that the state suffers irreparable harm any time it is enjoined from enforcing one of its statutes defies common sense and is not supported by any meaningful precedent. *Cf. Ex Parte Young*, 209 U.S. 123, 155-56 (1908) ("[I]ndividuals who, as officers of the

---

   [5] The original quotation comes from a case approving the stay of an injunction which enjoined enforcement of a California law requiring auto dealers to give notice to their competitors when relocating or building new dealerships on Fourteenth Amendment due process grounds. *New Motor Vehicle Bd. of California v. Orrin W. Fox. Co.*, 434 U.S. 1345, 1347-48 (1977). The quotation lies at the end of a paragraph describing the ongoing and concrete harm California suffered from being prohibited from regulating new auto dealerships, and is qualified by the opening clause omitted from Defendant's citation: "It seems to me that…" *Id.* at 1351. Again, this case is inapposite here.

state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten…to enforce against parties affected an unconstitutional act…may be enjoined by a Federal court of equity from such action."); *see also Green v. Mansour*, 474 U.S. 64, 68 (1985) ("*Young* also held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent continuing violation of federal law.").

### 2. Balance of Harms

The balance of harms weighs heavily in favor of protecting Floridians from this unconstitutional statute. On one hand, for the other interested parties—*i.e.*, all Floridians—"[t]here is a potential for extraordinary harm and a serious chill upon protected speech." *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 671 (2004). Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparably injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Conversely, the harm to Defendant if her motion is denied is minimal. She complains that the "portion of the injunction that applies to nonparties threatens Florida," but constitutionally valid statutes already exist to further the state's compelling interest in protecting minors from exposure to obscene exhibitions. *See* Doc. 33 at 2; *see also Ashcroft*, 542 U.S. at 670-71 ("[I]f the injunction is upheld, the Government in the interim can enforce obscenity laws already on the books."). For

instance, Fla. Stat. § 847.013 prohibits the exposure of minors to obscene "motion pictures, exhibitions, shows, presentations, or representations."

Moreover, inconsistencies between the Act and statutes like Fla. Stat. § 847.013(3)(c)—which allows minors to view films that include obscene content with parental consent—further undercut Defendant's cries of harm. *See also* Fla. Stat. § 1014 *et seq* (the "Parents' Bill of Rights," which reserves the right of parents to direct the moral upbringing of their children). She slyly argues that any potential parties experiencing a chill "have the tools" to challenge the statute in their own right, yet the Supreme Court has long recognized that, "[w]here a prosecution is a likely possibility…speakers may self-censor rather than risk the perils of trial." *Ashcroft*, 542 U.S. at 670-71; *see also Broadrick*, 413 U.S. at 612. Defendant's suggestion that any other harmed parties should bear the cost and delay of litigating their free speech rights simply does not comport with First Amendment principles. All of these harms weigh heavily in favor of protecting non-parties from enforcement of this unconstitutional statute.

### 3. Public Interest

Protecting the right to freedom of speech is the epitome of acting in the public interest. It is no accident that this freedom is enshrined in the *First* Amendment. This injunction protects Plaintiff's interests, but because the statute is facially unconstitutional, the injunction necessarily must extend to protect all Floridians.

" '[T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn.' Error in marking that line exacts an extraordinary cost." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000) (quoting *Speiser v. Randall*, 357 U.S. 513, 525 (1958)). Any prejudice suffered by Defendant here is *de minimis* and does not warrant risking the dangerous exposure of the public's interest in free speech to that "extraordinary cost." *See id.* Therefore, the public interest is best served by preserving this Court's injunction enjoining Defendant's enforcement of the Act against any party.

### IV.   Conclusion

Accordingly, it is **ORDERED** that Defendant's motion for partial stay is hereby **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on July 19, 2023.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

# DE47

1

1          UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
2                ORLANDO DIVISION

3

4    . . . . . . . . . . . . . . . . . . :
                                         :
5    HM FLORIDA-ORL, LLC,                :
                                         :
6              Plaintiff,                :
     vs.                                 : Case Number
7                                        : 6:23-CV-950-GAP-LHP
                                         :
8    RON DeSANTIS, MELANIE GRIFFIN,      :
     and STATE OF FLORIDA,               :
9                                        :
               Defendants.               :
10   . . . . . . . . . . . . . . . . . ..:

11

12          TUESDAY, JUNE 6, 2023; 1:30 P.M.
                      MOTION HEARING
13      BEFORE THE HONORABLE GREGORY A. PRESNELL
               UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   COUNSEL FOR PLAINTIFF,
       Brice Timmons, Esq.
17     Melissa Stewart, Esq.
       Gary Israel, Esq.
18       (by phone)

19

20   COUNSEL FOR DEFENDANTS:
       Nathan Forrester, Esq.
       Jeffrey DeSousa, Esq.
21     Daniel Bell, Esq.

22

23   Official Court Reporter:
       K. Stanford
24   _____
     Proceedings recorded by mechanical stenography.
25    Transcript produced by computer-aided transcription.

2

1              P R O C E E D I N G S

2              THE COURT:  Good afternoon, everyone.

3              Be seated, please.  Okay, Anita.  Call the case.

4              THE COURTROOM DEPUTY:  This is in the matter of

5     HM Florida-ORL, LLC versus Ron DeSantis, Melanie Griffin, and

6     the State of Florida, Case number 6:23-Civil-950-GAP-LHP.

7              Will counsel please state your name for the record.

8              MR. TIMMONS:  Brice Timmons, B-r-i-c-e

9     T-i-m-m-o-n-s, representing the plaintiffs.

10             MS. STEWART:  Melissa Stewart, M-e-l-i-s-s-a

11    S-t-e-w-a-r-t, representing the plaintiffs.

12             THE COURT:  Okay.  And I think Mr. Israel is on the

13    phone, correct?

14             THE COURTROOM DEPUTY:  Yes, sir.

15             THE COURT:  Okay.  And for the defendants?

16             MR. FORRESTER:  Nathan Forrester, N-a-t-h-a-n

17    F-o-r-r-e-s-t-e-r, for the defendants.

18             THE COURT:  Okay.

19             MR. DeSOUSA:  Jeffrey DeSousa, D-e-S-o-u-s-a.

20             MR. BELL:  And Daniel Bell for the defendants.

21             THE COURT:  Okay.  All right.

22             Well, some housekeeping matters before we begin.

23             We're here, obviously, on the motion for a temporary

24    injunction filed by the plaintiff.  And in their response,

25    defendants raised a motion to dismiss.

3

1          And so because of that, I gave the plaintiffs an

2     opportunity to respond to that in writing.

3          So technically, today's hearing is just on the

4     motion for temporary injunction, although there are obvious

5     issues that are common to both.

6          I didn't put a time limit in my order noticing this

7     hearing.  I would think 40 minutes should be adequate.  If you

8     think you need more time than that, just let me know, but

9     let's try to do it in 40 minutes per side.  And if the

10    plaintiff wants to reserve five or ten minutes for rebuttal,

11    that will be fine.

12         Also a housekeeping matter, there's an issue of the

13    propriety of including the governor and the State as

14    defendants.

15         Are plaintiffs willing to concede that they ought

16    not to be parties to this?

17         MR. TIMMONS:  We are, Your Honor.

18         THE COURT:  Okay.  So --

19         MR. TIMMONS:  We think Ms. Griffin is the proper

20    defendant.

21         THE COURT:  Okay.  Thank you.

22         And I assume the defendants agree that Ms. Griffin

23    is an appropriate defendant, correct?

24         MR. FORRESTER:  Yes, Your Honor.

25         THE COURT:  Okay.  All right.

4

1          Well, let me go ahead and entertain argument, then.

2          I'll begin with plaintiffs, and we'll go from there.

3          MR. TIMMONS:  Your Honor, we would like to reserve

4     ten minutes for rebuttal.

5          THE COURT:  Okay.

6          MR. TIMMONS:  Thank you, Your Honor.

7          My name, again, is Brice Timmons.  And I appreciate

8     the Court indulging us with pro hac vice admission.

9          Ms. Stewart and I are from Memphis, Tennessee, but

10    we've been asked to come down and represent the plaintiff in

11    this matter, HM Florida-ORL, LLC.

12         THE COURT:  Were you involved in the Friends of

13    George case?

14         MR. TIMMONS:  We were the -- yes, Your Honor.  We

15    were lead counsel.

16         THE COURT:  Okay.  You have a judge up there who

17    likes to write long opinions.  Don't expect that from me.

18         MR. TIMMONS:  Judge Parker is usually pretty

19    succinct, but 70 pages is -- that was impressive.  He also

20    made us go to trial in 58 days from filing.  So that was --

21         THE COURT:  I'm going to give you 60.

22    [Light laughter.]

23         MR. TIMMONS:  I appreciate that.

24         But that has allowed us -- Ms. Stewart and I have

25    been pretty deep in this case law for a while now, and so

App. 333

5

1   we're pretty familiar with the standards in both -- both the

2   Supreme Court standards and the Eleventh Circuit.

3           The Eleventh Circuit is not a circuit with a great

4   breadth of obscenity case law, but the standards at issue here

5   really are all set by Supreme Court precedent.  There's very

6   little need to drill down further.

7           I do want to first address the issue of standing.

8   The State has raised -- and even though Ms. Griffin is the

9   proper defendant, I will probably continue to refer to the

10  State as the State.

11          The State has raised concerns about whether

12  Hamburger Mary's is an appropriate plaintiff in this matter,

13  specifically because at present, Hamburger Mary's is

14  particularly careful not to violate this statute.  We don't

15  really know what the statute means, and we'll get to that in a

16  moment.  But the -- the question is whether Hamburger Mary's

17  engages in conduct that could arguably fall within the

18  statute's reach.  And that is from the Susan B. Anthony

19  Foundation case that's cited in our brief.

20          THE COURT:  Mr. Timmons, let me help you.  I really

21  don't have much concern about the standing issue.

22          MR. TIMMONS:  All right.  Let's move on.

23          THE COURT:  If, after you hear from the State, you

24  think you need some rebuttal time on that, I'll be happy to

25  hear it, but --

6

1          MR. TIMMONS:  Okay.  Well, let's move on, then.

2          The statute is vague and overbroad in three ways

3    that specifically affect Hamburger Mary's.  And

4    HM Florida-ORL, LLC, does business as Hamburger Mary's, and I

5    will refer to them that way because it's a lot easier.

6          The statute permits the Division of Professional

7    Regulations to revoke the licensure of any business that

8    permits children to attend what they call an adult live

9    performance.  Adult live performance is defined in a way that

10   is largely extremely specific and consistent with

11   constitutional standards.  However --

12          THE COURT:  Constitutional standards for obscenity.

13          MR. TIMMONS:  For obscenity.  However --

14          THE COURT:  What about lewd conduct?  Is there any

15   definition of that in Florida?

16          MR. TIMMONS:  You nailed it, Your Honor.  There is

17   no definition of lewd conduct in Florida.  There is no

18   definition of lewd conduct within the Eleventh Circuit.

19   There is no definition of lewd conduct that we've been able to

20   find in Florida state case law.

21          There is -- the term "lewd conduct" has never been

22   utilized by the Supreme Court in my lifetime and certainly is

23   not permissible as a term for defining regulable speech within

24   the bounds of Ashcroft versus ACLU or Reno versus ACLU, the

25   critical cases involving the protection of minors from

7

1    inappropriate material.

2           Also, there's no definition of lewd exposure of

3    prosthetic or imitation genitals or breasts.  And I really

4    want to talk about that one, because the statute does not

5    appear to target drag performers specifically.  However, that

6    language right there -- lewd exposure of prosthetic or

7    imitation genitals or breasts -- belies the statute's real

8    purpose, which is to target drag performers.

9           We know that's true because Governor DeSantis went

10   on television yesterday and said it.  He said, There is no

11   such thing as a harmless drag show, when referencing this

12   legislation.  But the text of the legislation is the more

13   important place to look and where the Court should ground its

14   decision to grant the preliminary injunction.

15          It should -- the Court should look to the issue of

16   lewd exposure of prosthetic or imitation genitals or breasts

17   to know who it's targeting, because there are two categories

18   of people in the world who wear prosthetic breasts.  They are

19   people who have undergone a mastectomy and drag performers.

20          And I think the Court can safely infer that the

21   Florida legislature was not attempting to target women who had

22   undergone a mastectomy when they drafted a statute about adult

23   live performances.  There's only one category of performer

24   that wears prosthetic breasts.

25          And, again, what does lewd exposure mean?

8

1              Is that showing some cleavage?

2              You know, in most statutes that govern these types

3    of performances, like strip club regulations, there will be

4    very detailed, specific language about the number of inches

5    below or, you know, the -- the areola that a top can --

6              THE COURT:  Well, I think Florida's general

7    obscenity statute has all those requirements, right?

8              MR. TIMMONS:  It does, Your Honor.  It absolutely

9    does.  And you will note also that Florida's obscenity statute

10   does not contain the words "lewd conduct" or "lewd exposure."

11   Those were added specifically to this statute, and they

12   enabled the State to target drag performers because of their

13   vagueness.

14             We know that the State has, in fact, targeted drag

15   performers.  We know that police were present undercover at a

16   drag performance entitled -- it was a Christmas drag show.

17             We know that the --

18             THE COURT:  Was that the one here in Orlando?

19             MR. TIMMONS:  I believe so, Your Honor.  Let me

20   confirm.

21             THE COURT:  Yeah, the Plaza Live.

22        (Brief pause in proceedings.)

23             MR. TIMMONS:  Yes, Your Honor.  That was here in

24   Orlando.

25             These drag performers were surveilled, targeted, and

9

1    a police report was ultimately written that said that they

2    didn't do anything illegal.  And yet the department -- or,

3    rather, the Division of Professional Regulations still

4    targeted them for the revocation of a liquor license.  This

5    has happened to another -- another venue as well.

6            So we know that law enforcement are interpreting

7    that language, lewd conduct, to mean drag performances.  We

8    know that the governor's said it out loud.  We know that it is

9    vague enough that it can certainly encompass anything that a

10   law enforcement officer believes subjectively to violate their

11   moral standards.  And we know that that's going to be used

12   against businesses, specifically LGBT-friendly businesses like

13   Hamburger Mary's that actively present drag performances.

14           This is a question that parents should answer:

15   Should my children go to a drag show?  What is the level of

16   appropriate -- you know, what's the appropriate level of

17   conduct for my child to see?  Those are things that parents

18   should figure out, not the State.

19           The third portion of the law that is problematic is

20   the provision about the age of the minor present.

21           Specifically -- let me get the exact quote again.

22   The statute requires the venue to ensure that the performance

23   is appropriate for the age of the minor present.

24           Now, that specific provision is problematic under

25   Reno versus ACLU and Ashcroft versus ACLU, but the best

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 10 of 50 PageID 586
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 122 of 185

10

1   analysis of that type of provision is found at ACLU versus

2   Mukasey, which is actually Ashcroft -- it's the Ashcroft case

3   on remand to the Third Circuit.  And in the Mukasey analysis,

4   the Third Circuit explicitly discusses this sort of moving

5   target age-range framework.

6           What the court said in that case -- and the Supreme

7   Court seems to have at least tacitly endorsed this result.

8   The court upheld the preliminary injunction in that case.

9   That was the Ashcroft versus ACLU opinion.  And the same

10  reasoning was found -- it was reiterated in the Mukasey

11  opinion and certiorari was denied after the Mukasey court

12  followed its own precedent and the Supreme Court's

13  instructions on remand and upheld the permanent injunction

14  against the Child Online Protection Act.

15          The court took specific issue with a definition of

16  minor that was essentially subjective, that it could -- that

17  minor could mean anything.  And when you talk about community

18  standards, as this statute does, the community standards for

19  what content is appropriate for a five-year-old and a

20  17-year-old are very different things.

21          So when you give law enforcement officers this power

22  to decide what is and isn't appropriate for minors, and

23  especially when you specifically tell them for the age of the

24  minor present, they get to make a lot of subjective decisions

25  of what they think is appropriate for any given age group to

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 11 of 50 PageID 587
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 123 of 185

11

1   see.

2        That gives businesses no guidance on what they can

3   and cannot do.  And it's completely inconsistent with the Reno

4   decision's requirement that Congress -- or the legislature in

5   this case -- not reduce all speech that is fit for the mailbox

6   to what is fit for the sandbox.

7        It requires businesses to essentially turn all of

8   their performances into performances that are appropriate for

9   kindergartners.  And the First Amendment simply does not

10  permit that.  The Supreme Court has reiterated it in Reno and

11  in Ashcroft, and then the McKenzie court in the Third Circuit

12  did a detailed analysis that I would encourage the Court to

13  take a look at.

14       Honestly, Your Honor, I had gotten up here planning

15  to spend ten minutes talking about standing issues, and if the

16  Court doesn't have concerns about that --

17       THE COURT:  Well, you can go ahead and summarize

18  your argument for me.  It may help.  I just -- I tend to be

19  one of these people up here that tell you what's on my mind.

20  So --

21       MR. TIMMONS:  Well, no.  I appreciate it.  I just

22  don't want to waste the Court's time.

23       THE COURT:  You're not wasting my time.

24       MR. TIMMONS:  Okay.  The standing argument simply is

25  that Hamburger Mary's has already had to self-censor.

12

1          They have taken shows that used to be 18 -- that

2     used to be all ages -- these are not shows where children were

3     encouraged to attend, but parents would bring their kids

4     because they wanted to go out and have fun and they wanted to

5     bring their kids with them -- and they've turned all the shows

6     except for Sunday shows into 18 and up.  And those Sunday

7     shows are now literally things like spoofs on the Lion King

8     and other G-rated, you know, Disney-type movies.  I think

9     they're doing Les Mis next week.

10          But Hamburger Mary's has been forced to self-censor.

11     They are directly impacted by this law, and they have a

12     reasonable concern that there's a credible threat of

13     enforcement based on Florida's -- the Department of

14     Professional Regulations' recent conduct.

15          THE COURT:  So there is -- their speech has been

16     chilled, as they would say.

17          MR. TIMMONS:  Their speech has been chilled, but I

18     would say that they -- it's more than just the chilling

19     effect.  This law is specifically targeted at the kind of

20     speech that drag performers typically engage in and is being

21     used to -- is actually being used against venues where drag

22     shows take place.  So they face a specific credible threat of

23     enforcement.  The standard is only that their speech, the

24     speech being put on at their performances, must arguably fall

25     within the bounds of the statute.

13

1          Lewd conduct is so generalized a term that it scoops

2    up a tremendous amount of speech and places them at a real

3    risk of enforcement of a criminal statute with heavy fines and

4    the revocation of the licenses necessary to operate their

5    business.

6          THE COURT:  Let me ask you your view about -- and

7    you mentioned it just a minute ago -- the legislative history.

8          As you know, courts are somewhat reluctant to put a

9    whole lot of confidence in legislative history because it's so

10   broad and difficult to discern.  But I notice Judge Parker

11   spent a lot of time in his opinion dealing with the

12   legislative history of the Tennessee Act.  And then you just

13   mentioned something Governor DeSantis said yesterday?

14          MR. TIMMONS:  Yes, Your Honor.

15          THE COURT:  What did he say yesterday?

16          MR. TIMMONS:  He gave a speech yesterday.

17          THE COURT:  I can't keep up with all his speeches.

18   See, that's the problem.

19          MR. TIMMONS:  I just found out about this.  So let

20   me see if I've got it here.

21          Melissa, would you send me that?

22      (Brief pause.)

23          That's it, Your Honor.

24          While Ms. Stewart pulls that up, I do want to be

25   clear.  We aren't basing any of our argument in the external

14

1   comments of political leadership.  I think it's important that

2   we -- let's not lie to ourselves or pretend that the legal

3   fiction is true, that this is not -- this statute wasn't

4   specifically targeted at drag queens.  The legislators passing

5   the law all said it.  Governor DeSantis has said it.  It's

6   very clear what they meant to do.  However, that's not where

7   the Court should ground the opinion.  You're right, Judge

8   Parker did undergo a lengthy analysis of the legislative

9   history.

10          Oddly enough, it's an analysis that Ms. Stewart and

11   I did not spend a great deal of time arguing, because we were

12   much more concerned with the text of the statute in question

13   and comparing it to other obscenity laws or other public

14   indecency laws in the State of Tennessee.  You could see very

15   clearly what the legislature was trying to do by just

16   comparing the statutes to existing statutes on the books, and

17   it's the same here.

18          Lewd conduct doesn't appear in any of these other

19   Florida obscenity statutes in a meaningful -- you know, it is

20   not a term that is defined anywhere in Florida law.  It's --

21   the statute is just designed to broaden the sweep of what

22   Florida law enforcement officers can do in their discretion to

23   arrest or shut down businesses or effect fines on those

24   businesses.

25          By the time -- even if the Court were to adopt an

15

1   as-applied challenge here or to prefer an as-applied

2   challenge, the harm will already have been done to any

3   business by the time a court is reviewing that -- those cases

4   because there are criminal penalties to this law.  Enforcement

5   can begin with an arrest.  Once that happens, the harm is

6   already done.

7           THE COURT:  Let me ask you about that.

8           It occurred to me that if an injunction is granted,

9   I would enjoin Ms. Griffin from using the department's

10  resources to fine or revoke a license.

11          But what about the state attorney in Orange County

12  bringing a misdemeanor charge against Hamburger Mary's.

13          How do I -- how do you deal with that?  Do I need

14  to enjoin the state attorney or the attorney general?

15          MR. TIMMONS:  I think you need to enjoin the

16  attorney general, Your Honor.

17          THE COURT:  Well, maybe the State's lawyers can help

18  me on that.  So --

19          MR. TIMMONS:  Understood.

20          Also, in order to determine that the statute

21  warrants injunctive relief, the Court functionally has to

22  grant declaratory relief first, finding that the statute is

23  unconstitutional.

24          THE COURT:  Sure.

25          MR. TIMMONS:  And I would like to believe that we

16

1    live in a place where law enforcement officers follow the

2    dictates of federal judges.

3              We -- certainly, that's not always been the case

4    throughout history, but as a general rule, I find that when

5    federal judges declare laws unconstitutional, law enforcement

6    officers don't spend a lot of resources on enforcing

7    unconstitutional laws.

8              THE COURT:  Well, that's hopefully still true.

9              MR. TIMMONS:  I hope it's still true.

10             Your Honor, honestly, I think that gets to the bulk

11   of my concerns with the statute.  And unless the Court has any

12   questions, I think I'll let the State tell you why I'm wrong.

13             THE COURT:  That's fine.  I appreciate you coming

14   down here from Memphis and appreciate your thoughts, and I'll

15   recognize you for rebuttal.

16             MR. TIMMONS:  Thank you, Your Honor.

17             THE COURT:  Okay.  Mr. Forrester.

18             MR. FORRESTER:  Your Honor, may I have a second to

19   confer with --

20             THE COURT:  Sure.

21        (Pause in proceedings.)

22             MR. FORRESTER:  Thank you, Your Honor.  And may it

23   please the Court.

24             My name is Nathan Forrester.  I represent the three

25   defendants in this case.  With me are my co-counsel,

17

1    Jeffrey DeSousa and Daniel Bell.

2           The plaintiff in this case, which I will just

3    abbreviate as HM, has brought a facial challenge to the

4    constitutionality of Florida's recently enacted Protection of

5    Children Act, and this Act makes it a misdemeanor to knowingly

6    admit a child to an adult live performance.

7           An adult live performance is defined as a sexually

8    explicit show -- and I'm condensing slightly here -- that the

9    adult community of the state would consider patently offensive

10   for the age of the child present.  And my opposing counsel

11   made something of the -- that phrase, for the age of the child

12   present, which I will come to in a second.

13          Our position, of course, is that this statute is

14   entirely constitutional because it tracks language that the

15   Supreme Court and the Eleventh Circuit have held

16   constitutional in other cases in which a state was seeking

17   through legislation to protect children from exposure to

18   activity or material that is obscene for the child; not

19   necessarily for adults, but for the child.

20          THE COURT:  Let me see if I can understand this.

21   Your briefing seems to switch from what I think is the issue

22   in this case, that is, a new standard that is -- I mean, if we

23   look at it, 827.11, as you know, defines adult live

24   performance meaning a show, exhibition, et cetera, that

25   depicts, simulates nudity or sexual conduct as defined in

18

1    847.001, which is Florida's obscenity statute.  So I read that

2    as not doing anything except reaffirming what is already in

3    the Florida statutes.

4           But then it goes further and says, sort of out of

5    the blue, lewd conduct.  And then it goes even a further step

6    by referencing the lewd conduct as the exposure of prosthetic

7    or imitation genitals or breasts, which seems to me to be a

8    brand-new standard, to the extent it is a standard, of lewd

9    conduct that applies to someone wearing a prosthetic breast,

10   I suppose, for -- as a drag person.

11          And then in your briefing, you keep going back to

12   the obscenity standard.  We're not dealing with an obscenity

13   case here.  We're dealing with a new statute that talks about

14   lewd conduct, including lewd exposure of a prosthetic or

15   imitation female breast.  So your reference to obscenity in

16   your briefing, as well as, I think, where you're starting to

17   go now, seems to me to be sort of not dealing with -- with the

18   elephant in the room.

19          MR. FORRESTER:  I understand what Your Honor is

20   saying.  I think there are two parts to your question --

21          THE COURT:  Okay.

22          MR. FORRESTER:  -- and I'll try to start with the

23   latter part first.

24          We would, with respect, dispute that this is not

25   about obscenity, because the list of activities that you just

19

1    read out are still modified and narrowed by the three-part

2    obscenity test that derives from cases like Ginsberg v.

3    New York and --

4         THE COURT:  I agree with you.  I agree.  I think

5    what you're doing here is trying to tie the term "lewd" into

6    the standard recognized for obscenity.

7         MR. FORRESTER:  "Lewd" is being narrowed by the

8    terms that define what is obscene so that really what is being

9    proscribed here is what is obscene for the age of the child

10   present.  So it is still something that is obscene for that

11   child.

12        THE COURT:  So it's your position that "lewd" falls

13   within the same definition of what would be obscene if it's

14   not appropriate for the particular age of that child?

15        MR. FORRESTER:  Yeah.  It is circumscribed by that

16   three-part test, which is critical to determining that a

17   particular activity is obscene under the Supreme Court's and

18   the Eleventh Circuit's case law here.

19        THE COURT:  So what the statute really does, then,

20   is make the obscenity standard applicable to someone wearing a

21   prosthetic breast.

22        MR. FORRESTER:  If it is done in a --

23        THE COURT:  I just said that.  If it's done -- if it

24   falls within one of these obscene standards.  The State of

25   Florida wants to make clear that something obscene by a drag

1    queen is illegal in Florida as if it was done by anybody else.

2               MR. FORRESTER:  Well, it's not necessarily just a

3    drag queen.  It is lewd exposure of prosthetic or imitation

4    genitals or breasts.  I mean, that could be done by anybody.

5    And lewd conduct is actually a word -- a phrase that is

6    also -- it does have a definition in Florida law.  It's a --

7               THE COURT:  It does?  Where?

8               MR. FORRESTER:  It's a phrase that appears

9    throughout Florida statutes.

10              THE COURT:  Where is it?  I've never seen it.

11              MR. FORRESTER:  There's a statute that -- several

12   statutes that prohibit lewd and lascivious conduct.  One of

13   them is discussed in this 1973 Florida Supreme Court case

14   called -- or 1971 Florida Supreme Court case called

15   Chesebrough, which we cite in our brief.  And it includes a

16   definition of lewd in there.

17              THE COURT:  Well, okay.  But there's no statutory

18   definition of it, right?

19              MR. FORRESTER:  Not in -- not in this particular

20   statute, no.  There is another lewd conduct statute that

21   includes a definition, but for this one, no, there is not a

22   definition.

23              But it is a term that has -- as the Florida Supreme

24   Court put it in Chesebrough, is a word in common use and it

25   connotes wicked, lustful, unchaste, licentious, or sensual

21

1    design on the part of the perpetrator.

2            So it does -- that comes -- the court talked in that

3    case about how lewdness or open and public indecency were

4    offenses even at common law.  It brings with it this entire

5    common law gloss of what the word "lewd" means.

6            And I would submit it's no more vague than the words

7    that are in the actual Miller test which have been imported

8    into the Florida statute, like prurient, shameful, or morbid,

9    and that those, obviously, have been approved by the courts.

10           The obscenity standards can only, you know, be

11   precise to a certain point in describing that the line here is

12   obviously a somewhat ineffable line that, you know,

13   Potter Stewart famously called difficult to discern; I would

14   know it when I see it.  But that is -- it's endemic to

15   obscenity, in general.  It's not unique to the Florida statute

16   in this respect.  So we do believe that this is about what is

17   obscene for the child.  Again, not necessarily for the adult,

18   but for the child.

19           THE COURT:  Let's talk about the vagueness in terms

20   of age appropriateness.

21           Would you agree that some things that would be

22   obscene, inappropriate, or lewd with respect to a six-year-old

23   would not be for a 16-year-old?

24           MR. FORRESTER:  Yes, Your Honor.  And that's

25   precisely why this statute has it keyed to the age of the

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 22 of 50 PageID 598
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 134 of 185

22

1    child present.  It actually addresses the concern from the

2    ACLU v. Ashcroft and ACLU v. Mukasey cases that opposing

3    counsel raised about what might be appropriate for a

4    17-year-old might not be appropriate for a five-year-old.

5          At it does is it actually prohibits the admission of

6    a child to the performance based on the age of that child.

7    And I would emphasize here, it doesn't prevent the performance

8    from happening, and it doesn't prevent adults from attending

9    the performance.  And it may very well be the case that the

10   kind of performance at issue would be one that 17-year-olds,

11   16-year-olds, 12-year-olds could attend, but not a five- or a

12   six-year-old.

13         THE COURT:  But you have the State of Florida making

14   that subjective -- that's such a subjective decision.  How is

15   anybody going to risk their liquor license by taking that

16   chance?

17         MR. FORRESTER:  Well, the Supreme Court in Ginsberg

18   upheld the harmful to minors test there that was actually

19   based on what was inappropriate for minors as a category,

20   which is, obviously, broader than one that is keyed to the age

21   of the child present.

22         And actually, in the Eleventh Circuit case American

23   Booksellers v. Webb, they said, We would interpret that, the

24   word "minors," to mean a reasonable 17-year-old.

25         And all that Florida has done in this case is said,

23

1   We're just going to now make it so that the prohibition here

2   on admission of the child is just simply keyed to the age of

3   the child.  We're no longer going to make it based on what

4   would be obscene for minors, which would then effectively be a

5   definition keyed to the reasonable 17-year-old.

6          THE COURT:  Let me ask you this.  Why does Florida

7   need this statute?  Doesn't Florida already have laws that

8   would prohibit everything we've been talking about today?

9          MR. FORRESTER:  It's not totally clear, Your Honor.

10   There is -- some of these -- some of the other statutes come

11   with requirements that the activity in question be done for

12   consideration.  Some have -- actually just enumerate specific

13   categories of sexual activity.

14          This brings together in one place and it does so

15   with a very tightly-tailored obscenity standard that is

16   designed to ensure compliance with the obscenity standards

17   that have been approved by the Supreme Court and Eleventh

18   Circuit.

19          It actually, in a very real sense, addresses

20   vagueness concerns that could otherwise arise from application

21   of statutes like nuisance and disorderly conduct to conduct of

22   this nature.

23          THE COURT:  What's the status of your case against

24   the Plaza Live?

25          MR. FORRESTER:  I'm sorry, Your Honor?

24

1          THE COURT:  The Secretary is seeking to revoke the

2  liquor license of the Plaza Live Foundation here, right?

3          MR. FORRESTER:  Oh.  I'm actually not sure,

4  Your Honor.  I don't know where that is.  We attached the

5  administrative complaint, but I don't know what the status of

6  it is.

7          THE COURT:  Well, I'm just -- I'm curious, because,

8  I mean, they're going after a license revocation and they're

9  not using this statute.  They're using another statutory

10  framework to do that, right?

11          MR. FORRESTER:  That was actually a point I wanted

12  to make.  These other complaints were brought under actually

13  different statutes than this one.  This one has not yet been

14  enforced, so -- and I would also point out that in the

15  investigations to which opposing counsel has referred, in some

16  cases they went and looked at drag clubs and determined that

17  they were not engaged in any problematic conduct under Florida

18  law.

19          So they're not just targeting drag clubs even in

20  that enforcement under a different statute.  They're looking

21  specifically for sexually explicit conduct.  And that's a bit

22  of a shorthand, I know, for the terms of these other statutes,

23  but that's the same thing that this statute does here.

24          On its face, it is simply making it unlawful to

25  admit a child to a sexually explicit performance meeting the

1     obscenity standard that would be inappropriate for the age of

2     that child present.  And in so doing, it is, again, not

3     prohibiting any speech by adults.  These adult live

4     performances could continue to go on.  It's not prohibiting

5     adults from having access to these performances.  They could

6     continue to attend.  It is only barring the admission of the

7     child.

8            THE COURT:  Well, it would bar a parent from

9     bringing a child that he thinks is age appropriate, right?

10           MR. FORRESTER:  Yes, it would.

11           THE COURT:  Does that square with the Florida

12    Parental Rights Act?

13           MR. FORRESTER:  In what way, Your Honor?  I'm --

14           THE COURT:  Telling the parent what the State thinks

15    is age appropriate for their child in terms of a drag show.

16           MR. FORRESTER:  Well, there are times when, you

17    know, the State, in the exercise of its police power, can

18    determine that something is inappropriate even for a parent

19    to, you know, allow a child to do or to do to a child.  That

20    sounds like a suggestion of perhaps -- actually, like a Fifth

21    Amendment substantive due process parental right to direct the

22    upbringing of the children claim.  That's not one that --

23           THE COURT:  No.  I'm talking about Florida's

24    parental rights statute.

25           MR. FORRESTER:  I'd have to go and look at what that

26

1    says specifically, Your Honor, in order to address that.

2              THE COURT:  I've got it up here somewhere.

3         (Brief pause.)

4              Parents' Bill of Rights, Chapter 101.4.

5              It raises another interesting issue.  You say this

6    doesn't have to be for compensation to be illegal, right?

7              MR. FORRESTER:  Right.

8              THE COURT:  So if on Father's Day a father went out

9    in the backyard for his Father's Day party dressed as -- in

10   female garb, he could be at risk of violating the statute if

11   he did anything that might suggest something sexual?

12             MR. FORRESTER:  It would have to be a show,

13   exhibition, or other presentation in front of a live audience.

14             THE COURT:  Yeah.  What's a live audience?  That's

15   another good question.  Does it take more than one person?

16   What's a live audience?

17             MR. FORRESTER:  Yeah.  I imagine at least one,

18   Your Honor.

19             Those are questions of interpretation that do remain

20   to be determined in the way we apply the law.

21             THE COURT:  Well, there are also questions of

22   vagueness and overbreadth of a statute, I think.

23             MR. FORRESTER:  Yeah, I just continue to think that

24   to say that this statute is vague in any respect is to suggest

25   that statutes like were upheld in Miller and Ginsberg and in

27

1    American Booksellers v. Webb also suffer from the same

2    infirmity.  They also use general phrases to describe both the

3    category of conduct that was of concern.  And then the

4    familiar three-part test for Miller that defines whether --

5    when that kind of conduct actually qualifies as obscene and

6    uses phrases like prurient, shameful, morbid.  You know, those

7    obviously come with a certain imprecision, but that's just

8    inherent in the nature of -- the standards of this nature.

9            I, again, just do not think the Florida statute here

10   is unique in this respect.  I think it represents a very

11   good-faith effort on the part of the State to tailor the

12   prohibition in this statute as closely as possible to what is

13   proscribable under these -- in these cases.

14           THE COURT:  With respect to these standards,

15   something that's patently offensive to prevailing standards in

16   the adult community of the state as a whole, how would a judge

17   go about determining that?

18           MR. FORRESTER:  I didn't quite hear, Your Honor.

19           I apologize.

20           THE COURT:  Sometimes I don't speak into the mic.

21           Part of the standard, the obscenity standard, is

22   something that's patently, which means obviously, offensive to

23   prevailing standards in the adult community of the state as a

24   whole with respect to what is suitable material for the age of

25   the child.

28

1        And I'm sitting up here thinking, How in the world

2   would I -- if I were trying a criminal case -- would I know

3   where that line is?  Am I in Key West or am I in Jacksonville?

4   Am I in Miami Beach or am I in Pensacola?

5        MR. FORRESTER:  I understand the concern,

6   Your Honor.

7        I believe in the America Booksellers v. Webb case,

8   they said that the first two of the three prongs of the Miller

9   test that was used in a modified form in the Georgia statute

10  in that case would assess prurience and patent offensiveness

11  by what the average member of that -- of the adult community

12  would consider it to be.

13        THE COURT:  Which is?

14        MR. FORRESTER:  And that would be the measure

15  that --

16        THE COURT:  But that would require a very

17  sophisticated statistical survey, I would think.

18        MR. FORRESTER:  Well, there's an element of judgment

19  inevitably involved in this.  I mean, I can't deny that.

20        But again, it just is endemic to statutes of this

21  nature.  The Florida statute is not unique in this respect.

22  You could take issue with nearly every obscenity statute that

23  has been passed in the wake of the Supreme Court decisions

24  from the '60s and '70s --

25        THE COURT:  I'm not trying to do that.

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 29 of 50 PageID 605
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 141 of 185

29

1          MR. FORRESTER:  -- on grounds like these.

2          THE COURT:  Okay.  Well, I'm sorry.  I didn't mean

3    to interrupt you.  I just -- I had these concerns and so I

4    thought I would --

5          MR. FORRESTER:  No.  I appreciate it, Your Honor.

6    It's helpful to focus the argument.

7          I would like to address standing, although it does

8    -- it sounds like Your Honor is skeptical of our standing

9    argument, but we do believe there is a serious standing

10   problem here.

11         THE COURT:  Okay.  Go for it.

12         MR. FORRESTER:  Opposing counsel correctly stated

13   what the applicable standard is under Driehaus.  There has to

14   be -- the plaintiff has to allege conduct that is at least --

15   or state an intention to engage in conduct that is at least

16   arguably proscribed by the statute.  And that does set a

17   bound.  You can't concoct an implausibly expansive

18   interpretation of the statute, say that that applies to your

19   conduct, then use that to bootstrap yourself into standing.

20         And in the way the plaintiff seems to characterize

21   the statute in this case as giving rise to their alleged

22   injury, in fact, is that it would have the effect of barring

23   even shows like I Love Lucy or Milton Berle comedy sketches.

24   And that is simply not the case.  That is not even an arguable

25   reading of the statute.

30

1          This is true even if they're invoking the

2     overbreadth standing doctrine, because the Eleventh Circuit

3     has made clear that to invoke the overbreadth standing

4     doctrine, you still have to point to an injury of your own.

5     It may arise from an entirely constitutional application of

6     the statute to you, but you have to show the statute applies

7     to you and would restrict your conduct.

8          And everything that they say in their complaint

9     indicates that nothing they do here would violate this

10    conduct -- violate this statute.  They insist that the

11    performances they host feature, quote, no lewd activity.

12    They evidently are able to determine what lewd means enough

13    to assert that they're not doing it.

14          No sexually explicit shows.  No disorderly conduct.

15    No public exposure.  No obscene exhibition or anything

16    inappropriate for a child to see.  And they say that if

17    entertainment were to cross a line and then become unsuitable

18    for a child, they would bar children from attending.  So they

19    profess an intention to steer well, well clear of any

20    violation of the Act.

21          And there's also a traceability and a redressability

22    concern with allowing such an implausibly expansive reading of

23    the statute to give rise to standing, because effectively what

24    they're saying is, We've chosen to take something of a

25    prophylactic approach to steer very, very far clear from

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 31 of 50 PageID 607
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 143 of 185

31

 1    violating the statute, and then they are faulting the

 2    defendants for that.

 3            But there's nothing that defendants can do about

 4    that kind of decision.  That is their prerogative, and that's

 5    their right.  But it has to stem from at least an arguable

 6    reading of the statute that would make the conduct that they

 7    profess to engage in arguably proscribed.  And we just don't

 8    see any way on the basis of the allegations in their verified

 9    complaint that what they're saying is even arguably

10    proscribed.

11            THE COURT:  Okay.

12            MR. FORRESTER:  And as for -- and the same goes for

13    the argument of standing based on chill.  In a recent this

14    recent Equality Florida case, the Northern District of Florida

15    said, You can't demonstrate standing merely by announcing a

16    chill.  You must show that the challenged law arguably forbids

17    the chilled speech.  And --

18            THE COURT:  What case was that you're referring to?

19            MR. FORRESTER:  Equality Florida versus Florida

20    State Board of Education is a decision from 2022 in the

21    Northern District of Florida.  We cite it in our brief.

22            THE COURT:  Okay.

23            MR. FORRESTER:  And it's true that in the case that

24    opposing counsel cited, Driehaus -- Susan B. Anthony List

25    v. Driehaus -- the Supreme Court did allow standing to a

Case 6:23-cv-00950-GAP-LHP    Document 47    Filed 08/15/23    Page 32 of 50 PageID 608
USCA11 Case: 23-12160    Document: 32-2    Date Filed: 12/01/2023    Page: 144 of 185

32

1    plaintiff who -- whose asserted injury was that they were

2    inhibited from making certain political statements because of

3    enforcement proceedings brought against other -- other

4    parties.  But the Court was clear, though, that the reason was

5    that the plaintiff had alleged an intent to engage in the same

6    speech.

7            And based on the statements in HM's verified

8    complaint, the performances that they say that are typical of

9    their venue, they're nothing like the performances that are

10   described in the administrative complaints, which we've

11   attached to the response for that reason.

12           There are other First Amendment issues that they

13   have raised.  I don't know if Your Honor wants me to go into

14   it, because Your Honor seems chiefly to be concerned with

15   content neutrality, overbreadth, and vagueness.  But they have

16   suggested, at least, that the Act is imbued with a viewpoint

17   discriminatory purpose, although they seem to be retreating

18   from that somewhat now by saying they're really not asking the

19   Court to look into legislative history.

20           But I do want to point out, the Eleventh Circuit has

21   taken a very dim view of the use of isolated lawmaker

22   statements to suggest a purpose to an otherwise

23   facially-neutral statute.  It has basically said, We

24   understand that a content-based purpose can be a basis for

25   invalidating a law, but you can't discern that by just picking

33

1    and choosing from legislative history.

2             And basically you have to engage in what is -- what

3    I gather from those cases is sort of a traditional analysis

4    of what the statute means from text structure.  And it may be

5    legislative history, you know, considered as a whole, but not

6    isolated statements of lawmakers.

7             And then finally, they also suggest that what really

8    is up here is an intent to target speakers based on their

9    identity, basically drag performers.  And that was a concern

10   that did come up in the Friend of George's case out of

11   Tennessee, which did actually have a list of the kinds of

12   performers that were subject to the prohibition there.

13            This statute doesn't have any such list.  It just

14   prohibits adult live performances.  It doesn't matter who is

15   performing it.  And we -- you know, we suggested, you know,

16   one example, a strip club risque patriotic performance that,

17   you know, is put on for service members or something like

18   that.  By its very operative effect, it is not targeting the

19   identity of any particular speakers.

20            THE COURT:  Well, my concern is it does that by

21   adding this lewd exposure of a prosthetic breast.  That, to

22   me, is specifically targeting something, a person wearing a

23   prosthetic breast, which, to me, is either a female who

24   medically requires one or someone performing in drag.

25            MR. FORRESTER:  But it has to be lewd, which, as

34

1    I've pointed out, does have a content that Florida law --

2              THE COURT:  I understand that.

3              MR. FORRESTER:  And it still has to satisfy the

4    three-part obscenity test.  So it's not just any --

5              THE COURT:  No, I understand that.  But there's no

6    question to me that this targets a drag performance and puts

7    them on notice that they are now subject to these standards.

8              MR. FORRESTER:  I would, you know, respectfully

9    disagree and say it may cover drag performances but it's by no

10   means limited to drag performances.

11             THE COURT:  Who else would it cover?

12             MR. FORRESTER:  Anybody who would, you know, choose

13   to wear prosthetic genitalia, I suppose, and do so in a way

14   that was, you know, in the face of a child at a particular

15   establishment.  I mean, it doesn't have to be somebody who is

16   of a particular sexual orientation, particular sexual

17   identity.  It doesn't have to be someone who identifies as

18   male or female.  I mean, it could be anybody.

19             It would be -- I mean, it's hard for me to

20   hypothesize what -- you know, circumstances in the world would

21   lead somebody to do that, but it's certainly possible.  And it

22   falls within a rationale which is itself viewpoint neutral,

23   which is based on the concern that that's just not the kind of

24   thing to do in the presence of a child.

25             THE COURT:  Okay.

1          MR. FORRESTER:  And unless Your Honor has further

2    questions along these lines, I would be happy to --

3          THE COURT:  I think they have some suggestions for

4    you.

5       (Pause in proceedings; confers with co-counsel.)

6          MR. FORRESTER:  I'm not going to pretend like this

7    thought came from me when it came from my co-counsel, but he

8    wanted -- suggested, I think cogently, that I point out that,

9    of course, the lewd exposure of prosthetic genitalia is only

10   part of a larger category of proscribed conduct, including the

11   sexual conduct that is defined specifically by statute.

12          And all it is doing, when the statute is read as a

13   whole, is ensuring that drag performances are not excluded,

14   that they are included but it is not, by no means, targeting

15   because it's making clear that if they do that, that they

16   might be within the proscription of the earlier statutes.

17          THE COURT:  Okay.

18          MR. FORRESTER:  Your Honor also raised a question

19   about the state attorneys or the attorney general.  They're

20   simply not defendants here so --

21          THE COURT:  I understand, but -- I'll deal with that

22   later if need be.

23          MR. FORRESTER:  Okay.  As a matter of -- there's a

24   lot of case law to indicate that the attorney general is not

25   the officer in Florida charged with enforcing statutes of this

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 36 of 50 PageID 612
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 148 of 185

36

1    nature.  It is the state attorney.

2             I was going to make an argument as to why the

3    governor didn't fall within Ex Parte Young.  That's been

4    mooted by Your Honor's introductory remarks.  But that would

5    also apply to the attorney general.  I think the attorney

6    general is not the one specifically who has the direct

7    connection to enforcement of the statute.  So it wouldn't be

8    appropriate, at the very minimum, to include the attorney

9    general in any such injunction.  But in any event, neither the

10   attorney general nor the state attorney is a defendant to this

11   case, like was the case in the Friend of George's case.

12             THE COURT:  And I understand.

13             Well, I think Mr. Timmons commented on that, that an

14   injunction by a federal judge ruling a particular statute

15   unconstitutional, I don't know many state attorneys would try

16   to bring a lawsuit until that was overturned.  So I suspect

17   that's not a real concern.

18             MR. FORRESTER:  Okay.  Well, thank you, Your Honor.

19             THE COURT:  Okay.  Thank you, sir.  I appreciate you

20   coming down.

21             MR. TIMMONS:  Thank you, Your Honor.

22             I do want to -- just so everybody is clear, we may

23   amend to add the state attorney as a defendant.

24             Ms. Stewart and I were brought on to this case a

25   little bit late in the game and originally were asked just to

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 37 of 50 PageID 613
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 149 of 185

37

1    do some back office work.  Mr. Israel, the attorney who was to

2    be lead counsel, had a medical condition that caused him to

3    have to have surgery on short notice, and he asked us to take

4    over completely.

5          As a result of that, we may make some decisions to

6    amend and add additional defendants.  But, obviously, that's

7    not before the Court right now.  And I don't expect my

8    opposing counsel to have to argue against things that we might

9    do in the future.

10         I want to address this obscenity -- this so-called

11   obscenity standard that's built into the statute.  I've heard

12   this referred to as a modified Miller test or a Miller for

13   minors.  It's not an obscenity standard.

14         It looks a lot like the obscenity standards set out

15   in Miller, but it isn't, because it changes the standard that

16   Miller sets forth and adds the term "for minors" to it.  That

17   renders the statute intrinsically a content-based regulation,

18   because it pulls that definition back from the line of pure

19   obscenity, which is unprotected speech, and moves it into the

20   realm of speech that is protected, that is at least

21   permissible for adults to engage in.

22         Now, the State certainly has a compelling

23   governmental interest in protecting children, no question

24   about that.  But any content-based speech regulation must be

25   narrowly tailored to achieve that compelling governmental

1    interest in order to survive strict scrutiny.

2           My co-counsel referred to this statute as requiring

3    an element of judgment and suffering from an inherent level of

4    interpretation that he described as endemic to statutes of

5    this nature.  It's endemic to statutes of this nature

6    because -- and you see this in a lot of different states',

7    you know, obscenity for minors laws, like display statutes

8    relating to pornography and things like that.

9           You will see states attempt to just insert the

10   Miller test as it's laid out in Miller and then add the word

11   "for minors," and then say, Okay, law enforcement can enforce

12   -- can stop any conduct or any speech that falls into this

13   category of what lawyers frequently term obscenity for minors.

14          That's not how Miller is supposed to work.  Miller

15   proscribes conduct, clearly defined conduct.  It doesn't say

16   you can just cut and paste the language from Miller and say,

17   Any conduct that falls into this category.

18          Miller is meant to be applied to statutes, not on a

19   case-by-case basis to an individual's speech.  That gives law

20   enforcement officers too much of that element of judgment such

21   that they can do anything we -- that they want.

22          My opposing counsel, respectfully, struggled

23   somewhat to give Your Honor a definition of lewd that could

24   mean anything.  The term "wicked" popped up.  You know, what

25   is wicked conduct?  You know, I think we all might have an

39

1   idea, but I think all of our ideas probably vary somewhat.

2          This is, again, really the sort of thing that

3   parents are supposed to deal with.  In fact, Your Honor

4   brought up the Florida Parental Rights statute.  That bill of

5   rights contains a right to direct the upbringing and the moral

6   or religious training of his or her minor child.  So Florida

7   clearly contemplates that that type of moral decision-making

8   belongs to parents, not to the State.

9          Let's see here.

10      (Brief pause.)

11          Let me go back just a moment to the discussion of

12   why Miller is supposed to apply to statutes that clearly

13   define proscribed conduct.  Reno versus ACLU, that's a 1997

14   Supreme Court case that addressed the CDA, the Communications

15   Decency Act, and struck down provisions of that law.

16          The court said, The second prong of the Miller test,

17   the purportedly analogous standard, contains a critical

18   requirement that is omitted from the CDA that the proscribed

19   material be specifically defined by the applicable state law.

20   This requirement reduces the vagueness inherent in the

21   open-ended term "patently offensive," as used in the CDA.

22   Moreover, the Miller definition is limited to sexual conduct,

23   whereas the CDA also extends to include -- so on and so forth.

24   That's not really the issue here.

25          But the Reno court clearly understood that the

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 40 of 50 PageID 616
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 152 of 185

40

1   Miller test was not to be handed out as an open-ended tool for

2   law enforcement to use to proscribe whatever conduct they

3   deemed patently offensive or, here, lewd, but is to be used by

4   courts to determine the validity of statutes that proscribe

5   specific conduct with particularity.

6          My opposing counsel described our construction of

7   the statute as implausibly expansive.  It appears that it's --

8   the very fact that we're having this discussion and that

9   it's -- that the conduct that we're talking about is not

10  clearly and specifically defined, it gives law enforcement the

11  ability to make whatever expansive definition of lewdness they

12  wish to.

13         My opposing counsel mentioned -- and I don't know

14  where this came from -- sketches like Milton Berle or I Love

15  Lucy.  Hamburger Mary's, to be very clear, has two separate

16  categories of performances.  There are 18 and up shows now.

17  As a result of this statute, there are shows that are 18 and

18  up, which are probably appropriate for older minor children.

19  They are certainly not appropriate for five-year-olds.

20         This law requires Hamburger Mary's to either make

21  those performances 18 and up or to assume that every minor

22  that comes into -- that anybody coming into the establishment

23  might be a young minor, because they've got to make those

24  performance decisions in advance.

25         If a parent comes in the door with their

1    five-year-old, does Hamburger Mary's have to stop all the

2    performances and make sure that they're now tailored to

3    children?  The real answer is, No, they just have to become an

4    18 and up establishment to do drag performances.

5              And when they did that -- as put out in paragraph 43

6    of our verified complaint, when they did that, they lost

7    20 percent of their bookings.  They lost 20 percent of their

8    bookings for the next show.

9              It shouldn't be incumbent on businesses to inquire

10   into the age of every single person who comes into their

11   establishment and then try to guess at what Floridians as a

12   whole think is appropriate for a five-year-old, a

13   ten-year-old, a 16-year-old, what have you.

14             When a statute is subject to strict scrutiny under

15   the First Amendment, it is not incumbent on the plaintiff to

16   prove that the statute is not narrowly tailored.  It is

17   incumbent on the defendant to prove that the statute is

18   narrowly tailored.  That's their burden to prove.

19             And the defendant has put forward no argument as to

20   why the statute is narrowly tailored.  Instead, the defendant

21   has ignored questions like, Why is there not a parental

22   consent affirmative defense?

23             That type of defense existed in the CDA,

24   Communications Decency Act.  It existed in COPA, the

25   Children's Online Protection Act.  Both of those statutes were

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 42 of 50 PageID 618
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 154 of 185

42

1    struck down even though they did contain certain affirmative

2    defenses, specifically including one for parental consent.

3          The State relies heavily on the Ginsberg opinion.

4    I'd note that Ginsberg, while not having been explicitly

5    overturned, pre-dates the Miller case and, thus, the Miller

6    test.  It pre-dates Reno.  It pre-dates Ashcroft.

7          Every single case addressing these issues of

8    obscenity and the protection of children from indecent

9    material is post-Ginsberg and essentially modifies the

10   Ginsberg standard.  Yes, states have a valid interest in

11   protecting minors from indecent material, but they have to do

12   so in a narrowly-tailored fashion.  And that's what every

13   post-Ginsberg case says.

14         Opposing counsel referenced a 1971 Florida Supreme

15   Court case that appeared to place some definition on lewdness.

16   I'd note, again, that pre-dates Miller.  It pre-dates

17   Ginsberg.  It pre-dates Ginsberg, pre-dates Miller,

18   pre-dates every other case referenced.  So a Florida Supreme

19   Court case from 1971 that does not even apply those modern

20   standards is probably not of very much utility.

21         The question of parental rights should also be taken

22   into account by the Court when dealing with the issue of

23   narrow tailoring.  The State should have included, if they

24   were going to try to -- first, they should have included a

25   definition of lewd conduct.  They should have been very clear

1    about what they meant.

2            Second, they should have included affirmative

3    defenses for parental consent.  They did include an

4    affirmative defense for the ignorance of a child's age.

5    However, they didn't do so in a way that actually protects --

6    I'm sorry.  It included a knowing requirement, a mens rea

7    requirement as to the child's age, but then included a

8    prohibition on using a person's ignorance of a child's age, a

9    child's misrepresentation of his or her age, or a bona fide

10   belief of a child's consent may not be raised as a defense in

11   a prosecution for a violation of this section.

12           That puts businesses in an awfully awkward position.

13   They have to not only -- they have to guess at the ages of

14   every single person who comes in, and they can't even argue

15   that somebody provided a fake ID or something to that effect.

16           If we, as attorneys, cannot agree today on a

17   definition of lewd conduct or lewd exhibition that gives

18   meaningful guidance on how a court should interpret the

19   statute, it is absolutely implausible that we could rely on

20   law enforcement officers who have high school or maybe some

21   level of college education to interpret this statute in a way

22   that is even-handed, fair, and conforms to the First

23   Amendment's requirement of narrow tailoring whenever a

24   content-based regulation impacts free speech.  And if the

25   Court does not have any questions, I'll conclude.

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 44 of 50 PageID 620
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 156 of 185

44

1        THE COURT:  No.  I don't think so.  Thank you, sir.

2        MR. TIMMONS:  Thank you, Your Honor.

3        THE COURT:  Mr. Forrester, I'll give you the final

4    few minutes if you need them.

5        MR. FORRESTER:  Thank you, Your Honor.

6        THE COURT:  You know, one thing Mr. Timmons just

7    mentioned is interesting.  Florida Statute 847.013, which

8    would apply to letting minors into an R-rated movie, for

9    example, or any other sort of presentation that contains

10   obscenity, as a parental -- it says, The paragraph does not

11   apply to a minor when the minor is accompanied by his or her

12   parents.  So there -- Florida already recognizes that with

13   respect to one aspect of this problem, it's the parent that

14   should decide what's appropriate for their child, not the

15   State of Florida, it seems.  But anyway, that's just an

16   observation.

17       MR. FORRESTER:  Yeah, that is a point I wanted to

18   address.  It's not at all clear that a parental consent

19   defense is compelled by the First Amendment.  I had mentioned

20   this earlier.  That seems to sound in a Fifth Amendment

21   substantive due process, parental right to direct upbringing

22   of a child claim.

23       It is true that in -- actually in Ginsberg, the

24   statute there that prohibited sales of obscene material to

25   minors didn't prevent an adult from bringing the same material

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 45 of 50 PageID 621
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 157 of 185

45

1    home and showing them to their child.  And that was an

2    observation that was made later by the court, the Supreme

3    Court, in ACLU v. Reno.  But these were passing remarks as

4    part of -- at least in the Reno case -- as part of several

5    grounds of potential distinction.

6            And in American Booksellers v. Webb, the Eleventh

7    Circuit case which upheld that the Georgia statute that

8    prohibited display of materials under a test very much like

9    this that was geared to what would be obscene for minors,

10   there was no parental consent defense there either.  So we

11   don't think it's at all clear that that is required.

12           And as for the innocent mistake defense, the State

13   would still bear the burden in its case in chief of showing

14   that the admission of a child was knowing and that at least

15   requires reason to have inquired and investigate.  And if

16   somebody had inquired and investigated and determined

17   reasonably that the child doesn't appear to be that age, they

18   wouldn't be -- the State wouldn't be able to make out a prima

19   facia case.  The lack of that defense wouldn't affect the

20   application of that knowing standard.  And that knowing

21   standard also comes directly out of Ginsberg.  It tracks the

22   language of Ginsberg almost directly.

23           I do want to also address the assertion that we

24   haven't made an argument that the statute is not narrowly

25   tailored.  We most definitely have.

Case 6:23-cv-00950-GAP-LHP   Document 47   Filed 08/15/23   Page 46 of 50 PageID 622
USCA11 Case: 23-12160   Document: 32-2   Date Filed: 12/01/2023   Page: 158 of 185

46

1          We, again, have pointed out that this -- nothing in

2    the statute does anything to actually prevent any of these

3    adult live performances from taking place or for the adults to

4    have access to them.  It merely denies admission of children

5    to them.

6          This is -- it's different critically from that

7    Tennessee statute in Friend of George's, which actually said,

8    You just can't put on -- I think the phrase there was -- adult

9    cabaret entertainment in any public place and any place where

10   a child could see it.  It was much broader, and it was an

11   actual prohibition on the performance ever occurring to begin

12   with.  That is not the case here.

13         So we believe this is, in fact, precisely tailored

14   to the State's interest, as opposing counsel concedes, which

15   is compelling in preventing children from exposure to

16   materials which is obscene as to them.

17         I would also point out the Chesebrough case, which

18   is from 1971.  It carries forward.  That is used as a jury

19   instruction.  You can look it up online.  But it's -- that

20   exact phrasing is still used in instructions to the juries on

21   what it means for there to be lewd and lascivious conduct

22   under the criminal statutes.  So it definitely has carried

23   forward to the present day.

24         It doesn't bear the characteristics of the statute

25   in ACLU v. Reno, which used the word "indecent," which was a

47

1    term that the Congress had come up sort of out of nowhere with

2    no definition, but no sort of common law or other statutory

3    backdrop to give it content.  I mean, there is definitely

4    longstanding content to the word "lewd" as a matter of Florida

5    law.

6               And I also want to say, finally, that if this Court

7    is inclined to grant a preliminary injunction, we would ask

8    that it be confined only to these plaintiffs.  The Eleventh

9    Circuit has, I believe, just yesterday enjoined an order in a

10   Southern District of Florida case that applied to more than

11   just the plaintiffs in that case.  And we think it would be

12   inappropriate to grant an injunction that would be -- that

13   would apply to all the establishments in the case instead of

14   just the plaintiffs in this case.

15              And I have nothing further, Your Honor.

16              THE COURT:  Okay.

17              MR. TIMMONS:  Your Honor, can I speak to just that

18   very last point, because it wasn't raised previously in

19   argument?

20              THE COURT:  Sure.

21              MR. TIMMONS:  That was the same request that the

22   Tennessee attorney general made at the very end of their

23   argument in the Friends of George's case, that the injunction

24   be confined to only the plaintiffs in this case.

25              THE COURT:  Yeah.  But there, the defendant was just

48

1    that state attorney, right?

2             MR. TIMMONS:  Correct.  But the injunction -- the

3    request is an odd one.  To determine that a statute is

4    unconstitutional and then only enjoin its application to one

5    particular defendant belies any understanding of how

6    constitutional arms function.

7             If you were enjoining somebody -- and this was

8    Judge Parker's observation.  Maybe if I were enjoining

9    somebody from burning trash on somebody else's property, that

10   might make some sense.  But I don't see how that can apply in

11   the First Amendment context.  And we challenged the State to

12   find any case in which a First Amendment injunction had been

13   rendered in that context, and they were unable to produce any.

14   So --

15            MR. FORRESTER:  Your Honor, as I understand it, the

16   case that I mentioned, the Garcia case --

17            THE COURT REPORTER:  Please adjust the microphone.

18       (Counsel adjusts microphone.)

19            MR. FORRESTER:  The Garcia case that I just

20   mentioned, it was a First Amendment case.  And I'll give you

21   the -- I'll give you the case number, at least.  I don't have

22   a Westlaw cite.  Number 23-10872.  Thank you.

23            THE COURT:  One-zero what?

24            MR. FORRESOTER:  10872.

25            THE COURT:  And that's the Southern District of

49

 1    Florida case?

 2              MR. FORRESTER:  It's the Eleventh Circuit.  It was

 3    the one that just stayed the -- it was out of the Southern

 4    District, and the Eleventh Circuit just stayed that

 5    injunction.

 6              THE COURT:  Okay.  I'll take a look at it.

 7              All right.  Well, unless there's something else that

 8    somebody feels compelled to comment on, I want to thank you

 9    all for being here on short notice and giving your arguments.

10    I've got a lot here to review, obviously.

11              Are you all inclined to order a transcript?

12              It would help me to have a transcript of this.

13              MR. TIMMONS:  If it would help the Court, then,

14    certainly, Your Honor.

15              THE COURT:  All right.

16              Can the State of Florida afford to pay half of it?

17              MR. FORRESTER:  Sure.

18              THE COURT:  Okay.  All right.  And then I may get

19    another paper from the plaintiffs with respect to the motion

20    to dismiss.  So I'll try to get an order out as soon as

21    reasonably possible.

22              MR. TIMMONS:  We'll have that in as quickly as

23    possible for you, Your Honor.

24              THE COURT:  Okay.  Thank you.

25         (Adjourned at 2:48 p.m.)

50

1                    *       *       *       *

2                Certificate of Official Reporter

3    I certify that the foregoing is an accurate transcript of the

4    record of proceedings held in the above-entitled matter.

5

     Koretta Stanford
6    _____
     Official Court Reporter
7    United States District Court
     Middle District of Florida      Date:  07/27/2023
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# DE51

United States District Court
Middle District of Florida
Orlando Division

HM FLORIDA-ORL, LLC,

               Plaintiff,                         Case No. 6:23-cv-00950-GAP-IRHP

v.

MELANIE GRIFFIN,

               Defendant

---

## FIRST AMENDED COMPLAINT

---

### I.     <u>NATURE OF THE ACTION</u>

1.     This action is brought under 42 U.S.C. § 1983 and is premised on the First and Fourteenth Amendments to the United States Constitution

### II.     <u>SUBJECT MATTER AND JURISDICTION</u>

2.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 on the grounds that the claims asserted herein arise under U.S.C. §§ 1983 and 1988.

3.     Venue is proper in this Court and Division pursuant to 28 U.S.C. § 1391 on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

### III.     <u>THE PARTIES AND PERSONAL JURISDICTION</u>

4.     Plaintiff, HM FLORIDA-ORL, LLC, is a Florida limited liability company, registered in the State of Florida in Orlando, Florida since 2008. Plaintiff is a restaurant and bar which serves alcohol and presents drag show performances, comedy sketches, and dancing.

5.     Defendant MELANIE GRIFFIN (hereinafter "Defendant" or the "State") is the Secretary of the State Department of Business and Professional Regulation for the state of Florida. She is sued in her official capacity and individual capacity. Defendant GRIFFIN may be served with process at her office, 2601 Blairstone Rd, Tallahassee, FL 32399.

## IV.     FACTUAL ALLEGATIONS

6.     In December 2022, the State of Florida began administrative proceedings with the Department of Business and Professional Regulation against businesses for violating public nuisance, lewd activity and disorderly conduct laws.[1]

7.     Two of the businesses, a hotel and a performing arts center, both hosted an event entitled, "A Drag Queen Christmas." The third business was a restaurant that hosted a drag queen weekend brunch. DBPR is seeking to revoke the liquor licenses of these businesses.[2]

8.     The venues are accused to failing to provide notice of the "sexually explicit nature of the performance" DBPR alleges that drag shows are tantamount to "lewd exhibition, operating a lewd establishment, public exposure, obscene exhibition, breach of the peace and public nuisance." The case is pending.[3]

---

[1] Tampa Bay Times, Ana Ceballos and Joey Flechas, *Florida goes after liquor license of Miami hotel over drag show,* March 14, 2023, https://www.tampabay.com/news/florida-politics/2023/03/14/drag-queen-minors-liquor-license- lgbtq-hotel-miami/

[2] Administrative Complaint, *Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco, Petitioner, v. HRM Owner, LLC, d/b/a Hyatt Regency Miami,* March 14, 2023

[3] The statutes that were allegedly violated and listed in the complaint were: Lewd or lascivious exhibition in the presence of a minor less than 16 years of age (s. 800.04{7)(a), F.S.); Operation of any place, structure, building, or conveyance for the purposes of lewdness (s. 796.07(2)(a0, F.S.); The unlawful exposing or exhibiting of one's sexual organs in public or on the private premises of another in a vulgar or indecent manner (s. 800.03, F.S.); Knowingly promoting, conducting, performing, or participating in an obscene show, exhibition, or performance by live persons or a live person before an audience (s. 847.011(4), F.S.; Breach of the peace and disorderly conduct with acts that are of such nature as to corrupt the public morals, or outrage the sense of public decency (s. 877.03, F.S.); and Maintaining a nuisance by erecting or maintaining a structure that tends to annoy the community or injure the health or the community, or becomes manifestly injurious to the morals or manners of the people (s. 8230.5(1), F.S.)

9.      On May 17, 2023, Governor DeSantis signed Senate Bill 1438 into law (hereinafter "S.B. 1438" or "the Act"). The Act amended FL. Stat. § 509.261 to include the following provisions:

> **(10)(a) The division may fine, suspend, or revoke the license of any public lodging establishment or public food service establishment if the establishment admits a child to an adult live performance, in violation of s. 827.11.**
>
> **(b) A violation of this subsection constitutes an immediate serious danger to the public health, safety, or welfare for the purposes of s. 120.60(6).**
>
> **(c) Notwithstanding subsection (1), the division may issue a $10,000 fine for an establishment's second or subsequent violation of this subsection.**

Paragraph (1) of FL. Stat. § 561.29 was amended to include the following language:

> **Revocation and suspension of license; power to subpoena.**
>
> **(1) The division is given full power and authority to revoke or suspend the license of any person holding a license under the Beverage Law, when it is determined or found by the division upon sufficient cause appearing of:**
>
> **(l) Maintaining a licensed premises that admits a child to an adult live performance in violation of s. 827.11.**
>
> > **1. A violation of this paragraph constitutes an immediate, serious danger to the public health, safety, or welfare for the purposes of s. 120.60(6).**
> >
> > **2. The division may issue a $5,000 fine for a first violation of this paragraph.**
> >
> > **3. The division may issue a $10,000 find for a second or subsequent violation of this paragraph.**

FL. Stat. § 827.11 was created to read:

> **Exposing children to an adult live performance**
>
> **(1) As used in this section, the term:**
>
> > **(a) "Adult live performance" means any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, specific sexual activities as those terms are defined in s. 847.011, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:**

App. 383

**1. Predominantly appeals to a prurient, shameful, or morbid interest;**
**2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and**

**3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.**

(b) **Knowingly" means having general knowledge of, reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:**

  1. **The character and content of any adult live performance described in this section which is reasonably susceptible of examination by the defendant; and**

  2. **The age of the child.**

(2) **A person's ignorance of a child's age, a child's misrepresentation of his or her age, or a bona fide belief of a child's consent may not be raised as a defense in a prosecution for a violation of this section.**

(3) **A person may not knowingly admit a child to an adult live performance.**

(4) **A violation of subsection (3) constitutes a misdemeanor of the first degree, punishable as provided in § 775.082 or § 775.083.**

13.     Plaintiff's restaurant, HAMBURGER MARY'S, has presented drag performances at its venue since 2008.

14.     Drag is defined as "clothing more conventionally worn by the other sex, especially exaggeratedly feminine clothing, makeup, and hair adopted by a man." [4]

15.     Drag is usually performed as entertainment and often includes comedy, singing, dancing, lip-syncing, or all of the above. Prosthetic breasts are commonly used by men impersonating women as part of the art.

---

[4] *Drag,* OxfordlearnersDictionary.com, https://www.oxfordlearnersdictionaries.com/us/definition/english/drag (last visited March 25, 2023)

App. 384

16.     Drag is not a new art form; nor is it inherently - or even frequently - indecent. Drag has been present in western culture dating back to Ancient Greek theatrical productions, where women were often not permitted to perform onstage or become actors. Instead, male actors would don women's attire and perform the female roles.[5]

17.     The earliest productions of William Shakespeare's plays also featured male actors in drag playing the female roles. By the 1800s, "male or female impersonation" was known as "drag".[6]

18.     The vaudeville shows of the late 1800s and early 1900s popularized drag, or "female impersonators."[7] One of the most well-known vaudeville female impersonators, Julian Eltinge, made his first appearance on Broadway in drag in 1904.[8]

19.     By 1927, drag had become specifically linked with the LGBTQIA community, and by the 1950s, drag performers began entertaining in bars and spaces that specifically catered to gay people. In the decades that followed, drag solidified itself as an art form.[9]

20.     Although drag is still centered around and holds special historical significance for the LGBTQIA community, the art form is now definitely a part of mainstream culture. One is as likely to find straight people at a drag show as gay people. RuPaul 's Drag Race - a drag competition

---

[5] Ken Gewertz, *When Men Were Men (and Women, Too),* The Harvard Gazette (July 17, 2003), https://news.harvard.edu/gazette/story/2003/07/when-men-were-men-and-women-too/

[6] Lucas Garcia, *Gender on Shakespeare's State: A Brief History,* Writer's Theatre, (November 21, 2018), https://www.writerstheatre.org/blog/gener-shakespeares-stage-history/

[7] Nan Alamilla Boyd, Wide Open Town: A History of Queer San Francisco to 1965, University of California Press, 2003.

[8] Michael F. Moore, Drag! Male and Female Impersonators on State, Screen, and Television: An illustrated World History, McFarland & Company, 1994.

[9] Nan Alamilla Boyd, *Wide Open Town: A History of Queer San Francisco to 1965*, University of California Press, 2003.

App. 385

television show - has won seven Emmy Awards and is currently in its fifteenth season. The show has spinoffs in the UK, Australia, Chile, Thailand, Canada, Italy, Spain, and elsewhere.

21.    Like all forms of performance art, drag encompasses a vast spectrum of expression. Every drag performer makes unique choices about attire, choreography, comedy, and music which can range from a performer in a floor-length gown lip-syncing to Celine Dion songs and making G- rated puns, to the Rocky Horror Picture Show, to sexual innuendo and the kind of dancing on could expect to see at a Taylor Swift or Miley Cyrus concert.

22.    Modern drag performances typically do not contain nudity. More often than not, drag performers wear more clothing than one would expect to see at a public beach, and many drag shows are intended to be appropriate for all ages.

23.    Undercover state agents were sent by the administration of Republican Florida Gov. Ron DeSantis to spy on an Orlando drag show- and they found nothing "lewd" about it, according to the Miami Herald. Yet, Florida has moved to revoke the venue operator's liquor license, alleging in an official complaint that the venue violated state law "by allowing performers to expose genitals in a lewd or lascivious manner and by conducting acts simulating sexual activity in the presence of children younger than 16 years of age."

24.    Undercover agents who attended the December 28, 2022 show titled, "A Drag Queen Christmas." at Orlando's Plaza Live recorded the performance on their state-issued iPhone's and spotted three children at the drag show, according to the Herald, which obtained and published an incident report from the agents. "Besides some of the outfits being provocative (bikinis and short shorts), agents did not witness any lewd acts such as exposure of genital organs," the agents

6

App. 386

wrote in their report, according to the newspaper. "The performers did not have any physical contact while performing to the rhythm of the music with any patrons."[10]

25.     It is apparent from the actions of the State of Florida that it considers drag shows to be a public nuisance, lewd, disorderly, sexually explicit involving public exposure and obscene and that it is necessary to protect children from this art form, in spite of evidence to the contrary. Such is the Summary Analysis of the Florida Senate when it passed the law signed by Governor Desantis.

26.     Florida already has laws preventing exposure of minors to lewd, sexually explicit, obscene, vulgar or indecent displays. *See generally*, FL. Stat. Chapter 847.

27.     The Act, as passed, intends to use the FDBP to revoke or suspend the licenses of businesses if it admits a child to an adult live performance, in violation of § 827.1113 It reads: (l0)(a) The division may fine, suspend, or revoke the license of any public lodging establishment or public food service establishment if the establishment admits a child to an adult live performance, in violation of § 827.11. (b) A violation of this subsection constitutes an immediate serious danger to the public health, safety, or welfare for the purposes of § 120.60(6).

28.     Plaintiff's business relies on drag performances to bring in business. Its performances are open to all ages, and many of its patrons are families. Parents and grandparents frequently dine at Hamburger Mary's with their children.

29.     The Act is incredibly broad, prohibiting "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts," without defining "lewd" anywhere in the law. Plaintiff cannot know what conduct would run afoul of such a vague prohibition.

---

[10] *DeSantis Admin Sent Undercover Agents to Drag Show, Found Nothing 'Lewd'* (businessinsider.com) https://www.businessinsider.com/desantis-florida-undercover-agents-drag-show-found-nothing-lewd-2023-3

30.     Because Plaintiff's business model revolves around its drag shows, its performers frequently wear prosthetic breasts, as is common in the art of drag.

31.     Plaintiff is reasonably concerned that its future performances will violate the law.

32.     Upon the announcement that S.B. 1438 had been signed and the law was in effect, Hamburger Mary's advised its customers that children would not be permitted to attend any drag shows, except a single, Sunday afternoon show aimed at very young children. The Sunday show usually includes material from Disney and other, similar media intended for small children.

33.      Immediately, 20% of Plaintiff's bookings cancelled for the May 21, 2023 show and for future bookings.

34.     The Act has forced Plaintiff to either heavily censor its shows, or else impose age limitations on who may attend, depriving Plaintiff of both revenue and of its First Amendment rights to free speech and expression.

35.     Plaintiff simply cannot take the chance that their business or liquor licenses would be suspended for hosting a drag show where children attend.

36.     In addition, the criminal penalties of the law put Plaintiff's individual performers at risk of prosecution because of the content of their speech.

### V.      CAUSES OF ACTION

### COUNT 1 -    VIOLATION OF 42 U.S.C. SECTION 1983
### FIRST AMENDMENT

37.     Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

38.     As alleged above, the Act is an unconstitutional violation of the First Amendment both on its face and as applied for the following reasons.

8

App. 388

39.     ***First***, Defendant seeks to restrict protected, First Amendment speech based on its content and message. The fact that drag may contain elements of non-obscene sexuality does not dispel First Amendment protections. *See, e.g., Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975).

40.     S.B. 1438 is a content-based restriction. As such, it is therefore "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). That is, strict scrutiny.

41.     S.B. 1438 fails strict scrutiny. Its sweeping effect is divorced from any real purpose. It is broad enough to encompass a wide variety of performances that are not harmful to minors, and removes from parents any freedom to decide what appropriate performances might be. Nor is the law narrowly tailored. It is broad enough to encompass even the most innocuous drag performances and provides virtually no standards by which to determine its scope in practice.

42.     ***Second***, S.B. 1438 is facially overbroad. A law is facially overbroad and violates the First Amendment when it sweeps in more speech than is necessary to satisfy the state's interest, regulating both protected and unprotected speech. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

43.     S.B. 1438 goes far beyond obscenity and reaches protected speech such as drag, as well as concerts, dancing, theater, etc. The unprotected speech that S.B. 1438 reaches— obscenity—is already proscribed by numerous statutes in Florida law and so the broad sweep of S.B. 1438 targets protected expression directly.

44.     The Act also opens up any establishment - or even a private home - that hosts drag shows to police raids, so law enforcement can be certain that no children are present at the event.

App. 389

45.     The law is therefore facially overbroad and impinges on the rights of Plaintiffs and countless others across Florida. Such an overbroad law violates the First Amendment and will have a chilling effect on the protected speech of citizens.

46.     **Third**, and in the alternative, S.B. 1438 was adopted for an impermissible purpose. The text of Fla. Stat. § 827.11 demonstrates that the Act was "adopted by the government because of disagreement with the message the speech conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). While many terms in the Act appear elsewhere in the Florida code, "lewd exposure of prosthetic or imitation genitals or breasts" is unique to the Act. There are two primary categories of people who wear prosthetic breasts: people who have had mastectomies and drag performers. Since the Act specifically regulates "any show, exhibition, or other presentation in front of a live audience," the law is obviously targeted at the conduct of *performers* who wear prosthetic breasts. It impermissibly target targets drag performers.

### COUNT TWO: 42 U.S.C. § 1983
### FOURTEENTH AMENDMENT DUE PROCESS (VAGUENESS)

47.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

48.     A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citations omitted).

49.     S.B. 1438 is unconstitutionally vague, as it is impossible to determine from the text of the statute what conduct is prohibited. The statute encompasses "lewd conduct," but nowhere in the text of the law is "lewd" defined.

50.     The statute also prohibits "lewd exposure of prosthetic or imitation genitals and breasts," but "lewd exposure" is undefined. Does prosthetic cleavage, common at drag shows, qualify as "lewd exposure?"

51.     Plaintiff is left without any certainty as to whether it or its performers may face criminal or civil penalties for engaging in an array of expressive activities, or whether the penal activity may vary across the state. As such, S.B. 1438 is unconstitutionally vague.

## COUNT THREE: 28 U.S.C. § 2201 DECLARATORY JUDGMENT

52.     Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

53.     28 U.S.C. § 2201(a) provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration[.]"

54.     This case presents an actual controversy between the Plaintiff and Defendant as to whether Plaintiff has a First Amendment right to engage in expressive activity. As alleged, Plaintiff's claims S.B. 1438 violates its First Amendment rights.

55.     Plaintiff seeks a declaration that S.B. 1438 violates the Constitution on its face.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each Count of the Complaint and prays for the following relief:

1.     That the Defendant be permanently enjoined from enforcing S.B. 1438;

2.     That this Court declare that S.B. 1438 violates the Constitution on its face;

3.     Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure.

4.      Grant the Plaintiff such further relief as the Court may deem just and proper.


Respectfully submitted,

*/s/ Melissa J. Stewart*
Melissa J. Stewart, Esq. *Pro Hac Vice*
Brice M. Timmons, Esq. *Pro Hac Vice*
DONATI LAW, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
brice@donatilaw.com


Gary S. Israel, Esq. 270709
121 S. Orange Avenue, Suite 1500
Orlando, Florida 32801
407 210-3834
attorneyisrael@hotmail.com
gsi55@hotmail.com
Counsel for Plaintiff

\

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been served upon all parties to this action via the court's ECF filing system this 15th day of August 2023.

*/s/ Melissa J. Stewart*

# DE52

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

HM FLORIDA-ORL, LLC,

     Plaintiff,

        v.

MELANIE GRIFFIN, in her official capacity as Secretary of the Department of Business and Professional Regulation, State of Florida,

     Defendant.

Case No. 6:23-cv-00950-CAP-IRHP

## ANSWER TO FIRST AMENDED COMPLAINT

Defendant Melanie Griffin, in her official capacity as Secretary of the Florida Department of Business & Professional Regulation ("DBPR") hereby answers the First Amended Complaint (Doc. 51) as follows:

### I. NATURE OF THE ACTION

1.    Admitted that Plaintiff purports to bring this action pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the U.S. Constitution.

### II. SUBJECT MATTER AND JURISDICTION

2.    Admitted.

3.    Admitted that venue is proper pursuant to 28 U.S.C. § 1391.

### III. THE PARTIES AND PERSONAL JURISDICTION

4.    Admitted.

5.    Admitted.

## IV. FACTUAL ALLEGATIONS

6–8.    Upon information and belief, Paragraphs 6–8 refer to three administrative complaints:

> *DBPR v. R House, Inc.*, Case No. 2022-35976;
>
> *DBPR v. HRM Owner, LLC*, Case No. 2022-5693; and
>
> *DBPR v. Orlando Philharmonic Plaza Found.*, Inc. Case No. 2022-61146.

The administrative complaints in those cases have been filed in this case as Docs. 21-3, 21-4, and 21-5, and speak for themselves. Denied as to the remainder of Paragraphs 6–8.

9.    The provisions of Senate Bill 1438, approved by the Governor on May 17, 2023, and enacted as chapter 2023-94, Laws of Florida (Doc. 21-1), speak for themselves.

13.    Admitted.[1]

14.    Admitted that the cited dictionary definition speaks for itself.

15.    Admitted.

16.    Admitted that drag is not a new art form and has long been present in western culture; denied that drag is not frequently indecent.

17.    Admitted.

18.    Without knowledge; therefore denied.

---

[1] The First Amended Complaint omits Paragraphs 10-12.

2

App. 396

19.    Without knowledge; therefore denied.

20.    Without knowledge; therefore denied.

21.    Without knowledge; therefore denied.

22.    Without knowledge; therefore denied.

23.    To the extent this paragraph is intended to duplicate Paragraph 23 of the original complaint (Doc. 1), the referenced *Miami Herald* report speaks for itself. Denied that it tells the full, accurate story. Denied as to the remainder of Paragraph 23.

24.    The referenced *Business Insider* article speaks for itself. Denied that it tells the full, accurate story. Denied as to the remainder of Paragraph 24.

25.    The bill analyses for SB 1438 speak for themselves.[2] Denied as to the remainder of Paragraph 25.

26.    The various provisions of chapter 847, Florida Statutes, speak for themselves.

27.    Admitted that DBPR has a duty to protect the public by enforcing the statutes the Legislature has tasked it with enforcing. Admitted that the cited provisions of section 509.261, Florida Statutes, speak for themselves. Denied as to the remainder of Paragraph 27.

28.    Without knowledge; therefore denied.

---

[2] According to the website of the Florida Senate, there were four bill analyses of SB 1438.  It is unclear to which analysis Plaintiff refers in Paragraph 25.

App. 397

29.   The terms of the Act speak for themselves; denied as to the remainder of Paragraph 29.

30.   Without knowledge; therefore denied.

31.   Denied.

32.   Without knowledge; therefore denied.

33.   Without knowledge; therefore denied.

34.   Without knowledge; therefore denied.

35.   Without knowledge; therefore denied.

36.   Denied.

## V. CAUSES OF ACTION

### COUNT 1—42 U.S.C. § 1983
### (FIRST AMENDMENT)

37.   Defendant realleges her responses to Paragraphs 1- 36 above as if fully set forth herein.

38.   Denied.

39.   Denied.

40.   Denied.

41.   Denied.

42.   Denied.

43.   Denied.

44.   The terms of the Act speak for themselves.

45.   Denied

46.   Denied.

## COUNT TWO—42 U.S.C. § 1983
## (FOURTEENTH AMENDMENT DUE PROCESS—VAGUENESS)

47. Defendant realleges her responses to Paragraphs 1-46 above as if fully set forth herein.

48. The cited case speaks for itself.

49. The terms of S.B. 1438 speak for themselves; denied as to the remainder of Paragraph 49.

50. The terms of S.B. 1438 speak for themselves.

51. Denied.

## COUNT THREE—28 U.S.C. § 2201
## (DECLARATORY JUDGMENT)

52. Defendant realleges her responses to Paragraphs 1-51 above as if fully set forth herein.

53. The terms of 28 U.S.C. § 2201 speak for themselves.

54. Denied.

55. Admitted that Plaintiff seeks a declaration that S.B. 1438 is unconstitutional on its face; denied that Plaintiff is entitled to such relief.

## VI. PRAYER FOR RELIEF

1-4. Denied that Plaintiff is entitled to the relief it seeks in this action.

**WHEREFORE**, Defendant respectfully requests that the Court deny relief to Plaintiff and enter judgment in her favor.

App. 399

Respectfully submitted,

August 29, 2023

ASHLEY MOODY
  ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
  SOLICITOR GENERAL

Jeffrey Paul DeSousa (FBN 110951)
  CHIEF DEPUTY SOLICITOR GENERAL

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Nathan.Forrester@myfloridalegal.com

*/s/ Nathan A. Forrester*
* Nathan A. Forrester (FBN 1045107)
  SENIOR DEPUTY SOLICITOR GENERAL

William H. Stafford III (FBN 70394)
  SPECIAL COUNSEL

*Counsel for Defendants*

* *Lead Counsel*

6

App. 400

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of August, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Nathan A. Forrester*
Senior Deputy Solicitor General

7

## CERTIFICATE OF SERVICE

I certify that on December 1, 2023, I electronically filed both volumes of this Appendix with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ Nathan A. Forrester
Senior Deputy Solicitor General