No. 23-12160

# In the United States Court of Appeals for the Eleventh Circuit

HM FLORIDA-ORL, LLC,

*Plaintiff-Appellee,*

v.

MELANIE GRIFFIN, Secretary,
Department of Business and
Professional Regulation,
State of Florida,

*Defendant-Appellant.*

## PLAINTIFF-APPELLEE'S RESPONSE BRIEF

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 6:23-cv-950-GAP-LHP

January 22, 2024

Brice M. Timmons, Esq.
Melissa J. Stewart, Esq.
Craig A. Edgington, Esq
Shelby N. Teeter, Esq.
Donati Law, PLLC 1545
Union Ave. Memphis, TN
38104 (901) 278-1004
melissa@donatilaw.com

Gary S. Israel, Esq.
121 S. Orange Avenue, Suite 1500
Orlando, Florida 32801
(407) 210-3834
attorneyisrael@hotmail.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

As required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5 Plaintiff-Appellee identifies the following interested person in addition to the persons identified in Defendant-Appellant's Brief:

Teeter, Shelby N.

## ORAL ARGUMENT STATEMENT

The case involves important questions concerning the application of the First Amendment Free Speech Clause and the Fourteenth Amendment Due Process Clause. Appellee believes that oral argument would aid the Court in resolving this appeal.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ................................................................ viii

STATEMENT OF THE ISSUES ................................................................ ix

STATEMENT OF THE CASE ................................................................ 1

  I.  Background ................................................................ 1

  II.  Procedural History ................................................................ 4

STANDARD OF REVIEW ................................................................ 6

SUMMARY OF THE ARGUMENT ................................................................ 8

ARGUMENT ................................................................ 11

  I.  HM has Article III Standing to Bring First and Fourteenth Amendment Challenges to the Act ................................................................ 11

    A.  Injury In Fact ................................................................ 11

      1. HM's speech is arguably forbidden by the Act ................................................................ 13

      2. The Act is arguably vague as applied to HM. ................................................................ 16

      3. HM faces at least a credible threat that the Act will enforced if violated ................................................................ 18

    B.  Traceability and Redressability ................................................................ 22

  II.  The Act is an Unconstitutional Regulation of Protected Speech ................................................................ 27

    A.  The Act indisputably regulates protected speech ................................................................ 22

    B.  The Act is a content-based regulation ................................................................ 25

C. Alternatively, the Act was created for an impermissible purpose......28

D. The Act is not narrowly tailored.........................................................30

III. The Act is Unconstitutionally Vague ...............................................................34

III. Scope of Relief ................................................................................................40

A. The scope of the preliminary injunction is proper, because the district court found that the Act is likely overbroad..................................................40

B. HM may properly challenge the Act under the overbreadth doctrine ..44

CONCLUSION ......................................................................................................46

## TABLE OF AUTHORITIES

**Cases**

*American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990) ..................... 24, 25

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) ...................................................25

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ............................................... 22, 23, 28, 29

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) .......................................22

*Bd. of Trs. v. Fox*, 492 U.S. 469 (1989) ...................................................44

*Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011) ..................................................7

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ........................................... 39, 43, 44

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC.*, 142 S. Ct. 1464 (2022) .....26

*City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464 (2022)

...................................................................................................4

*Connally v. General Const. Co.*, 269 U.S. 385 (1926) ...............................................4

*Friends of Georges, Inc. v. Mulroy*, 2:23-cv-02163-TLP-tmp (W.D. Tenn. Jun. 2, 2023) ...................................................................................................29

*Ginsberg v. New York*, 390 U.S. 629 (1968) ........................................ 23, 24, 25, 30

*Gonzalez v. Governor*, 978 F.3d 1266 (11th Cir. 2020) ........................................6, 7

*Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756 (11th Cir.1991) ...................................................................................11

*Harrell v. The Florida Bar*, 608 F.3d 1241 (11th Cir. 2010) ................. 8, 11, 12, 17

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) ............................11

*Kelly v. Harris*, 331 F.3d 817 (11th Cir. 2003) ........................................................8

*Kolender v. Lawson*, 461 U.S. 352 (1983) .................................................................33

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................................11

*Nixon v. United States*, 506 U.S. 224 (1993) ...........................................................27

*Pittman v. Cole,* 267 F.3d 1269 (11th Cir.2001) ............................................... 11, 12

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......................................... 26, 27, 28

*Reno v. ACLU*, 542, U.S. 844 (1997) ................................................... 23, 25, 30, 32

*Sable Communications of Cal. v. FCC*, 492 U.S. 115 (1989) ......................... 22, 29

*Smith v. Goguen*, 415 U.S. 566 (1974) .....................................................................32

*Steffel v. Thompson*, 415 U.S. 452 (1974) ...............................................................12

*Steffel v. Thompson*, 415 U.S. 452 (1974). .............................................................12

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)................................ 11, 13

*United States v. 12 200-Ft. Reels of Super 8mm. Film,* 413 U.S. 123 (1973).........34

*United States v. Nat'l Treas. Emps. Union*, 513 U.S. 454 (1995) .............. 38, 39, 40

*United States v. Sepulveda*, 115 F.3d 882 (11th Cir. 1997)....................................34

*United States v. Williams*, 553 U.S. 285 (2008) .....................................................33

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) .....................................................7

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...............................................27

*Wollschlaeger v. Governor of Fla.*, 814 F.3d 1159 (11th Cir. 2015)... 11, 12, 17, 18

**Statutes**

28 U.S.C. § 1292(a)(1)............................................................................ iii

42 U.S.C. § 1988 .................................................................................... ii

42 U.S.C. §§ 1983 .................................................................................. ii

Child Online Protection Act, 47 U.S.C. § 231....................................23

Fla. Stat. § 1014 ...................................................................................32

Fla. Stat. § 509.261(10)..........................................................................1

Fla. Stat. § 561.29(1).............................................................................1

Fla. Stat. § 800.04, .............................................................................20

Fla. Stat. § 827.11 .......................................................................... passim

Fla. Stat. § 847.013 ........................................................................ 32, 33

Fla. Stat.§ 768.125 ........................................................................ 18, 31

## STATEMENT OF JURISDICTION

Plaintiff-Appellee HM Florida-ORL, LLC ("Hamburger Mary's" or "HM") is a restaurant and bar in Orlando, Florida that presents drag show performances, comedy sketches, and dancing. Following the enactment of Florida S.B. 1438 ("the Act") in May 2023, HM brought suit under 42 U.S.C. §§ 1983 and 1988 alleging the Act violates the First and Fourteenth Amendment to the United States Constitution. DE1 at PageID 1. The district court had original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 on the grounds that the claims asserted herein arise under U.S.C. §§ 1983 and 1988. *Id.*

On June 23, 2023, the district court entered a preliminary injunction enjoining all enforcement proceedings by Defendant under the Act. The next day, having inadvertently omitted a section from its order, the district court issued an amended order, which is the operative order on appeal. DE30 at PageID 429. Appellant-Defendant Melanie Griffin, Secretary of Florida's Department of Business and Professional Regulation (DBPR), filed a timely notice of appeal on June 27, 2023. Doc. 1-2. This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in finding that Hamburger Mary's has Article III standing to challenge the Act.

2.  Whether the district court abused its discretion in holding the Act likely violates the First Amendment.

3.  Whether the district court abused its discretion in holding that the Act is likely void for vagueness on its face under the Fourteenth Amendment Due Process Clause.

4.  Whether, after finding the Act likely violates the First Amendment, the district court had authority to enjoin all enforcement of the Act by Defendant.

## STATEMENT OF THE CASE

### I.    Background

On May 17, 2023, Florida Governor Ron DeSantis signed Senate Bill 1438 into law. *See* 2023 Fla. Laws Ch. 2023-94. Along with amending three existing laws, S.B. 1438 created a new statute – Fla. Stat. § 827.11 ("the Act") – which prohibits any person from "knowingly" admitting a child to what it terms an "adult live performance." *Id.* Violation of the statute authorizes the Florida Department of Business and Professional Regulation ("DBPR") to impose fines and revoke or suspend the operating and/or liquor license of any public lodging, food service establishment, or other licensee. Fla. Stat. §§ 509.261(10) 561.29(1). Additionally, any person who violates § 827.11 may be prosecuted and subject to punishment as a first-degree misdemeanor. The Act defines an "adult live performance" as:

> [A]ny show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 827.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:
>
> 1. Predominantly appeals to a prurient, shameful, or morbid interest;
>
> 2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and
>
> 3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

§ 827.11(1)(a).

Plaintiff-Appellee HM Florida-ORL, LLC ("HM") is a for-profit business operating Hamburger Mary's Restaurant and Bar in Orlando, Florida. HM "frequently presents drag show performances, comedy sketches, and dancing" at its venue. DE30 at PageID 432.[1] Drag performances are a core element of HM's business model. The content of HM's drag performances, comedy sketches, and dances "can range from a performer in a floor-length gown lip-syncing to Celine Dion songs and making G-rated puns, to the Rocky Horror Picture Show, to sexual innuendo and the kind of dancing one could expect to see at a Taylor Swift or Miley Cyrus concert." First Verified Complaint, DE1 at PageID 7. HM is and has always marketed itself as a family restaurant. As such HM's drag performances "have [traditionally] been open to all ages." *Id.* at PageID 19. Parents and grandparents often attend shows with their children, and HM leaves it up to parents to determine whether a particular show is appropriate for the age of their own child.

*One* of HM's *many* drag performances is tailored to be appropriate for even the youngest possible audience member: Sunday Broadway Drag Brunch. In its First Verified Complaint, HM described its Sunday Broadway Drag Brunches, and *only* these performances, as "a wholesome form of art and entertainment" that can be

---

[1] Unless otherwise indicated, references to "DE__" are to the docket entry number in the district court's record. References to "Doc. __" are to the document entry number in the appellate court's record.

2

"enjoyed by all." *Id.* at PageID 8. It further stated that its Sunday Broadway Drag Brunch has "no lewd activity, sexually explicitly shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." *Id.* at PageID 6. HM's Sunday Broadway Drag Brunch is the most family-friendly of all of its performances. Even still, HM fears that all of its performances, including its Sunday Broadway Drag Brunch, "could be construed to fall within the Act's purview of proscribed conduct[.]" DE30 at PageID 439-44011-12.

In its Verified Complaint, HM raised concerns that by the Act "[r]equiring Plaintiff to consider the age of the child, then determine what the prevailing standards are in the adult community, then determine what is suitable material or conduct for the age of the child," HM, and other Floridians, "will be forced to guess at the bottom end of the range of ages of children to which the statute applies." DE1 at PageID 12. The Defendant-Appellant's recent enforcement actions against other venues hosting drag performances, "despite the fact that undercover agents reportedly observed 'no lewd acts,'" are "indicative of Defendant's appetite for finding obscenity in drag performances, even where undercover state agents have reportedly concluded none exists." DE30 at PageID 434, 441.

Upon passage of the Act, "Plaintiff advised its customers that children would no longer be permitted to attend its drag shows." *Id.* at PageID 440 (citing DE1 at PageID 18). The newly-imposed age restrictions resulted in the immediate

cancellation of "20% of [HM's] bookings for its May 21, 2023 show and for future bookings." DE1 at PageID 18. Following the district court's order granting a preliminary injunction, HM returned to its previous policies. However, its business has suffered lasting injury, because while its performances do not pose any threat of harm to minors, they likely still run afoul of the Act.

## II.    Procedural History

HM brought this suit, challenging the Act as a facial violation of the First Amendment and the Fourteenth Amendment Due Process Clause. DE1. The district court granted HM's motion for a preliminary injunction, ruling in part that HM had shown a substantial likelihood of success on the merits of its claims. DE30 at PageID 443-451. The district court ruled that Fla. Stat. § 827.11 is "content-based on its face," because the Act "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at PageID 443 (quoting *City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022)). The district court found that the State did not use the least restrictive means of achieving its purported goal of protecting children from explicit content. *Id.* at PageID 444-448. Additionally, the district court found that the Act is likely unconstitutionally vague, because it fails to define key terms such as "lewd conduct" leaving both citizens and law enforcement to "necessarily guess at [their] meaning." *Id.* at PageID 449 (citing *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926)). Finally, the district court

4

determined that the Act is likely overbroad because it is "dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected speech[.]" *Id.* at PageID 451.

The State asked the district court for a partial stay of the preliminary injunction, so that it could enforce the Act against everyone except for HM. *See* DE33. The district court denied the motion for a partial stay, reasoning that where a statute is found to be overbroad, a preliminary injunction prohibiting all enforcement is proper. DE41. After appealing the district court's preliminary injunction, the State sought a partial stay of the injunction pending appeal from this Court. A divided panel denied the motion for partial stay, finding that the district court had not abused its discretion when it enjoined the State from all enforcement of the statute. Doc. 26. The panel majority emphasized the district court's finding that the Act is likely overbroad, and determined that "a successful overbreadth challenge 'suffices to invalidate *all* enforcement of th[e] law[.]'" *Id.* at 7 (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2005)).

After this Court denied the State's motion for a partial stay of the injunction pending appeal, the State filed an application with the Supreme Court of the United States seeking a partial stay of the district court's preliminary injunction. The Supreme Court also denied the State's motion, with Justice Kavanaugh, joined by Justice Barrett, noting that the First Amendment "presents its own doctrinal

5

complexities about the scope of relief." *Griffin v. HM Florida-ORL, LLC*, 601 U.S. __, No. 23A366, slip op. at 3 (Nov. 16, 2023) (statement of Kavanaugh, J.). ___, ___ (2023). Thus, this case is "an imperfect vehicle for considering the general question of whether a district court may enjoin a government from enforcing a law against non-parties to the litigation." *Id.*

The State now appeals the district court's issuance of the preliminary injunction.

## STANDARD OF REVIEW

District courts have the authority to enter preliminary injunctions when the moving party has established that: "(1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor*, 978 F.3d 1266, 1270-71 (11th Cir. 2020) (citations omitted). When the government is the opposing party, the third and fourth factors merge. *Id.*. This Court reviews a district court's grant of a preliminary injunction for abuse of discretion. *Id.* "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are

6

clearly erroneous." *Id.* (internal citations omitted). This standard is "very narrow and deferential." *Id.*

Because the purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held" and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Bloedorn v. Grube*, 631 F.3d 1218, 1229-30 (11th Cir. 2011) (citing *Camenisch*, 451 U.S. at 395). Accordingly, neither party is "required to prove his case in full at a preliminary-injunction hearing[.]" *Camenisch*, 451 U.S. at 395. In reviewing a district court's grant of a preliminary injunction for abuse of discretion, this Court reviews underlying legal conclusions *de novo* and findings of fact for clear error.  *Gonzalez*, 978 F.3d at 1266. (citations omitted).

## SUMMARY OF ARGUMENT

At issue in this appeal is the district court's finding that HM is likely to succeed on its claims that Fla. Stat. § 827.11– on its face – violates the First and Fourteenth Amendments to the United States Constitution and the district court's subsequent order enjoining all enforcement of the Act by Defendant Melanie Griffin (the "State") pending a full trial on the merits. For the reasons that follow, the district court did not abuse its discretion in holding that the Act likely violates the First and

Fourteenth Amendments, nor did it exceed the scope of its authority in issuing the preliminary injunction.

HM has Article III standing to bring First and Fourteenth Amendment challenges to the Act because HM has demonstrated that "(1) [it] has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the operation of the [Act]; and (3) a favorable judgement is likely to redress the injury." DE30 at PageID 438-442 (quoting *Harrell v. The Florida Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010) (citing *Kelly v. Harris*, 331 F.3d 817, 819–20 (11th Cir. 2003)). The district court found that HM self-censorship, namely imposing a strict 18+ requirement for all of its drag performances, is a cognizable injury-in-fact for both First and Fourteenth Amendment standing. DE30 at PageID 438-442. It further found that "because [HM] cannot know what is encompassed by the terms 'lewd conduct' or 'lewd exhibition of prosthetic genitals or breasts,' [HM] cannot know with any confidence whether its shows will expose it to liability under the Act." DE30 at PageID 440. Thus, HM's self-censorship is reasonable and a sufficient injury-in-fact for both claims. *Id.* at PageID 442. The district court found that HM's "injury is fairly traceable to the operation of the Act and would be redressed by a favorable judgment." *Id.* Indeed, the preliminary injunction has allowed HM to return to its normal course of business, allowing people of all ages to attend its drag performances.

On HM's First Amendment claims, the district court properly held that the Act is a content-based restriction on protected speech that does not survive strict scrutiny. The prohibited conduct in the Act cannot be defined without referencing the content of the speech. The State admits as much but alleges that the proscribed speech is "unprotected" because it is "obscenity," making content discrimination permissible. But the Act does not regulate "obscenity" as defined by the Supreme Court in *Miller v. California*, 413 U.S. 15 (1973). It regulates something more – content the government believes is indecent for children, but which is still protected speech for adults. Thus, the Act is subject to strict scrutiny. In addition, as the district court properly found, the Act was passed for an impermissible purpose, "to suppress the speech of drag queen performers," which also subjects it to strict scrutiny analysis. DE30 at PageID 429.

Under strict scrutiny, the State bears the burden of proving that the law is narrowly tailored – that the government has chosen the least restrictive means to achieve its compelling interest in protecting children. Here, the government has not chosen the least restrictive means of regulating inappropriate content for minors. For instance, the Act contains no exception for parental consent, which the Supreme Court has repeatedly taken issue with. If parental monitoring is a sufficient alternative to regulating internet pornography, it is certainly a sufficient alternative

to regulating the far broader category of expression that falls under whatever the State arbitrarily interprets as "lewd conduct.".

The Act is unconstitutionally vague, as it is impossible to determine from the text of the statute what conduct is prohibited. "There are several aspects of § 827.11 that raise vagueness concerns." DE30 at PageID 20. The Act does not define "lewd conduct" or "lewd exposure." The State's attempts to define these terms through references to Florida Supreme Court jury instructions and as-applied challenges by criminal defendants only "further broaden the scope of what may be covered" by the Act and make the Act "dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected speech." DE30 at PageID 444, 451.

Finally, the district court did not exceed the scope of its authority by enjoining all enforcement of the Act by the State pending a full trial on the merits. DE30. Before enjoining all enforcement, the district court found that the Act – on its face – is an overbroad regulation on protected speech in violation of the First Amendment. Thus, the scope of the preliminary injunction issued in this case is appropriate, because *all* enforcement may be lawfully suspended when a court invalidates a speech-restricting law on facial overbreadth grounds, as is the case here. The panel majority in this case and the Supreme Court of the United States agree.

**ARGUMENT**

## I.  HM has Article III standing to bring First and Fourteenth Amendment challenges to the Act.

Hamburger Mary's has plead facts sufficient to establish Article III standing to challenge the Act. Plaintiffs in federal court must establish Article III standing by demonstrating: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

### A. Injury In Fact

This Court has long recognized that the injury in fact requirement is applied "most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar,* 608 F.3d 1241, 1254 (11th Cir.2010) (citing *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756, 760 (11th Cir.1991)). It is well-settled that an "actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Wollschlaeger v. Governor of Fla.*, 814 F.3d 1159, 1173 (11th Cir. 2015) (quoting *Pittman v. Cole,* 267 F.3d 1269, 1283 (11th Cir.2001) (internal quotations omitted)). A plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his

constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). In the First Amendment context, "self-censorship . . . may be a cognizable injury-in-fact for standing purposes." *Wollschlaeger*, 814 F.3d at 1173.

To establish a cognizable self-censorship injury in the First Amendment context, a plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and that the plaintiff faces "a credible threat of prosecution." *Pittman*, 267 F.3d at 1283 (internal citations omitted); *see also Wollschlaeger.*, 814 F.3d at 1173-75.

The standard to establish a cognizable self-censorship injury for a vagueness claim is substantially similar to the standard for a First Amendment claim. Plaintiff must show that, "(1) he seriously wishes to speak; (2) such speech would arguably be affected by the rules, but the rules are at least arguably vague as they apply to him; and (3) there is at least a minimal probability that the rules will be enforced, if they are violated." *Wollschlaeger*, 814 F.3d at 1175 (cleaned up). Critically, "it is the existence, not the imposition, of standardless requirements that causes the injury." *Id.* (quoting *Harrell*, 608 F.3d at 1254).

### 1. HM's protected speech is arguably forbidden by the Act.

The district court correctly found that HM has suffered a cognizable self-censorship injury, because HM has demonstrated an intention to engage in conduct "arguably proscribed" by the Act. *See Driehaus*, 573 U.S. at 159. The Act prohibits,

12

among other things, "lewd conduct" and "lewd exhibition of prosthetic genitals or breasts," without providing definitions for any of these terms. The majority of HM's performers wear prosthetics, which are a standard part of drag attire. DE1 at PageID 6 ("Prosthetic breasts are commonly used by men impersonating women as part of the art."). And while HM does not consider any of its shows to be "obscene," some of the performances feature jokes, dances, and innuendo that might not be appropriate for every child. *See Id.* at PageID 6-7; *see also Id.* at PageID 13 (raising concerns that moderating content to "what is suitable material or conduct for the age of the child present is too indistinct for the speaker to know what is prohibited."). It is plausible that some or all of HM's drag performances could be viewed as violating the Act.

The State's Brief misunderstands the facts alleged in HM's Complaint, which clearly states that the establishment offers drag performances "*on Sundays* where children are invited to attend." DE1 at PageID 6 (emphasis added). These Sunday performances are tailored to be appropriate for very young children and are typically themed around Disney productions or Broadway musicals. During these Sunday shows, "there is no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." *Id.* HM has never claimed, either in its Complaint or in any other pleading, that *all* of its drag performances are appropriate for children of *all* ages. While HM's Sunday shows

13

are specifically intended to be family friendly, all of HM's shows are open to minors, so long as they are accompanied by an adult.[2] A parent may choose to bring their child to an 18+ drag show at HM, just as a parent may choose to bring their child to a PG-13 or R-rated movie at the local movie theatre.

Regardless, HM's own opinion about what is and is not appropriate for children has no bearing on its standing in this case. HM is a family-friendly establishment that hosts drag shows as a core element of its business model; it follows that HM does not believe that drag is inherently lewd or harmful to children. But, as HM points out in its complaint, "[i]t is apparent from the actions of the State of Florida[] that it intends to consider drag shows to be . . . lewd, disorderly, sexually explicit involving public exposure and obscene[.]" DE1 at PageID 9. The vague

---

[2] Since opening its business in 2008, HM's drag performances have generally been marketed as 18+, but those under 18 were allowed to attend any HM drag performance with adult supervision. HM used an honor system to enforce this age policy.

In approximately April 2023, as the Act was making its way through the legislature and with the State's other enforcement actions on-going, HM, for the first time, made all drag performances strictly 18+ without an adult supervision exception. The one exception was the family-friendly Sunday Broadway Brunch, which was still generally 18+ but those under 18 could attend with adult supervision. HM used an honor system to enforce these policies.

In May 2023, following the enactment of S.B. 1438, HM made the difficult decision to make all drag performances, including its Sunday Broadway Brunch, strictly 18+ without an adult supervision exception. This policy was enforced by private, armed security checking I.D.s at the door.

Finally, in June 2023 when the district court issued the preliminary injunction prohibiting Defendant from enforcing the Act, HM reverted to its long-standing age policy: all drag performances are 18+, but those under 18 may attend any show with adult supervision. Enforced, once again, by the honor system.

statutory language of the Act coupled with the State's enforcement activity against similarly situated venues that host drag performances are "indicative of Defendant's appetite for finding obscenity in drag performances[.]" DE30 at PageID 441. It is Florida state law, not HM's opinion, that is subject of this litigation. HM need only demonstrate that its conduct is "arguably proscribed" by the statute; it need not prove conclusively that its conduct is proscribed under the State's preferred reading of the statute.

Because of the Act, HM was forced to self-censor by amending its age policies to make all shows exclusively 18+ without exception. DE30 at PageID 452 (citing DE1 at PageID 18). HM had to hire armed security to check patron identification at the door, something the restaurant had never done before. Only after the district court issued a preliminary injunction prohibiting enforcement of the law did HM re-open its performances to families with minor children.

As is discussed *infra* Part I.A.3, HM faces a credible threat of enforcement under the Act. If the law were to take effect again, HM would be forced to reinstate stricter age policies. For an Orlando restaurant that depends heavily on the local tourist economy, prohibiting minor children from attending shows with their families would have a significant impact on HM's revenue. DE1 at PageID 18; DE30 at PageID 440 ("Plaintiff . . . has been forced to chill its regular practice of opening many of its performances to all ages – at an economic loss."). But the risk of losing

15

its liquor license – and thus its business – leaves HM with little other choice. DE30 at PageID 452.

### 2.  The Act is arguably vague as applied to HM

The Act is arguably vague as applied to HM in at least two ways. <u>First</u>, the Act prohibits admitting a minor child to an "adult live performance," which is defined in part as "any show, exhibition, or other presentation in front of a live audience, which, in whole or in part, depicts or simulates . . . lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts . . ." Fla. Stat. 827.11(1)(a). Neither "lewd conduct" nor "lewd exposure of prosthetic or imitation genitals or breasts" is defined in the text of the Act or in any cross-referenced section of Florida law. HM is left to guess what conduct the State may or may not decide to prosecute.

<u>Second</u>, the Act's *mens rea* requirement is a source of great uncertainty for HM. "A person may not knowingly admit a child to an adult live performance." Fla. Stat. 827.11(3). "Knowingly" is defined as:

> having general knowledge of, reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:
>
> 1. The character and content of any adult live performance described in this section which is reasonably susceptible of examination by the defendant; and
>
> 2. The age of the child.

Fla. Stat. 827.11(2). However, the Act then states that "A person's ignorance of a child's age [or] a child's misrepresentation of his or her age . . . may not be raised as a defense in a prosecution for a violation of this section." Fla. Stat. 827.11(3). When a crime contains a *mens rea* requirement, absence of *mens rea* is inherently a defense to prosecution. Yet the Act precludes such a defense, seemingly creating a strict liability offense as to the age of the minor child. HM could retain security to check identification at the door for every performance. But as any bar or club owner can attest, that system is not infallible. In the age of the internet, it is easier than ever for minor children to obtain counterfeit identification. If ignorance of the child's age – despite stringent security measures – is not a defense to prosecution, then HM risks enforcement of the law every time it hosts a drag show, *even if* those drag shows are strictly limited to adults over the age of 18. *Compare* Fla. Stat.§ 768.125 (requiring willfulness for liability arising from the sale of alcohol to minors).

For these reasons, HM has demonstrated that the Act is at least arguably vague as applied to HM's speech.

### 3.  HM faces at least a credible threat that the Act will be enforced if violated.

Finally, to establish a credible threat of prosecution, HM must show that "there is at least some minimal probability that the challenged rules will be enforced if violated." *Wollschlaeger*, 814 F.3d at 1174 (quoting *Harrell*, 608 F.3d at 1241 (internal citations omitted)). Article III standing requires a credible *threat* of

prosecution under the Act; a plaintiff need not prove that prosecution is certain. If, as is the case in this litigation, "the challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Id.* (internal citations omitted). Here, as in *Wollschlaeger*, "[t]he Act was recently enacted, and the State is defending it, so we may infer that there is at least some probability that the Act will be enforced if violated." *Id.* HM has thus established a cognizable self-censorship injury for their First Amendment and vagueness claims.

The State disagrees, arguing that HM's fear of prosecution is "unreasonable" and repeating its misleading assertion that all of HM's drag shows are "family friendly" and therefore beyond "the manifest limitations in the Act to conduct that is truly obscene for children." Doc. 30 at 36.

HM's fear of enforcement is not baseless. Prior to the passage of the Act, the State began to use existing Florida obscenity and decency statutes [3] to target venues

---

[3] The statutes that were allegedly violated and listed in the complaint were: Lewd or lascivious exhibition in the presence of a minor less than 16 years of age (s. 800.04{7}(a), F.S.); Operation of any place, structure, building, or conveyance for the purposes of lewdness (s. 796.07(2)(a0, F.S.); The unlawful exposing or exhibiting of one's sexual organs in public or on the private premises of another in a vulgar or indecent manner (s. 800.03, F.S.); Knowingly promoting, conducting, performing, or participating in an obscene show, exhibition, or performance by live persons or a live person before an audience (s. 847.011(4), F.S.; Breach of the peace and disorderly conduct with acts that are of such nature as to corrupt the public morals, or outrage the sense of public decency (s. 877.03, F.S.); and Maintaining a nuisance by erecting or maintaining a structure that tends to annoy the community or injure the health or the community, or becomes manifestly injurious to the morals or manners of the people (s. 8230.5(1), F.S.). DE1 at PageID 3, note 3.

that host drag shows. DE30 at PageID 441. In December 2022, the historic Plaza Live theater in Orlando hosted a Christmas drag show. The State sent undercover agents to the show, to determine whether children were being exposed to conduct that violated Florida's decency and obscenity laws. In an incident report written by state agents and published by the Miami Herald, undercover agents "did not witness any lewd acts such as exposure of genital organs." DE6 at PageID 106.

Still, the State's Department of Business and Professional Regulation (DBPR) filed a complaint against the nonprofit that runs Plaza Live, alleging in part that the venue violated Fla. Stat. § 800.04(7)(a), which prohibits "lewd or lascivious exhibition in the presence of a victim who is less than 16 years of age." DE6 at PageID 23; *see also* DE1 at PageID 8.  While that statute is not the subject of this litigation, the State's actions are highly instructive here.

Fla. Stat. 800.04 defines "lewd or lascivious exhibition" with great specificity:

**(a)** A person who:

**1.** Intentionally masturbates;

**2.** Intentionally exposes the genitals in a lewd or lascivious manner; or

**3.** Intentionally commits any other sexual act that does not involve actual physical or sexual contact with the victim, including, but not limited to, sadomasochistic abuse, sexual bestiality, or the simulation of any act involving sexual activity in the presence of a victim who is less than 16 years of age, commits lewd or lascivious exhibition.

19

Fla. Stat. 800.04(7)(a). The statute provides clear standards for both compliance with and enforcement of the law. Yet when the State's own undercover agents reported that they did *not* witness any lewd exhibition, the State took action against the Plaza Live anyway, seeking to strip the venue of its liquor license, a blow that would likely put the theatre out of business. DE1 at PageID 8.

The Plaza Live case demonstrates the seriousness of the threat against HM. Even while operating under a statute with such clearly-defined limitations, the State and its own agents could not agree about what constitutes "lewd and lascivious exhibition" in a drag show. The Act at issue in *this* case prohibits "lewd conduct" and "lewd exhibition" without defining either term, drastically expanding the State's ability to enforce the law at its whim.

HM operates a small business in Orlando, the same city where Plaza Live operates. HM hosts drag shows as a regular and core part of its business model, and permits minors accompanied by an adult to attend. And finally, enforcement of the Act is entrusted to DBPR and Secretary Griffin, who has already demonstrated an "appetite for finding obscenity in drag performances, even where undercover state agents have reportedly concluded none exists." DE30 at PageID 441. In light of these facts, HM's fear of prosecution is eminently reasonable.

20

**B. Traceability and Redressability**

HM's self-censorship is the direct result of the Act and the looming threat of enforcement by Secretary Griffin. In the absence of preliminary injunctive relief, HM will be forced to self-censor or risk losing its business. HM has Article III standing to bring its claims.

## II.    The Act is an Unconstitutional Regulation of Protected Speech

### A. The Act indisputably regulates protected speech.

In an attempt to spare the Act from strict scrutiny, the State claims that the Act exclusively regulates speech unprotected by the First Amendment because it "proscribes only the knowing exposure of a child to . . . speech that is obscene for children of that age." Doc. 30 at 25-26. This disregards a host of Supreme Court precedent that is directly on point.

"Obscenity" is a legally-defined category of speech that is unprotected by the First Amendment. *Miller v. California*, 413 U.S. 15, 24 (1973). Speech or content is "obscene" when,

> A. the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;
>
> B.  the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and
>
> C.  the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. 15 at 24. The Supreme Court has only sparingly labeled speech as "obscene." Most nudity – and much pornography – does not qualify as obscenity under *Miller*. Even simulated child sex abuse materials ("sexually explicit images that appear to depict minors but were produced . . . using adults who look like minors or by using computer imaging") do not inherently cross the line of the *Miller* test and trigger a strict scrutiny analysis. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 239 (2002). Speech that is "obscene" under *Miller* is distinct from speech that is merely indecent or offensive. "Sexual expression which is indecent but not obscene is protected by the First Amendment." *Sable Communications of Cal. v. FCC*, 492 U.S. 115, 126 (1989).

Fla. Stat. § 827.11 incorporates an amended version of the *Miller* standard to define "Adult live performance:

**(a)** "Adult live performance" means any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:

1. Predominantly appeals to a prurient, shameful, or morbid interest;

2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct **for the age of the child present**; and

3. Taken as a whole, is without serious literary, artistic, political, or scientific value **for the age of the child present**.

22

Fla. Stat. § 827.11 (emphasis added). In *Ashcroft v. ACLU*, 542 U.S. 656 (2004) ("*Ashcroft II*"), the Supreme Court considered the constitutionality of the Child Online Protection Act (COPA), a federal statute enacted to protect children from exposure to sexually explicit materials on the internet that were "harmful to minors." COPA defined "harmful to minors" by adapting the *Miller* test in a manner nearly identical to the Act's definition of "Adult live performance." [4] *Ashcroft II*, 542 U.S. at 661. The Supreme Court found that COPA was a content-based regulation on protected speech, because the law "effectively suppresses a large amount of speech that adults have a constitutional right to receive and address to one another[.]" *Id.* at 665 (quoting *Reno v. ACLU*, 542, U.S. 844, 874 (1997). The Court applied strict scrutiny, and determined that COPA violated the First Amendment. *Ashcroft II* conclusively contravenes the notion that the Act proscribes only unprotected speech.

---

[4] Any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that—

"(A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

"(B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and

"(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." § 231(e)(6).

23

To support its assertion that the Act regulates only unprotected speech, the State relies primarily on *Ginsberg v. New York*, 390 U.S. 629 (1968). *Ginsberg* is a pre-*Miller* case wherein the Supreme Court considered the constitutionality of a New York state law which prohibited the sale of certain explicit content to minors, such as pornographic "girlie" magazines. *Ginsberg*, 390 U.S. at 632. The statute at issue defined "harmful to minors" by adapting a pre-*Miller* definition of "obscenity:" *Id.* at 646. A bookseller who had been tried and convicted under the statute challenged the constitutionality of the law under the First Amendment, and the Court upheld the statute. *Id.*

The State notes that the definition of "harmful to minors" in the Act is substantially similar to that in *Ginsberg*; the Florida law adapts the *Miller* standard for obscenity to apply to minors, just as the New York law adapted the a pre-miller standard for obscenity to apply to minors. This comparison is technically accurate, but ultimately irrelevant to the question of whether the Act in this case regulates protected speech.

Contrary to the State's assertion, *Ginsberg* Court did not hold that "a statute of the same form as the Protection of Children Act does not regulate protected First Amendment speech at all." Doc. 30App. Br. at PageID 38-39. Rather, the Court considered whether it was constitutionally permissible "to accord minors under 17 a more restricted [First Amendment] right than that afforded to adults to judge and

determine what sex material they may read or see." *Ginsberg*, 390 U.S. at 637. The Court answered in the affirmative, and determined that the New York statute was not "an invasion of such minors' constitutionally protected freedoms." *Id.* at 638.

In *American Booksellers v. Webb*, 919 F.2d 1493, 1501 (11th Cir. 1990), this Court analyzed *Ginsberg* to mean that "[m]inors have no right to view or in any way consume" sexually explicit materials "obscene as to them," as defined by an adapted obscenity standard. *Webb*, 919 F.2d at1501. The State's argument would transform the *Ginsberg* holding to mean that such materials are legally obscene, and therefore entirely outside the bounds of the First Amendment. "*Ginsberg* did not address the difficulties which arise when the government's protection of minors burdens (even indirectly) adults' access to material protected as to them." *Id.* The bookseller challenged the law only in so far as it violated the First Amendment rights of minors under the age of 17, and did not claim that the law implicated the constitutional rights of adults. *Ginsberg*, 390 U.S. at 636. "We must look to other case law and general principles of First Amendment jurisprudence to discern the constitutional parameters of the government's power under these circumstances." *Webb*, 919 F.2d at 1501.

"The mere fact that a statutory regulation of speech was enacted for the important purpose of protecting children from exposure to sexually explicit material does not foreclose inquiry into its validity." *Reno*, 521 U.S. at 876. In its efforts to

skirt constitutional scrutiny, the State asks this Court to ignore decades of subsequent case law explicitly rejecting its arguments. This Court should decline to do so.

**B. The Act is a content-based regulation of protected speech.**

"As a general matter, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("*Ashcroft I*"). Content-based regulations on speech are therefore "presumptively unconstitutional," and must survive strict scrutiny "regardless of the government's benign motive" or "content-neutral justification." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law is content-based when it "'targets speech based on its communicative content' – that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Adver. of Austin, LLC.*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed*, 576 U.S. 155,163 (2015)). The district court correctly determined that the Act is a content-based regulation because the prohibited conduct cannot be defined without referencing the content of the speech. DE1 at PageID 16.

The Act does not prohibit children from attending *all* live performances. It only prohibits children from attending "adult live performances" which feature certain content, such as "nudity, sexual conduct, sexual excitement . . . lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it . . . offends

26

the prevailing standards in the adult community…with respect to what is suitable material…for the age of [a] child present". Fla. Stat. § 827.11(a). Therefore, the Act is a facially content-based restriction.

The State admits that the Act is a content-based law but argues that the proscribed speech is "unprotected" because it is "obscenity," making content discrimination permissible. Doc. 30 at 43 ("Content discrimination within a category of unprotected speech does not trigger strict scrutiny if that 'discrimination consists of entirely the very reason the entire class of speech at issue is proscribable.'"). But, as discussed previously, the Act does not regulate "obscenity" within the meaning of *Miller*. *See* discussion *supra Part I.A.1. [internal citation].* It regulates something more – content the government contends is indecent for children, but which is still protected speech for adults. Thus, as a facially content-based restriction on protected speech, the Act is subject to strict scrutiny.

C. **Alternatively, the Act was created for an impermissible purpose.**

"Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed*, 576 U.S. at 167 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). If this Court finds that the Act is facially

27

content-neutral, but that "an impermissible purpose or justification" underpins the law, then the law is still subject to strict scrutiny.

The text of the Act is "the best indicator of intent." *Nixon v. United States*, 506 U.S. 224, 232 (1993). The text of Fla. Stat. 827.11 demonstrates that the Act was "adopted by the government because of disagreement with the message the speech conveys." *Ward*, 491 U.S. at 791. While many terms in the Act appear elsewhere in the Florida code, "lewd exposure of prosthetic or imitation genitals or breasts" is unique to the Act. There are two primary categories of people who wear prosthetic breasts: people who have had mastectomies and drag performers. Since the Act specifically regulates "any show, exhibition, or other presentation in front of a live audience," the law is obviously targeted at the conduct of *performers* who wear prosthetic breasts. It targets drag performers.

Governor DeSantis, who signed the Act into law on May 17, 2023, stated just before signing the bill that the law was about "adult performances, like these drag shows" and described drag as "sexually explicit" and "adult entertainment."[5] While HM maintains that the text of the Act is sufficient to demonstrate impermissible purpose, statements from the Governor further supports that the Act was adopted by

---

[5] Full Press Conference: Governor Ron DeSantis signs education bills in Tampa (May 17, 2023) at timestamp 8:10, https://www.youtube.com/watch?v=t1kIP2dd2xc

the State to target drag, because the State disagrees with the message drag conveys. Thus, even if the law is facially neutral, it is still subject to strict scrutiny.

### D. The Act does not survive strict scrutiny because it is not narrowly tailored.

Because the Act is a content-based regulation, it is "presumptively unconstitutional" and must pass strict scrutiny. *Reed*, 576 U.S. at 163; *see also Ashcroft I* 535 U.S. at 573. Under strict scrutiny, the government bears the burden of proving that the law is narrowly tailored to serve compelling state interests. *Id.* (quoting *R.A.V.*, 505 U.S. at 395); *see also Ashcroft II*, 542 U.S. at 665. To make this determination, "the Court inquires 'whether the challenged regulation is the least restrictive means among available, effective alternatives.'" *Friends of Georges, Inc. v. Mulroy*, 2:23-cv-02163-TLP-tmp, 56-57 (W.D. Tenn. Jun. 2, 2023) (quoting *Ashcroft II*, 542 U.S. at 666).

HM acknowledges the State's "compelling interest in protecting the physical and psychological well-being of minors." DE1at PageID 10 (quoting *Sable*, 482 U.S. at 126. Even still, it is insufficient for the State to merely show that the Act effectively protects children. Furthermore, HM is not required "to introduce, or offer to introduce, evidence that [its] proposed alternatives are more effective. The Government has the burden to show they are less so." *Ashcroft II*, 542 U.S. at 669. The government cannot make this showing because it has not chosen the least restrictive means of regulating inappropriate content for minors.

First, despite including a "knowledge" requirement, the Act seemingly creates a strict liability offense as to the age of the child present. When a crime contains a *mens rea* requirement, as the Act does, absence of *mens rea* is inherently a defense to prosecution. Yet the Act precludes such a defense stating that "[a] person's ignorance of a child's age, a child's misrepresentation of his or her age, or a bona fide belief of a child's consent may not be raised as a defense in a prosecution for a violation of this section." Fla. Stat. § 827.11(2). Thus, even with stringent security measures and I.D. checks, a person may face criminal prosecution under the Act for *unknowingly* admitting a child to a prohibited performance. The legislature could have written the law to require the "willful admission" of a child to a proscribed performance, as it has done in the context of liability arising from the sale of alcohol to minors. *See* Fla. Stat. § 768.125. The State offers no explanation whatsoever as to why a willfulness requirement as to the child's age would not suffice in this context.

Second, the Act contains no exception for parental consent, which the Supreme Court has repeatedly taken issue with. For example, in *Ginsberg,* 390 U.S. 629 (1968), the Court upheld a law prohibiting the sale of "girlie magazines" to minors under the age of 17, in part because "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." *Id*. Relying on the "principle that 'the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our

society,'" the Supreme Court specifically distinguished the contested statute in *Reno* from that in *Ginsberg*, beginning with the fact that the statute in Reno failed to provide a parental consent exception. *Reno v. ACLU*, 521, 542 U.S at 874.. Furthermore, the Court found that user-based software which parents could use to "prevent their children from accessing material which the *parents* believe is inappropriate" was a sufficient alternative to the criminal statute, even though such software was only hypothetical at the time the Court rendered its decision. *Id.* at 877 (emphasis original).

The Act provides no such limiting language or affirmative defenses. If parental monitoring was a sufficient alternative to regulating internet pornography, it is certainly a sufficient alternative to regulating the far broader category of expression that falls under whatever the State arbitrarily interprets as "lewd conduct."

Third, the State argues that its interest in protecting children does not "depend on the disparate views of individual parents." Doc. 30 at 31. Nevertheless, the State's disregard for the rights of parents to "direct the rearing of their children" is inconsistent with other Florida law, specifically the Florida "Parents' Bill of Rights." Fla. Stat. § 1014 (2023). This statute states that, "All parental rights are reserved to the parent of a minor child in this state…including…[t]he right to direct the upbringing and the moral or religious training of his or her minor child." *Id.* As the

31

district court notes, "this comports with other laws in Florida, such as Fla. Stat. §

847.013, which governs the exposure of minors to 'harmful motion pictures,

*exhibitions, shows, presentations*, or representations.' That law prohibits the kind of

obscene material described in *Miller* and, indeed, the Act here, with the exception

that it does not incorporate ambiguities like 'lewd conduct' or 'lewd exposure of

prosthetic or imitation genitals or breasts.'" DE30 at PageID 447 (citing §

847.013(3)). Critically, however, § 847.013 includes a limiting provision which

specifically allows for minors *of any age* to attend such exhibitions if they are

accompanied by a parent. Fla. Stat. § 847.013(3)(c); *see also* DE30 at PageID 447.).

The State has offered no explanation why parental consent is a suitable exception

under § 847.013 but not § 827.11.

Finally, the Act differs from the statutes like those in *Ginsberg* and *Webb* in

several other ways. For example, "the statute in *Ginsberg* only applied to

commercial transactions, as opposed to the apparent universal application of §

827.11 to anyone, anywhere—the statute does not define a 'live performance,' which

could conceivably range from a sold-out burlesque show to a skit at a backyard

family barbecue." DE30 at PageID 446 (citing *Reno*, 521 U.S. at 865).

Furthermore, the Act fails to define other important terms: "lewd conduct;"

and "lewd exposure of prosthetic or imitation genitals or breasts." See DE30 at

PageID 446; *Reno*, 521 U.S. at 865 (distinguishing *Ginsberg* from a statute which

32

included, without definition, the term "indecent"). Such ambiguities "represent a material departure from the established obscenity outline set forth in *Miller*." *See* DE30 at PageID 446 (citing *Miller*, 43 U.S. at 24 and *Webb*, 919 F.2d at 1513). Unlike comparable statutes which target commercial activity and are more narrowly tailored in their scope to allow for parental discretion, specific age thresholds, and clearly defined terms, the district court found that "§ 827.11 proscribes conduct universally and threatens to permit 'a standardless sweep [which would] allow[] policemen, prosecutors, and juries to pursue their personal predilections.'" DE30 at PageID 447 (citing *Smith v. Goguen*, 415 U.S. 566, 575 (1974)). At the very least, a functional *mens rea* requirement or parental consent exception would be less restrictive means for achieving the State's interest in protecting children from inappropriate material.

## III.   The Act is Unconstitutionally Vague

A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citations omitted). As the district court pointed out, the "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory

enforcement." DE30 at PageID 448 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Courts are especially concerned with discriminatory enforcement of vague statutes. The Supreme Court has held that "legislatures [are required to] establish minimal guidelines to govern law enforcement." *Id.* at 358.  The text of § 827.11 is open to numerous interpretations, leaving the Act ripe for discriminatory enforcement. *See* Doc. 30 at 40.

As the district court noted, "there are several aspects of § 827.11 that raise vagueness concerns." DE30 at PageID 448. Without the benefit of a full trial on the merits, the district court focused its vagueness analysis on the text of the statute, specifically the undefined terms "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts." DE30 at PageID 448-449. HM does not dispute the State's assertion that "a statute is not ambiguous merely because it contains a term without a statutory definition." Doc. 30 at 40 (quoting *United States v. Sepulveda*, 115 F.3d 882, 886 (11th Cir. 1997)). But, despite the State's implication to the contrary, the district court did not deem the Act vague solely because it failed to define "lewd conduct" or "lewd exposure." Doc. 30 at 40. Rather, the district court attempted to apply the definitions provided by the State, which only exacerbated the vagueness issue.

In an attempt to define "lewd conduct" and "lewd exposure" on behalf of the legislature, the State points to one United States Supreme Court case, one Florida criminal law case, and a set of Florida Supreme Court Jury Instructions.

The State cites to *United States v. 12 200-Ft. Reels of Super 8mm. Film,* 413 U.S. 123, 130 n.7 (1973) as an example of the Supreme Court finding a statute using "lewd" to not be void for vagueness. The statute at issue in *12 200-Ft. Reels* involved the importation of obscene articles into the United States and is "markedly distinguishable" from Fla. Stat. § 827.11. DE30 at 22. In a footnote, the Supreme Court prospectively interpreted "lewd" – in the context of the specific statutes at issue – to mean "hard core sexual conduct given as examples in Miller." *Id.* In *12 200-Ft Reels*, "lewd" is used to describe static, unchanging materials such as a "book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article." *Id.* Such content is definitively knowable by a defendant in advance of importation. In contrast, "lewd conduct" and "lewd exposure" in the Fla. Stat. § 827.11 are used to define the content of live performances, which frequently include improvisation and spontaneous interactions with audience members.

The State also provides two possible definitions that can be found in existing Florida law. The first is a jury instruction that defines "lewd" as "wicked, lustful,

unchaste, licentious, or sensual intent on the part of the person doing an act" (Fla. Bar, Criminal Jury Instructions S 11.10(d)). As the district court notes, this definition "serves only to further broaden the scope of what may be covered by using terms like 'wicked,' 'lustful,' and 'unchaste' – all vulnerable to broad subjectivity which ultimately leaves an individual of common intelligence to 'necessarily guess at [their] meaning.'" DE30 (citing *Connally*, 269 U.S. at PageID 449). Furthermore, this definition is used to retroactively categorize the criminal *intent* of a defendant in a trial context. It is not used in real-time to subjectively describe or analyze evolving, context-specific conduct.

Finally, the State cites to a fifty-year-old Florida Supreme Court case, which defines "lewd" as "an unlawful indulgence in lust, eager for sexual indulgence." *Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971); Doc. 30 at 40-41. *Chesebrough* again presents a drastically different context from the instant case. First, the statute in *Chesebrough* did not involve government restriction of protected speech. It was an as-applied challenge by a defendant accused of knowingly exhibiting sexual intercourse to her fourteen-year-old son. The Florida Supreme Court "primarily held that this particular egregious act sufficiently fell within the bounds of a 'lewd and lascivious act.'" DE30 at PageID 451. The Florida statute at issue in *Chesebrough* included detailed descriptions of the prohibited conduct, including "handl[ing], fondl[ing] or mak[ing] an assault upon any male or female

36

child under the age of fourteen years in a lewd, lascivious or indecent manner" and "knowingly commit[ting] any lewd or lascivious act in the presence of such child, without intent to commit rape." Fla. Stat. § 800.04. In the context of § 800.04, the Florida Supreme Court stated that these terms are "in common use, and the definitions indicate with reasonable certainty the character of the acts and conduct" prohibited. *Chesebrough*, 255 So. 2d at 676. The court went on to explain that "when used in a statute to define an offense," lewd and lascivious can be defined as "an unlawful indulgence in lust, eager for sexual indulgence." *Id.* at 677. As the district court points out, "that calculation was understandably less opaque in a case which held that sexual intercourse exhibited to a fourteen-year-old was sufficient to constitute a 'lewd and lascivious act'." DE30 at PageID 450.

Most critically, this case is from 1971, a time when "lewd and lascivious" may very well have been in common use. But "definitions of 'an unlawful indulgence in lust, eager for sexual indulgence,' do very little to inform a 'person of ordinary understanding [today] … what conduct on his part is condemned' under Fla. Stat § 827.11. DE30 at PageID 451.

Taken independently or together, citizens of Florida have no meaningful way to discern what conduct is prohibited by the Act. Would Taylor Swift's performance of "Vigilante Shit" at the Eras Tour constitute "an unlawful indulgence in lust, eager for sexual indulgence"? What about performances by the Miami Dolphins

cheerleaders? Defining "lewd" to include "wicked, lustful, unchaste, licentious, or sensual design on the part of the perpetrator," sweeps in a range of conduct susceptible to discriminatory enforcement. For example, "a fully clothed drag queen with cleavage-displaying prosthetic breasts reading an age-appropriate story to children may be adjudged "wicked"—and thus "lewd"—by some, but would not constitute the kind of obscene conduct prohibited by the statutes in cases like *Miller.*" DE30 at PageID 451. Similarly, many people have claimed that Taylor Swift's performances in the Eras Tour are witchcraft and adjudged "wicked." Neither of these examples "constitute the kind of obscene conduct prohibited by the statutes in cases like *Miller*." *Id*. Rather, they demonstrate how the vague statutory language is "dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected speech – which distinguishes § 827.11 and renders HM's claim likely to succeed on the merits." *Id.*

## IV.   Scope of relief

### A. The scope of the preliminary injunction is appropriate because the district court found that the Act is likely overbroad – the 11th Circuit and the Supreme Court of the United States agree.

The State alleges that the district court exceeded its equitable powers when it enjoined enforcement of the Act statewide. The State puts forward a theory of "traditional equitable remedies" that explains how, in the State's view, the law *should* be. While this makes for an interesting academic exercise, it is not the law.

38

The State's Brief does not meaningfully engage with modern precedent that is directly on-point, such as *Ashcroft II*. The two primary contemporary cases that the State cites, *United States v. Nat'l Treas. Emps. Union ("NTEU")*, 513 U.S. 454 (1995) and *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) have already been analyzed and distinguished from the present case by both this Court and the Supreme Court.

The district court found that HM is likely to succeed on the merits of its overbreadth claim, because the Act is "dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected speech[.]" DE30 at PageID 451-452. It is well-settled in both Supreme Court and 11th Circuit precedent that a successful facial overbreadth challenge "suffices to invalidate *all* enforcement of th[e] law 'until and unless a limiting construction or partial invalidation so narrows it as to remove the threat or deterrence to constitutionally protected expression.'" *Hicks*, 539 U.S. at 119 (emphasis in original) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)); *See, e.g., FF Cosmetics Fl, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1303-04 (11th Cir. 2017) (relying on *Broadrick* and explaining that enforcement of the overbroad ordinance was "totally forbidden" until it was judicially narrowed or partially invalidated); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1262, 1273 (2006) (permanent injunction: "Quite simply, the district court did not abuse its discretion by enjoining the enforcement

of section 1.0 of the [billboard] ordinance."); *Clean Up '84 v. Heinrich*, 759 F.2d 1511, 1512–1514 (11th Cir. 1985) (affirming a district court's ruling that a Florida statute prohibiting the solicitation of signatures on petitions within 100 yards of a polling place was facially overbroad and affirming a preliminary injunction prohibiting enforcement of the statute).

The State relies on two Supreme Court decisions for the proposition that, as a general rule, even where courts apply the overbreadth and chilling effect doctrines, relief should be narrowed only to the parties before the court. Neither case bears any resemblance to the instant dispute. The first case is *United States v. Nat'l Treas. Emps. Union*. *NTEU* addressed a preliminary injunction barring enforcement of a federal ban on all executive branch employees of any grade or rank from accepting payment for writing or speaking engagements regardless of whether there was a nexus with their actual employment. *NTEU*, 513 U.S. at 477. The plaintiffs were a class comprising "all Executive Branch employees below grade GS-16" and a single GS-16 lawyer for the Nuclear Regulatory Commission who had published articles unrelated to his position in the Executive Branch. The injunction on appeal applied to "the entire Executive Branch of the Government" including officials above grade GS-15 who were not party to the case.

The government asked the Supreme Court to narrow the injunction by permitting enforcement against employees who were not party to the case –

40

Executive Branch employees above grade GS-15. *Id.* Those officials had also received a 25% pay increase to offset the ban. *Id.* The Court reasoned that Congress "reasonably could assume that payments of honoraria to judges or high-ranking officials in the Executive Branch" might result in the "appearance of improper influence." *Id.* But the government provided no similar justification for applying the ban to low-level employees "with negligible power to confer favors on those who might pay to hear them speak or to read their articles." *Id.* Thus, it made sense for the Court to narrow the scope of the injunction to the parties before the Court, which included all Executive Branch employees below grade GS-16. The Court made no finding of overbreadth in that case. *See id.* at 46-46, 60 (declining to entertain a facial challenge where respondents admitted their objective could be achieved through an as-applied challenge). HM did not bring an as-applied challenge here, and the district court determined that HM is likely to succeed on its overbreadth claim. DE30 at PageID 451-452.

The second case the State relies on is *Doran v. Salem Inn, Inc.* At issue in *Doran* was a local strip club ordinance, rather than a state law. Two of the *Doran* plaintiffs had complied with the ordinance and sought pre-enforcement relief; the third plaintiff had violated the ordinance and was already being prosecuted in state court. In that case, the Supreme Court considered whether federal injunctive relief is permitted when a state prosecution is pending against the plaintiff. The Court

limited the scope of the injunction to the two compliant corporations, affirming that the *Younger* doctrine bars federal courts from issuing injunctions if doing so would interfere with pending state proceedings. *Doran*, 442 U.S. at 931. The injunction in this case does not interfere with any existing state court prosecutions, because the law has not yet been enforced. Doc. 26 at 9. *Doran*, too, is inapposite.

The State argues that the panel majority's reasoning in this case "conflates the merits of a legal claim with the scope of the remedy for that claim." Doc. 26 (quoting Brasher, J., dissenting from denial of partial stay). But the panel did not merely infer this remedy from the overbreadth doctrine. Rather, the Supreme Court explicitly "provided this *expansive remedy* out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech." *Hicks*, 539 U.S. at 119. (emphasis added). "Overbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces the social costs caused by the withholding of protected speech." *Id*.

The overbreadth doctrine is concerned not only with the parties before the court, but with a chilling effect on society as a whole. The State asks this Court to require that every person affected by an overbroad restriction on speech litigate the issue individually in order to secure their own rights. This impracticality is precisely what the overbreadth doctrine seeks to remedy. "Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights

42

through case-by-case litigation, will choose simply to abstain from protected speech – harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id*.

> **B. The scope of relief is proper, because the district court determined that the Act is likely overbroad.**

Finally, the State argues that HM lacks standing to bring an overbreadth challenge as a result of "the district court's conclusion that the Act was unconstitutional as applied to Hamburger Mary's." DE30 at PageID 66. According to the State, such a finding precludes HM's overbreadth claim, because the overbreadth doctrine permits plaintiffs to challenge the constitutionality of a statute on its face only when "*the statute is constitutional as applied to the plaintiff*." DE30 at PageID 67. (emphasis original). This argument is unserious at best.

First, the district court did not make any finding that "the Act was unconstitutional as applied to Hamburger Mary's," because HM did not bring an as-applied challenge to this case. The only factual findings the district court made as to HM were for the purpose of determining whether HM had Article III standing to bring suit. *See* DE30 at PageID 438-443. Nowhere in the merits portion of its order does the district court analyze whether or not the Act *would be* constitutional if it were applied to HM. Instead, the district court conducted a thorough analysis of First Amendment precedent as it applies to the text of the Act, and determined that the Act, on its face, does not survive strict scrutiny and is unconstitutionally vague and

43

overbroad. The merits analysis scarcely mentions Plaintiff-Appellee at all, except to refer to the legal arguments put forth in HM's Motion. *See* DE30 at PageID 444-445; 448.

Second, even if the district court had made such a finding, the State's argument grossly misconstrues the boundaries of the overbreadth doctrine. Under traditional rules of constitutional adjudication, "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick*, 413 U.S. at 610. In the First Amendment context, however, the Supreme Court has relaxed this traditional rule of standing to permit a plaintiff to "challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* at 612. The State's argument construes this expansion of standing as a limitation, narrowing the overbreadth doctrine in First Amendment challenges to *only* those litigants whose rights are not violated.

The State's argument is not new, and it has been explicitly rejected by the Supreme Court. In *Bd. of Trs. v. Fox*, 492 U.S. 469 (1989), the Supreme Court considered the constitutionality of a State University of New York regulation which prohibited the operation of private commercial enterprises in student dormitories.

44

The student plaintiffs who challenged the regulation brought both an as-applied challenge and a facial overbreadth claim. The basis for the facial overbreadth challenge in *Fox* was not "hypothetical applications to third parties, but applications to the student respondents themselves[.]" The Supreme Court held that, "while the overbreadth doctrine was born as an expansion of the law of standing, it would produce absurd results to limit its application strictly to that context." *Id.* at 484.

Here, district court made no findings about the application of the Act to HM; it did not need to, because HM did not bring an as-applied challenge. Regardless, the Supreme Court's holding in *Fox* settles the matter. The district court did not abuse its discretion when it determined for the purpose of a preliminary injunction that the Act is likely overbroad.

## CONCLUSION

For the foregoing reasons, this Court should affirm the ruling of the district court.

Respectfully submitted,
*Melissa J. Stewart*

Brice M. Timmons, #29582
Melissa J. Stewart, #40638
Craig A. Edington, #38205
Shelby N. Teeter, # 1780239
Donati Law, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 (Office)

45

(901) 278-3111 (Fax)
melissa@donatilaw.com

## CERTIFICATE OF COMPLIANCE

1.  This document complies with the Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 11,152 words

2.  This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27, Federal Rule of Appellate Procedure 32(a)(5), and Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface in 14-point Times New Roman font using Microsoft Word.

/s/ Melissa J. Stewart
Counsel for Plaintiff-Appellee

**CERTIFICATE OF SERVICE**

I certify that on January 22, 2024, I electronically filed this Response with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Melissa J. Stewart*
Counsel for Plaintiff-Appellee
