# In the United States Court of Appeals for the Eleventh Circuit

HM FLORIDA-ORL, LLC,

*Plaintiff-Appellee,*

v.

MELANIE GRIFFIN, Secretary, Department of Business and Professional Regulation, State of Florida,

*Defendant-Appellant.*

## DEFENDANT-APPELLANT'S REPLY BRIEF

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 6:23-cv-950-GAP-LHP

ASHLEY MOODY
  *Attorney General*

HENRY C. WHITAKER
  *Solicitor General*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300 (phone)
(850) 414-2672 (fax)
nathan.forrester@myfloridalegal.com

February 12, 2024

JEFFREY PAUL DESOUSA
  *Chief Deputy Solicitor General*
NATHAN A. FORRESTER
  *Senior Deputy Solicitor General*
BRIDGET K. O'HICKEY
  *Assistant Solicitor General*
WILLIAM H. STAFFORD III
  *Special Counsel*

*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendant-Appellant certifies that, to the best of her knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5:

1. America First Legal Foundation

2. Department of Business and Professional Regulation, State of Florida

3. DeSantis, Ron

4. DeSousa, Jeffrey Paul

5. Edgington, Craig A.

6. Forrester, Nathan A.

7. Griffin, Melanie

8. HM Florida-ORL, LLC

9. Israel, Gary S.

10. Mitchell, Jonathan F.

11. Moody, Ashley

12. O'Hickey, Bridget K.

13.　　Presnell, Hon. Gregory A.

14.　　Price, Hon. Leslie Hoffman

15.　　Stafford, William H.

16.　　Stewart, Melissa

17.　　Timmons, Brice M.

18.　　Whitaker, Henry Charles

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................. 3

I.     Hamburger Mary's did not plead, much less prove, facts sufficient to support Article III standing ........................................ 3

II.    The Protection of Children Act does not regulate constitutionally protected speech. ................................................. 7

      A.     The Act does not impose any restriction, let alone a content-based restriction, on the speech of adults. ............... 8

      B.     The Act's purpose is not viewpoint- or content-based. ......... 10

      C.     The Act does not infringe the First Amendment rights of children. ............................................................. 13

III.   The Protection of Children Act is not vague .................................. 22

IV.   Even if Hamburger Mary's were entitled to a preliminary injunction, the district court erred in enjoining the Protection of Children Act universally. ....................................... 26

CONCLUSION ........................................................................... 31

CERTIFICATE OF COMPLIANCE ...................................................... 32

CERTIFICATE OF SERVICE ............................................................. 33

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003) ............................................................. 16

*Am. Booksellers v. Webb*,
919 F.2d 1493 (11th Cir. 1990) .................................... 2, 13, 14, 16, 20

*Ashcroft v. ACLU*,
535 U.S. 564 (2002) ........................................................................ 17

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ...................................................................... 8, 10

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) ........................................................................ 15

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989) .................................................................... 29, 30

*Bischoff v. Osceola Cnty.*,
222 F.3d 874 (11th Cir. 2000) ........................................................... 4

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ........................................................................ 29

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) ........................................................................ 18

*Chesebrough v. State*,
255 So. 2d 675 (Fla. 1971) .................................................... 22, 23, 24

*Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*,
777 F.2d 598 (11th Cir. 1985) ........................................................... 4

*Church v. City of Huntsville*,
30 F.3d 1332 (11th Cir. 1994) ........................................................... 5

*City of Miami Gardens v. Wells Fargo & Co.*,
  931 F.3d 1274 (11th Cir. 2019) ...........................................5

*Doe v. Nat'l Bd. of Med. Ex'rs*,
  199 F.3d 146 (3d Cir. 1999) ...............................................4

*Elec. Priv. Info. Ctr. v. United States Dep't of Com.*,
  928 F.3d 95 (D.C. Cir. 2019) .............................................4

*Ex parte Lo*,
  424 S.W.3d 10 (Tex. Crim. App. 2013) ...........................15

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)..........................................................23

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ...........................................5

*Free Speech Coal., Inc. v. Att'y Gen. of U.S.*,
  677 F.3d 519 (3d Cir. 2012) .............................................27

*Ga. Pac. Corp. v. Occupational Safety & Health Rev. Comm'n*,
  25 F.3d 999 (11th Cir. 1994) ............................................23

*Georgia v. President of the U.S.*,
  46 F.4th 1293 (11th Cir. 2022) ........................................26

*Ginsberg v. New York*,
  390 U.S. 629 (1968).................. 8, 12, 13, 14, 15, 18, 20

*Gonzales v. Carhart*,
  550 U.S. 124 (2007)..........................................................25

*Hill v. Colorado*,
  530 U.S. 703 (2000)..........................................................24

*Jones v. Governor of Fla.*,
  975 F.3d 1016 (11th Cir. 2020).................................23, 25

*Lowe v. State,*
    40 So. 3d 789 (Fla. 5th Dist. Ct. App. 2010) ....................................... 11

*Miller v. California,*
    413 U.S. 15 (1973) ........................................................ 12, 13, 14, 15

*Pittman v. Cole,*
    267 F.3d 1269 (11th Cir. 2001) ....................................................... 3

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ................................................................. 15

*Renne v. Geary,*
    501 U.S. 312 (1991) ................................................................. 29

*Reno v. ACLU,*
    521 U.S. 844 (1997) .......................................... 8, 9, 10, 15, 18, 19, 20

*Sable Commc'ns of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989) ....................................................... 10, 15, 17

*United States v. 12 1200-Ft. Reels of Super 8mm. Film,*
    413 U.S. 123 (1973) ................................................................. 22

*United States v. Conage,*
    50 F.4th 81 (11th Cir. 2022) ......................................................... 15

*United States v. Duran,*
    596 F.3d 1283 (11th Cir. 2010) ....................................................... 24

*United States v. Hansen,*
    599 U.S. 762 (2023) ........................................................ 27, 28, 30

*United States v. Waymer,*
    55 F.3d 564 (11th Cir. 1995) ......................................................... 25

*United States v. Williams,*
    553 U.S. 285 (2008) ............................................................. 23, 27

*Wollschlaeger v. Governor*,
    814 F.3d 1159 (11th Cir. 2015) ........................................................ 3, 4

**Statutes**

18 U.S.C. § 2256 ................................................................................. 15

47 U.S.C. § 230 ................................................................................... 18

47 U.S.C. § 231 ................................................................................. 9, 10

Fla. Stat. § 800.04 ............................................................................... 11

Fla. Stat. § 827.11 ......................................... 6, 9, 11, 12, 14, 16, 20, 21

Fla. Stat. § 847.001 ........................................................................ 11, 14

Fla. Stat. § 847.013 ........................................................................ 10, 11

Tex. Penal Code § 33.021 ..................................................................... 15

**Rules**

Fed. R. Civ. P. 23 ................................................................................. 26

# INTRODUCTION

In its response brief, Hamburger Mary's persists in its fundamental confusion of the speech rights of adults with the speech rights of children. Hamburger Mary's insists that Florida's Protection of Children Act is content-based, and therefore subject to strict scrutiny, merely because it requires adults who are hosting sexually explicit live performances to exclude children for whom those performances would be obscene. This is simply not correct.

To be considered a restriction on the speech rights of adults, the Protection of Children Act would have to either (1) prevent adults from hosting or participating in sexually explicit live performances or (2) prevent adults from viewing sexually explicit live performances. The Act does neither. The adult proprietors and entertainers at Hamburger Mary's can continue with all their live performances—and the adult patrons who wish to attend those live performances can continue to do so—without the slightest interference.

The only thing the proprietors of Hamburger Mary's cannot do is admit children for whom the live performances would be obscene. But this is self-evidently not a First Amendment right, any more than adults

have a right to admit other adults to live performances that are obscene for adults. The Protection of Children Act thus affects no First Amendment rights of adults, not even at the margins.

The Act affects only the rights of children. And because it prevents children from viewing only those live performances that would be obscene *as to them*, it applies only to speech that is beyond the protection of the First Amendment. "[A] state may, absent an impermissible burden on adults, deny minors all access *in any form* to materials obscene as to them." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1501 (11th Cir. 1990). The Protection of Children Act is therefore not subject to strict or indeed any kind of heightened scrutiny.

Hamburger Mary's remaining attempts to defeat the arguments in the State's initial brief are no more sound. For purposes of Article III standing, Hamburger Mary's did not prove, as was its burden, that it had suffered or would suffer injury in fact that is traceable to the Protection of Children Act. Hamburger Mary's likewise cannot show that "lewd"—a word of longstanding common-law and statutory usage—is unconstitutionally vague. And even if Hamburger Mary's did have Article III standing, and could show a likelihood of success on the merits of either its free-

speech or its vagueness claim, Hamburger Mary's has no basis for enjoining the Protection of Children Act universally. For all these reasons, the district court's award of a preliminary injunction should be reversed.

## ARGUMENT

### I.  Hamburger Mary's did not plead, much less prove, facts sufficient to support Article III standing.

In seeking a preliminary injunction, Hamburger Mary's did not meet its burden of proving that it satisfied all the elements of Article III standing. In particular, it did not prove injury in fact. Hamburger Mary's concedes that, "[t]o establish a cognizable self-censorship injury in the First Amendment context," it "must show 'an intention to engage in a course of conduct arguably . . . proscribed by a statute'" and "'a credible threat of prosecution.'" Resp. Br. 12 (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001); *Wollschlaeger v. Governor*, 814 F.3d 1159, 1173–75 (11th Cir. 2015)). Similarly, to show "a cognizable self-censorship injury for a vagueness claim," Hamburger Mary's must show that "(1) [it] seriously wishes to speak; (2) such speech would arguably be affected by the rules, but *the rules are at least arguably vague as they apply to [it]*; and (3) there is at least a minimal probability that the rules will be enforced, if they are violated." *Id.* (quoting *Wollschlaeger*, 814 F.3d at

1175) (emphasis added). For purposes of its preliminary-injunction motion, Hamburger Mary's made neither showing.

This Court has made clear that it cannot grant a preliminary injunction based on "naked allegations." *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 777 F.2d 598, 608 (11th Cir. 1985). This is no less true for Article III standing than for any other element of preliminary injunctive relief. *See Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 152 (3d Cir. 1999) ("[M]ere allegations will not support standing at the preliminary injunction stage."). Accordingly, and contrary to what it suggests in its brief (at 11), Hamburger Mary's had to do more than "plead facts" that would support standing to seek a preliminary injunction. It had to supply actual evidence. *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000) ("Moreover, each element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'").[1] The only evidence

---

[1] *See also Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("In determining whether the plaintiff has 'a substantial likelihood of success on the merits,' then, we have considered whether the plaintiff has a 'substantial likelihood of standing'—that is,

Hamburger Mary's supplied in this case, prior to the district court's entry of the preliminary injunction, was its verified complaint. App. 12–32. Hamburger Mary's is therefore confined to the representations in that complaint and cannot supplement those representations with elaborations in its appellate brief.

In its verified complaint, Hamburger Mary's stated that it offered "'family friendly' drag performances announced on Sundays where children [we]re invited to attend." App. 17. The verified complaint insist[ed] that "[t]here [wa]s no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate

---

whether the plaintiff is likely to be able to demonstrate standing at the summary judgment stage." (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)).

In *Church v. City of Huntsville*, this Court allowed the plaintiffs seeking a preliminary junction to establish standing from the allegations in their complaint, but only because the defendant there had failed to question the plaintiffs' standing in the district court. 30 F.3d 1332, 1336 (11th Cir. 1994); *see also City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1285 (11th Cir. 2019) ("To be sure, both this Court and the Supreme Court have determined that in limited circumstances, the absence of notice of the need to prove standing may mandate either the application of a more lenient standard or remand for further development of the record."). Here, the State contended in its very first filing in this case—the motion to dismiss and response to Hamburger Mary's preliminary-injunction motion, App. 77–81—that Hamburger Mary's lacked standing to file its complaint.

for a child to see." *Id*. This is all the verified complaint said about the live performances Hamburger Mary's hosted at its restaurant. It made no mention of any other shows or what happened during them.

Hamburger Mary's argues (at 13) that it "never claimed . . . that *all* of its drag performances are appropriate for children of *all* ages." But neither did it claim—or put on evidence—that any of its drag performances were *not* appropriate for children of all ages, or that those performances came anywhere close to "depict[ing] or simulat[ing] nudity, sexual conduct, sexual excitement, or specific sexual activities as . . . defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts." Fla. Stat. § 827.11(1)(a). Hamburger Mary's response brief alludes to the existence of other shows that might not be as family-friendly as its Sunday brunch. But Hamburger Mary's introduced no evidence about those shows into the preliminary-injunction record. Without such evidence, Hamburger Mary's failed to show that its drag shows would even arguably be "proscribed" by the Protection of Children Act. Hamburger Mary's thus failed to supply an essential factual predicate for injury in fact and did not establish Article III standing for purposes of a preliminary injunction.

For the same reason, Hamburger Mary's did not establish standing to seek a preliminary injunction on its Fourteenth Amendment claim. It did not raise any evidence that the Act was "arguably vague" as applied to its shows. In fact, the evidence in the preliminary-injunction record indicated that the Act did not apply at all, because Hamburger Mary's affirmatively stated that its shows were "family friendly," devoid of anything meeting the statutory definition of an "adult live performance." Again, without evidence of other shows besides the Sunday brunch, Hamburger Mary's gave the district court no basis to find injury in fact.

For these reasons alone, the district court should have denied Hamburger Mary's motion for a preliminary injunction.

## II. The Protection of Children Act does not regulate constitutionally protected speech.

Aside from its lack of Article III standing, Hamburger Mary's failed to show a likelihood of success on the merits. Hamburger Mary's argues that the Protection of Children Act likely violates the First Amendment because it regulates speech that would not be obscene for adults, Resp. Br. 23, and does so based on the content of that speech, Resp. Br. 26. The Actors' Equity Association argues similarly in its amicus brief (at 8–9). These arguments entirely miss the mark. The Act does not restrict the

speech rights of adults in the slightest, let alone based on content. It restricts the speech rights of children, but only by preventing children from viewing live performances that are obscene for them. That restriction is consistent with longstanding precedent in the Supreme Court and in this Court. Because the Act does not infringe the speech rights of adults or children, it is not subject to heightened First Amendment scrutiny. The district court therefore erred in finding that Hamburger Mary's was likely to succeed on the merits of its First Amendment claim.

## A.    The Act does not impose any restriction, let alone a content-based restriction, on the speech of adults.

The State is not arguing, as Hamburger Mary's suggests, that materials obscene for children (under the age-variable standards approved in *Ginsberg v. New York*, 390 U.S. 629 (1968), and its progeny) are also obscene for adults "and therefore entirely outside the bounds of the First Amendment." Resp. Br. 25. Of course not. A restriction on children's access to materials obscene as to them might still be subject to First Amendment scrutiny, insofar as it "heav[ily] burden[ed]" the right of adults to produce or view those materials. *Reno v. ACLU*, 521 U.S. 844, 882 (1997); *see also Ashcroft v. ACLU* ("*Ashcroft II*"), 542 U.S. 656, 665 (2004) ("A statute that 'effectively suppresses a large amount of speech that adults

have a constitutional right to receive and to address to one another . . . is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.'" (quoting *Reno*, 521 U.S. at 874)). But the question here is not whether the Act too heavily burdens the non-obscene speech of adults. The question, which Hamburger Mary's and its amici fail to engage, is how the Act burdens the speech of any adults at all.

By its terms, the Protection of Children Act's restrictions apply only to children. The Act does not prohibit any adult from (1) putting on what it defines as an "adult live performance" or (2) viewing an "adult live performance." The only restriction is that a child for whom the show would be obscene must be excluded from it. Fla. Stat. § 827.11(3). The show can otherwise go on without any change in content.

In short, it is simply not the case that the Protection of Children Act "regulates . . . content the government contends is indecent for children, but which is still protected speech for adults." Resp. Br. 27. As Hamburger Mary's itself states, the Supreme Court found the Child Online Protection Act to be content-based and therefore subject to strict scrutiny only because it "effectively suppresse[d] a large amount of

speech that adults have a constitutional right to receive and address to one another." *Ashcroft II*, 542 U.S. at 665; Resp. Br. 23. Because the Protection of Children Act, unlike the Child Online Protection Act, suppresses no protected speech for adults, it cannot be content-based and subject to strict scrutiny.

## B.  The Act's purpose is not viewpoint- or content-based.

Hamburger Mary's is also wrong that "the Act was created for an impermissible purpose"—to "target[] drag performers." Resp. Br. 27–28. The Protection of Children Act was passed to fill gaps in existing law and comprehensively prohibit exposing children to age-inappropriate, sexually explicit live performances. The Supreme Court has recognized a state's "compelling interest" in "protecting the physical and psychological well-being of minors," including an interest in "shielding" minors "from indecent messages that are not obscene by adult standards." *Reno*, 521 U.S. at 869 (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)). The Act is meant to fulfill that interest.

Prior to the Act's passage, other Florida statutes protected children from sexually explicit performances and materials, but each had a limited scope. Section 847.013(3)(a), for example, makes it a misdemeanor

to knowingly admit a minor to "a motion picture, exhibition, show, repre-sentation, or other presentation which, in whole or in part, depicts nu-dity, sexual conduct, sexual excitement, sexual battery, bestiality, or sad-omasochistic abuse and which is harmful to minors," as defined in section 847.001(7). But section 847.013(3)(a) applies only when the minor is ad-mitted in exchange for consideration. Another statute, section 800.04(7), makes it a felony to engage in a "lewd or lascivious exhibition" in the presence of a child under 16. But it limits "lewd or lascivious exhibition" to certain live or simulated sex acts, like masturbation or bestiality. *See, e.g.*, *Lowe v. State*, 40 So. 3d 789, 792 (Fla. 5th Dist. Ct. App. 2010).

Now, the Protection of Children Act makes it a first-degree misde-meanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4). It defines an "adult live performance" as a live "show, exhibition, or other presentation in front of a live audience" that "depicts or simulates nudity, sexual conduct, sexual excitement, or spe-cific sexual activities as those terms are defined in s 847.001, lewd con-duct, or the lewd exposure of prosthetic or imitation genitals or breasts." *Id*. § 827.11(1)(a). And to meet the statutory definition, the performance must rise to the level of obscenity under a more refined version of the

age-variable standard derived from *Ginsberg* and *Miller v. California*, 413 U.S. 15 (1973). Under this more refined version, the performance (1) must be "patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct *for the age of the child present*"; (2) must "[d]epict[] or describe[], in a patently offensive way, sexual conduct as specifically defined herein"; and (3) must be "without serious literary, artistic, political, or scientific value *for the age of the child present*." Fla. Stat. § 827.11(1)(a) (emphasis added). Thus, with the Act's passage, protecting children from age-inappropriate, sexually explicit live performances in Florida is no longer contingent upon the exchange of consideration, nor limited to the display of certain sex acts. And to evaluate the propriety of the exposure, one must now specifically consider the age of the child present.

Hamburger Mary's contends that the Act targets drag performers because it prevents children from viewing the "lewd exposure of prosthetic or imitation genitals or breasts" in a manner that would be obscene for children, and because this language is "unique to the Act." Resp. Br. 28. But the "lewd exposure of prosthetic or imitation genitals or breasts" is only one of a host of sexually explicit activities to which children may

not be exposed when those activities would be obscene for them. The inclusion of this language ensures that this kind of lewd conduct, when it rises to the level of being obscene for a child, is not excluded from the larger array of sexually explicit conduct to which a child should not be exposed. It thus betrays no illicit purpose of targeting drag performances. It merely seeks to remedy the under-inclusiveness of the existing statutory scheme and to protect children from exposure to obscene live performances, no matter who performs them or what social viewpoint they seek to convey. In short, the Act's purpose also does not justify the application of strict scrutiny.

## C.  The Act does not infringe the First Amendment rights of children.

The question remains whether the Protection of Children Act burdens the First Amendment rights of children. It does not.

As noted, the Act only prevents minors from viewing performances obscene as to children of their age. Like the Georgia law in *Webb*, the Act "employs a narrowly crafted *Ginsberg*-type adaptation of the current definition of adult obscenity announced in *Miller* . . . to determine whether material is harmful to minors." *Webb*, 919 F.2d at

1503. And it is unquestioned that "[m]inors have no right to view or in any way consume . . . material[s] [obscene as to them]." *Id.* at 1501.

In its amicus brief, the ACLU contends that the Protection of Children Act regulates more than performances that are obscene for children (at 12–19), because the list of sexually explicit activities to which it applies includes "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts," and "the word lewd is much broader than obscene" (at 14). That argument is a non sequitur. "Lewd" is of course broader than "obscene," but all the sexually explicit live performances described in the prefatory clause of section 827.11(1)(a) still have to satisfy the carefully tailored, age-variable, three-part test derived from *Ginsberg* and *Miller*. Children thus must be prevented from viewing "lewd conduct" or "lewd exposure of prosthetic or imitation genitals or breasts" only when those activities are so sexually explicit that they become obscene.

The ACLU also asserts (at 15, 19–20) that "the *Miller/Ginsberg* test was already fully covered" by the other activities listed in section 827.11(1)(a) ("nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001."). But it is unclear

whether any of these defined terms, alone or in combination, necessarily extends to the full reach of what is regulable as obscenity. The State is surely entitled to use additional language to ensure that the statute leaves no gaps in its coverage of sexually explicit live performances that could be obscene.[2] Any resulting overlap in terminology can hardly be fatal to the statutory design. *See, e.g.*, *United States v. Conage*, 50 F.4th 81, 88 (11th Cir. 2022) (noting without controversy that the Florida legislature was "willing to tolerate some redundancy" in its enumeration of activities that constitute drug trafficking under Fla. Stat. § 893.135(1)).

Because the Protection of Children Act regulates only unprotected speech—speech obscene as to minors—it does not trigger strict scrutiny. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). And even if it did, it would survive it. There is no dispute that the State has a "compelling interest in protecting the physical and psychological well-being of minors." *Reno*, 521 U.S. at 869 (quoting *Sable*, 492 U.S. at 126); Resp. Br.

---

[2] The child-protection statutes in the cases the ACLU cites as examples of overbroad coverage (at 19–20) each failed to employ the three-part *Ginsberg/Miller* test to ensure that the covered activities were obscene. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 256 (2002) (18 U.S.C. § 2256(8)(B)); *Ex parte Lo*, 424 S.W.3d 10, 20 (Tex. Crim. App. 2013) (Tex. Penal Code § 33.021(b)).

29. And contrary to Hamburger Mary's assertion that the State "has not chosen the least restrictive means of regulating inappropriate content for minors," Resp. Br. 29, the Act is meticulously tailored to protect that interest. In *Webb*, the appellees maintained that the Georgia law was "overly broad because it [did] not accommodate the differences between older and younger minors in maturity levels." 919 F.2d at 1504. While this Court rejected that challenge anyway, *id.* at 1504–05, the Protection of Children Act leaves no room for doubt by tying its variable-obscenity standard to the actual age of the child at the adult live performance. The Act requires the exclusion of a child from a performance that is "patently offensive" and lacks "serious literary, artistic, political, or scientific value *for the age of the child present*." Fla. Stat. § 827.11(1)(a)2.–3. (emphasis added). The Act thus resolves the concern that prohibiting minors from viewing materials obscene for minors as a whole may violate the First Amendment rights of older children, since what is obscene for a "five-year-old" might not be obscene for "a person just shy of age seventeen." *ACLU v. Ashcroft*, 322 F.3d 240, 254 (3d Cir. 2003).[3]

---

[3] Citing this Court's decision in *Webb*, 919 F.2d at 1504–05, the ACLU suggests that the only way to address the concern about not

Narrow tailoring does not require a parental-consent exception. Resp. Br. 9. Whether material is obscene for a child does not depend on parental consent. Rather, it is tied to the community's standards, to "[w]hether the average person, applying contemporary community standards[,] would find that the work, taken as a whole, appeals to the prurient interest." *Ashcroft v. ACLU* ("*Ashcroft I*"), 535 U.S. 564, 574 (2002) (quotation omitted). This ensures that "material will be judged by its impact on an average person." *Id.* at 575. If, as the Supreme Court has acknowledged many times, the State has an independent "interest in protecting the physical and psychological well-being of minors," *Sable*, 492 U.S. at 126 (citations omitted), it would make no sense to require an exception for parental consent. Obscene material is no less obscene just because a parent permits a child to view it. Indeed, including a parental-consent

_____

subjecting a seventeen-year-old to the test of obscenity for a five-year-old is to use what is obscene for the seventeen-year-old as the measure for children of all ages. Resp. Br. 26. But nothing in *Webb* hints that this approach to protecting children from exposure to obscene materials is exclusive. In *Webb*, this Court was construing a *non*-age-variable obscenity standard—one that defined obscenity for children as an undifferentiated class. It thus used seventeen-year-olds as the measure of obscenity for all children in order to avoid constitutional concerns. It would be remarkable if the only way the State could vindicate its legitimate interest in protecting a five-year-old from exposure to obscene materials would be to treat the five-year-old as if she were seventeen.

exception would "raise[] serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).

Still, Hamburger Mary's argues that the Supreme Court "upheld a law prohibiting the sale of 'girlie magazines' to minors . . . in part because 'the prohibition against sales to minors [did] not bar parents who so desire from purchasing the magazines for their children.'" Resp. Br. 30 (quoting *Ginsberg*, 390 U.S. at 639). But *Ginsberg* did not hold that a statute applying a variable-obscenity standard *must* have a parental-consent exception; it merely noted that feature as limiting the restrictive impact of the New York statute. Instead, it relied on the State's "independent interest in the well-being of its youth" to justify the statute's prohibition, an interest that again does not vary with an individual parent's permissiveness. *Ginsberg*, 390 U.S. at 640.

Similarly, the reason the Communications Decency Act did not pass constitutional muster in *Reno* was not that it lacked a parental-consent exception. The problem, rather, was that it "effectively suppresse[d] a large amount of speech that adults have a constitutional right to receive

and address to one another." *Reno*, 521 U.S. at 874. Again, the Protection of Children Act poses no such concern.

Hamburger Mary's points to a discussion in *Reno*, in which the Court quoted the lower court's observation that "user-based software" was available to allow parents to view materials deemed obscene or indecent for children and still "prevent their children from accessing material which the *parents* believe is inappropriate." Resp. Br. 31 (quoting *Reno*, 521 U.S. at 877). Hamburger Mary's thus contends that parental monitoring provides a "sufficient alternative" to protecting children from viewing material obscene for them. Hamburger Mary's misunderstands the point of this discussion. The utility of such software, in the Supreme Court's view, was that it provided an alternative to forcing online content providers to come up with ways to prevent minors from viewing indecent material without also denying access to adults. The decision in *Reno* was thus driven by the "fundamentally different" context of the electronic world, where it is difficult for content providers both to allow adults access and deny children access. *Reno*, 521 U.S. at 889 (O'Connor, J., concurring in judgment in part and dissenting in part). The Protection of Children Act operates in the physical world, where "geography and

identity" enable proprietors to exclude children without limiting adult access, eliminating the need for any kind of parental-monitoring mechanism to screen out children while maintaining access for adults. *Id.*

Narrow tailoring also does not require, as Hamburger Mary's suggests, that the Protection of Children Act be limited to commercial transactions. Resp. Br. 32. This Court has made clear that under *Ginsberg*, "a state may, absent an impermissible burden on adults, deny minors all access *in any form* to materials obscene as to them." *Webb*, 919 F.2d at 1501. The State's interest in protecting the well-being of minors from speech obscene as to them does not depend on whether any money changes hands. Were the Protection of Children Act to apply only to commercial transactions, Hamburger Mary's no doubt would argue that it is under-inclusive. The statute would furthermore fail to protect children in circumstances where they are even more vulnerable because they face one less barrier—exchange of consideration—to viewing obscene live performances.

Last, the Protection of Children Act's mens rea requirement does not defeat the Act's careful tailoring. The Act proscribes "*knowingly* admit[ting] a child to an adult live performance," Fla. Stat. § 827.11(3)

(emphasis added), and prohibits relying on "ignorance of a child's age, a child's misrepresentation of his or her age, or a bona fide belief of the child's consent" as a defense to prosecution, *id*. § 827.11(2). Hamburger Mary's argues that the ignorance-is-no-defense provision "creates a strict liability offense as to the age of the child present" and that the "legislature could have written the law to require the 'willful admission' of a child." Resp. Br. 30. But the Act defines "knowingly" as "having general knowledge of, *reason to know*, or *a belief or ground for belief* which warrants further inspection or inquiry of both: 1. The character and content of any adult live performance . . . reasonably susceptible of examination by the defendant; and 2. The age of the child." *Id*. § 827.11(1)(b) (emphasis added). Thus, the ignorance-is-no-defense provision simply reinforces that a defendant could be liable if he had reason to know or reason to believe that the child was too young to view the adult live performance, but lacked full certainty. It does not negate the mens rea requirement, under which knowledge or constructive knowledge is necessary for an offense. And the statute need not require an even higher level of scienter, like willfulness or intent, in order to be narrowly tailored to the State's interest in protecting children from exposure to obscene performances.

## III. The Protection of Children Act is not vague.

Next, defining "adult live performance" to include "lewd conduct" and the "lewd exposure of prosthetic or imitation breasts or genitals" does not render the Act unconstitutionally vague. The word "lewd" is one of longstanding usage both in criminal statutes and at common law. The Protection of Children Act furthermore has a mens rea requirement, which the Supreme Court and this Court have said repeatedly will serve in most cases to address any concerns about vagueness. Hamburger Mary's arguments to the contrary are unavailing.

Hamburger Mary's fails, first of all, in its attempts to distinguish both *United States v. 12 1200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 130 n.7 (1973), and *Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971). Hamburger Mary's contends that *12 1200-Foot Reels* provides no helpful example of a statute's clear use of the word "lewd" because there the materials barred from importation were "static" and "unchanging," such that importers could determine whether their content was lewd before bringing them into the United States. Resp. Br. 35. In contrast, the live performances regulated by the Act include "improvisation and spontaneous interactions." *Id*. But that has nothing to do with whether the

term "lewd" is so hopelessly indeterminate that one "must necessarily guess at its meaning." *Ga. Pac. Corp. v. Occupational Safety & Health Rev. Comm'n*, 25 F.3d 999, 1005 (11th Cir. 1994). At most, it is an argument that the nature of the regulated conduct makes the standard more difficult to apply—not that the standard itself is unknowable. "[A] law 'is not vague because it may at times be difficult to prove an incriminating fact.'" *Jones v. Governor of Fla.*, 975 F.3d 1016, 1046–47 (11th Cir. 2020) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). Rather, "[w]hat renders a statute vague is . . . the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008).

Further, Hamburger Mary's contends that *Chesebrough* does not apply because there the "calculation" of what qualified as lewd "was understandably less opaque" when analyzing whether the term applied to exhibiting "sexual intercourse . . . to a fourteen-year-old." Resp. Br. at 37. But Hamburger Mary's concession that the term "lewd" has a discernable meaning at its core dooms any facial vagueness challenge. As the Supreme Court has emphasized, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial

attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000). "[S]tatutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language,' and there is a strong presumption supporting the constitutionality of legislation." *United States v. Duran*, 596 F.3d 1283, 1290 (11th Cir. 2010).

Hamburger Mary's also attempts to distinguish *Chesebrough* on the ground that the statute there "included detailed descriptions of the prohibited conduct," such as "handl[ing], fondl[ing], or mak[ing] an assault upon any male or female child under the age of fourteen years in a lewd, lascivious, or indecent manner." Resp. Br. 36–37. But it does not explain how those descriptions shed any light on when "handling" or "fondling" or an "assault" was considered to have been done "in a lewd manner." That understanding necessarily came from the word "lewd" itself. As *Chesebrough* explained, "lewd" has an established understanding at common law and is a word in "common use," such that "a person of ordinary understanding may know what conduct on his part is condemned." 255 So. 2d at 677.

Hamburger Mary's nevertheless maintains that any meaning "lewd" may have had in 1971 "do[es] very little to inform a 'person of ordinary understanding [today].'" Resp. Br. 37. Hamburger Mary's ignores the term's continued and widespread usage in criminal statutes. It cites nothing other than its own musings about Taylor Swift and Miami Dolphins' cheerleaders to suggest that the statute here invokes any meaning other than the word's established, historical meaning. And it does not dispute that deeming the term to be unconstitutionally vague in 2024—even though readily understood in 1971—would be fatal to scores of federal and state statutes that have used the same term and been applied successfully for decades. *See* Init. Br. 41 & nn. 5–7.

Any concerns, finally, about imprecision at the margins of the term "lewd" are laid to rest by the mens rea requirement in the Protection of Children Act. The Act imposes criminal liability only for "knowing[]" violations. As this Court and the Supreme Court have explained, "even laws that are in some respects uncertain may be upheld against a vagueness challenge if they contain a scienter requirement." *Jones*, 975 F.3d at 1047 (citing *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995)); *see also, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007). For all these

reasons, the district court erred in ruling that the Protection of Children Act was likely void for vagueness.

## IV. Even if Hamburger Mary's were entitled to a preliminary injunction, the district court erred in enjoining the Protection of Children Act universally.

Hamburger Mary's argues that the district court properly enjoined the State from enforcing the Act statewide because it "found that [Hamburger Mary's] is likely to succeed on the merits of its overbreadth claim," and because of the "impracticality" of requiring "every person affected by an overbroad restriction on speech to litigate the issue individually." Resp. Br. 39, 42. These arguments are wrong for several reasons.

First, the impracticality of which Hamburger Mary's complains is addressed by the Rule 23 class action. This Court has specifically said that "[s]everal procedural devices"—like "class certification under Rule 23, joinder and intervention in an existing lawsuit, or even filing a new lawsuit"—enable "nonparties with similar interests to seek the protection of injunctive relief." *Georgia v. President of the U.S.*, 46 F.4th 1293, 1306 (11th Cir. 2022). As a result, this Court admonished, "[a] district court cannot circumvent [those] mechanisms in the name of providing injunctive relief only for nonparties' benefit." *Id*. Hamburger Mary's did

not bring a class action and instead urges this Court to affirm the district court's attempt to circumvent the procedural devices in place to secure relief to nonparties.

Second, even assuming overbreadth standing could justify universal relief (it cannot, *see* Init Br. 38–39; 43–55), the district court did not conduct a proper overbreadth analysis. An overbroad statute is one that "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *Williams*, 553 U.S. at 292) (cleaned up). "To judge whether a statute is overbroad," a court "must first determine what it covers." *Id*. Then, the court must compare "the likelihood and frequency of invalid applications of the statute" with its "valid applications." *Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 538 (3d Cir. 2012). An overbroad law is facially invalid only when the number of its "realistic" invalid applications is "substantially disproportionate" to its valid applications. *Hansen*, 599 U.S. at 770. "In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case." *Id*.

The district court recited the requirement that an overbroad statute must "prohibit a substantial amount of protected speech relative to its plainly legitimate sweep," App. 279, but it failed to make the findings necessary to support that conclusion in this case. Instead, it contemplated one scenario—whether a "fully clothed drag queen with cleavage-displaying prosthetic breasts reading an age-appropriate story to children" qualified as "lewd." App. 282. Then, without comparing the volume of valid applications to those it considered invalid, the court held that certain "vague language" rendered the Act "dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected speech." App. 282–83. This is not nearly enough to show the "lopsided ratio" of invalid to valid applications necessary to support a determination of overbreadth. *Hansen*, 143 S. Ct. at 1940; *see also id.* at 1948. Without such a finding, the district court had no warrant for deeming the statute facially overbroad, even assuming that such a conclusion could justify universal relief.

Finally, Supreme Court precedent makes clear that the district court should not have considered overbreadth when a narrower as-applied remedy was available. Overbreadth standing is "strong medicine,"

to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Thus "it is not the usual judicial practice," nor is it "desirable, to proceed to an overbreadth issue . . . before it is determined that the statute would be valid as applied" to the plaintiff. *Renne v. Geary*, 501 U.S. 312, 324 (1991). Here, however, the district court made no preliminary determination that the Act was valid as applied to Hamburger Mary's and went straight to overbreadth.

In response, Hamburger Mary's insists that the district court did not make any finding about the as-applied constitutionality of the Act because Hamburger Mary's did not bring an as-applied challenge to begin with. Resp. Br. 43. But this only reinforces that proceeding to overbreadth analysis on the district court's part was error. In the overbreadth context, the Supreme Court has warned against "resolving the facial constitutionality of [the statute] without first addressing its application to a particular set of facts." *Renne*, 501 U.S. 323. A plaintiff cannot advance to "Go" and collect $200 simply by alleging facial overbreadth and then asserting that its challenge is facial only.

Hamburger Mary's paints *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989), as "explicitly reject[ing]" the State's

argument, when in fact it confirms it. Resp. Br. 44. *Fox* plainly warns that a court should not "proceed to an overbreadth issue unnecessarily— that is, before it is determined that the statute would be valid as applied." 492 U.S. at 484–85; *see also id.* at 485 ("[T]he lawfulness of the particular application of the law should ordinarily be decided first."). Doing otherwise "would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws." *Id.* at 485. Hamburger Mary's thus does not get to skip past as-applied analysis and bring a facial challenge based only on overbreadth standing, thereby evading the traditional rule that a facial challenge must prove the statute unconstitutional in every application. *See Hansen*, 599 U.S. at 769 (explaining that "overbreadth challenge[s] [are] unusual" because "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid'").

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and vacate the preliminary injunction.

Respectfully submitted,

ASHLEY MOODY
  *Attorney General*

HENRY C. WHITAKER
  *Solicitor General*
JEFFREY PAUL DESOUSA
  *Chief Deputy Solicitor General*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
(850) 414-2672 (fax)
nathan.forrester@
  myfloridalegal.com

  */s/ Nathan A. Forrester*
NATHAN A. FORRESTER
  *Senior Deputy Solicitor General*
BRIDGET K. O'HICKEY
  *Assistant Solicitor General*
WILLIAM H. STAFFORD III
  *Special Counsel*

February 12, 2024

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with Federal Rule of Appellate Procedure 32(a)(7), because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,436 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6), because it has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook font using Microsoft Word.

*/s/ Nathan A. Forrester*
Senior Deputy Solicitor General

## CERTIFICATE OF SERVICE

I certify that on February 12, 2024, I electronically filed this brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

 /s/ Nathan A. Forrester
Senior Deputy Solicitor General
