No. 23-12160

# In the United States Court of Appeals for the Eleventh Circuit

HM FLORIDA-ORL, LLC,

*Plaintiff-Appellee,*

v.

MELANIE GRIFFIN, Secretary, Department of Business and Professional Regulation, State of Florida,

*Defendant-Appellant.*

## DEFENDANT-APPELLANT'S INITIAL BRIEF ON REHEARING EN BANC

On Appeal from the United States District Court for the Middle District of Florida Case No. 6:23-cv-950-GAP-LHP

JAMES UTHMEIER
*Attorney General*

JEFFREY PAUL DESOUSA
*Acting Solicitor General*
NATHAN A. FORRESTER
*Chief Deputy Solicitor General*
CASEY J. WITTE
*Solicitor General Fellow*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
nathan.forrester@myfloridalegal.com
jenna.hodges@myfloridalegal.com

February 25, 2026                    *Counsel for Defendant-Appellant*

*HM Florida-ORL, LLC v. Melanie Griffin, Secretary, Dep't of*
*Business & Professional Regulation, State of Florida*
*Eleventh Circuit Case No. 23-12160*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellant certifies that, to the best of her knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5:

1. America First Legal Foundation

2. Department of Business and Professional Regulation, State of Florida

3. DeSantis, Ron

4. DeSousa, Jeffrey Paul

5. Edgington, Craig A.

6. Forrester, Nathan A.

7. Griffin, Melanie

8. HM Florida-ORL, LLC

9. Israel, Gary S.

10. Mitchell, Jonathan F.

11. Moody, Ashley

12. Presnell, Hon. Gregory A.

13. Price, Hon. Leslie Hoffman

14. Stafford, William H.

15. Stewart, Melissa

16.    Timmons, Brice M.

17.    Uthmeier, James

18.    Whitaker, Henry Charles

19.    Witte, Casey Jarrod.

## ORAL ARGUMENT STATEMENT

In its En Banc Briefing Notice of December 16, 2025, this Court scheduled oral argument for June 2026 in Atlanta, Georgia.

# TABLE OF CONTENTS

ORAL ARGUMENT STATEMENT .................................................................i

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF JURISDICTION ........................................................ xii

INTRODUCTION................................................................................... 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE AND FACTS .............................................. 3

STANDARD OF REVIEW ....................................................................... 7

SUMMARY OF ARGUMENT ................................................................. 8

ARGUMENT ...................................................................................... 11

I.      HM does not have Article III standing. ................................... 11

II.     The Protection of Children Act does not violate the First Amendment.......... 16

        A.      The Act does not infringe children's speech rights................................. 16

                1.      The Act targets only speech that is obscene for children. ............ 17

                2.      The district court's arguments to the contrary are flawed. ........... 24

                3.      The panel majority's arguments to the contrary are flawed......... 29

        B.      The Act does not unduly restrict adult access to protected speech. ....... 33

III.    The Protection of Children Act is not void for vagueness................................. 35

IV.     Even if HM were entitled to a preliminary injunction, this Court should limit that relief to HM. ........................................................... 40

CONCLUSION .................................................................................... 46

CERTIFICATE OF COMPLIANCE ........................................................ 47

CERTIFICATE OF SERVICE ........................................................................... 48

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Ashcroft,*
  322 F.3d 240 (3d Cir. 2003) ...................................................................21, 22

*Am. Booksellers v. Webb,*
  919 F.2d 1493 (11th Cir. 1990) .....................................1, 16, 21, 22, 26, 27, 28, 33, 34

*Am. Commc'ns Ass'n v. Douds,*
  339 U.S. 382 (1950) ............................................................................... 39

*Ashcroft v. ACLU,*
  535 U.S. 564 (2002) ............................................................................... 26

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ...........................................................................21, 34

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ............................................................................... 14

*Bd. of Trs. of State Univ. of N.Y. v. Fox,*
  492 U.S. 469 (1989) ...........................................................................22, 23

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) ............................................................22, 23, 38, 39, 42

*Brockett v. Spokane Arcades, Inc.,*
  472 U.S. 491 (1985) ............................................................................... 23

*Brown v. Entmt. Merchants Ass'n,*
  564 U.S. 786 (2011) ...........................................................................18, 21, 27

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ............................................................................... 41

*Chesebrough v. State,*
  255 So. 2d 675 (Fla. 1971) ..............................................6, 10, 13, 36, 37

*Dep't of Homeland Sec. v. New York,*
  589 U.S. 1173 (2020) ............................................................................. 41

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975) ................................................................................ 40

*FCC v. Pacifica Found.*,
    438 U.S. 726 (1978............................................................................... 27

*Florida v. Dep't of Health & Hum. Servs.*,
    19 F.4th 1271 (2021) ............................................................................. 43

*Free Speech Coal., Inc. v. Paxton*,
    606 U.S. 461 (2025) ................................................................ 1, 33, 34, 35

*Friends of George's, Inc. v. Mulroy*,
    108 F.4th 431 (6th Cir. 2024) ...........................................................12, 14, 15

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) ............................................................... 40

*Ginsberg v. New York*,
    390 U.S. 629 (1968) .............................................. 1, 16, 18, 19, 25, 29, 36

*Globe Newspaper Co. v. Super. Ct.*,
    457 U.S. 596 (1982) ............................................................................... 16

*Graham v. Butterworth*,
    5 F.3d 496 (11th Cir. 1993) .................................................................... 15

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ............................................................................... 39

*Greenberg v. Lehocky*,
    81 F.4th 376 (3d Cir. 2023) .................................................................... 14

*Griffin v. HM Florida-ORL, LLC*,
    144 S. Ct. 1 (2023) ............................................................................. 6, 44

*Hamling v. United States*,
    418 U.S. 87 (1974) .........................................................................9, 30, 38

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) ............................................................... 41

*Kinney-Coastal Oil Co. v. Kieffer,*
  277 U.S. 488 (1928) ................................................................. 40

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ................................................................. 11

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. 118 (2007) ................................................................. 15

*Memoirs v. Att'y Gen. of Mass.,*
  383 U.S. 413 (1966) ................................................................. 30

*Miller v. California,*
  413 U.S. 15 (1973) ........................................... 1, 3, 19, 20, 25, 26, 29, 30, 37

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ................................................................. 40

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ................................................................. 30

*NAACP v. Att'y Gen. of Ala.,*
  161 F.4th 1286 (11th Cir. 2025) ................................................ 14

*New York v. Ferber,*
  458 U.S. 747 (1982) ............................................................. 16, 24

*Noble Prestige Ltd. v. Galle,*
  83 F.4th 1366 (11th Cir. 2023) .................................................. 7

*Osborne v. Ohio,*
  495 U.S. 103 (1990) ................................................................. 38

*People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n,*
  60 F.4th 815 (4th Cir. 2023) ..................................................... 45

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ................................................................. 25

*Renne v. Geary,*
  501 U.S. 312 (1991) ................................................................. 23

*Reno v. ACLU,*
    521 U.S. 844 (1997) ......................................................25, 26, 28, 33, 34, 35

*Roth v. United States,*
    354 U.S. 476 (1957) ................................................................. 36

*Sabetti v. Dipaolo,*
    16 F.3d 16 (1st Cir. 1994) ........................................................ 39

*Sable Comm'ns of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989) ............................................................26, 33

*Sessions v. Dimaya,*
    584 U.S. 148 (2018) ................................................................. 40

*Steel Co. v. Citizens for Better Environment,*
    523 U.S. 83 (1998) ................................................................... 43

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...........................................................8, 11, 14

*Swain v. Junior,*
    961 F.3d 1276 (11th Cir. 2020) ................................................ 7

*Thornhill v. Alabama,*
    310 U.S. 88 (1940) ................................................................... 43

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ..................................................10, 40, 42, 43, 44

*Turner Broad. Sys., Inc. v. FCC,*
    520 U.S. 180 (1997) ................................................................. 34

*United States v. 12 200-Ft. Reels of Super 8mm. Film,*
    413 U.S. 123 (1973) ................................................. 10, 30, 37, 38

*United States v. Hansen,*
    599 U.S. 762 (2023) ............................................................9, 23, 30

*United States v. Playboy Ent't Grp., Inc.,*
    529 U.S. 803 (2000) ................................................................. 16

*United States v. Sepulveda*,
115 F.3d 882 (11th Cir. 1997) ....................................................................... 36

*United States v. Stevens*,
533 F.3d 218 (3d Cir. 2008) (en banc) ........................................................... 44

*United States v. Stevens*,
559 U.S. 460, 464 (2010) ........................................................................ 17, 44

*United States v. Williams*,
553 U.S. 285 (2008) ................................................................................. 9, 39

*Virginia v. Black*,
538 U.S. 343 (2003) ..................................................................................... 25

*Virginia v. Hicks*,
539 U.S. 113 (2003) ......................................................................... 23, 24, 42

*W. Va. by & through Morrisey v. U.S. Dep't of the Treas.*,
59 F.4th 1124 (11th Cir. 2023) ..................................................................... 14

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ..................................................................................... 39

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ..................................................................................... 17

*Woodhull Freedom Found. v. United States*,
948 F.3d 363 (D.C. Cir. 2020) ...................................................................... 14

*Woodland Pride v. Paxton*,
157 F.4th 775 (5th Cir. 2025) ....................................................................... 13

**Statutes**

18 Pa. Cons. Stat. § 5901 .............................................................................. 37

18 U.S.C. § 1384 ......................................................................................... 37

18 U.S.C. § 1461 .................................................................................... 37, 38

18 U.S.C. § 1462 ......................................................................................... 37

18 U.S.C. § 1463 ................................................................ 37

18 U.S.C. § 1464 ................................................................ 27

18 U.S.C. § 1465 ................................................................ 37

20 U.S.C. § 7131 ................................................................ 37

28 U.S.C. § 1292 ................................................................ xii

42 U.S.C. § 1331 ................................................................ xii

42 U.S.C. § 1343 ................................................................ xii

42 U.S.C. § 1983 ............................................................ xii, 4

42 U.S.C. § 1988 ............................................................ xii, 4

47 U.S.C. § 941 ................................................................ 37

Cal. Civ. Code § 1746.1 ...................................................... 27

Cal. Penal Code § 288 ........................................................ 37

Child Online Protection Act, 47 U.S.C. § 231 ......................... 21

Communications Decency Act,
    Pub. L. No. 104-104, tit. V, 110 Stat. 56 (1996) .................... 28

Fla. Stat. § 787.01 .............................................................. 37

Fla. Stat. § 787.02 .............................................................. 37

Fla. Stat. § 794.011 ............................................................ 37

Fla. Stat. § 794.051 ............................................................ 37

Fla. Stat. § 794.053 ............................................................ 37

Fla. Stat. § 796.07 .............................................................. 37

Fla. Stat. § 798.02 .............................................................. 37

Fla. Stat. § 800.04 ........................................................................... 37

Fla. Stat. § 800.09 ........................................................................... 37

Fla. Stat. § 825.1025 ....................................................................... 37

Fla. Stat. § 827.01 ............................................................................. 3

Fla. Stat. § 827.071 ......................................................................... 37

Fla. Stat. § 827.11 ........................................... 1, 3, 4, 12, 18, 19, 20, 21, 29, 30

Fla. Stat. § 847.001 ................................................................ 3, 18, 20, 29

Fla. Stat. § 847.012 ......................................................................... 18

Fla. Stat. § 847.013 ......................................................................... 18

Fla. Stat. § 847.0135 ....................................................................... 37

Ga. Code Ann. § 16-12-103 ........................................................... 26

Haw. Rev. Stat. § 712-1217 ........................................................... 37

Idaho Code § 52-104 ..................................................................... 37

Kan. Stat. Ann. § 21-5513 ............................................................. 37

La. Stat. Ann. § 14:281 ................................................................. 37

Mass. Gen. Law ch. 272, § 16 ....................................................... 37

Miss. Code Ann. § 97-29-31 ......................................................... 37

N.C. Gen. Stat. § 19-1.2 ................................................................ 37

N.J. Rev. Stat. § 2C:14-4 .............................................................. 37

N.Y. Penal Law § 245.00 (McKinney) ......................................... 37

Nev. Rev. Stat. § 201.210 ............................................................. 37

Okla. Stat. tit. I, § 1123 ................................................................ 37

Protection of Children Act,
   2023 Fla. Laws ch. 94 (May 17, 2023) (SB 1438) ........................................................ 1

S.C. Code Ann. § 16-15-365 ........................................................................................ 37

Utah Code Ann. § 76-9-702 ........................................................................................ 37

Vt. Stat. Ann. tit. 13, § 2601 ..................................................................................... 37

Wash. Rev. Code § 7.48A.020 .................................................................................... 37

**Other Sources**

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ........................................ 15

Fla. Std. Jury Instr. (Crim.) § 11.10 ...................................................................10, 13, 37

*Mrs. Doubtfire*, IMDb (Dec. 30, 2025), https://perma.cc/UC9X-URPR ..................... 13

Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853
   (1991) ..................................................................................................................... 45

*Tootsie*, IMDb (Dec. 31, 2025), https://perma.cc/AJ3Q-C6DF .................................. 13

## STATEMENT OF JURISDICTION

Plaintiff-Appellee HM Florida-ORL, LLC ("HM") has sued Defendant-Appellant Melanie Griffin, Secretary of Florida's Department of Business and Professional Regulation, seeking to enjoin enforcement of a Florida statute on First and Fourteenth Amendment grounds. MDFL-DE1 at 1.[1] HM presents claims under 42 U.S.C. §§ 1983 and 1988 and invokes federal jurisdiction under 28 U.S.C. §§ 1331 and 1343. *Id.* The district court's preliminary injunction, from which the Secretary timely appealed, MDFL-DE31, purports to bar enforcement of the statute against anybody in the State of Florida. MDFL-DE29; MDFL-DE30. Were it not for HM's lack of Article III standing, addressed in Part I below, this Court would have jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

---

[1] In this brief, "MDFL-DE__" refers to an entry in the district court's docket and "CA11-DE__" refers to an entry in this Court's docket. Page numbers are as in the PDF of the filing.

## INTRODUCTION

"[N]o person—adult or child—has a First Amendment right to access speech that is obscene to minors without first submitting proof of age." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 478 (2025). In line with this principle, Florida has a law—the Protection of Children Act, Fla. Laws ch. 2023-94 (May 17, 2023) (SB 1438) (MDFL-DE21-1)—that makes it a misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4). An "adult live performance" is "any show, exhibition, or other presentation in front of a live audience" that depicts certain kinds of explicit sexual activity, including "lewd conduct," and is obscene "for the age of the child present." *Id.* § 827.11(1)(a). This standard tracks statutes approved in *Ginsberg v. New York*, 390 U.S. 629 (1968), *Miller v. California*, 413 U.S. 15 (1973), and *American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990)—with the refinement that obscenity is measured by the age of the child viewing the "adult live performance" and not by what is obscene for children as a whole.

In other words, Florida outlaws admitting a child to performances that include things like nude dancing or sexual depictions. Its law reflects a basic constitutional truth: the First Amendment does not handcuff the government from shielding children from depictions of sex and nudity that are patently inappropriate for their age. "When regulating minors' access to sexual content, the State may broaden *Miller*'s 'definition of obscenity' to cover that which is obscene from a child's perspective." *Paxton*, 606 U.S. at 474 (citing *Ginsberg*, 390 U.S. at 638).

1

The plaintiff in this case—HM—operates a restaurant in Orlando, called Hamburger Mary's, that hosts live drag show performances. Shortly after the Act's passage, HM brought a pre-enforcement challenge against the Act. Though HM insisted that it only invites children to attend "family friendly" drag shows (and thus would not violate the Act), HM also alleged that the law violated the Free Speech Clause and was void for vagueness, MDFL-DE1 at 9-20, and obtained a preliminary injunction from the Middle District of Florida preventing the Secretary from enforcing most of the operative provisions of the Act. MDFL-DE6. The preliminary injunction applied not just to HM, but to anybody, anywhere in the State of Florida.

A divided panel of this Court affirmed, but that decision was vacated pending this Court's en banc review. This Court has since stayed the preliminary injunction as to all entities except HM. The en banc Court now faces the question of whether to uphold that injunction, in whole or in part. It should reverse the injunction in full. HM lacks standing to bring this suit, the Protection of Children Act is constitutional, and the injunction was overbroad.

## STATEMENT OF THE ISSUES

1. Whether HM has Article III standing to challenge the Protection of Children Act.

2. Whether the Protection of Children Act violates the First Amendment on its face or as applied to HM.

3.      Whether the Protection of Children Act is void for vagueness on its face under the Fourteenth Amendment's Due Process Clause.

4.      Whether the district court had authority to award relief to non-parties by enjoining enforcement of the Protection of Children Act against anybody in the State.

## STATEMENT OF THE CASE AND FACTS

The Protection of Children Act makes it a first-degree misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4). A "child" is defined as a person under 18 years of age. Fla. Stat. § 827.01(2). An "adult live performance" is defined in two parts.

First, the "adult live performance" must be a "show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts." Fla. Stat. § 827.11(1)(a). This part of the definition is designed to satisfy *Miller*'s requirement that a regulation of obscenity target "sexual conduct . . . specifically defined by the applicable state law, as written or authoritatively construed." 413 U.S. at 24.

Second, the "adult live performance" must rise to the level of obscenity for any child who is to be excluded under the Act. To determine whether the performance is obscene for a particular child, the Act employs an age-variable standard derived from the Supreme Court's decisions in *Ginsberg* and *Miller*, and this Court's decision in *Webb*. Under that standard, the performance must (1) "[p]redominantly appeal[] to a prurient,

3

shameful, or morbid interest"; (2) be "patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct *for the age of the child present*"; and (3) "[t]aken as a whole," be "without serious literary, artistic, political, or scientific value *for the age of the child present*." Fla. Stat. § 827.11(1)(a)1.-3. (emphasis added). Put simply, the Act prohibits exposing a child to a live show with sexually explicit conduct that would be obscene for a child of his or her age.

On May 22, 2023, five days after enactment of the Protection of Children Act, HM sued the Secretary under 42 U.S.C. §§ 1983 and 1988, MDFL-DE1 at 1, 3, alleging that the Act violated the First Amendment and was void for vagueness. HM sought to enjoin, preliminarily and permanently, most of the operative provisions of the Act. MDFL-DE1 at 9-20; MDFL-DE6.

In its verified complaint, HM stated that it offered "'family friendly' drag performances announced on Sundays where children are invited to attend." MDFL-DE1 at 6. At these shows, HM insisted that "[t]here [wa]s no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." *Id.* HM did not allege that it hosted any other drag shows or, if it did, that the other drag shows were any different. HM nevertheless claimed injury from the Act because of its decision not to permit children "to attend any drag shows." MDFL-DE1 at 18. It claimed it made this decision because it understood the term "adult live

performances" in the Act to include any show featuring "female impersonators," including classics like "I Love Lucy" and "Some Like It Hot." MDFL-DE1 at 17.

On June 23, 2023, the district court granted a preliminary injunction and denied the Secretary's motion to dismiss. MDFL-DE29. The court first found that HM had standing and rejected the Secretary's contention that HM's complaint was a shotgun pleading. MDFL-DE30 at 9-14. The court then ruled that HM was likely to succeed on both its First Amendment free-speech claim and its Fourteenth Amendment void-for-vagueness claim. On the free-speech claim, the court ruled that the Protection of Children Act was content-based and likely would not withstand the resulting strict scrutiny. MDFL-DE30 at 15-16. The court acknowledged the connection between the variable-obscenity standard used in the Act and the variable-obscenity standard approved in *Ginsberg*, but purported to distinguish that decision on several grounds, including that the Act applied to more than just commercial speech and did not provide an exception for parental consent. MDFL-DE30 at 17-20.

The district court further ruled that the Protection of Children Act was unconstitutionally vague. It located this "vagueness" in the failure to define phrases such as "live performance," "child," "lewd conduct," and "lewd exposure of prosthetic or imitation genitals or breasts." MDFL-DE30 at 18. It conceded that the term "lewd" was present in other Florida criminal statutes and had been upheld against a vagueness challenge more than fifty years earlier. MDFL-DE30 at 22-23. But it concluded that the meaning of the term had somehow been lost to time and "would do very little inform

a 'person of ordinary understanding [today] ... what conduct on his part is con-
demned.'" MDFL-DE30 at 23 (quoting *Chesebrough v. State*, 255 So. 2d 675, 677 (Fla.
1971)).

On June 27, 2023, the Secretary appealed. MDFL-DE31. Only afterwards did
HM obtain leave to amend its complaint. MDFL-DE50. The initial verified complaint
(MDFL-DE1) and the exhibits attached to the Secretary's response to the preliminary-
injunction motion (MDFL-DE21-1 through MDFL-DE21-5) thus remain the only cog-
nizable evidence in the record before this Court.

Initially, the Secretary moved this Court to stay the preliminary injunction with
respect to all parties besides HM. CA11-DE20. A divided panel denied the stay, CA11-
DE26, and the Secretary then sought a stay pending certiorari from the Supreme Court.
The Court also denied the stay, with three dissenters. *Griffin v. HM Florida-ORL, LLC*,
144 S. Ct. 1 (2023).

After briefing and oral argument, another divided panel of this Court upheld the
preliminary injunction. CA11-DE82-1. The majority held that HM's facial constitu-
tional challenge was likely to succeed. *Id.* at 29-75. Unlike the district court, the majority
did not deem the Act content-based and so did not apply strict scrutiny. The majority
also did not expressly state that the statute was void for vagueness under the Due Pro-
cess Clause of the Fourteenth Amendment. Rather, it acknowledged that "the law has
some permissible applications at its core," but it declared the Act vague in other regards
and concluded that the Act's "vagueness threatens a broad range of protected speech"

in violation of the First Amendment. *Id.* at 30. It located the Act's supposed vagueness, and resulting overbreadth, in the term "lewd conduct" and in the Act's age-variable obscenity standard. It professed a willingness to sever the "lewd conduct" provision, *id.* at 61, but deemed the age-variable obscenity standard "impossibly vague" and, apparently, incompatible with any constitutional avoidance construction. *Id.* at 64.

The Secretary petitioned for rehearing or in the alternative rehearing en banc. CA11-DE85. On December 1, 2025, the en banc Court granted the petition for rehearing en banc and vacated the panel opinion. CA11-DE105-1. The en banc Court then granted the Secretary's renewed motion for a stay of the preliminary injunction with respect to all regulated entities besides HM.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a litigant must establish each of the following four elements: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284-85 (11th Cir. 2020) (citation omitted). This Court reviews the decision to enter a preliminary injunction for abuse of discretion but reviews the underlying legal conclusions de novo. *Noble Prestige Ltd. v. Galle*, 83 F.4th 1366, 1374 (11th Cir. 2023).

7

## SUMMARY OF ARGUMENT

The district court universally enjoined Florida's Protection of Children Act. That injunction should be reversed because HM has not met any of the requirements for a preliminary injunction—chiefly, likelihood of success on the merits.

1. HM does not have standing. In its verified complaint, which was the only evidence it presented in support of its preliminary injunction motion, HM stated flatly that "[t]here is no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see" at its family-friendly Sunday drag show brunch. MDFL-DE1 at 6. It did not allege that it hosted any other kind of show at the restaurant. Given that description, HM's conduct is not even "arguably proscribed" by the Protection of Children Act. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014). HM therefore cannot show injury in fact, which should have precluded the district court's exercise of jurisdiction under Article III.

2. The Protection of Children Act does not violate the First Amendment because it regulates only unprotected speech. All it does is deny a child access to any "adult live performance" which is obscene for that child. The Act does not prohibit any "adult live performance" or prevent any adult from attending one. Even older children for whom a performance is not obscene may attend.

It is thus unnecessary to apply any level of First Amendment scrutiny to the Act. But even assuming that it was, the Act would survive. The Act is precisely tailored to Florida's unquestioned interest in preventing the admission of a child to live

entertainment so explicit it is obscene *for that child*. It follows from the Act's tailoring that the Act also cannot be considered facially overbroad—i.e., it does not "'prohibit[] a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" *United States v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).

No term in the Act becomes overbroad by virtue of vagueness. "Lewd" is a word commonly used in obscenity regulations to define the conduct, in accordance with *Miller*, that must in turn be filtered through the three-part *Miller* test in order to determine whether it is obscene. The line-drawing required by Florida's age-variable variant of the *Miller* test is no different than the line-drawing required by *Miller* itself. It also tracks the so-called *Miller*-for-minors test of *Ginsberg* and *Webb*, which requires distinguishing what is obscene for adults from what is obscene for children as a group. "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *Hamling v. United States*, 418 U.S. 87, 115-16 (1974) (quotations omitted). And it is certainly not cause to conclude that the quantity of edge cases "substantially outweighs" the mine run of easy cases where people of common sense can readily discern that a show is too explicit for children of a given age.

3. For related reasons, the Act is not void for vagueness in violation of the Fourteenth Amendment's Due Process Clause. The district court and the panel majority both fixated on the Act's use of the word "lewd"—a term of longstanding usage in

American law. The Florida Supreme Court has defined the term, upheld it against a vagueness challenge, and promulgated standard jury instructions to guide juries in applying the term in the several Florida statutes that already use it. *See Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971); Fla. Std. Jury Instr. (Crim.) § 11.10(d), https://tinyurl. com/3pu2tcvv. Even if the Act's use of the word "lewd" was still unconstitutionally vague, the way to address that concern is through a savings construction that "limit[s] regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller*." *United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123, 130 n.7 (1973) (addressing use of the word "lewd" in a federal statute). Statutes should be construed to avoid unconstitutionality, not find it.

4. Finally, even if this Court believes HM is likely to succeed on the merits, it should still limit the preliminary injunction in this case to HM. The Supreme Court has recently reaffirmed the traditional principle that equitable relief should be limited to the parties before the court. *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). The panel majority thought the universal injunction justified because (1) the statute is facially overbroad and (2) overbreadth is a special exception to the traditional principle barring universal relief. Both the premise and the conclusion are false. The statute is not overbroad, and overbreadth does not change the remedial power of the district court. Facial overbreadth expands the substantive arguments available to a First Amendment plaintiff by permitting the invocation of third-party rights when the statute happens to be constitutional as applied to that plaintiff. It does not expand the scope of relief available to

10

that plaintiff. A statute that is facially unconstitutional does not ipso facto justify universal relief. Nothing in *CASA* suggests otherwise. *CASA* was based on limits to the remedial authority of federal courts imposed by the Judiciary Act of 1789. Those limits remain in place regardless of the particular claim for relief.

## ARGUMENT

### I.    HM does not have Article III standing.

To establish injury in fact at the preliminary-injunction stage, HM had to offer evidence that (1) it intended to engage in speech that is "arguably proscribed" by the Protection of Children Act; and (2) it faced a "substantial" threat of enforcement under the Act. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162-64 (2014); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (after the pleadings stage, "standing must be supported" by "evidence"). HM never made it past the first step. The only evidence it offered was its verified complaint, and nothing it described in the complaint even arguably violates the Act. *See* CA11-DE30 at 16 (Florida's acknowledgment that the performances HM described in its complaint are not "arguably" lewd).

According to the verified complaint, the Hamburger Mary's restaurant "present[s] drag performances" that "range from a performer in a floor-length gown lip-syncing to Celine Dion songs and making G-rated puns, to the Rocky Horror Picture Show, to sexual innuendo and the kind of dancing on[e] could expect to see at a Taylor Swift or Miley Cyrus concert." MDFL-DE1 at 6-7. The restaurant invites "children" to "family friendly" performances that contain "no lewd activity, sexually explicit shows,

disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." *Id.* at 6. The performances are "a wholesome form of art"—"family entertainment." *Id.* at 8. If any "entertainment . . . is not suitable for children, children are not allowed to attend and the venue announces this in advance on their website and in their advertising." *Id.* at 19.

These sworn statements are the only evidence HM supplied to support its preliminary injunction. The verified complaint did not describe any other type of entertainment at its venue. Those statements by themselves do not establish that HM intends to expose children to "adult live performance[s]" in violation of the Act. An "adult live performance . . . depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities . . . , lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts." Fla. Stat. § 827.11(1)(a). The verified complaint states pointedly that HM does *not* expose children to such material. *See Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 436-38 (6th Cir. 2024) (drag organization lacked standing to challenge Tennessee's Adult Entertainment Act where it "insist[ed]" its shows had artistic value and were not obscene). But even setting that aside, nothing in the complaint suggests that HM intends to expose children to anything more than performers wearing "clothing more conventionally worn by the other sex." MDFL-DE1 at 6. That is not arguably "sexual" or "lewd" conduct under the Act.

As explained more below, the Florida Supreme Court has defined "lewd" as the "indulgence of lust, signifying that form of immorality which has a relation to sexual

impurity" and "indicat[ing] gross indecency with respect to the sexual relations." *Chesebrough*, 255 So. 2d at 677; *see also* Fla. Std. Jury Instr. (Crim.) § 11.10(d). Performers wearing clothing of the other sex while engaging in "wholesome" singing and dancing is not gross indecency. MDFL-DE1 at 8. It is of a piece with Mrs. Doubtfire and Tootsie—which no one would consider lewd under Florida law.[2]

This case is therefore no different than *Woodlands Pride, Inc. v. Paxton*, 157 F.4th 775 (5th Cir. 2025). There, drag organizations "brought a pre-enforcement challenge" to a Texas law regulating "sexually oriented performances . . . in the presence of minors." *Id.* at 780. The organizations' evidence, however, showed only that they intended to expose minors to "family friendly" shows where the performers dress in drag and "danc[e], lip sync[], [and] engag[e] with the audience by hugging, kissing on the cheek, [and] sometimes bumping hips." *Id.* at 783-84. The Fifth Circuit held that the organizations lacked standing because Texas's law did not "arguably proscribe[]" that conduct. *Id.* The same is true here.

HM has claimed that its shows are "arguably forbidden by the Act" because Florida "intends to consider [all] drag shows to be a public nuisance, lewd, disorderly, [and] sexually explicit." CA11-DE39 at 12, 14-15; MDFL-DE1 at 9. Apart from the falsehood of this statement, what state officials "intend" to do is relevant only to

---

[2] *See Mrs. Doubtfire*, IMDB, https://perma.cc/UC9X-URPR (last visited Feb. 25, 2025); *Tootsie*, IMDB, https://perma.cc/AJ3Q-C6DF (last visited Feb. 25, 2025).

whether HM has established a substantial threat of enforcement. At the arguably-proscribed step, all that matters is the reach of the statutory text: whether HM's intended conduct is "arguably proscribed by the statute." *Driehaus*, 573 U.S. at 162 (cleaned up); *see also W. Va. ex rel. Morrisey v. U.S. Dep't of the Treas.*, 59 F.4th 1124, 1137 (11th Cir. 2023) ("[r]eviewing the text of the statute" to determine whether the plaintiffs' conduct was "arguably proscribe[d]"); *NAACP v. Att'y Gen. of Ala.*, 161 F.4th 1286, 1295-96 (11th Cir. 2025) (certifying statutory-interpretation question to Alabama Supreme Court because parties disputed meaning and standing depended on reach of text).[3] HM cannot leapfrog the arguably-proscribed step—and the text of the Act—to claim standing solely because it thinks state officials have it out for drag shows. *See Driehaus*, 573 U.S. at 162-64 (injury in fact in a pre-enforcement case requires both arguably proscribed conduct and a substantial threat of enforcement); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (same).

The panel majority made the same mistake. It surmised that Florida officials "might" consider drag shows "lewd" because "the federal government has recently indicated its intent to police firm 'sex-based distinctions,' including those related to people's 'appearance.'" CA11-DE82-1 at 13 (citing Exec. Order No. 14168, 90 Fed. Reg.

---

[3] *Accord Friends of George's*, 108 F.4th at 435 (construing the statute to decide whether the conduct was arguably proscribed); *Greenberg v. Lehocky*, 81 F.4th 376, 385 (3d Cir. 2023) (same); *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 372 (D.C. Cir. 2020) (same).

8615 (Jan. 20, 2025)). The federal government's policies have no bearing on the meaning of a Florida statute. If the Florida Supreme Court does not interpret "lewd" to include wearing "clothing more conventionally worn by the other sex," MDFL-DE1 at 6, then that conduct is not arguably proscribed, regardless of whether state or federal officials believe drag shows to be obscene.

Nor does it matter if the Act's reach is "imprecis[e]." CA11-DE82-1 at 12-13; CA11-DE39 at 14-15 (arguing that HM has standing because the Act is "vague"). Even if the full range of conduct covered by the Act were unclear (which it is not, *see infra* Part III), the Act would not be vague as to the "family friendly" performances HM has described. Just like other sorts of "G-rated" entertainment, MDFL-DE1 at 6-7, those performances are plainly beyond the reach of the statute.

In short, HM lacks standing because it will not "expose [it]self to liability" if it allows children to attend the performances identified in its complaint. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). HM cannot manufacture standing by speculating that state officials will "misconstrue[]" the Act and enforce it against all drag shows. *Friends of George's*, 108 F.4th at 437. Even if a risk of rogue enforcement could somehow satisfy the arguably-proscribed requirement, HM's fear of enforcement is unfounded given that Florida has "repeatedly" said during "this case," *Graham v. Butterworth*, 5 F.3d 496, 500 (11th Cir. 1993), that nothing in HM's verified complaint violates the Act. *See* MDFL-DE21 at 18; CA11-DE30 at 16; CA11-DE85 at 7.

## II.    The Protection of Children Act does not violate the First Amendment.

The Protection of Children Act prohibits exposing children to sexually explicit performances that are obscene for their age. "A governmental restriction on the distribution of obscene materials receives no First Amendment scrutiny." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 829 (2000) (Thomas, J., concurring). But even if it were appropriate to apply some level of scrutiny to the Act, the Act would withstand that scrutiny with flying colors. "It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *New York v. Ferber*, 458 U.S. 747, 756 (1982) (quoting *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 607 (1982)). This interest includes restricting children's access to materials obscene for them, even if not obscene for adults. *Ginsberg*, 390 U.S. at 640-43. The Act is precisely tailored to this interest. It is not in any way overbroad.

In *Webb*, this Court described two ways in which a statute restricting children's access to harmful materials could nevertheless trigger heightened scrutiny and become unconstitutionally "overbroad." 919 F.2d at 1502-09. The first is by going beyond what is obscene and denying children access to materials that are not in fact obscene for them. The second is by incidentally burdening the speech rights of adults. The statute here is overbroad in neither respect.

### A.    The Act does not infringe children's speech rights.

The first way a child-obscenity statute can violate the First Amendment is if it "directly regulate[s] material protected even as to minors." *Webb*, 919 F.2d at 1503. Both

the district court and the panel majority in this Court seem to have considered the Protection of Children Act unconstitutionally overbroad on this basis. *See* MDFL-DE30 at 16-22; CA11-DE82-1 at 54-61. Both courts were wrong. The Act does not restrict any child's access to constitutionally protected speech. It requires only the exclusion of children so young that the performance is obscene for them, according to an obscenity test borrowed from the Supreme Court's rulings in *Miller* and *Ginsberg*. Older children for whom the performance is not obscene may still attend. The tailoring is surgical; the Act would satisfy strict scrutiny, if it had any applications to strictly scrutinize. And even if HM could invoke the facial overbreadth standard, which this Court should permit only if it finds the Act constitutional as applied to HM, it certainly cannot show that the Act is unconstitutional in "a substantial number of its applications," "judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

### 1.    The Act targets only speech that is obscene for children.

The Protection of Children Act is constitutional in all its applications. It targets only obscenity, which is not protected speech. But even if it did capture some protected speech, its many undoubtedly lawful applications mean that the law is not facially overbroad.

**a.** Before even getting to the facial overbreadth question, the Court should ask whether the challenged regulation implicates the First Amendment at all. It does not. The Protection of Children Act targets only unprotected obscenity.

To explain, the Protection of Children Act makes it a misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4). "Adult live performance" means:

> [A]ny show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:
>
> 1. Predominantly appeals to a prurient, shameful, or morbid interest;
>
> 2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and
>
> 3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

Fla. Stat. § 827.11(1)(a). In other words, the Act protects children from exposure to age-inappropriate sexually explicit live performances, no matter the identity of the performer, the nature of the performance, or the viewpoint the performance seeks to convey. It is similar in this regard to other Florida statutes that were on the books when this law was created, such as §§ 847.012 and 847.013, which restrict the exposure of minors to sexually explicit materials, images, and films.

Because of its limited scope, the Act regulates only unprotected speech: "*sexual material that would be obscene from the perspective of a child.*" *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 793 (2011) (citing *Ginsberg*). In *Ginsberg*, the Supreme Court upheld a New York statute's use of what the Court termed a "variable" obscenity standard for

18

minors. 390 U.S. at 635 n.4, 637. The statute prohibited the sale to minors of materials deemed "harmful to minors," which it defined as "that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse," when the representation

> (i) predominantly appeals to the prurient, shameful or morbid interest of minors, and

> (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and

> (iii) is utterly without redeeming social importance for minors.

*Id.* at 646. The Court declined to apply heightened First Amendment scrutiny to this statute because "obscenity is not protected expression." *Id.* at 641. The Supreme Court thus held that a statute of the same form as the Protection of Children Act did not regulate protected First Amendment speech.

The Act also faithfully combines the *Ginsberg* variable-obscenity standard with the tweaks to that test provided by *Miller*. First, in defining "adult live performance," the Act asks whether the performance in question "[p]redominantly appeals to a prurient, shameful, or morbid interest." Fla. Stat. § 827.11(1)(a)1. This corresponds to prong one of the *Miller* test, which asks whether "the work, taken as a whole, appeals to the prurient interest." 413 U.S. at 24.

Second, the Act asks whether the performance "[i]s patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present." Fla. Stat. § 827.11(1)(a)2.

This corresponds to prong two of the *Miller* test, which asks whether the work "depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law." 413 U.S. at 424. The latter part of this prong, requiring that the "sexual conduct" be "specifically defined," is satisfied by the preliminary language in § 827.11(1)(a), defining an "adult live performance" as any show "which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001."

Third, the Act asks whether the performance, "[t]aken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present." Fla. Stat. § 827.11(1)(a)3. This corresponds to prong three of the *Miller* test, which asks whether "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24.

In *Webb*, this Court followed the lead of *Ginsberg* and *Miller* in upholding a Georgia statute that criminalized providing minors with material "harmful" to them. Similar to the Protection of Children Act, the statute in *Webb* defined "harmful to minors" as "that quality of description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse," which

(A) Taken as a whole, predominantly appeals to the prurient, shameful, or morbid interest of minors;

(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

(C) Is, when taken as a whole, lacking in serious literary, artistic, political, or scientific value for minors.

919 F.2d at 1513. The Protection of Children Act uses this model.

The only material difference between the Protection of Children Act and the statutes upheld in *Ginsberg* and *Webb* is that the scope of the Act is even more carefully defined. It uses a variable-obscenity standard to tie what is considered obscene—for the child and no one else—to the actual age of the child at the "adult live performance." It does so by measuring what is "patently offensive," and what lacks "serious literary, artistic, political, or scientific value," by "the age of the child present." Fla. Stat. § 827.11(1)(a)2., 3. That refinement resolves a constitutional concern the Third Circuit identified in *ACLU v. Ashcroft*, 322 F.3d 240, 254 (3d Cir. 2003), *aff'd*, *Ashcroft v. ACLU* (*Ashcroft II*), 542 U.S. 656 (2004); *see also Brown*, 564 U.S. at 812 (Alito, J., joined by Roberts, C.J., concurring) (faulting California's proscription of sale of "violent video games" to minors for "draw[ing] no distinction between young children and adolescents who are nearing the age of majority"). In *ACLU v. Ashcroft*, the Third Circuit invalidated the part of the Child Online Protection Act ("COPA"), 47 U.S.C. § 231, that provided civil and criminal penalties for anyone who knowingly made commercial communications to minors that included "material that is harmful to minors." 322 F.3d at 245 (emphasis omitted) (quoting 47 U.S.C. § 231(a)(1)). COPA's definition of what was "harmful to minors" employed a three-part obscenity test derived from *Ginsberg* and *Miller* that did not calibrate what was considered "harmful" to the age of the particular

21

child. *Id.* at 246. The Third Circuit was thus concerned that what is obscene for a "five-year-old" might not be obscene for "a person just shy of age seventeen." *Id.* at 254-55. The plaintiffs in *Webb* had the same complaint. 919 F.2d at 1504.

The Protection of Children Act allays any such concern by gearing application of the Act to the age of the actual child in question. Because of this feature, the Act does not unnecessarily deny or impede access of older children to communications that are constitutionally protected for them. The Act proscribes only the knowing exposure of a child to unprotected speech—speech that is obscene for children of that age. It is therefore perfectly tailored and would survive even strict scrutiny, if that were applicable.

**b.** In short, the Protection of Children Act is valid in all its applications. But even if HM could identify some unconstitutional applications, it would not prevail in a facial overbreadth challenge. First, a court should not even consider whether a statute is facially overbroad unless it first determines that the statute is constitutional as applied to the party challenging the statute. "The First Amendment doctrine of overbreadth was designed as a 'departure from traditional rules of standing,' *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973), to enable persons who are themselves unharmed by the defect in a statute 'to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court,' *id.* at 610." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484 (1989). In other words, if the district court and the panel majority believed that the Act did apply to HM, *but see* Part I, and

22

if they believed that the Act was unconstitutional as applied to HM, they should have stopped. They should not have taken the further step of asking whether the Act was facially overbroad. As the Supreme Court has counseled, "[i]t is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied." *Renne v. Geary*, 501 U.S. 312, 324 (1991) (quoting *Fox*, 492 U.S. at 484-85). "Such a course would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws." *Id.*; *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501-04 (1985). Yet that is the course the district court and the panel majority took in this case.

Second, "[e]ven assuming that [the Act] reaches some protected speech, and even assuming that its application to all of that speech is unconstitutional, the ratio of unlawful-to-lawful applications is not lopsided enough to justify the 'strong medicine' of facial invalidation for overbreadth." *Hansen*, 599 U.S. at 784 (quoting *Broadrick*, 413 U.S. at 613). "[T]here comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law— particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (quoting *Broadrick*, 413 U.S. at 615). "For there are substantial social costs created by the overbreadth doctrine when it blocks application of a law to

23

constitutionally unprotected speech, or especially to constitutionally unprotected conduct." *Id.* That concern is no more trenchant than in this case, where there are numerous heartland applications of the Act that should be entirely beyond constitutional reproach. The Act could lawfully be applied, for example, to forbid adult bars and clubs from admitting children ages 5, 6, and 7, and even older children from attending strip shows or explicit sexual performances. *Most* of the Act's applications would, in fact, be valid. Overbreadth simply has no place here.

### 2. The district court's arguments to the contrary are flawed.

Confronted with these principles, the district court resorted to strained rationales to find the Protection of Children Act substantially overbroad. It pronounced the Act a presumptively invalid "content-based" regulation, because the statute did "not restrict the attendance of children from all live performances, only those engaged in the portrayal of a specific, enumerated subset of content." MDFL-DE30 at 15-16. That reasoning misses the point. The question is whether the "specific, enumerated subset of content" is protected by the First Amendment. Unprotected speech is of course defined by content, *Ferber*, 458 U.S. at 763-64, but that does not mean regulation of that speech is subject to strict scrutiny. The district court's reasoning would require strictly scrutinizing all regulations of obscenity—a position long rejected by the Supreme Court. *Id.* (collecting cases).

It is also immaterial that the Protection of Children Act proscribes only a limited portion of unprotected speech—the exposure of children to live performances that are

obscene as to them. Content discrimination within a category of unprotected speech does not trigger strict scrutiny if that "discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992). For instance, "a State might choose to prohibit only that obscenity . . . which involves the most lascivious displays of sexual activity" without triggering strict scrutiny. *Id.*; *see also Virginia v. Black*, 538 U.S. 343, 361-62 (2003). Or, as it has done here, the State can choose to protect a vulnerable class from exposure to unprotected speech that is harmful specifically to them. Indeed, the very feature of the statute the district court said would require strict scrutiny—its definition of a class of sexually explicit performances—is a constitutionally required element of any obscenity regulation. *See Miller*, 413 U.S. at 24 (requiring the prohibited sexual conduct "to be specifically defined by the applicable state law").

Similarly immaterial is the district court's remonstration that the Act takes the decision whether to admit a child to an obscene live performance out of parents' hands. MDFL-DE30 at 17. The district court noted that the New York statute in *Ginsberg* "d[id] not bar parents who so desire[d] from purchasing [obscene] magazines for their children." *Id.* (quoting *Reno v. ACLU*, 521 U.S. 844, 865 (1997)). But *Ginsberg* did not suggest that this feature was a prerequisite to upholding New York's variable-obscenity standard, which is why the Court relied upon the State's "independent interest in the well-being of its youth" quite apart from parental wishes. 390 U.S. at 640. Here, moreover, the State's interest is arguably even greater because it is not regulating the exposure

25

of children to mere obscene "magazines," MDFL-DE30 at 17 (quoting *Reno*, 521 U.S. at 865), but to live adult performances.

The district court also overlooked that the display prohibition this Court upheld in *Webb* had no exception for parental consent. The Georgia statute in *Webb* barred display, in public places where minors might be present, of materials deemed "harmful to minors" under the *Ginsberg-Miller* test. 919 F.2d at 1514 (quoting Ga. Code Ann. § 16-12-103(e)). It did not allow such displays if parents gave their consent. Nowhere in this Court's thorough analysis of why the display prohibition was sufficiently tailored to Georgia's interest in protecting children from exposure to obscene materials, *see id.* at 1500-02, did this Court indicate that a parental-consent exception was required.

That makes sense. Whether material is in fact obscene for a child does not depend on parental consent. It instead is tied to the standards of the whole community: "[w]hether the average person, applying contemporary community standards[,] would find that the work, taken as a whole, appeals to the prurient interest." *Ashcroft v. ACLU* (*Ashcroft I*), 535 U.S. 564, 574 (2002) (cleaned up) (quoting *Miller*, 413 U.S. at 24). "The primary concern" of the community-standards yardstick "is to be certain that material will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one." *Id.* at 575 (cleaned up) (quoting *Miller*, 413 U.S. at 33). Nor does the State's "interest in protecting the physical and psychological well-being of minors," *Sable Comm'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989), depend on the disparate views of individual parents.

26

Indeed, including a parental-consent exception could have invited a claim that the Protection of Children Act was *under*inclusive, "rais[ing] serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. In *Brown*, the Supreme Court struck down a California statute that prohibited the sale or rental of "violent video games" to minors. Among other reasons for ruling that the statute violated the First Amendment, the Supreme Court criticized the California Legislature for its willingness "to leave this dangerous, mind-altering material in the hands of children so long as one parent (or even an aunt or uncle) says it's OK." *Id.*; *see* Cal. Civ. Code § 1746.1(c). "That," the Court scolded, "is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802.

The Supreme Court has long upheld laws whose practical effect, if not central design, is to protect children from exposure to harmful materials over and above what individual parents might be willing to permit—e.g., the prohibition on "obscene, indecent, or profane language by means of radio communications," 18 U.S.C. § 1464 (1976), which was upheld in *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978). "Bookstores and motion picture theaters, for example, may be prohibited from making indecent material available to children," *id.* at 749, or from allowing "minors unfettered physical access to offensive material," *Webb*, 919 F.2d at 1507. The Protection of Children Act fits comfortably within this approved practice.

27

Finally, the district court tried to distinguish *Ginsberg* on the ground that the Protection of Children Act applies to "anyone, anywhere," whereas the New York statute in *Ginsberg* "only applied to commercial transactions." MDFL-DE30 at 18. But the district court did not explain why an obscenity determination should turn on whether consideration is given for the material in question.

It is true that in *Reno*, the Supreme Court pointed out the New York statute in *Ginsberg* "applied only to commercial transactions," whereas the Communications Decency Act (CDA)[4]—the statute at issue in that case—"contain[ed] no such limitation." 521 U.S. at 865 (citation omitted). But the Court mentioned that feature only among several that differentiated the CDA, with no indication that this feature was dispositive of the question whether that Act was sufficiently tailored to withstand strict scrutiny. As this Court observed in *Webb*, "[w]hile the statute in *Ginsberg* banned only the *sale* or *distribution* of this material to minors, . . . it is clear from our reading of *Ginsberg* that a state may, absent an impermissible burden on adults, deny minors *all access in any form* to materials obscene as to them." 919 F.2d at 1501 (emphasis added). "Minors have no right to view or in any way consume this material—even if they do not purchase or otherwise take control of it." *Id.*

Sexually explicit live performances that are obscene for a particular child's viewing are no less so when the parent or the child does not have to pay for it. If anything,

---

[4] Pub. L. No. 104-104, tit. V, 110 Stat. 56 (1996).

free obscenity is of greater concern, because it poses one less barrier to the child's access. The constitutionality of the Protection of Children Act should not turn on this factor.

### 3. The panel majority's arguments to the contrary are flawed.

The panel majority traveled a different route to its conclusion that the Protection of Children Act was substantially overbroad. Recall that the first part of the definition of an "adult live performance" identifies six categories of sexually explicit conduct that would need to be considered for whether it is obscene: "[1] nudity, [2] sexual conduct, [3] sexual excitement, or [4] specific sexual activities as those terms are defined in s. 847.001, [5] lewd conduct, or [6] the lewd exposure of prosthetic or imitation genitals or breasts." Fla. Stat. § 827.11(1)(a). The majority acknowledged that "the statute meticulously explains the first four terms, whose definitions cross-reference a preexisting statute," and therefore found no fault with those elements of the statute. CA11-DE82-1 at 43. But it deemed the fifth term—"lewd conduct"—to be vague and therefore overbroad. *Id.* at 43-54. This was wrong on multiple fronts.

First, as discussed below in Part III, *see infra* pp. 36-38, the word "lewd" is not vague. It is a term of longstanding usage in Florida common law and statutes, and has been defined in authoritative rulings and jury instructions promulgated by the Florida Supreme Court. The word is at least as definite as terms like "prurient," "shameful," or "morbid," which appear in statutes the Supreme Court sustained in *Ginsberg*, 390 U.S. at 646, and *Miller*, 413 U.S. at 16 n.1. It is no more indefinite than the term "patently

29

offensive," which is part of the "basic guidelines" the Supreme Court has long endorsed as a safe harbor for states to use in defining obscenity. *Id.* at 24-25; *see also Memoirs v. Att'y Gen. of Mass.*, 383 U.S. 413, 418 (1966) (plurality op.).

Second, even if "lewd" were vague, the appropriate response is a limiting construction, as the Supreme Court has repeatedly admonished in vagueness challenges to obscenity regulations, including to obscenity regulations that use the word "lewd." *See, e.g.*, *Hamling*, 418 U.S. at 110-16; *Reels*, 413 U.S. at 130 n.7. The majority refused to do so, however, because it said a limiting construction would render the term "lewd conduct" mere surplusage. CA11-DE82-1 at 46. That was because the majority assumed without demonstration that the other five species of sexually explicit conduct catalogued in section 827.11(1)(a) "essentially exhaust the types of 'hard core' depictions that *Miller* described as potentially obscene." *Id.* The majority was unwilling to accept that "lewd conduct" could be a permissible "catchall" for any sexually explicit conduct that may fall through the cracks of the other five terms. *Id.* at 49.

Having studiously declined all opportunity to construe the phrase "lewd conduct" as just another species of sexually explicit conduct, the majority pronounced that "lewd conduct" must "reach speech that is constitutionally protected, even as to minors." *Id.* at 53. It then proceeded to an analysis of whether that reach was substantially overbroad in relation to the statute's "plainly legitimate sweep." *Id.* at 54; *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723-24 (2024); *Hansen*, 599 U.S. at 770.

At this point, one might have thought that the four categories the statute "meticulously explains"—"nudity," "sexual conduct," "sexual excitement," and "specific sexual activities"—would still supply the Act a considerable, if not overwhelming, "plainly legitimate sweep," more than enough to defeat a facial overbreadth challenge. Inexplicably, however, the panel majority chose to limit its overbreadth analysis to the phrase "lewd conduct" in isolation. It then declared that phrase to have "no 'legitimate sweep,'" because "the rest of the Act's prohibitions cover the bulk of content that can be deemed obscene under *Miller*." CA11-DE82-1 at 77 n.17. The majority effectively voided the many applications in which "lewd conduct" could rise to the level of obscenity, just because those applications happened already to be covered by other parts of the statute. By discounting this vast and "plainly legitimate sweep," the majority gave itself license to presume that the illegitimate applications of "lewd conduct" overwhelmed the legitimate ones, rendering the phrase facially overbroad.

The Secretary is unaware of any precedent for deeming redundant applications of a statute to cancel each other out for purposes of measuring the statute's legitimate sweep. It is an analytical principle the panel majority conjured out of thin air. Not only does it make no sense, it should not have resulted in invalidation of the entire statute. At most, it would require severing the phrase "lewd conduct" and leaving the other "meticulously explain[ed]" categories of sexually explicit conduct intact. The panel majority essentially admitted as much: "Were the 'lewd conduct' provision the Act's only

31

constitutional infirmity," it said, "we might be able to sever the clause and preserve the rest of the statute." CA11-DE82-1 at 61.

But here the panel majority made another suspect move. It deemed Florida's three-part age-variable standard derived from *Ginsberg* and *Miller*, which as a matter of syntax could serve only to limit the range of sexually explicit conduct to which a child may be exposed, not to "narrow the Act's scope but . . . [to] expand[] it." *Id.* It attempted to justify this result by declaring the "age-by-age maturity test" to be "impossibly vague." *Id.* at 64. Not only does this reasoning again conflate vagueness with over-breadth, it faults Florida's age-variable test for a feature endemic to any obscenity regulation: the need to draw lines in close cases. The fallacy of using edge cases to declare statutory language void for vagueness is addressed further below, *see infra* pp. 36-38, but for present purposes suffice it to say: If a business proprietor can be expected to apply the Supreme Court's obscenity standards and differentiate what is obscene for people aged 18 and over from what is obscene for people aged 17 and under, as the Supreme Court ruled in *Ginsberg* and this Court ruled in *Webb*, it can surely be expected to perform the same line-drawing for children of other ages. A business proprietor can safely say, for instance, that a strip show is obscene for a 5-, 6-, or 7-year-old child. That com-monsense understanding is the very reason that states have always been permitted to render strip clubs off limits to minors. The analyses are no different in kind. To call the Protection of Children Act vague and therefore overbroad is to call the Supreme Court's own obscenity measures vague and therefore overbroad. That cannot be right.

In effect, the district court and the Eleventh Circuit panel faulted the Act for being too well-tailored—for requiring a business proprietor to apply the Supreme Court's obscenity standards to children of different ages, instead of treating all children as if they were 17-year-olds. There is no warrant for imposing such a wooden constraint on the states as they seek to shield children from exposure to age-inappropriate, sexually explicit materials that rise to the level of obscenity. Florida should not penalized for improving upon the tailoring already deemed constitutionally sufficient in *Ginsberg* and *Webb*.

### B.    The Act does not unduly restrict adult access to protected speech.

The second way a statute restricting children's access to harmful materials can trigger heightened scrutiny is if it "indirectly affects speech protected as to adults." *Webb*, 919 F.2d at 1502; *see also, e.g.*, *Sable*, 492 U.S. at 126; *Reno*, 521 U.S. at 879-81. That kind of collateral burden is subject to a form of intermediate scrutiny akin to the test for time-speech-manner restrictions: "indirect burdens placed on protected speech in an effort to regulate obscenity must be supported by important state interests and should not be unnecessarily burdensome." *Webb*, 919 F.2d at 1500-02; *see also Paxton*, 606 U.S. at 480-83. The district court did not appear to cite a burden on adults as a basis for its ruling, but the Eleventh Circuit panel nodded in that direction, speculating that some adults might come to a show without proof of age and be excluded, and that some establishments might falter under the cost of checking IDs at the door. CA11-DE82-1 at 60-61.

The constraints on adult speech cited by the panel are incidental at most. They do not "burden substantially more speech than necessary to further" Florida's "important governmental interests" in protecting children from exposure to material obscene for them. *Paxton*, 606 U.S. at 495-96 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)); *see also Webb*, 919 F.2d at 1500-02. Again, the Protection of Children Act does not prevent even a single "adult live performance" from being staged. It does not prevent any adult from attending such a performance. It requires only the exclusion of a child when the performance happens to be obscene for that child.

The Supreme Court's decisions in *Reno* (striking down the CDA) and *Ashcroft II* (striking down COPA) are not to the contrary. In both cases, the Supreme Court found that the statutes inordinately constrained adults' ability to access electronic material that would not be obscene for them. In invalidating those parts of the statutes, the Court observed that the statutes achieved their legitimate aims of denying minors access to potentially harmful speech only by "effectively suppress[ing] a large amount of speech that adults have a constitutional right to receive and to address to one another." *Ashcroft II*, 542 U.S. at 665 (quoting *Reno*, 521 U.S. at 874).

In *Free Speech Coalition, Inc., v. Paxton*, the Supreme Court characterized both the CDA and COPA as having imposed outright "ban[s]" on speech to adults. 606 U.S. at 487-88. The Court contrasted those laws to a Texas statute that required pornographic websites to use age-verification technologies to prevent children from accessing materials obscene for them. *Id.* at 489-91. The Texas statute, the Court held, imposed merely

34

incidental burdens on adult speech and therefore received only intermediate scrutiny, which it survived because it "undoubtedly advance[d] an important governmental interest"—"shielding children from sexual content"—and was "sufficiently tailored" to that interest. *Id.* at 496.

Compared to the statutes struck down in *Reno* and *Ashcroft* and even the Texas statute upheld in *Paxton*, the Protection of Children Act poses a negligible threat to adult access. Like the New York law in *Ginsberg*, it "create[s] a constitutionally adequate adult zone" that "on its face . . . denie[s] access only to minors." *Id.* at 889 (O'Connor, J., concurring in the judgment in part and dissenting in part, joined by Rehnquist, C.J.). The key difference from the statutes in *Reno* and *Ashcroft* (as well as *Paxton*) is that the Florida statute "operate[s] in the physical world" of the adult live performance, and not in the "fundamentally different" electronic world, where it is difficult to permit adult access while still screening out minors. *Id.* In the physical world, "the twin characteristics of geography and identity enable the establishment's proprietor to prevent children from entering the establishment, but to let adults inside." *Id.* The Protection of Children Act takes advantage of this reality and steers well clear of infringing on adult speech rights in any way that would fail to meet intermediate scrutiny.

## III.   The Protection of Children Act is not void for vagueness.

The district court ruled that the Protection of Children Act was void for vagueness for purposes of the Due Process Clause, taking issue with several terms in the statute. The Eleventh Circuit panel majority did not explicitly state that the Act was

35

unconstitutionally vague, but its reasoning in support of its overbreadth determination suggests that it would agree with the district court, at least with respect to the phrase "lewd conduct," and also because it thought the Act's age-variable obscenity standard was vague. Contrary to the reasoning of both courts, the Protection of Children Act gives "adequate notice of what is prohibited," as required by due process. *Ginsberg*, 390 U.S. at 643 (quoting *Roth v. United States*, 354 U.S. 476, 492 (1957)). It is not void for vagueness.

The district court deemed the Act vague because it defined "adult live performance" to include "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts," without separately defining "lewd conduct" or "lewd exposure." MDFL-DE30 at 20-21. The panel majority put similar emphasis on the phrase "lewd conduct." CA11-DE-82-1 at 55-61.

But "a statute is not ambiguous merely because it contains a term without a statutory definition." *United States v. Sepulveda*, 115 F.3d 882, 886 n.9 (11th Cir. 1997). "Lewd" is a term of longstanding usage: "[l]ewdness, or open and public indecency, were offenses even at common law." *Chesebrough*, 255 So. 2d at 678. The word "lewd"

appears throughout the Florida criminal code[5] and in numerous federal[6] and state[7] statutes and has been held appropriate to define the kind of conduct that could be considered obscene if it met the *Miller* test.[8] The Florida Supreme Court has defined the term,[9] upheld it against vagueness challenge,[10] and promulgated standard jury instructions to guide juries in applying the term in those statutes.[11]

The U.S. Supreme Court has rejected vagueness challenges and repeatedly upheld a federal statute that prohibits the mailing of "[e]very obscene, *lewd*, lascivious,

---

[5] *See, e.g.*, Fla. Stat. §§ 800.04(4), 800.09(2)(a)2., 787.01(3)(a)3., 798.02, 794.053, 825.1025(2)(a), 787.02(3)(a)3., 794.051(1), 796.07(1)–(2), 794.011(4)(d)1., 847.0135(5), 827.071(1)(*l*).

[6] *See, e.g.*, 18 U.S.C. §§ 1384, 1461, 1462, 1463, 1465; 47 U.S.C. § 941(j)(1)(B); 20 U.S.C. § 7131(e)(6)(B).

[7] *See, e.g.*, Nev. Rev. Stat. § 201.210; N.J. Rev. Stat. § 2C:14-4; Utah Code Ann. § 76-9-702; Vt. Stat. Ann. tit. 13, § 2601; Idaho Code § 52-104; Cal. Penal Code § 288; 18 Pa. Cons. Stat. § 5901; Wash. Rev. Code § 7.48A.020; Okla. Stat. tit. 21, § 1123; Haw. Rev. Stat. § 712-1217; La. Stat. Ann. § 14:281; N.Y. Penal Law § 245.00 (McKinney); N.C. Gen. Stat. § 19-1.2; Kan. Stat. Ann. § 21-5513; Mass. Gen. Law ch. 272, § 16; S.C. Code Ann. § 16-15-365; Miss. Code Ann. § 97-29-31.

[8] *See, e.g.*, *Reels*, 413 U.S. at 130 n.7 ("If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral,' . . . we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller*" (citations omitted)).

[9] "[W]hen used in a statute to define an offense," "lewd" and "lascivious" each means "an unlawful indulgence in lust, eager for sexual indulgence." *Chesebrough*, 255 So. 2d at 677.

[10] *Id.*

[11] *See* Fla. Std. Jury Instr. (Crim.) § 11.10(d) (defining "lewd" and "lascivious" to mean "a wicked, lustful, unchaste, licentious, or sensual intent on the part of the person doing an act"), https://tinyurl.com/3pu2tcvv.

indecent, filthy or vile article, matter, thing, device, or substance." *Hamling*, 418 U.S. at 98 n.8 (quoting 18 U.S.C. § 1461, emphasis added); *see also Reels*, 413 U.S. at 130 n.7. It has deemed "lewd" precise to the point that state statutes using the term "plainly survive[] overbreadth scrutiny." *Osborne v. Ohio*, 495 U.S. 103, 113 (1990) (upholding state supreme court's construction of statute using the term "lewd exhibition"). Though the panel majority strains against this conclusion, the war over whether terms like "lewd conduct" are sufficiently precise was decided more than 35 years ago. *See id.* at 114 (declining to adopt the dissent's conclusion that "lewd exhibition" is impermissibly vague). Widespread statutory use of the term "lewd" and its variants shows that "the ordinary person exercising ordinary common sense can sufficiently understand" the conduct proscribed by the Protection of Children Act. *Broadrick*, 413 U.S. at 608.

The panel majority also deemed the Act's three-part age-variable obscenity standard to be "impossibly vague." CA11-DE82-1 at 64. As already discussed, this cannot be right. *See supra* pp. 32-33. The panel majority essentially ruled that Florida was allowed to require one and only one line-drawing based on age—between 17- and 18-year-olds—even while acknowledging that this distinction was "not inherently less arbitrary or less vague than the distinction between any other two ages." CA11-DE82-1 at 67. The majority tried to spin this mechanistic constraint as "leav[ing] younger children able to access speech essentially for the benefit of older children as to whom it's not obscene." *Id.* at 68. That is a sanitized way of saying that the vagueness doctrine requires

Florida to let younger children view obscenity. It is a grotesque caricature of due process.

The Protection of Children Act is, by any reasonable measure, an unremarkable public-health statute moored well within the safe harbors for obscenity regulation marked out by the Supreme Court. Any ambiguity in the Act results merely from the fact that "[w]ords inevitably contain germs of uncertainty." *Broadrick*, 413 U.S. at 603. It is "always . . . true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" *Grayned v. City of Rockford*, 408 U.S. 104, 110 n.15 (1972) (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950)). But "[i]f run-of-the-mill statutory ambiguities were enough to violate the Constitution, no court could ever clarify statutes through judicial interpretation, for the first person against whom the clarified version applied (and likely others as well) could argue that he was unfairly surprised and thus his due process rights were violated." *Sabetti v. Dipaolo*, 16 F.3d 16, 18 (1st Cir. 1994) (Breyer, J.). "Courts, of course, clarify textual ambiguities all the time," *id.*, and "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). The Protection of Children Act is unremarkable in this respect. In ruling to the contrary, the district court and the panel majority set a benchmark for legislative draftsmanship that is both unrealistic and wholly unnecessary to guarantee that "ordinary people have 'fair

notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (citations omitted).

## IV. Even if HM were entitled to a preliminary injunction, this Court should limit that relief to HM.

Even if the district court was correct to rule that the Protection of Children Act is likely to violate the First Amendment, it still erred in entering a universal injunction prohibiting the state from enforcing the statute against anyone statewide. "A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). "[N]either declaratory nor injunctive relief . . . can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plain-tiffs." *Id.* at 844 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)). The Supreme Court and this Court have therefore reminded lower courts repeatedly that an injunc-tion should generally apply only to the parties before the court. *See id.* at 841-47; *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010); *Georgia v. President of the United States*, 46 F.4th 1283, 1303-08 (11th Cir. 2022). The circumstances justifying universal relief are "rare" and should be limited to when there is no other way to afford the plaintiff complete relief. *Georgia*, 46 F.4th at 1304 (quotation omitted); *see also CASA*, 606 U.S. at 851 ("equitable tradition" permits a court only to "'administer complete relief *between the parties*'" (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). Here, a universal injunction is unnecessary to provide complete relief because

HM would be fully protected from whatever injury it postulates by a preliminary injunction that applies to it alone.

The district court nevertheless posited that "[a] statute subject to facial attack is likewise susceptible to facial enjoinment," citing a class-action case. MDFL-DE41 at 4 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The panel majority intimated a similar principle. CA11DE82-1 at 81 ("when a court holds a law facially unconstitutional, broad-based relief may follow"). This reasoning misses the mark, for it "conflates the merits of a legal claim with the scope of the remedy for that claim." CA11-DE26-1 at 14 (Brasher, J., dissenting). When a court concludes that a law is unconstitutional on its face, it does not "eliminate[] the legal effect of the statute in all contexts." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020). Ruling that HM was likely to succeed in its facial challenge did not relieve the district court or the panel of its duty to heed the admonition "that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Yamasaki*, 442 U.S. at 702. A successful facial challenge may result in a precedent that can be used to defend against future enforcement of a statute, but not in a remedy that pretermits enforcement altogether. Limiting the injunction to the plaintiff "permits the airing of competing views" by other courts addressing the same challenge by a different plaintiff, *Dep't of Homeland Sec. v. New York*, 589 U.S. 1173, 1176 (2020) (Gorsuch, J., concurring, joined by Thomas, J.), and avoids the "fast and furious process of rushed, high-stakes,

[and] low-information decisionmaking" that attends the prospect of universal relief, *CASA*, 606 U.S. at 855-66 (cleaned up).

The district court and the panel majority also proposed that facial overbreadth should be one of those unique circumstances in which universal relief is justified. Quoting two Supreme Court cases in which the scope of relief was not even an issue, they seized on loose language to the effect that substantial overbreadth "suffices to invalidate *all* enforcement of that law." *Hicks*, 539 U.S. at 119 (citing *Broadrick*, 413 U.S. at 615); *see also id.* (calling overbreadth an "expansive remedy"). But in context it is clear that these statements address the potential scope of the holding in the case at hand and its precedential effect, not the permissible scope of relief.

In *Hicks*, the petitioner was defending against enforcement of a trespass statute, not seeking any kind of injunctive relief. 539 U.S. at 117. His argument was that a government agency's policy limiting access to the property he was convicted of trespassing was facially overbroad. *Id.* at 117-18. The Court upheld the policy anyway and so did not have occasion to address what civil remedies might have been available to the petitioner. *Id.* at 124. In *Broadrick*, the Court rejected the request brought by three state employees for a declaration and an injunction based on a claim that a state statute regulating their political activity was facially overbroad. 413 U.S. at 602, 618. Scope of relief thus was not at issue in that case either. The other cases cited by the panel majority, CA11-DE82-1 at 76, and the motions panel majority that denied the Secretary's request for a partial stay, CA11-DE26 at 10-11, suffer largely the same infirmity: no party was

contesting the scope of the injunction.[12] "Like a 'drive-by-jurisdictional rulin[g],' implicit acquiescence to a broad remedy 'ha[s] no precedential effect.'" *CASA*, 606 U.S. at 845 n.7 (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 91 (1998)).

Nothing in *CASA* suggests that the Judiciary Act of 1789—without which a federal court would have no authority to issue any kind of injunction—countenances a facial overbreadth exception to the rule that courts in equity are limited to awarding "complete relief *between the parties*." 606 U.S. at 851 (quotation omitted). Facial overbreadth is a First Amendment doctrine of relatively recent vintage. *See Thornhill v. Alabama*, 310 U.S. 88, 96 (1940) (first allowing a plaintiff challenging a statute on First Amendment grounds to invoke the rights of third parties even when the statute was constitutional as applied to him). It would not have been within the contemplation of the drafters of the Judiciary Act of 1789 as a potential exception to traditional rules of equity. And the language of the majority opinion in *CASA* is categorical. "The universal injunction was conspicuously nonexistent for most of our Nation's history. Its absence from 18th- and 19th-century equity practice settles the question of judicial authority." 606 U.S. at 845. "Because the universal injunction lacks a historical pedigree, it falls

---

[12] The panel majority also cited dicta in *Florida v. Department of Health & Human Services*, 19 F.4th 1271 (2021), that "even nationwide injunctions are acceptable 'in appropriate circumstances.'" CA11-DE82-1 at 78 (quoting *Florida*, 19 F.4th at 1281-82). Except for when universal relief "is necessary to provide complete relief to the plaintiffs," *Florida*, 19 F.4th at 1282, the "appropriate circumstances" suggested in *Florida* (e.g., immigration, vindication of individual constitutional rights) do not appear to survive *CASA*.

outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* at 847.

It is notable that the *CASA* majority opinion made no effort to reserve for another day whether facial overbreadth might be a special case. The author of the opinion, Justice Barrett, had earlier concurred in the denial of the Secretary's request for a partial stay pending certiorari because "the issue arises here in the context of a First Amendment overbreadth challenge, which presents its own doctrinal complexities about the scope of relief." *HM*, 144 S. Ct. at 2 (Kavanaugh, J., joined by Barrett, J.). Now writing for the Court in *CASA*, Justice Barrett took care to preserve "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action," 606 U.S. at 847 n.10—another issue she and Justice Kavanaugh had distinguished in their *HM* concurrence—but she said nothing of facial overbreadth.

Finally, in *United States v. Stevens*, the Supreme Court asked whether a statute prohibiting commercial creation, sale, or possession of certain depictions of animal cruelty was constitutional. 559 U.S. 460, 464 (2010). Relying on the overbreadth doctrine, the Court said no. *Id.* at 473, 481-82. But again, the relief the Court approved was not a universal injunction; it was vacatur of the respondent's conviction. *Id.* at 482; *see also United States v. Stevens*, 533 F.3d 218, 235 (3d Cir. 2008) (en banc) ("[W]e will vacate Robert Stevens' conviction.").

In short, when "a lower federal court pronounces a state statute void for overbreadth . . . the binding effect of the federal judgment extends no further than the

44

parties to the lawsuit." Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 853-54 (1991) (footnotes omitted). Even when one district court pronounces a statute overbroad, "the state remains free" to enforce it "[a]gainst nonparties." *Id.* at 854; *see also id.* at 881 ("A lower federal court's declaration that a state statute is unenforceable because overbroad, however beneficial to the prevailing party, confers no protection on nonparties to the litigation."). "Because state courts and lower federal courts stand in a coordinate, not a hierarchical, relationship, the binding effect of the federal judgment extends no further than the parties to the lawsuit; against nonparties, civil and criminal actions can go forward." *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n*, 60 F.4th 815, 834 (4th Cir. 2023). Any relief awarded in this case should therefore be limited to HM.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and vacate the preliminary injunction.

Respectfully submitted,

February 25, 2026

JAMES UTHMEIER
  *Attorney General*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*

  */s/ Nathan A. Forrester*
NATHAN A. FORRESTER
  *Chief Deputy Solicitor General*
CASEY J. WITTE
  *Solicitor General Fellow*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
nathan.forrester@myfloridalegal.com
jenna.hodges@myfloridalegal.com

*Counsel for Defendant-Appellant*

46

## CERTIFICATE OF COMPLIANCE

1. This document complies with Federal Rule of Appellate Procedure 27(d)(2)(A), because, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,167 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27, Federal Rule of Appellate Procedure 32(a)(5), and Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface in 14-point Garamond font using Microsoft Word.

 /s/ Nathan A. Forrester
Chief Deputy Solicitor General

47

**CERTIFICATE OF SERVICE**

I certify that on February 25, 2026, I electronically filed this brief with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Nathan A. Forrester*
Chief Deputy Solicitor General