Case No. 23-12160

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

HM FLORIDA-ORL, LLC,

  *Plaintiff – Appellee*,

v.

SECRETARY OF THE FLORIDA DEPARTMENT OF BUSINESS AND
PROFESSIONAL REGULATION,

  *Defendant – Appellant.*

_____

On Appeal from the United States District Court for the
Middle District of Florida (Case No. 6:23-cv-950)
The Honorable Gregory A. Presnell

_____

**APPELLEE'S EN BANC BRIEF**

_____

Melissa J. Stewart
1545 Union Avenue
Memphis, TN 38104

Gary S. Israel
121 South Orange Avenue
Suite 1500
Orlando, FL 32801

Adam W. Hansen
 *Counsel of Record*
CIVIL RIGHTS APPELLATE CLINIC
UNIVERSITY OF MINNESOTA LAW
SCHOOL
229 19th Avenue South
Minneapolis, MN 55455
(612) 927-2969
adam@apollo-law.com

*Counsel for Appellee*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellee certifies that, to the best of its knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5, excluding the persons already identified in Appellant's en banc brief:

Hansen, Adam W.

Teeter, Shelby N.

University of Minnesota Law School Civil Rights Appellate Clinic

Appellee certifies that, to the best of its knowledge, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: May 4, 2026                        s/ Adam W. Hansen
                                          Adam W. Hansen

ii

# STATEMENT IN SUPPORT OF ORAL ARGUMENT

This Court has already scheduled oral argument in this case.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ........................................................... 1

STATEMENT OF THE ISSUES ............................................................... 1

INTRODUCTION .................................................................................... 1

STATEMENT OF THE CASE ................................................................. 4

I.    FACTUAL BACKGROUND ............................................................ 4

    A.   Hamburger Mary's, a Restaurant in Orlando, Florida, Hosts Drag Shows ................................................................ 4

    B.   The Art of Drag Has Ancient Origins and Deep Roots in American Culture ................................................................. 5

    C.   Hamburger Mary's Hosts Several Weekly Drag Shows, Including a Family-Oriented Sunday Broadway Brunch ......... 7

    D.   Prior to 2023, Hamburger Mary's Marketed Its Drag Performances as 18+ Events but Permitted Minors to Attend with Adult Supervision ........................................... 9

    E.   Beginning in 2022, Florida Began Aggressively Sanctioning Businesses That Hosted Drag Shows with Minors Present ..... 9

    F.   Florida Already Has Several Laws on the Books Prohibiting Obscene Conduct ................................................. 11

    G.   Florida Enacts Senate Bill 1438, Criminalizing a Broad Swath of Ill-Defined Speech Related to Drag Performances ............. 12

    H.   Hamburger Mary's Changed Its Age Policies to Shield Itself from Potentially Ruinous Liability .......................................... 16

    I.   Hamburger Mary's Suffered Serious Harm Because of the Act .............................................................................................. 17

II.   PROCEDURAL BACKGROUND ................................................. 18

    A.   Hamburger Mary's Challenges the Act in District Court ...... 18

    B.   The District Court Grants a Preliminary Injunction ............. 19

C.    Florida Seeks—Without Success—to Narrow the Injunction 19

D.    The Panel Affirms ...................................................................20

E.    The En Banc Court Vacates the Panel Decision and Narrows
the Injunction ..........................................................................21

SUMMARY OF THE ARGUMENT ........................................................21

ARGUMENT ...........................................................................................23

I.    HAMBURGER MARY'S HAS ARTICLE III STANDING ...............23

A.    Self-Censorship and Credible Fear of Prosecution Are
Sufficient to Establish Standing.............................................23

B.    The Act Arguably Proscribes Hamburger Mary's Speech,
Threatens It with Prosecution, and Chills Protected
Expression ...............................................................................24

C.    Hamburger Mary's Complaint Does Not Defeat Standing.....27

D.    *Friends of George's* and *Woodlands Pride* Are Distinguishable
...................................................................................................29

II.    THE ACT VIOLATES THE FIRST AMENDMENT........................31

A.    *Paxton* Does Not Save the Act ..............................................31

B.    The Act Cannot Survive Strict Scrutiny ................................35

(1)    Florida's existing obscenity laws already protect children
from genuinely obscene live performances ....................36

(2)    The Act's elimination of parental consent and its
disregard for established alternatives also defeat narrow
tailoring .........................................................................37

(3)    The Act's universal reach and its strict-liability regime
confirm the absence of narrow tailoring ........................38

C.    The Act Is Substantially Overbroad on Its Face....................40

(1)    The "lewd conduct" catchall has no constitutional
limiting principle............................................................41

(2)   The age-variable framework compounds the overbreadth and creates pervasive opportunities for arbitrary enforcement ................................................................... 43

(3)   The Act's plainly legitimate sweep does not outweigh its protected-speech sweep ................................................. 45

III.  THE ACT IS VOID FOR VAGUENESS UNDER THE DUE PROCESS CLAUSE ....................................................................... 46

A.   The Act Fails to Provide Fair Notice ...................................... 46

B.   The Act Authorizes Arbitrary and Discriminatory Enforcement ............................................................................. 47

C.   Florida's "Lewd-Is-Everywhere" Defense Fails ...................... 48

IV.  THE STATEWIDE INJUNCTION SHOULD BE REINSTATED .. 50

A.   First Amendment Overbreadth Is a Substantive Constitutional Doctrine, Not an Equitable Remedy .............. 50

B.   Decades of First Amendment Facial Cases Are Not "Drive-By" Acquiescence ........................................................................... 54

C.   Post-CASA Decisions Have Confirmed That First Amendment Facial Relief Survives .............................................................. 56

D.   Plaintiff-Specific Relief Cannot Provide Complete Relief to Hamburger Mary's ................................................................ 57

E.   Precedent and Stare Decisis Both Foreclose the Secretary's Reading of CASA ................................................................... 59

CONCLUSION ................................................................................. 60

CERTIFICATE OF COMPLIANCE ...........................................................

CERTIFICATE OF SERVICE....................................................................

# TABLE OF AUTHORITIES

## CASES

*American Booksellers Ass'n, Inc. v. Virginia,*
  882 F.2d 125 (4th Cir. 1989) .............................................................. 34

*American Booksellers v. Webb,*
  919 F.2d 1493 (11th Cir. 1990) ................................................. 33-34, 44

*Americans for Prosperity Foundation v. Bonta,*
  594 U.S. 595 (2021) ................................................................... 55-60

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ................................................................ 35, 37-38

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) ...................................................... 40, 51, 54-55, 59

*Brown v. Entertainment Merchants Ass'n,*
  564 U.S. 786 (2011) ....................................................................... 37-38

*Brown v. Kemp,*
  86 F.4th 745 (7th Cir. 2023) ................................................................ 28

*Career Colleges & Schools of Texas v. Department of Education,*
  98 F.4th 220 (5th Cir. 2024) ............................................................... 53

*Chesebrough v. State,*
  255 So. 2d 675 (Fla. 1971) .................................................................. 42

*Commonwealth v. American Booksellers Ass'n, Inc.,*
  372 S.E.2d 618 (Va. 1988) ................................................................... 34

*Connally v. General Construction Co.,*
  269 U.S. 385 (1926) .......................................................................... 47

*Dobbs v. Jackson Women's Health Organization,*
  597 U.S. 215 (2022) .......................................................................... 60

*Doe v. Trump*,
  157 F.4th 36 (1st Cir. 2025) .............................................................. 56

*FCC v. Pacifica Foundation*,
  438 U.S. 726 (1978) .......................................................................... 39

*FF Cosmetics FL, Inc. v. City of Miami Beach*,
  866 F.3d 1290 (11th Cir. 2017) ....................................................... 50-51

*Florida v. Department of Health & Human Services*,
  19 F.4th 1271 (11th Cir. 2021) ........................................................ 58

*Free Speech Coalition, Inc. v. Paxton*,
  606 U.S. 461 (2025) .......................................................................... 31

*Friends of George's, Inc. v. Mulroy*,
  108 F.4th 431 (6th Cir. 2024) .......................................................... 29

*Ginsberg v. New York*,
  390 U.S. 629 (1968) ............................................................... 32, 37, 44

*Griffin v. HM Florida-ORL, LLC*,
  144 S. Ct. 1 (2023) ........................................................ 20, 50, 53, 58

*Hamling v. United States*,
  418 U.S. 87 (1974) ............................................................................ 48

*Harrell v. Florida Bar*,
  608 F.3d 1241 (11th Cir. 2010) ....................................................... 23-25

*HM Florida-ORL, LLC v. Governor of Florida*,
  No. 23-12160, 2023 WL 6785071 (11th Cir. Oct. 11, 2023) ............... 19

*Jackson Federation of Teachers v. Fitch*,
  799 F. Supp. 3d 571 (S.D. Miss. 2025) ............................................ 57

*KH Outdoor, LLC v. City of Trussville*,
  458 F.3d 1261 (11th Cir. 2006) ....................................................... 55

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ................................................................ 46-47

*Louisiana v. FDA,*
    No. 26-30203 (5th Cir. May 1, 2026) .................................... 52

*Marx v. General Revenue Corp.,*
    568 U.S. 371 (2013) ............................................................... 41

*Moms for Liberty—Brevard County v. Brevard Public Schools,*
    118 F.4th 1324 (11th Cir. 2024) ........................................... 26

*Osborne v. Ohio,*
    495 U.S. 103 (1990) ........................................................ 42, 48

*Pittman v. Cole,*
    267 F.3d 1269 (11th Cir. 2001) ............................................ 23

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................................... 35

*Reno v. ACLU,*
    521 U.S. 844 (1997) ........................................... 32, 35, 37, 46

*Rodriguez de Quijas v. Shearson/American Express, Inc.,*
    490 U.S. 477 (1989) ............................................................... 59

*Sable Communications of California, Inc. v. FCC,*
    492 U.S. 115 (1989) ........................................................... 35-36

*Sessions v. Dimaya,*
    584 U.S. 148 (2018) ............................................................... 46

*Smith v. Goguen,*
    415 U.S. 566 (1974) ............................................................... 47

*Solantic, LLC v. City of Neptune Beach,*
    410 F.3d 1250 (11th Cir. 2005) ............................................ 55

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ................................................................58

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ...............................................23-25, 28

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ...............................................................23

*Stanley v. Georgia*,
394 U.S. 557 (1969) ...............................................................39

*Steffel v. Thompson*,
415 U.S. 452 (1974) ...............................................................25

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ...............................................................24-26

*Troxel v. Granville*,
530 U.S. 57 (2000) .................................................................39

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .................................................... 3-4, 21-22, 50-60

*United States v. 12 200-Foot Reels of Super 8mm. Film*,
413 U.S. 123 (1973) .............................................................. 42, 43, 49

*United States v. Hansen*,
599 U.S. 762 (2023) .............................................................. 40, 45

*United States v. Stevens*,
559 U.S. 460 (2010) .............................................................. 54, 59

*United States v. Williams*,
553 U.S. 285 (2008) .............................................................. 44, 46-47

*Virginia v. Hicks*,
539 U.S. 113 (2003) ...........................................40, 45, 50-51, 54, 59-60

*Welty v. Dunaway,*
    791 F. Supp. 3d 818 (M.D. Tenn. 2025) ............................................... 56

*Wollschlaeger v. Governor of Florida,*
    848 F.3d 1293 (11th Cir. 2017) (en banc).......................... 23-26, 28, 46

*Woodlands Pride v. Paxton,*
    168 F.4th 293 (5th Cir. 2026) ......................................................... 30

## STATUTES

2023 Fla. Laws Ch. 2023-94 ............................................................... 12

Fla. Stat. § 509.261 ...................................................... 15, 26, 47

Fla. Stat. § 561.29 ........................................................ 15, 26, 47

Fla. Stat. § 768.125 ................................................................. 40

Fla. Stat. § 775.082 ..................................................... 14, 26, 47

Fla. Stat. § 775.083 ................................................................. 26

Fla. Stat. § 796.07 ................................................................... 11

Fla. Stat. § 800.03 ................................................................... 12

Fla. Stat. § 800.04 ............................................................. 11, 36

Fla. Stat. § 823.5 ..................................................................... 12

Fla. Stat. § 827.11 ..................................... 13-14, 26, 33-34, 39, 41, 47

Fla. Stat. § 847.001 ............................................................ 13, 41

Fla. Stat. § 847.011 ................................................................. 12

Fla. Stat. § 847.013..............................................................................36-38

Fla. Stat. § 877.03........................................................................... 12

Fla. Stat. § 921.16........................................................................... 14

## OTHER AUTHORITIES

Administrative Complaint, Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco v. HRM Owner, LLC, d/b/a Hyatt Regency Miami (Mar. 14, 2023) ............... 10

DeSantis Admin Sent Undercover Agents to Drag Show, Found Nothing 'Lewd,' Business Insider, https://www.businessinsider.com/desantis-florida-undercover-agents-drag-show-found-nothing-lewd-2023-3 ... 10

Drag, Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/drag............................................................................................................. 5

Fla. Dep't of Bus. & Prof'l Regul., Hyatt Regency Miami Settles After Exposing Innocent Children to Inappropriate Sexualized Shows (Nov. 29, 2023), https://www2.myfloridalicense.com/hyatt-regency-miami-settles-after-exposing-innocent-children-to-inappropriate-sexualized-shows/............................................................................. 10

Fla. H.R. Comm. on Commerce, HB 1423 (2023), Meeting Packet (Mar. 23, 2023) ................................................................................. 13, 15

FOX 13 Tampa Bay, Full Press Conference: Governor Ron DeSantis Signs Education Bills in Tampa, YouTube (May 17, 2023), https://www.youtube.com/watch?v=t1kIP2dd2xc............................. 15

Lucas Garcia, Gender on Shakespeare's Stage: A Brief History, Writer's Theatre (Nov. 21, 2018), https://www.writerstheatre.org/blog/gender-shakespeares-stage-history/ ............................................................... 6

Michael F. Moore, Drag! Male and Female Impersonators on Stage, Screen, and Television: An Illustrated World History (McFarland & Company 1994) ................................................................................. 6

Nan Alamilla Boyd, Wide Open Town: A History of Queer San Francisco to 1965 (University of California Press 2003) .................................... 7

State Representative Randy Fine, Facebook (Mar. 3, 2023),
    https://www.facebook.com/voterandyfine/posts/761831661970637 ... 15

## STATEMENT OF JURISDICTION

Appellee agrees with Appellant's statement supporting jurisdiction, except for the claim that Appellee lacks standing. Appellee has established standing, as explained in the argument below.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding that Hamburger Mary's has Article III standing to challenge the Act.

2. Whether the district court abused its discretion in holding the Act likely violates the First Amendment.

3. Whether the district court abused its discretion in holding that the Act is likely void for vagueness under the Fourteenth Amendment Due Process Clause.

4. Whether, after finding the Act likely violates the First Amendment, the district court had authority to enjoin all enforcement of the Act by Appellant.

## INTRODUCTION

The First Amendment holds that a state cannot prohibit speech because it disfavors the content of that speech. Florida's heavy-handed attempt to criminalize drag show performances where any minor could be present violates that bedrock free-speech principle. This Court should affirm the district court's order and injunction striking down Florida's law on its face.

1

Hamburger Mary's is a family-owned restaurant in Orlando that hosts drag shows. Sometimes family friendly, other times like an R-rated movie, drag is an art form that embraces a wide range of expression. At turns bawdy, irreverent, funny, and risqué, drag has long provided light-hearted entertainment blended with serious commentary on sex, gender, and cultural norms. Drag has deep roots in western culture and American history.

Though Hamburger Mary's generally marketed its shows as 18+, it permitted children to attend drag shows with adult supervision. But things changed when Florida passed a law ("Senate Bill 1438" or "the Act") its sponsors said was meant to end "the gateway propaganda to…evil—'Drag Queen Story Time.'" The law does not say "drag." But its terms—criminalizing live shows with "lewd conduct" or "lewd exposure of prosthetic or imitation genitals or breasts"—leave no doubt about the law's intended target. The Act asks businesses to determine whether a performance is appropriate "for the age of the child present," without providing any guidance on how to do so. It imposes all-but-strict liability on anyone who admits any minor to a performance. It renders parental consent wholly irrelevant. And it imposes punishing criminal jail sentences, fines, and business sanctions on anyone who violates the law.

Hamburger Mary's had no choice but to change course. Faced with a vague and overbroad statute and a state that had already shown an

2

appetite for enforcement, Hamburger Mary's stopped admitting children to any of its drag shows. It hired armed security, imposed a strict 18-and-over policy, and lost significant revenue as a result.

This Court should affirm the district court's injunction in full. Hamburger Mary's has standing because the harm it suffered—through financial loss and self-censorship—is real, concrete, and ongoing. Hamburger Mary's likewise faces a credible risk of future harm through prosecution.

On the merits, the Act fails strict scrutiny because Florida already has narrower laws that protect children from genuine obscenity—laws that respect parental consent and protected speech. The Act is overbroad because its undefined "lewd conduct" and "lewd exposure of prosthetic[s]" provisions sweep in speech that has nothing to do with obscenity. And the Act is void for vagueness because no business can know, in advance, which performances Florida will treat as criminal.

The remedy must be a statewide injunction. By design, the Act chills protected speech far beyond Hamburger Mary's doors. Drag artists travel between venues. Audiences cross city lines. Florida's law tells every drag-hosting establishment that it cannot engage in protected expression with children present. *Trump v. CASA* changed nothing about this analysis. *CASA* addressed the equitable authority of federal courts. The First Amendment overbreadth doctrine is something else: a

3

substantive constitutional rule that has long required facial invalidation of speech-restrictive statutes. Two Supreme Court Justices, in refusing to stay the district court's injunction, flagged that distinction in this very case. Other federal courts have recognized the same point after *CASA*. Florida's law is facially unconstitutional. Nothing short of a statewide, facial invalidation of that law will remedy that constitutional violation.

## STATEMENT OF THE CASE

### I.  FACTUAL BACKGROUND.

### A.  Hamburger Mary's, a Restaurant in Orlando, Florida, Hosts Drag Shows.

Appellee HM Florida-ORL, LLC ("Hamburger Mary's") owns and operates Hamburger Mary's Restaurant & Bar in Orlando, Florida. R.1 at 16; R.51 at 1.[1] Hamburger Mary's is a small, family-owned business and a fixture of Orlando's restaurant scene. R.56-1 at 91.

Part of a nationwide franchise, Hamburger Mary's bills itself as "an open-air bar and grille for open-minded people." *See* https://www.hamburgermarys.com/. The dining experience at Hamburger Mary's starts with world-class hamburgers, fries, and shakes. *Id.* Hamburger Mary's also holds a Florida liquor license and serves alcohol to patrons who are 21 and older. R.1 at 2; R.51 at 1.

---

[1] This brief cites references to the record using the page number that appears in the header generated by the district court's electronic filing system. *See* 11th Cir. R. 28-5.

4

But the Hamburger Mary's experience goes beyond just food and drinks. Complementing the cuisine, Hamburger Mary's provides its customers with an array of drag-themed entertainment. R.1 at 6; R.51 at 1, 4.

### B.  The Art of Drag Has Ancient Origins and Deep Roots in American Culture.

Drag, generally defined, is a performance involving "clothing more conventionally worn by the other sex, especially exaggeratedly feminine clothing, makeup, and hair adopted by a man." R.1 at 6; R.51 at 4.[2] Drag shows are a form of entertainment that typically involves comedy, singing, lip-synching, and dancing. R.1 at 6; R.51 at 4. Drag can be boundary-pushing or risqué. R.1 at 6-7; R.51 at 4-5. Drag shows sometimes incorporate playful innuendo, gestures, movements, music, and words intended to serve as a commentary on the role of sex, gender, and cultural norms. R.1 at 6-7; R.51 at 4-5. Drag performers impersonating women typically wear prosthetic breasts. R.1 at 6; R.51 at 8.

Like many forms of performance art, drag encompasses "a vast spectrum of expression." R.1 at 7; R.51 at 6. Every drag performer makes unique choices about attire, choreography, words, and music. R.1 at 7; R.51 at 6. One performer might sport a floor-length gown while lip-

---

[2]    Citing    *Drag*,    OxfordlearnersDictionary.com, https://www.oxfordlearnersdictionaries.com/us/definition/english/drag.

syncing to Celine Dion. R.1 at 7; R.51 at 6. Another might wear a low-cut shirt and make puns to the music of the Rocky Horror Picture Show. R.1 at 7; R.51 at 6. Yet another performer might dance suggestively in a bodysuit in the spirit of a Taylor Swift or Miley Cyrus concert. R.1 at 7; R.51 at 4.

As an art form, drag has ancient roots. "Drag has been present in western culture dating back to Ancient Greek theatrical productions." R.1 at 6; R.51 at 5. The earliest productions of William Shakespeare's plays also featured male actors in drag playing female roles. R.1 at 6; R.51 at 5.[3]

Drag also runs deep through American history. The vaudeville shows of the late 1800s and early 1900s popularized drag to a mass audience. R.1 at 7; R.51 at 5.[4] Drag performances on Broadway began in the early 1900s. R.1 at 7; R.51 at 5.[5] By the 1950s, drag performers regularly put on shows in bars and other spaces catering to the LGBTQ

---

[3] Citing Lucas Garcia, Gender on Shakespeare's Stage: A Brief History, Writer's Theatre (November 21, 2018), https://www.writerstheatre.org/blog/gender-shakespeares-stage-history/.

[4] Nan Alamilla Boyd, Wide Open Town: A History of Queer San Francisco to 1965, University of California Press (2003).

[5] Michael F. Moore, Drag! Male and Female Impersonators on Stage, Screen, and Television: An illustrated World History, McFarland & Company (1994).

6

community. R.1 at 7; R.51 at 5.[6] And by the twenty-first century, drag had solidified itself as a pillar of mainstream American entertainment. R.1 at 7; R.51 at 6. From Mrs. Doubtfire to Saturday Night Live to RuPaul's Drag Race, the art of drag remains firmly rooted in contemporary American culture. R.1 at 7; R.51 at 6-7.

### C. Hamburger Mary's Hosts Several Weekly Drag Shows, Including a Family-Oriented Sunday Broadway Brunch.

Hamburger Mary's has regularly staged drag shows and other drag-themed events since it opened in 2008. R.1 at 6-7; R.51 at 7.

Hamburger Mary's typically puts on five shows a week—plus occasional special events. R.56-1 at 18. Its customers can attend "Twisted Bingo" on Tuesdays, "Dining with Divas" on Fridays, and "Mary's and Mimosas" on Saturdays, among other regular programs. *Id.* at 19, 102. These shows feature a rotating cast of drag performers. *Id.* at 21, 103. No two shows are exactly alike. *Id.* at 21. Drag shows at Hamburger Mary's often include flamboyant, provocative, or suggestive gestures, innuendo, movements, outfits, and words. R.1 at 6-7; R.56-1 at 37, 48. Hamburger Mary's prohibits performers from engaging in a few discrete acts—for example, performers may not expose their genitals. R.56-1 at 37, 40, 115. Outside of these narrow prohibitions, though, performers hold a broad

---

[6] Nan Alamilla Boyd, Wide Open Town: A History of Queer San Francisco to 1965, University of California Press (2003).

artistic license to shape their work. *Id.* at 37, 40, 115. Most drag shows are akin to an R-rated movie. *Id.* at 48.

Every Sunday, Hamburger Mary's hosts a drag show called the "Sunday Broadway Brunch." *Id.* at 29. The Broadway Brunch is the most family-friendly program among Hamburger Mary's offerings. R.1 at 8; R.56-1 at 29. At these shows, drag performers typically act out musical scenes popularized in Broadway shows or Disney movies like Mary Poppins, Hairspray, or Grease. R.51 at 8; R.56-1 at 29, 52. Performers limit or eliminate the use of inappropriate language or off-color jokes. R.56-1 at 29. But these shows are still quintessentially drag. Male performers still present themselves in exaggeratedly feminine clothing, makeup, and hair. R.1 at 6; R.51 at 5-6. They still move and dance provocatively. R.1 at 6-7; R.51 at 5-6. And performers still usually wear prosthetic breasts. R.1 at 6; R.51 at 5-6. In its DNA, the Sunday Broadway Brunch is still very much a drag show—it's just "a little less provocative and edgy." R.56-1 at 29.

Hamburger Mary's relies on drag performances to bring in business. R.51 at 7. And many of its patrons are families. *Id.* Parents and grandparents often visit Hamburger Mary's with their children. *Id.*

**D.    Prior to 2023, Hamburger Mary's Marketed Its Drag Performances as 18+ Events but Permitted Minors to Attend with Adult Supervision.**

Before 2023, Hamburger Mary's marketed its shows as 18+ events and generally permitted only people who were 18 years old or older to attend drag performances. R.56-1 at 24, 91. Children, though, were permitted to attend drag shows with adult supervision—typically with parents or grandparents. *Id.* at 24, 28, 91-92.

Hamburger Mary's did not verify patrons' ages. *Id.* at 91-92. Instead, Hamburger Mary's communicated its age policies when customers made reservations and relied on customers' goodwill to follow the rules. *Id.* at 24, 91. Hamburger Mary's policies reflected its view that parents—not the restaurant or the government—ought to make the ultimate judgment about "whether they feel the content is appropriate for their child." *Id.* at 51, 92.

**E.    Beginning in 2022, Florida Began Aggressively Sanctioning Businesses That Hosted Drag Shows with Minors Present.**

In 2022, the state of Florida began targeting businesses hosting drag shows. The state initiated administrative proceedings against three businesses that allegedly held drag performances with minors present. R.1 at 2-3; R.56-1 at 95. In one case, a restaurant hosted a drag queen weekend brunch. R.1 at 3; R.56-1 at 95. In the other two cases, a hotel and a performing arts center hosted "Drag Queen Christmas" events. R.1

9

at 3; R.56-1 at 95. In all three cases, the state of Florida, through the Department of Business and Professional Regulation, accused the businesses of violating Florida laws prohibiting (i) lewd exhibition, (ii) operating a lewd establishment, (iii) public exposure, (iv) obscene exhibition, (v) breach of the peace, and (vi) public nuisance. R.1 at 2-3 (citing statutes); R.56-1 at 95.[7] Florida threatened to revoke the liquor licenses held by these establishments, among other sanctions. R.1 at 3; R.56-1 at 95.

Contemporaneous state investigatory materials cast serious doubt on the truthfulness of Florida's allegations against these businesses. R.1 at 8; R.51 at 6-7. For example, undercover agents who attended one of the "Drag Queen Christmas" shows, at The Plaza Live venue in Orlando, recorded the performance on their phones and wrote in their investigative report that "[b]esides some of the outfits being provocative (bikinis and short shorts), agents did not witness any lewd acts such as exposure of genital organs during the acts by various performers." R.1 at 8; R.51 at 6.[8] Despite these findings, the state of Florida plowed ahead

---

[7] Citing Administrative Complaint, *Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco, Petitioner, v. HRM Owner, LLC, d/b/a Hyatt Regency Miami* (Mar. 14, 2023).

[8] Citing DeSantis Admin Sent Undercover Agents to Drag Show, Found Nothing 'Lewd' (businessinsider.com) https://www.businessinsider.com/desantis-florida-undercover-agents-drag-show-found-nothing-lewd-2023-3.

10

with charges of unlawful conduct. R.1 at 3; R.51 at 2; R.56-1 at 95. These charges—in contrast to the investigatory findings—reveal the core truth that Florida seeks to evade in this litigation: Florida considers drag shows to be *inherently* "a public nuisance, lewd, disorderly, sexually explicit...and obscene." R.51 at 7.

Under immense pressure, all three businesses ultimately agreed to pay fines and abide by far-reaching injunctions generally prohibiting children from attending future drag-themed shows.[9]

### F.    Florida Already Has Several Laws on the Books Prohibiting Obscene Conduct.

As these prosecutions illustrate, Florida already has several laws on the books prohibiting various forms of obscene conduct. Florida prohibits:

* Lewd or lascivious exhibition, including masturbation or exposing of genitals, in the presence of a minor less than 16 years of age. Fla. Stat. § 800.04(7)(a).

* Operation of any place or building for the purposes of lewdness. Fla. Stat. § 796.07(2)(a).

---

[9] *See* Florida Department of Business and Professional Regulation, Hyatt Regency Miami Settles After Exposing Innocent Children To Inappropriate Sexualized Shows (Nov. 29, 2023), https://www2.myfloridalicense.com/hyatt-regency-miami-settles-after-exposing-innocent-children-to-inappropriate-sexualized-shows/.

11

* The unlawful exposing or exhibiting of one's sexual organs in public or on the private premises of another in a vulgar or indecent manner. Fla. Stat. § 800.03.

* Knowingly promoting, conducting, performing, or participating in an obscene show, exhibition, or performance before an audience. Fla. Stat. § 847.011(4).

* Breach of the peace and disorderly conduct with acts that are of such nature as to corrupt the public morals or outrage the sense of public decency. Fla. Stat. § 877.03.

* Causing a nuisance by erecting or maintaining a structure that tends to annoy the community or injure the health of the community or becomes manifestly injurious to the morals or manners of the people. Fla. Stat. § 823.5(1).

### G.  Florida Enacts Senate Bill 1438, Criminalizing a Broad Swath of Ill-Defined Speech Related to Drag Performances.

Not satisfied with the existing menu of criminal sanctions, the Florida legislature passed a new law specifically targeting drag performances.

On May 17, 2023, Florida Governor Ron DeSantis signed Senate Bill 1438 into law. *See* 2023 Fla. Laws Ch. 2023-94. Along with amending three existing laws, S.B. 1438 created a new statute—Fla. Stat.

§ 827.11—which prohibits any person from "knowingly" admitting a child to an "adult live performance." *Id.* § 827.11(3).

The Act defines an "adult live performance" as:

[A]ny show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:

1. Predominantly appeals to a prurient, shameful, or morbid interest;

2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and

3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

*Id.* § 827.11(1)(a). A "child" is "any person…younger than 18 years of age." *Id.* § 847.001(10). The Act does not define the phrases "lewd conduct," or "lewd exposure of prosthetic or imitation genitals or breasts." *Id.* § 827.11; *see* Fla. H.R. Comm. on Commerce, HB 1423 (2023), Meeting Packet at 9 (Mar. 23, 2023).

The Act defines "knowingly"—just not in a way that resembles any ordinary English meaning. Under the Act, "[k]nowingly" means:

having general knowledge of, reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:

1. The character and content of any adult live performance described in this section which is reasonably susceptible of examination by the defendant; and

2. The age of the child.

Fla. Stat. § 827.11(1)(b).

The Act complements its technical definition of "knowingly" with a special exclusionary rule further impairing a defendant's ability to avoid liability for innocent mistakes: "A person's ignorance of a child's age, a child's misrepresentation of his or her age, or a bona fide belief of a child's consent may not be raised as a defense in a prosecution for a violation of this section." *Id.* § 827.11(2). A parent's consent likewise provides no defense under the law. *Id.* § 827.11.

The Act levies severe punishments. It provides that any person who violates the Act commits a first-degree misdemeanor punishable by up to one year in prison. *Id.* § 827.11(4); Fla. Stat. § 775.082(4)(a). Because Florida law empowers judges to impose sentences consecutively, Fla. Stat. § 921.16, the Act functionally authorizes extraordinary criminal sanctions. A person deemed to have admitted 50 minors to a single adult live performance could face up to 50 years in prison. Fla. Stat. § 827.11(4); Fla. Stat. § 775.082(4)(a).

14

The Act also authorizes the Florida Department of Business and Professional Regulation to impose fines of up to $10,000 for each violation and revoke or suspend the operating and liquor licenses of any business that violates the Act. Fla. Stat. §§ 509.261(10), 561.29(1).

The Act's framers left no doubt that they passed the law to put drag performers—and businesses hosting drag shows—directly in the crosshairs. Governor DeSantis described the Act as being about "adult performances…like those drag shows."[10] One legislative sponsor said the law would criminalize "the gateway propaganda to…evil—Drag Queen Story Time."[11] Other material in the legislative record made clear that the Act was designed to be both vague and overbroad in its terms. Fla. H.R. Comm. on Commerce, HB 1423 (2023), Meeting Packet at 11 (Mar. 23, 2023). More than that, the Florida legislature specifically anticipated that the combined effect of the Act's vague terms and harsh punishments would cause businesses hosting drag shows to self-censor, "prohibiting such performances or discontinuing…performances based on a fear or lack of understanding of the law or fear of violating the law." *Id.* at 11.

---

[10] FOX 13 Tampa Bay, Full Press Conference: Governor Ron DeSantis Signs Education Bills in Tampa, YOUTUBE, AT 8:22 (May 17, 2023), https://www.youtube.com/watch?v=t1kIP2dd2xc.

[11] State Representative Randy Fine, FACEBOOK (Mar. 3, 2023), https://www.facebook.com/vot-erandyfine/posts/761831661970637.

### H.    Hamburger Mary's Changed Its Age Policies to Shield Itself from Potentially Ruinous Liability.

Hamburger Mary's began changing its policies both before and after the passage of the Act. Beginning in April 2023, Hamburger Mary's generally no longer permitted minors to attend its drag shows, even with adult supervision. R.1 at 18; R.56-1 at 25, 28, 91-92, 106. The lone exception: Hamburger Mary's still permitted minors to attend the family-oriented Sunday Broadway Brunch, but only with adult supervision. R.56-1 at 25, 28, 92, 106. Hamburger Mary's made these changes because of Florida's enforcement actions against other venues hosting drag shows. *Id.* at 25, 27. Hamburger Mary's feared losing its liquor license, which would "destroy the business." R.1 at 18; R.56-1 at 27.

Hamburger Mary's began enforcing even more restrictive policies after the Act was passed in May 2023. All shows remained 18+ events. R.56-1 at 30, 92, 108. But minors were no longer permitted to attend *any* shows, including the Sunday performance, even with adult supervision. *Id.* at 30, 92, 108. The only alternative to these new age restrictions, in Hamburger Mary's view, would be to "heavily censor its shows"—a step Hamburger Mary's was deeply reluctant to take. R.51 at 8; R.56-1 at 92.

Hamburger Mary's also hired private security guards, at the company's expense, to check identification and verify that all patrons were 18 years old or older. R.56-1 at 92.

16

Hamburger Mary's made these changes because of the passage of the Act. R.51 at 8; R.56-1 at 31. Hamburger Mary's simply could not risk exposing itself or its principals to punishing criminal penalties or "take the chance that [its] business or liquor licenses would be suspended for hosting a drag show where children attend." R.51 at 8; R.56-1 at 31.

After the district court entered a preliminary injunction in this case, Hamburger Mary's largely reverted to its pre-2023 policies. R.56-1 at 33. Hamburger Mary's again generally limited drag-show attendance to adults but permitted minors to attend with adult supervision. *Id.* at 33, 93, 111. Hamburger Mary's also reverted to the honor system for age verification—trusting its customers to abide by the restaurant's restrictions. *Id.* at 93.

Should the injunction in this case ever be dissolved, Hamburger Mary's remains "reasonably concerned that its future performances will violate the law." R.51 at 8.

## I.    Hamburger Mary's Suffered Serious Harm Because of the Act.

Hamburger Mary's incurred a significant loss of business because of the Act. Shortly after the Act was passed, many customers cancelled their drag-show reservations. R.56-1 at 54, 58, 96. Many more simply never made reservations in the first place. *Id.* at 54-55, 59-60, 96. This directly affected Hamburger Mary's bottom line. Hamburger Mary's

17

assesses a cover charge and requires minimum food or drink orders for drag-show attendees. *Id.* at 51, 95, 106. Hamburger Mary's lost revenue on food and drinks that were never ordered. *Id.* at 95. All told, Hamburger Mary's revenue in 2023 dropped by more than $185,000 compared to the prior year. *Id.* at 64-65, 99. The passage of the Act was the proximate cause of these losses. *Id.* at 99.

Hamburger Mary's and its owners suffered harm in other ways, too. Since the Act passed, Hamburger Mary's has been inundated with threatening and hateful messages. *Id.* at 69. Frequent negative comments such as "we hope you close" and "we hope you die" prompted Hamburger Mary's owners to hire private security to protect their workers, performers, and customers. *Id.* at 68-69.

## II. PROCEDURAL BACKGROUND.

### A. Hamburger Mary's Challenges the Act in District Court.

Five days after Florida enacted the Act, Hamburger Mary's filed this lawsuit. R.1.[12] The next day, it moved for a temporary restraining order and a preliminary injunction. R.6.

---

[12] Appellant in this case is nominally the Secretary of the Florida Department of Business and Professional Regulation. For ease of reading, this brief will refer to Appellant as Florida.

**B.    The District Court Grants a Preliminary Injunction.**

On June 23, 2023, the district court granted Hamburger Mary's motion for a preliminary injunction and denied Florida's motion to dismiss. R.30.

The court held that Hamburger Mary's was likely to succeed on the merits of both its First and Fourteenth Amendment claims. R.30 at 15-23. The Act, the court explained, is "facially content-based" and could not survive strict scrutiny. R.30 at 15-20. The court further held that the Act's failure to define key terms—including "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts"—rendered the law "dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected speech." R.30 at 23-24. The court enjoined Florida from "instituting, maintaining, or prosecuting any enforcement proceedings under the Act." R.30 at 25.

**C.    Florida Seeks—Without Success—to Narrow the Injunction.**

Florida appealed. R.31. It moved three times to limit the injunction to Hamburger Mary's alone. The district court denied the first such motion. R.41. A divided motions panel of this Court—Judges Jordan and Rosenbaum, with Judge Brasher dissenting—denied the second. *HM Florida-ORL, LLC v. Governor of Fla.*, No. 23-12160, 2023 WL 6785071 (11th Cir. Oct. 11, 2023) (per curiam). The motions panel acknowledged

19

that the First Amendment overbreadth doctrine "can take on special importance" when it comes to the scope of relief. *Id.* at *3-*4.

The Secretary's third attempt was an application for a partial stay in the Supreme Court. The Court denied it by a vote of 6 to 3. *Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1 (2023). Justice Kavanaugh, joined by Justice Barrett, explained that whether "a district court, after holding that a law violates the Constitution, may nonetheless enjoin the government from enforcing that law against non-parties" might "warrant" the Court's review one day. *Id.* at 2. But, he recognized, this case "arises…in the context of a First Amendment overbreadth challenge, which presents its own doctrinal complexities about the scope of relief." *Id.*

### D.    The Panel Affirms.

A divided panel of this Court—Judges Rosenbaum and Abudu, with Judge Tjoflat dissenting—affirmed. The panel held unanimously that Hamburger Mary's had Article III standing. It held, 2 to 1, that the Act likely violates the First Amendment because both its "lewd conduct" provision and its age-variable obscenity standard are unconstitutionally overbroad, and that the district court correctly enjoined enforcement of the Act statewide.

**E.    The En Banc Court Vacates the Panel Decision and Narrows the Injunction.**

Florida petitioned for rehearing en banc. Doc. 85. While the petition was pending, the Supreme Court decided *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Florida then renewed its motion to narrow the injunction. Doc. 100.

This Court granted rehearing en banc. Doc. 105. Two weeks later, the Court stayed the preliminary injunction except as it applies to Hamburger Mary's, pending the en banc disposition of this appeal. Doc. 106.

## SUMMARY OF THE ARGUMENT

Hamburger Mary's has standing. The Act uses undefined terms— "lewd conduct," "lewd exposure of prosthetic or imitation genitals or breasts," obscenity calibrated "for the age of the child present"—to reach speech the state has publicly identified as its target. Hamburger Mary's shows feature exactly the kind of content those vague terms arguably reach: sexual innuendo, dirty jokes, performers in bustiers and prosthetic breasts. Florida has prosecuted other drag venues even where its own undercover agents reported no lewd acts. Hamburger Mary's hired security, imposed a strict 18-and-over policy, and lost significant earnings because of the Act. It credibly fears future prosecution. This is a textbook case of First Amendment standing.

21

The Act violates the First Amendment three times over. The Act fails strict scrutiny because Florida's existing statutes already cover cases involving genuine obscenity. The Act is substantially overbroad on its face: its undefined "lewd conduct" catchall provisions must reach beyond *Miller*'s core prohibitions, and its per-child age-variable framework forecloses the saving construction this Court applied in *Webb*. *Free Speech Coalition v. Paxton* does not save the Act: *Paxton* upheld a means-of-access regulation of already-unprotected speech under intermediate scrutiny. Here, the Act prohibits live performances based on a vague, age-variable standard that captures speech protected as to most of its audience.

The Act is also void for vagueness under the Due Process Clause. It fails to give ordinary people fair notice of what it forbids and authorizes the cascading arbitrary enforcement the doctrine exists to prevent.

Statewide relief is the only remedy that redresses Hamburger Mary's First Amendment injury. *Trump v. CASA* did not displace the substantive First Amendment overbreadth doctrine that has produced facial invalidation of statutes for decades. The original injunction should be reinstated.

## ARGUMENT

## I.    HAMBURGER MARY'S HAS ARTICLE III STANDING.

Hamburger Mary's has standing. Florida forced it to censor its offerings—limiting drag shows to adults and hiring private security to enforce its age policies. Hamburger Mary's lost revenue as a result. Hamburger Mary's also credibly fears prosecution—a fear vindicated by Florida's zealous prosecution of similar businesses. These are classic injuries sufficient to confer standing to sue.

### A.    Self-Censorship and Credible Fear of Prosecution Are Sufficient to Establish Standing.

To establish Article III standing, Hamburger Mary's must show "an injury in fact, that is fairly traceable to the challenged conduct of the defendant, and that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Florida contests only the first element.

This Court applies the injury-in-fact requirement "most loosely" in the First Amendment context, "lest free speech be chilled even before the law or regulation is enforced." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). Self-censorship is itself a cognizable injury. *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc); *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001). And the inquiry is objective: standing exists when a statute "would cause a reasonable would-be speaker to self-censor." *Speech First, Inc. v.*

23

*Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (cleaned up). A "credible threat of prosecution" inheres in any "recently passed law," *Harrell*, 608 F.3d at 1257—and especially one the State has "vigorously defend[ed]" in court. *Wollschlaeger*, 848 F.3d at 1305 (en banc).

> **B.    The Act Arguably Proscribes Hamburger Mary's Speech, Threatens It with Prosecution, and Chills Protected Expression.**

This is a textbook First Amendment standing case. A new criminal statute uses undefined terms to reach speech the state has publicly identified as its target. The plaintiff has incurred concrete economic loss to comply. Every factor this Court considers in pre-enforcement First Amendment standing cases—the reach of the statutory text, the severity of penalties, the history of state enforcement, and the reasonableness of the speaker's self-censorship—supports standing.

Hamburger Mary's drag performances arguably fall within the Act's reach. Drag performers at Hamburger Mary's shows traditionally wear "exaggeratedly feminine clothing, makeup, and hair," with "[p]rosthetic breasts…commonly used…as part of the art." R.1 at 6. These shows feature exactly the kinds of content the Act's vague terms—"lewd conduct," "lewd exposure of prosthetic or imitation genitals or breasts," "patently offensive…for the age of the child present"—arguably prohibit.

Hamburger Mary's "need not 'confess that [it] will in fact violate that law'" to establish standing. Panel Op. at 9 (quoting *Susan B.*

24

*Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014)); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974). The "arguably proscribed" requirement is satisfied so long as the statute could plausibly be read to cover the speech in question. *Driehaus*, 573 U.S. at 162. The Act's vague terms only sharpen that fear: "imprecision exacerbates [a] chilling effect." *Speech First*, 32 F.4th at 1121. As the panel put the point: "It would defeat decades of First Amendment jurisprudence to allow states to impose laws whose 'breadth—and slipperiness' obfuscate their reach, then dodge lawsuits by saying plaintiffs are confused as to a law's scope." Panel Op. at 14. "The government cannot shroud rules in foggy language and then blame would-be speakers for their fears of what may lurk in the fog." *Id.*

The credible threat of enforcement independently supports standing. A "credible threat of prosecution" inheres in any "recently passed law" because courts "assume that law enforcement agencies will not disregard…a recent expression of the legislature's will." *Harrell*, 608 F.3d at 1257 (cleaned up). The presumption applies with special force when the State has "vigorously defend[ed]" the law in court. *Wollschlaeger*, 848 F.3d at 1305 (en banc). Florida's vigorous defense of the recently passed statute supports standing here.

So too does Florida's documented pattern of targeting businesses hosting drag shows for sanctions. Florida has prosecuted multiple

25

venues—despite evidence from its own investigators showing nothing lewd about the shows. R.1 at 2-3; R.56-1 at 95. These similar prosecutions support Hamburger Mary's fear of future sanctions. *Susan B. Anthony List*, 573 U.S. at 164.

The Act's penalties are severe—further supporting standing. Fla. Stat. §§ 509.261(10)(c)-(d) (fines); 561.29(1) (business licenses); 775.082(4)(a), 775.083(1)(d), 827.11(4) (jail sentences). This Court recently described penalties of "60 days in jail and a $500 fine" as "severe." *Moms for Liberty—Brevard Cnty. v. Brevard Pub. Schs.*, 118 F.4th 1324, 1330 (11th Cir. 2024). The Act's penalties dwarf those.

Faced with this risk, Hamburger Mary's took the only step that could reasonably reduce its enforcement exposure—across-the-board age restrictions. That change produced concrete economic injury through cancellations, lost revenue, and the costs of hiring security to enforce the new admissions rules. R.56-1 at 25, 28, 30, 92, 106, 108. The Secretary does not contest these losses. And for good reason: they are precisely the injuries the First Amendment standing doctrine exists to redress. *See Wollschlaeger*, 848 F.3d at 1305.

**C.  Hamburger Mary's Complaint Does Not Defeat Standing.**

Florida's central standing move is to read Hamburger Mary's complaint out of context to manufacture an admission Hamburger Mary's never made.

Florida's argument distills to a single sentence in Hamburger Mary's complaint: that its Sunday Broadway Drag Brunch features "no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." R.1 at 6. From that line, Florida alleges that because Hamburger Mary's says its shows are not lewd, the Act does not arguably reach them; and because the Act does not reach them, no injury exists. *See* Sec'y Br. 6-10.

That argument fails for three reasons.

The complaint—and Hamburger Mary's injury—turns on more than the Sunday Brunch. The "no lewd activity" sentence describes the Sunday Broadway Drag Brunch—the most family-friendly of the five core programs. R.30 at 5; R.56-1 at 47-48. Hamburger Mary's other shows feature more provocative content: "language and sexual innuendo and provocative outfits," "obviously dirty jokes," and performers "wearing bustiers" and prosthetic breasts. R.56-1 at 47. And the Act forced Hamburger Mary's to restrict children from attending these shows too. R.56-1 at 30, 92, 108. Florida cannot manufacture an admission about

27

every show by quoting a sentence about Hamburger Mary's most PG performance.

Standing likewise does not turn on what Hamburger Mary's thinks "lewd" means. "Lewd" is the Act's term, not Hamburger Mary's. Whether its drag performances constitute "lewd conduct" or feature "lewd exposure of prosthetic or imitation genitals or breasts" depends on how the Department, Florida prosecutors, and Florida juries interpret those terms. *Speech First*, 32 F.4th at 1120. The relevant question is whether a reasonable would-be speaker, looking at the statutory text and the enforcement record, would self-censor. *Id*. The Act's vague terms make that self-censorship eminently reasonable. Florida cannot rely on Hamburger Mary's own characterization of its shows to escape the chill the Act imposes.

Florida's self-serving litigation representations don't defeat standing either. Florida's lawyers claim that Florida doesn't think Hamburger Mary's shows violate the Act. *See* Sec'y Br. 9-10. But "anything less than a 'clear disavowal of enforcement' does not divest a plaintiff of standing." Panel Op. at 14 (quoting *Brown v. Kemp*, 86 F.4th 745, 769 (7th Cir. 2023)). What the Secretary's counsel says in a brief is not a binding commitment by the Department. *See Wollschlaeger*, 848 F.3d at 1306 (en banc) (nonbinding letter disavowing enforcement does not deprive plaintiff of standing).

**D.** *Friends of George's* **and** *Woodlands Pride* **Are Distinguishable.**

Florida leans on two recent decisions from sister circuits. Both involved different statutes, different factual records, and different circuit standing doctrines. Neither controls the outcome here.

In *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431 (6th Cir. 2024), the Sixth Circuit held that a Tennessee theater company lacked standing to challenge Tennessee's Adult Entertainment Act. *Id.* at 436-38. The Tennessee statute reached only "adult cabaret entertainment" defined by reference to Tennessee's separate "harmful to minors" obscenity statute, *id.* at 435, and the Sixth Circuit concluded that the plaintiff's described "family-friendly" performances did not meet the statutory definition as the Tennessee Supreme Court had construed it, *id.* at 437-38. The plaintiff there had no enforcement record to point to, and no Tennessee official had publicly threatened or undertaken action against its shows. *Id.*

This case is different in several respects. First, statutes are different. The Act includes a vague "lewd conduct" catchall that the Tennessee statute lacked, and an age-variable framework that no Tennessee provision incorporated. Hamburger Mary's drag shows arguably fall within those vague terms in ways the Tennessee statute would not have reached. Second, Hamburger Mary's claim of injury does not rest on its own characterization of its shows as artistic or non-

29

obscene; it rests on the objective overlap between its drag performances and the Act's ambiguous terms. Third, Florida has a documented record of treating drag as obscene—a record absent in *Friends of George's*. The Sixth Circuit's analysis flowed from an enforcement vacuum that does not exist here.

*Woodlands Pride v. Paxton*, 168 F.4th 293 (5th Cir. 2026), is similarly distinguishable. There, the Fifth Circuit held that some—but not all—drag-organization plaintiffs lacked standing to challenge a Texas statute regulating "sexually oriented performances…in the presence of minors." *Id.* at 298-99. The two that lost—Woodlands Pride itself and the Abilene Pride Alliance—did so because their representatives testified that *all* their performances were "family friendly" or "age appropriate." *Id.* at 301-02. Another plaintiff, though, established standing based on evidence that that plaintiff—a drag production company—exhibited provocative shows involving prosthetics. *Id.* at 304. Hamburger Mary's is similarly situated to the *Woodlands Pride* plaintiff that established standing.

The Texas statute itself was also narrower. It required a covered performance to "appeal to the prurient interest in sex" and to feature actual or simulated nudity, *Woodlands Pride*, 168 F.4th at 298. The Texas Supreme Court had narrowed the statute through authoritative construction. *Id.* The Act has no such judicial narrowing. Its "lewd

30

conduct" catchall and age-variable framework extend its reach beyond what the Texas statute covered.

Hamburger Mary's intends to engage in protected drag performance that the Act's vague text arguably reaches. It faces a credible threat of prosecution, confirmed by Florida's documented appetite for treating drag as obscene. It has self-censored at substantial cost. That is more than enough to establish injury in fact under this Court's First Amendment standing doctrine.

## II.   THE ACT VIOLATES THE FIRST AMENDMENT.

The Act violates the First Amendment many times over. It is a content-based restriction on speech that is largely protected—speech adults have a constitutional right to attend, perform, and witness. It cannot survive strict scrutiny because Florida already has statutes that protect children from genuinely obscene material. The Act adds nothing but vagueness and overreach. And the Act is substantially overbroad on its face.

### A.   *Paxton* Does Not Save the Act.

Florida's contrary argument leans almost entirely on *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025). But *Paxton* upheld a Texas statute that conditioned adult access to material already unprotected as obscene to minors using age verification. Florida does something fundamentally different: criminalize live performances based on a vague,

31

age-variable obscenity standard that captures speech protected as to most of its audience. The Supreme Court has rejected exactly that kind of regulation before, in *Reno v. ACLU* and *Ashcroft v. ACLU*. *Paxton* did not overrule those cases.

In *Paxton,* the Supreme Court considered a Texas statute that required commercial websites to verify the age of their users before allowing access to material that satisfied a minor-targeted variant of the *Miller* test. 606 U.S. at 467-68. The challengers conceded—and the Court emphasized—that all of the regulated material was already unprotected as to minors under the long-settled *Ginsberg v. New York*, 390 U.S. 629 (1968), framework. *Paxton*, 606 U.S. at 474 ("When regulating minors' access to sexual content, the State may broaden *Miller*'s 'definition of obscenity' to cover that which is obscene from a child's perspective." (quoting *Ginsberg*, 390 U.S. at 638)). The First Amendment question was therefore narrow: whether the means Texas chose—age verification before access—imposed an unjustified incidental burden on adults who could lawfully view the material. The Court applied intermediate scrutiny and held that the burden was minimal and therefore insufficient to invalidate the law. *Id.* at 489-96.

This case is entirely different from *Paxton*.

For starters, the Act regulates speech itself, not the means of access to already-unprotected speech. The Texas statute operated as a

gatekeeping condition: prove your age, view the obscene material. The performance itself was not prohibited; only the conditions of viewing were regulated. The Act has no comparable structure. It criminalizes the performance itself when minors are present. There is no fool-proof age-verification escape valve. The performance the Act prohibits as to all viewers depends on who happens to walk in. That is content regulation of presumptively protected speech, not an incidental burden on access to unprotected speech.

This Court drew these same distinctions in *American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990). The statute in *Webb* prohibited the display of harmful-to-minors material in places where minors might be present. *Id.* at 1495-96. This Court upheld it under intermediate scrutiny because purveyors retained alternative means of distributing the material to adults: sealed wrappers, behind-counter placement, separate adult sections. *Id.* at 1502-09. The Act offers proprietors no such alternatives. There is no sealed wrapper for a live performance.

On top of that, *Paxton* and *Webb* both regulated material that was unprotected as to minors as a class under *Ginsberg*. The Act inverts that framework. Under the Act, a performance is prohibited if it is obscene "for the age of the child present." Fla. Stat. § 827.11(1)(a). When a proprietor admits a five-year-old, the performance becomes obscene-as-to-her—even if the same performance is fully protected as to the sixteen-

33

year-old standing next to her. The proprietor must therefore calibrate every performance to the youngest potential minor in the room.

This Court's limiting construction in *Webb* condemns the Act for the same reason. Variable-obscenity statutes have always been read—to avoid constitutional infirmity—as covering only material obscene as to minors as a class. *See Commonwealth v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618, 620 (Va. 1988) (construing Virginia "harmful to juveniles" statute to require that material lack serious value for "a legitimate minority of juveniles…consisting of older, normal (non deviant) adolescents"), *aff'd sub nom. Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127 (4th Cir. 1989). This Court adopted the same construction in *Webb*: "[I]f any reasonable minor, including a seventeen-year-old, would find serious value [in the material], the material is not 'harmful to minors.'" *Webb*, 919 F.2d at 1505. That construction was constitutionally necessary, this Court explained, because reading the statute any other way would sweep in material protected as to older minors. *Id.* at 1505-06. The Act, by its plain terms, forecloses *Webb*'s saving construction by tying the obscenity inquiry to "the age of the child present."

*Paxton* has other distinguishing features. *Paxton* incorporated *Miller*'s definitional categories. 606 U.S. at 474. The Act adds something *Paxton* did not: vague and undefined "lewd conduct" catchall provisions. Fla. Stat. § 827.11(1)(a). Since the Act's four defined categories already

34

cover *Miller*'s obscenity heartland, the "lewd conduct" provisions must reach something else. *Paxton* concerned regulation of *Miller*-defined obscene material. The Act reaches further, triggering a need to analyze Florida's substantive prohibitions on protected speech.

*Paxton* itself made this point when it distinguished the Texas statute from the federal laws struck down in *Reno v. ACLU*, 521 U.S. 844 (1997), and *Ashcroft v. ACLU*, 542 U.S. 656 (2004). In *Paxton*, the Court characterized those laws as imposing "outright 'ban[s]'" on speech to adults. 606 U.S. at 487-88. In *Reno*, the *Paxton* Court explained, the statute "made it a crime for any person to post content that is 'indecent' or 'patently offensive' anywhere in 'the entire universe of cyberspace' where the person knew a child would be among the recipients." *Id.* at 487 (cleaned up). That's exactly what Florida has done here. It does not say to a proprietor, "verify the age of your patrons and proceed." It says, "if a child is present, the performance is forbidden." That brings this case—unlike *Paxton*—within the *Reno*/*Ashcroft* strict-scrutiny framework.

## B.    The Act Cannot Survive Strict Scrutiny.

Because the Act is a content-based regulation of largely protected speech, it is presumptively unconstitutional and may be justified only if it is "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Florida's interest in protecting children from genuine obscenity is unquestioned. *Sable Commc'ns of*

35

*Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). But the Act fails strict scrutiny because Florida already protects children from obscene live performances through narrowly tailored statutes. And the Act adds vagueness, overreach, and a parental-consent-stripping framework that the Supreme Court has repeatedly rejected.

### (1)    Florida's existing obscenity laws already protect children from genuinely obscene live performances.

The Act is not narrowly tailored because it is not necessary. Florida law already prohibits the kinds of performances at which the Act is ostensibly aimed.

A Florida statute makes it a felony to engage in "lewd or lascivious exhibition" in the presence of a minor under sixteen. That definition reaches actual or simulated sex acts—masturbation, penetration, bestiality. Fla. Stat. § 800.04(7)(a)-(b). Another statute prohibits admitting a minor to "premises whereon there is exhibited a motion picture, exhibition, show, representation, or other presentation which, in whole or in part, depicts nudity, sexual conduct, sexual excitement, sexual battery, bestiality, or sadomasochistic abuse and which is harmful to minors." Fla. Stat. § 847.013(3)(a).

Section 847.013 in particular does precisely what Florida says the Act is for—protects children from harmful live performances—and it does so with two features the Act lacks. First, it cross-references Florida's

36

specifically-defined obscenity categories without adding a vague "lewd conduct" catchall. Second, it includes a parental-consent exception: a minor accompanied by a parent or guardian may attend such a performance. Fla. Stat. § 847.013(3)(c). The Act has neither. The Act is therefore not the least restrictive means of advancing Florida's interest. *Ashcroft*, 542 U.S. at 666.

**(2)    The Act's elimination of parental consent and its disregard for established alternatives also defeat narrow tailoring.**

Even if Florida had no existing statutes, the Act would fail narrow tailoring on its own terms. The Act eliminates parental consent. It applies anywhere—including private homes, backyards, and family barbecues. And it disregards alternatives the Supreme Court has identified as workable.

In *Ginsberg*, the Supreme Court emphasized that the New York statute it upheld permitted parents to purchase magazines for their children if the parents wished to do so. 390 U.S. at 639. That feature reflected a basic principle: "the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Id.* (citation omitted). The Supreme Court has since reaffirmed that principle repeatedly. *Reno*, 521 U.S. at 865; *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

37

The Act overrides parental authority entirely. A parent who brings her own seventeen-year-old to a drag show cannot consent to her attendance. And as the Supreme Court warned in *Brown*, eliminating parental consent in this area "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." 564 U.S. at 802.

The Secretary responds that *Ginsberg* did not "require" a parental-consent exception, and that *Webb* upheld a statute lacking one. Sec'y Br. 23. That misses the point. Strict scrutiny asks whether the government has chosen the least restrictive means available. *Ashcroft*, 542 U.S. at 666. When less restrictive means exist—including parental consent—the government must explain why those means do not suffice. Florida has not done so. It cannot explain why parental consent works for "harmful motion pictures" under § 847.013 but not for drag-show performances under the Act.

### (3) The Act's universal reach and its strict-liability regime confirm the absence of narrow tailoring.

Two final features put a nail in the coffin of any claim of narrow tailoring. The Act reaches private spaces a state has no business policing. And its "knowledge" requirement imposes strict liability in circumstances no proprietor could reasonably prevent.

Start with the physical scope of the law. The Act applies anywhere and everywhere. It criminalizes admitting a child to "any show, exhibition, or other presentation in front of a live audience." Fla. Stat. § 827.11(1)(a). The district court flagged the obvious problem: the Act reaches a "skit at a backyard family barbecue" as easily as it reaches a sold-out theatrical show. R.30 at 17. States maintain leeway to regulate commercial venues that admit minors to obscene performances. *See FCC v. Pacifica Found.*, 438 U.S. 726, 749 (1978). But the state's heavy-handed attempt to control expression in a private home is another matter. "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). And "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by th[e] [Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Florida's insistence on regulating this private conduct shows the Act isn't narrowly tailored.

The Act's "knowledge" regime is also unconstitutionally one-sided. The statute defines "knowingly" to cover all manner of things beyond actual knowledge. *Id.* § 827.11(3). It then strips a proprietor of any defense based on a "child's misrepresentation of his or her age" or "a bona fide belief of [the] child's consent." *Id.* § 827.11(2). A proprietor who hires

39

armed security, demands ID at the door, and admits a patron who presents a convincing fake ID still violates the Act. Florida's analogous alcohol statute, by contrast, allows a willfulness defense in just this circumstance. *See* Fla. Stat. § 768.125. Florida cannot demonstrate narrow tailoring while simultaneously imposing strict liability for circumstances no proprietor can reasonably avoid. This is not narrow tailoring. It's a brazen attempt to chill speech using the Sword of Damocles.

### C.    The Act is Substantially Overbroad on Its Face.

The Act is also unconstitutionally overbroad. Two structural features—the undefined "lewd conduct" catchall and the per-child age-variable framework—capture more protected speech than the Supreme Court has tolerated in any modern overbreadth case. The Act's text and structure foreclose any reading that would limit them to constitutional applications.

A statute is overbroad when its unconstitutional applications are substantial relative to its plainly legitimate sweep. *United States v. Hansen*, 599 U.S. 762, 770 (2023). Overbreadth "suffices to invalidate all enforcement of [a] law" because the statute's existence "may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 615 (1973)).

40

### (1)    The "lewd conduct" catchall has no constitutional limiting principle.

The Act's first overbreadth defect is structural. By placing "lewd conduct" alongside four already-defined obscenity categories, the legislature ensured that "lewd conduct" must reach protected speech.

The Act enumerates six categories of sexually explicit content that may constitute an "adult live performance": nudity, sexual conduct, sexual excitement, specific sexual activities, lewd conduct, and lewd exposure of prosthetic or imitation genitals or breasts. Fla. Stat. § 827.11(1)(a). The first four categories are defined by cross-reference to Fla. Stat. § 847.001. Together they cover the *Miller* heartland of "hard-core" obscenity.

The fifth and sixth categories—"lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts"—must therefore reach something else. If they were redundant with the first four categories, they would be surplusage, and Florida's drafters cannot be assumed to have written meaningless words. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). So "lewd conduct" must mean conduct that is sexually suggestive but not itself "hard-core" sexual depiction—conduct that, by definition, falls outside the obscenity category the Supreme Court has held unprotected.

The Secretary responds that "lewd" is a longstanding term of art with definitions in Florida's Standard Jury Instructions and in

41

*Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971). Sec'y Br. 36-38. But those sources actually deepen the problem. The Florida Standard Jury Instruction defines "lewd" to mean "wicked, lustful, unchaste, licentious, or sensual intent on the part of the person doing an act." That definition does not narrow the term—it makes it more capacious. A drag performer wearing a prosthetic chest and reading a children's book may strike some viewers as "wicked" or "unchaste"; it may strike others as wholesome. The Standard Jury Instruction provides no objective measure for distinguishing the two.

*Chesebrough* is even less helpful. That case involved a defendant convicted of exhibiting actual sexual intercourse to a fourteen-year-old. 255 So. 2d at 679. The Florida Supreme Court had little difficulty concluding that conduct of that kind was "lewd and lascivious" within the meaning of the statute. *Id.* But that holding addresses cases at the *Miller* heartland. *Chesebrough* says nothing about whether "lewd conduct" can constitutionally reach drag performances featuring no nudity, no sexual contact, and no simulated sex acts.

Florida's reliance on *Osborne v. Ohio*, 495 U.S. 103 (1990), and *United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123 (1973), is similarly unavailing. Both cases are inapposite. *Osborne* upheld a child-pornography statute that the Ohio Supreme Court had narrowed by judicial construction to reach only depictions involving actual minors.

42

495 U.S. at 112-14. No such limiting construction is available here. *12 200-Foot Reels* construed federal obscenity statutes prospectively to limit "lewd" to *Miller*'s core categories. 413 U.S. at 130 n.7. That construction is likewise not available here, because the Act separately enumerates *Miller*'s core categories—and adds "lewd conduct" as a distinct, additional term.

**(2)    The age-variable framework compounds the overbreadth and creates pervasive opportunities for arbitrary enforcement.**

Layered on top of the "lewd conduct" catchall is the Act's age-variable framework—another source of fatal overbreadth. Variable-obscenity statutes have always been calibrated to minors as a class, with a single line between adults and minors. The Act draws no single line. It forces businesses to draw a different line for every child in every audience. The result is a statute under which no proprietor can know in advance whether a performance is criminal—and under which enforcement officials, police, landlords, insurers, and patrons will all reach different conclusions, creating exactly the discriminatory enforcement the First Amendment forbids.

Under the Act, a single performance has different First Amendment protection depending on which child happens to walk in. A theatrical production that is plainly protected as to a sixteen-year-old becomes—when an eight-year-old enters the room—potentially unlawful. The

43

proprietor must assess each minor patron individually and calibrate the performance accordingly. The Act offers no guidance on how to make that assessment.

Making matters worse, the Act offers no guidance on how to draw the appropriate line. The police officer deciding whether to investigate, the prosecutor deciding whether to charge, the landlord weighing whether to renew a lease, the insurer pricing or refusing coverage, the patron deciding whether attendance carries social or professional risk— each of those actors must reach an independent judgment about what "lewd conduct" means for a fifteen-year-old, an eleven-year-old, an eight-year-old. The predictable result is "ample room for discriminatory enforcement." Panel Op. at 65.

Florida responds that *Webb* and *Ginsberg* both involved variable-obscenity standards. Sec'y Br. 28-32. They did. But each calibrated obscenity to minors as a class—drawing a single line between adults and minors. *Webb*, 919 F.2d at 1505; *Ginsberg*, 390 U.S. at 638. But a statute that gauges obscenity "for the age of the child present" cannot be read to reach only material obscene as to all minors. Its very structure prohibits that reading.

Florida also responds that the panel's vagueness concern reduces to a complaint that "close cases can be imagined." Sec'y Br. 41 (citing *United States v. Williams*, 553 U.S. 285, 305-06 (2008)). Not so. The problem is

44

not that the Act presents close cases at the margins. The problem is that the Act consists almost entirely of margins. The "lewd conduct" catchall has no defined center. The age-variable framework has no fixed line. Together they produce a statute under which the proprietor cannot identify *any case* as plainly outside the Act's reach.

### (3)    The Act's plainly legitimate sweep does not outweigh its protected-speech sweep.

The Act is overbroad because its unconstitutional applications are substantial relative to its legitimate ones. *Hansen*, 599 U.S. at 770.

The Act's legitimate sweep is narrow because Florida's existing statutes already cover the heartland of cases involving genuine obscenity. The Act's practical contribution is what those statutes do not cover: speech that is sexually suggestive but not obscene, conduct labeled "lewd" by enforcement officials but not satisfying *Miller*, and performances that are protected as to most viewers but not as to the youngest minor in the room.

That is the universe of the Act's unique applications. And every application in that universe is, by construction, an application to constitutionally protected speech. A statute whose unique work consists entirely of restricting protected speech is the paradigm case of overbreadth. *Hicks*, 539 U.S. at 118-19.

45

### III. THE ACT IS VOID FOR VAGUENESS UNDER THE DUE PROCESS CLAUSE.

Even setting aside the First Amendment defects, the Act fails the most basic due-process requirement: that a criminal statute give ordinary people fair notice of what it forbids and constrain enforcement officials' discretion. The Act does neither. Its undefined "lewd conduct" provisions and its per-child age-variable framework leave proprietors guessing at the boundaries of criminal liability and empower enforcement officials to fill the gaps with their own preferences. That is the textbook vagueness problem—and fatal under the Fourteenth Amendment.

The Due Process Clause forbids criminal statutes that "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited" or that are "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *Williams*, 553 U.S. at 304; *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Both prohibitions apply with "particular force" to laws that regulate speech. *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997); *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc).

### A.    The Act Fails to Provide Fair Notice.

The Act fails to provide fair notice by criminalizing conduct it never defines. A proprietor reading the statute cannot tell whether his show

contains "lewd conduct" within the Act's reach. He cannot tell whether the prosthetic chest his performers wear is "lewd exposure of prosthetic or imitation genitals or breasts." He cannot tell whether the show is obscene "for the age of the child present." The Due Process Clause does not require legislative perfection. *Williams*, 553 U.S. at 304. But it does require that "ordinary people…understand what conduct is prohibited." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). The Act doesn't do that.

### B. The Act Authorizes Arbitrary and Discriminatory Enforcement.

The Act likewise invites biased and arbitrary enforcement.

"[A] legislature [must] establish minimal guidelines to govern law enforcement." *Smith v. Goguen*, 415 U.S. 566, 574 (1974). A statute fails this test when it "permits a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358 (cleaned up).

The Act invites practically unlimited standardless enforcement.

Determining what counts as "lewd conduct," "lewd exposure of prosthetic or imitation genitals or breasts," or obscene "for the age of the child present" is a hopelessly subjective task. Fla. Stat. §§ 509.261(10)(c), 561.29(1), 775.082(4)(a), 827.11(4).

47

Florida's pattern of enforcement drives home the same point. Florida sent undercover agents to a drag show at Orlando's Plaza Live. R.1 at 8. The undercover agents—the very people Florida assigned to investigate—reported that they "did not witness any lewd acts." *Id.* Florida prosecuted anyway, claiming the show presented lewd conduct. *Id.*; R.21-5. That is not a possibility of arbitrary enforcement. It is documented arbitrary enforcement under existing Florida obscenity law. The Act's even-more-vague terms will produce more of the same, not less.

## C.    Florida's "Lewd-Is-Everywhere" Defense Fails.

Florida claims that the meaning of the word "lewd" was "decided…more than 35 years ago." Sec'y Br. 36-38. It was not. The cases the Secretary cites involve narrowing constructions, *Miller*-tied limitations, and judicial doctrines that are unavailable here. Statutes using "lewd" survive vagueness scrutiny when courts have anchored the term to *Miller* or to a specific pre-existing definitional context. *See Osborne v. Ohio*, 495 U.S. 103, 113-14 (1990) (upholding an Ohio child-pornography statute that prohibited "lewd exhibition" of minors by construing the statute to reach only depictions involving actual minors engaged in graphic sexual conduct or in nudity that constituted "a graphic focus on the genitals"); *Hamling v. United States*, 418 U.S. 87 (1974) (construing "lewd" in conjunction with standard obscenity terms to mean "patently offensive representations or descriptions of that

48

specific 'hard core' sexual conduct given as examples in *Miller*."); *United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 130 n.7 (1973) (same).

But the construction that saved those statutes is textually unavailable here. The Act separately enumerates *Miller*'s core categories—nudity, sexual conduct, sexual excitement, specific sexual activities—then *adds* "lewd conduct" as a distinct, additional term. The construction Florida invokes would render the Act's "lewd conduct" provision surplusage. Florida cannot have it both ways: either "lewd conduct" reaches beyond *Miller* or it does not—in which case the Florida legislature wrote a meaningless provision.

The age-variable framework compounds these problems. Even if "lewd" had a fixed meaning at the *Miller* heartland, the Act's per-child framework strips that fixed meaning of any practical content. The "lewd conduct" inquiry under the Act is not just "is this conduct lewd?"—it is "is this conduct lewd, and if so is it patently offensive and without serious value, for the age of the child present?" The age-variable overlay multiplies the vagueness rather than constraining it. No prior decision upholds a statute structured this way.

The Act's "lewd conduct" catchall and per-child age-variable framework deprive ordinary people of fair notice and authorize arbitrary enforcement. The statute is void for vagueness on its face.

49

## IV. THE STATEWIDE INJUNCTION SHOULD BE REINSTATED.

The First Amendment overbreadth doctrine has required facial invalidation of statutes for seventy years. *Trump v. CASA* did not change any of that. *CASA* addressed the equitable authority of federal courts to issue universal injunctions in the absence of a substantive doctrine compelling broader relief. First Amendment overbreadth is such a substantive doctrine: it determines that a statute is unconstitutional on its face, and "all enforcement of [the] law" is therefore "totally forbidden." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003); *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1300 (11th Cir. 2017). Justices Kavanaugh and Barrett, in their statement on the denial of the partial stay here, flagged this distinction and noted that First Amendment overbreadth "presents its own doctrinal complexities about the scope of relief." *Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 2 (2023). Post-*CASA*, every federal court that has confronted this question has reached the same conclusion: *CASA* did not displace First Amendment facial invalidation. The statewide injunction should be reinstated.

### A. First Amendment Overbreadth Is a Substantive Constitutional Doctrine, Not an Equitable Remedy.

*CASA* and *Hicks* operate in different doctrinal universes. *CASA* asked whether federal courts have equitable authority under the Judiciary Act of 1789 to issue injunctions broader than necessary to

redress the named plaintiff's injury. The answer was no—as a matter of historical equity practice. *CASA*, 606 U.S. at 845-47. First Amendment overbreadth cases ask something different: whether a statute that punishes a substantial amount of protected speech is constitutionally valid on its face. The answer there is that the statute is invalid—as a matter of substantive constitutional law—and that "all enforcement of [the] law" is forbidden. *Hicks*, 539 U.S. at 118-19. The two questions have different sources, different standards, and different answers.

The Supreme Court has been clear about which framework governs First Amendment overbreadth. The doctrine is "an exception to traditional rules of standing." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). It allows challenges based not on the plaintiff's own injury but on "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* The remedy follows the doctrine. As this Court explained in *FF Cosmetics*: "[t]he consequence of [the Court's] departure from traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." 866 F.3d at 1300 (emphasis added) (quoting *Broadrick*, 413 U.S. at 613).

51

That holding does not describe an equitable choice. It describes a substantive determination about the constitutional status of the statute. A facially overbroad statute is unenforceable not because the court has issued a discretionary remedy that reaches beyond the named plaintiff, but because the statute itself is constitutionally infirm.

That distinction matters because *CASA*'s rule operates only on the equitable side. The *CASA* majority took care to make this explicit. The Court "rest[ed] solely on the statutory authority that federal courts possess under the Judiciary Act of 1789." 606 U.S. at 850 n.4. It described its holding as concerning the "equitable authority" of federal courts. *Id.* at 845. And it expressly preserved "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Id.* at 847 n.10. That reservation matters: the APA pathway operates outside CASA not because of some unique APA carve-out but because the APA's "set aside" remedy, like First Amendment overbreadth, is a substantive source of law that produces non-party-bounded effect by its own terms. *CASA* did not reach those substantive sources. It addressed only the equitable injunction power.

The Fifth Circuit has now made the parallel structure explicit. In *Louisiana v. FDA*, No. 26-30203 (5th Cir. May 1, 2026), the court granted a § 705 APA stay with effect against the federal government nationwide. The court rejected the argument that CASA foreclosed such relief: "In

52

CASA, the Supreme Court plainly said it was addressing only equitable relief and not remedies under the APA." *Id.* slip op. at 25 (quoting *CASA*, 606 U.S. at 847 n.10). And the court noted that "[n]othing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to [parties]." *Id.* at 25 n.10 (quoting *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024)). The same logic applies to First Amendment overbreadth, which has even deeper doctrinal roots than the APA pathway. Both produce non-party-bounded effect because of what the underlying source of law inherently requires—not because the court has made a discretionary equitable choice.

The Justices who decided this case at the partial-stay stage understood the distinction, too. Justice Kavanaugh, joined by Justice Barrett, explained that "if this Court…were ultimately to affirm the District Court's First Amendment judgment on the merits, the State could not successfully enforce this law against anyone, party or not, in light of stare decisis." *Griffin*, 144 S. Ct. at 2. That sentence states the substance/equity distinction in a single line: a First Amendment merits judgment, properly affirmed, makes a statute unenforceable as a matter of law against everyone, regardless of the equitable-remedy question CASA later addressed. And it explains why this case "presents its own doctrinal complexities about the scope of relief"—complexities that make

53

it "an imperfect vehicle" for the universal-injunction question. *Id.* Justice Barrett, who wrote the *CASA* majority, did not disturb that understanding. *CASA* nowhere mentions First Amendment overbreadth, mentions the First Amendment, or addresses the substantive doctrine that controls here.

### B.    Decades of First Amendment Facial Cases Are Not "Drive-By" Acquiescence.

The Supreme Court and this Court have applied the substance/equity distinction for decades, in dozens of cases, with full doctrinal awareness of what they were doing. Florida's effort to dismiss those cases as "implicit acquiescence" under *CASA* footnote 7, Sec'y Br. 41-42 (citing *CASA*, 606 U.S. at 845 n.7), fails on its own terms. The Supreme Court's First Amendment overbreadth cases articulate the doctrine and apply it as the rule of decision. They are not silent acquiescence. They are the holding.

*Broadrick* explicitly framed overbreadth as an "exception to traditional rules of standing" and articulated the "totally forbidden" remedial consequence. 413 U.S. at 612-13. *Hicks* held that a substantial-overbreadth showing "suffices to invalidate all enforcement of th[e] law." 539 U.S. at 119. *United States v. Stevens*, 559 U.S. 460 (2010), facially invalidated a federal statute under the overbreadth doctrine, expressly rejecting the dissent's argument that as-applied analysis should come

54

first. *Id.* at 472-73 & n.3. *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), conducted facial overbreadth analysis even though the case presented an as-applied challenge—explaining that "First Amendment freedoms need breathing space to survive." *Id.* at 615. None of these cases acquiesced to broad relief. They articulated and applied a substantive constitutional doctrine that produces broad relief.

This Court's cases are no different. *FF Cosmetics* held an ordinance "totally forbidden" under *Broadrick*. 866 F.3d at 1300. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006), and *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250 (11th Cir. 2005), each invalidated municipal ordinances facially under the overbreadth doctrine and granted statewide-equivalent relief. None of those decisions characterized broad relief as a discretionary choice. Each treated facial invalidation as the operative consequence of the overbreadth holding.

*CASA* itself confirms that facial First Amendment doctrines escape its rule. The *CASA* majority cited the APA reservation—preserving substantive sources of relief without separately enumerating them all. The natural reading of *CASA* is that the Court left First Amendment overbreadth where it found it. The Secretary's contrary reading—that *CASA* sub silentio overruled years of First Amendment doctrine—is implausible on its face.

55

**C.  Post-*CASA* Decisions Have Confirmed That First Amendment Facial Relief Survives.**

Three federal courts have now applied the substance/equity distinction in several post-*CASA* First Amendment cases. They all reached the same conclusion: *CASA* does not foreclose facial relief in First Amendment overbreadth cases. The post-*CASA* landscape vindicates the district court's injunction in this case.

The First Circuit addressed the issue directly in *Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025). The court held that nothing in *CASA* "provides that, as a categorical matter, it is improper for a district court to impose an injunction of such breadth if it is necessary to do so to provide the plaintiff with complete relief." *Id.* at 80-81. *CASA*'s rule, the First Circuit explained, requires courts to assess what relief is necessary to redress the plaintiff's injury—not to mechanically narrow injunctions to the plaintiff alone. When the constitutional injury is structural (as in First Amendment chill), broader relief may be the necessary remedy.

District courts have applied the same logic. In *Welty v. Dunaway*, 791 F. Supp. 3d 818 (M.D. Tenn. 2025), the court enjoined enforcement of a Tennessee statute on First Amendment grounds and rejected the argument that *CASA* required narrower relief. As the court explained, *CASA* "does not address the need for broader injunctions in the First Amendment context…the Supreme Court has repeatedly affirmed that when a law is unconstitutionally overbroad 'all enforcement of that law'

56

may be enjoined." *Id.* at 843. In *Jackson Federation of Teachers v. Fitch*, 799 F. Supp. 3d 571 (S.D. Miss. 2025), the court reached the same result, observing that "injunctions of this type should be all-or-nothing renditions" and that "[s]omething less than a statewide preliminary injunction would be insufficient to afford complete relief." *Id.* at 584.

Those decisions converge on a single principle: *CASA*'s "complete relief" standard, properly applied to First Amendment overbreadth cases, requires broader-than-named-plaintiff relief—because the constitutional injury *is* the chill, and chill is irreducibly third-party. A statute left enforceable against everyone except Hamburger Mary's continues to chill the artists who perform at Hamburger Mary's, the franchise affiliates, other businesses that host drag shows, and the audiences who attend. That is not complete relief. That is partial relief that leaves the constitutional injury—chill on protected speech—substantially intact.

### D. Plaintiff-Specific Relief Cannot Provide Complete Relief to Hamburger Mary's.

The current partial-stay order leaves the Act enforceable against everyone in Florida except Hamburger Mary's. That is not complete relief. It perpetuates the chill that injured Hamburger Mary's in the first place. Drag artists who perform at Hamburger Mary's also perform at other venues. Audiences who attend Hamburger Mary's also attend other shows. The "marketplace of ideas" the First Amendment protects does

57

not exist in single-venue isolation. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 583 (2011). Silencing every other Florida venue silences a substantial part of the speech Hamburger Mary's exists to host.

To redress the chill, the injunction must reach the speakers whose performances Hamburger Mary's depends on, the venues where those speakers perform, and the audiences who attend. This is what Justice Kavanaugh and Justice Barrett anticipated when they wrote that this case raises "doctrinal complexities about the scope of relief" distinct from the universal-injunction question. *Griffin*, 144 S. Ct. at 2. The complexities are not technicalities. They are the structural reason First Amendment chill demands non-party-bounded relief. Hamburger Mary's cannot be made whole by a remedy that restores its operations while leaving every other Florida drag venue subject to the Act. The chill is the injury, and the chill is statewide.

This Court has recognized that statewide injunctions can be appropriate even outside the First Amendment context where "necessary to provide complete relief to the plaintiffs." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281-82 (11th Cir. 2021) (Rosenbaum, J.). Florida contends that *Florida v. HHS*'s "appropriate circumstances" framework "do[es] not appear to survive *CASA*." Sec'y Br. 44. But *Florida v. HHS* identified the very substantive considerations *CASA* preserved— including the recognition that some constitutional injuries cannot be

58

remedied through plaintiff-specific relief. *CASA* did not overrule *Florida v. HHS*; it occupies a different doctrinal space. And *CASA* did not address First Amendment overbreadth at all.

**E.** **Precedent and *Stare Decisis* Both Foreclose the Secretary's Reading of CASA.**

Even if *CASA* could be read to reach First Amendment overbreadth, this Court would still be bound to follow *Hicks*, *Broadrick*, *Stevens*, and *AFP v. Bonta*. The Supreme Court has not overruled those cases. Until it does, this Court must apply them. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme] Court has direct application in a case…the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."). Florida's argument requires this Court to read *CASA* as overruling decades of Supreme Court decisions without even mentioning the point. *Rodriguez de Quijas* forbids that move. If the Supreme Court wants to alter First Amendment overbreadth doctrine, that's the Supreme Court's job—not this Court's.

And even if *CASA* permitted such a reading, ordinary *stare decisis* principles would not. The Supreme Court applies stare decisis with reference to "the quality of [a precedent's] reasoning, the workability of the rule it established, its consistency with other related decisions, [and] developments since the decision was handed down," along with "reliance

59

on the decision." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 268 (2022). Each factor counsels against displacing the First Amendment overbreadth doctrine. The doctrine's reasoning is doctrinally precise: it follows from the substantive recognition that vague or overbroad speech regulations chill protected expression by their very existence. *Hicks*, 539 U.S. at 119. The rule is workable, applied across decades by federal courts at every level. The doctrine is consistent with the broader First Amendment framework, including the requirement that statutes regulating speech provide breathing space. *Bonta*, 594 U.S. at 615. And the reliance interests are substantial: state and federal legislatures have drafted speech regulations against the backdrop of overbreadth doctrine for half a century, and litigants—including Hamburger Mary's—have shaped their conduct, their pleadings, and their litigation strategy in reliance on it. Adopting Florida's reading would discard a stable, workable, deeply embedded doctrine in favor of an unspoken inference from a *CASA* opinion that did not address the First Amendment at all. *Stare decisis* counsels against that result. So does common sense.

## CONCLUSION

The district court's preliminary injunction should be affirmed.

Dated: May 4, 2026                    Respectfully submitted,


                                      s/ Adam W. Hansen
                                      Adam W. Hansen
                                        *Counsel of Record*
                                      CIVIL RIGHTS APPELLATE CLINIC
                                      UNIVERSITY OF MINNESOTA LAW
                                      SCHOOL
                                      229 19th Avenue South
                                      Minneapolis, MN 55455
                                      (612) 927-2969
                                      adam@apollo-law.com

                                      Melissa J. Stewart
                                      1545 Union Avenue
                                      Memphis, TN 38104

                                      Gary S. Israel
                                      121 South Orange Avenue
                                      Suite 1500
                                      Orlando, FL 32801


                                      *Counsel for Appellee*

61

## <u>CERTIFICATE OF COMPLIANCE<br>WITH TYPE-VOLUME LIMITATION, TYPEFACE<br>REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) because the brief contains 12,776 words, as determined by the word-count function of Microsoft Word for Office 365, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.


Dated: May 4, 2026                    s/ Adam W. Hansen
                                      Adam W. Hansen