**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-12160
_____

HM FLORIDA-ORL, LLC,

*Plaintiff-Appellee,*

*versus*

GOVERNOR OF FLORIDA, et al.,

*Defendants,*

SECRETARY OF THE FLORIDA DEPARTMENT OF
BUSINESS AND PROFESSIONAL REGULATION,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:23-cv-00950-GAP-LHP
_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, BRASHER, ABUDU, KIDD, and TJOFLAT,* Circuit Judges.

BRASHER, Circuit Judge, delivered the opinion of the Court in which WILLIAM PRYOR, Chief Judge, and BRANCH, LUCK, LAGOA, and TJOFLAT, Circuit Judges, joined, and in which NEWSOM and GRANT, Circuit Judges, joined except for Part III.A.

GRANT, Circuit Judge, filed a concurring opinion in which NEWSOM, Circuit Judge, joined.

ROSENBAUM, Circuit Judge, filed a dissenting opinion in which JORDAN, JILL PRYOR, ABUDU, and KIDD, Circuit Judges, joined.

ABUDU, Circuit Judge, filed a dissenting opinion.

BRASHER, Circuit Judge[1]:

This appeal is about the constitutionality of Florida's Protection of Children Act. The Act makes it a misdemeanor to "knowingly admit a child to an adult live performance." FLA. STAT. § 827.11(3)-(4). The Act defines an "adult live performance" as a live performance that depicts "nudity, sexual conduct, sexual excitement, or specific sexual activities [as defined], lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts"

---

* Senior Circuit Judge Tjoflat elected to participate in this decision, pursuant to 28 U.S.C. § 46(c).

[1] Six judges join this opinion in full (Chief Judge William Pryor and Judges Branch, Luck, Lagoa, Brasher, and Tjoflat). Two judges join this opinion except for Part III.A (Judges Newsom and Grant).

and meets three additional criteria. *Id.* § 827.11(1)(a). The three additional criteria are that the performance "[p]redominantly appeals to a prurient, shameful, or morbid interest," "[i]s patently offensive to prevailing standards in the adult community of [Florida] as a whole with respect to what is suitable material or conduct for the age of the child present," and "[t]aken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present." *Id.* § 827.11(1)(a)(1)-(3).

The restaurant Hamburger Mary's sued to enjoin the Act's enforcement under the First and Fourteenth Amendments. Specifically, Hamburger Mary's takes issue with two parts of the definition of "adult live performance." First, Hamburger Mary's argues that the use of the word "lewd" makes the Act overbroad and vague, expanding the ban beyond speech that may be constitutionally regulated as obscenity. Second, Hamburger Mary's argues that the use of the phrase "the age of the child present" in two of the Act's criteria makes it unconstitutionally overbroad and vague, as it imposes an age-variable standard for testing whether speech is obscene. The district court agreed with Hamburger Mary's and preliminarily enjoined the Florida Department of Business and Professional Regulation Secretary, Melanie Griffin, from enforcing it against anyone.

After a divided panel of this Court affirmed, *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207 (11th Cir.), we granted rehearing en banc to consider the scope of the district court's injunction and the Act's constitutionality. *See HM Fla.-ORL, LLC v. Sec'y of*

*Fla. Dep't of Bus. & Pro. Regul.*, 160 F.4th 1282 (11th Cir. 2025). We also voted en banc to stay the preliminary injunction except as it applied to Hamburger Mary's. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

After additional briefing and with the benefit of oral argument, we are convinced the district court erred in preliminarily enjoining the enforcement of the Act. This is so for two reasons. First, the district court lacked authority to impose a universal injunction that prevented the enforcement of the Act against everyone in Florida. The Supreme Court has held that a so-called "universal injunction" "falls outside the bounds of a federal court's equitable authority under the Judiciary Act," *id.* at 847, and we see no exception that would apply in this case. Second, Hamburger Mary's was not entitled to even a more limited preliminary injunction to prevent the enforcement of the Act because its claims do not have a substantial likelihood of success on the merits. The Supreme Court of Florida's definition of "lewd" eliminates any overbreadth, and the use of the phrase "age of the child present" does not render the Act unconstitutionally vague. Accordingly, we vacate the district court's preliminary injunction in its entirety.

## I.

In 2023, the Florida Legislature passed the Act, making it a misdemeanor offense to "knowingly admit a child to an adult live performance." FLA. STAT. § 827.11(3)-(4). The Act defines the term "adult live performance" as a live show that "depicts or simulates

nudity, sexual conduct, sexual excitement, or specific sexual activities," as defined under Florida law, as well as "lewd conduct" or the "lewd exposure of prosthetic or imitation genitals or breasts." *Id.* § 827.11(1)(a). The Act is limited to adult live performances that "[p]redominantly appeal[] to a prurient, shameful, or morbid interest," are "patently offensive to prevailing standards in the adult community of [Florida] as a whole with respect to what is suitable material or conduct for the age of the child present," and "[t]aken as a whole, [are] without serious literary, artistic, political, or scientific value for the age of the child present." *Id.* § 827.11(1)(a)(1)-(3).

The restaurant Hamburger Mary's sued Florida, its governor, and Melanie Griffin in her official capacity under 42 U.S.C. § 1983. All defendants except Griffin were later dismissed. Hamburger Mary's facially challenged the Act on First Amendment and Fourteenth Amendment free-speech and void-for-vagueness grounds. It argued that "[t]he uncertainty about what specific conduct this law prohibits" made it unconstitutionally broad and vague. Doc. 1 at 18-20. The restaurant believed that the Act prohibited it from admitting minors to its drag shows. Hamburger Mary's also moved for a temporary restraining order and preliminary injunction. Doc. 6.

In its complaint, Hamburger Mary's explained that it offered a variety of drag performances, which it defines as shows in which performers wear "clothing more conventionally worn by the other sex." Doc. 1 at 6 (citation omitted). Their shows included a "family friendly" one on Sundays where children were invited to attend. *Id.*

If a show was "not suitable for children," Hamburger Mary's announced it in advance and barred children from attending. *Id.* at 19. But Hamburger Mary's also asserts that Florida has a history of overzealous enforcement of obscenity and related laws against drag venues. So, in response to the Act, Hamburger Mary's canceled its family drag shows and barred children from attending its other shows. *Id.* at 18-19. It also alleged a "20% decrease in bookings." Doc. 28 at 3; Doc. 1 at 18.

The United States District Court for the Middle District of Florida granted the preliminary injunction. *See HM Fla.-ORL, LLC v. Griffin*, 679 F. Supp. 3d 1332 (M.D. Fla. 2023). It held that Hamburger Mary's had established a substantial likelihood of success on the merits because the Act did not survive strict scrutiny and was unconstitutionally overbroad and vague. *Id.* at 1341-44. The district court then enjoined Griffin from enforcing the Act against anyone in the State. *Id.* at 1345.

Griffin appealed. A divided panel of this Court affirmed the district court's universal preliminary injunction. *See HM Fla.-ORL,* 137 F.4th at 1248. We vacated the panel opinion and ordered rehearing en banc. *HM Fla.-ORL*, 160 F.4th 1282 (mem.). We also stayed the injunction to the extent it extended to nonparties unassociated with Hamburger Mary's.

We asked the parties to file briefs addressing "the scope of the district court's injunction and the district court's conclusion that Hamburger Mary's First Amendment claim is likely to succeed on the merits."

## II.

A party is entitled to injunctive relief if (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury without the injunction; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

We review for abuse of discretion a district court's grant of a preliminary injunction. *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020). In conducting our review, we evaluate legal conclusions *de novo* and factual findings for clear error. *Id.* We review *de novo* questions of constitutional law. *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1181 (11th Cir. 2017).

## III.

Hamburger Mary's lawsuit is a pre-enforcement facial challenge, and the problems with pre-enforcement facial litigation are well known. "For a host of good reasons, courts usually handle constitutional claims case by case, not en masse." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). "'Claims of facial invalidity often rest on speculation' about the law's coverage and its future enforcement." *Id.* (citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008)). "And facial chal-

lenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (citation modified).

This case stands as a cautionary tale. Hamburger Mary's sued because it believed certain words in the Act—"lewd" and "age of the child present"—were so broad or vague as to apply to children attending its shows. But the State has never threatened Hamburger Mary's with prosecution.[2] And no state court has ever interpreted the Act to justify Hamburger Mary's fear. Likewise, even if it applied by its terms to Hamburger Mary's shows, no court has addressed whether the Act could constitutionally do so. *See Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 484-85 (1989) ("It is not the usual judicial practice, . . . nor do we consider it generally

---

[2] In fact, the State says that the Act's connection to Hamburger Mary's is so tenuous that it lacks standing to even bring its claims. We disagree. At the preliminary injunction stage, Hamburger Mary's need only establish that it is "likely" to have standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). And, because unconstitutional laws may chill speech prior to enforcement, the requirements for standing are "somewhat more lenient for facial challenges" in the First Amendment context. *Bischoff v. Osceola County*, 222 F.3d 874, 883 (11th Cir. 2000). To bring a pre-enforcement challenge, a plaintiff must show (1) that he has "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that his conduct is "arguably proscribed," and (3) that he is subject to a "credible threat of enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 161-62 (2014) (citation omitted). Here, based on the allegations in the complaint, Hamburger Mary's allegedly canceled its "family drag shows" and lost twenty percent of its bookings. Doc. 1 at 18-19. Considering all allegations in the complaint in its favor, we think Hamburger Mary's "likely" has standing on the current record.

desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied."). The district court's universal injunction calcifies this uncertainty: as long as it is in effect, there will be no threat of enforcement against anyone, and no state or federal court will *ever* answer these questions with respect to Hamburger Mary's or anyone else.

We believe the district court's preliminary injunction must be vacated in its entirety. We will address the issues in the order we directed the parties to brief them. First, we conclude that the district court lacked authority to issue a universal injunction. Second, we hold that Hamburger Mary's was not entitled to a narrower preliminary injunction because its claims are unlikely to succeed on the merits.

*A.*

We begin by addressing the authority for the district court to impose a universal injunction. "A universal injunction can be justified only as an exercise of equitable authority." *CASA*, 606 U.S. at 841. Because this issue goes to the district court's authority, we address it first. *See id.* at 839 (addressing scope of injunctive relief before reaching merits); *Trump v. Barbara*, No. 25-365 (U.S. June 30, 2026) (addressing the merits). We conclude that the district court erred in granting an injunction that applied against anyone and everyone in Florida.

The Supreme Court addressed the scope of a federal court's authority to enter a universal injunction in *CASA*. It reasoned that, because a court's power to issue equitable remedies comes from

the Judiciary Act of 1789, "the statutory grant encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *CASA*, 606 U.S. at 841 (citation modified). It held that because universal injunctions lack a "historical pedigree," courts do not have the authority to issue them. *Id.* at 847. Instead, they "may administer complete relief *between the parties*." *Id.* at 851 (citation omitted); *see also Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (injunctive relief should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." (citation omitted)).

Hamburger Mary's asked for, and the district court granted, a universal injunction forbidden by *CASA*. *See* 606 U.S. at 851. The district court enjoined the defendants "from instituting, maintaining, or prosecuting *any* enforcement proceedings under the Act." Doc. 30 at 25 (emphasis added). The district court later explained that "the injunction necessarily must extend to protect all Floridians," not merely Hamburger Mary's and its associates, from the enforcement of the Act. Doc. 41 at 10-11.

The district court reasoned that a universal injunction was permissible because it applied statewide as opposed to nationwide. But there is no statewide-injunction exception to *CASA*. *CASA*'s holding—that universal injunctions exceed a district court's authority—applies equally to statewide injunctions. The Court in *CASA* made clear that its ruling was not limited to so-called "na-

tionwide injunctions," for the "difference between a traditional injunction and a universal injunction is not so much *where* it applies, but *whom* it protects." 606 U.S. at 837 n.1 (citation omitted). Additionally, in support of its holding, the Court approvingly cited *Scott v. Donald*, *see id.* at 843, which concerned an injunction against a state law that the Court restricted "to the parties named as plaintiff and defendants in the bill." *Scott v. Donald*, 165 U.S. 107, 109, 117 (1897).

For its part, Hamburger Mary's argues that the district court had authority to contemplate imposing a universal injunction because it brought a facial overbreadth claim. We disagree. The reasoning in *CASA* had nothing to do with a plaintiff's cause of action. Rather, it concerned the remedies authorized under the Judiciary Act. And, when the Supreme Court held in *CASA* that federal courts do not have equitable authority to issue relief to nonparties, it did not carve out an exception for First Amendment overbreadth challenges. *See CASA*, 606 U.S. at 841-47. On the contrary, *CASA* approvingly cited precedent in which the Supreme Court upheld an injunction of an overbroad municipal ordinance limited "to the particular federal plaintiffs." *Id.* at 844 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975)). The Court's failure to leave room for an overbreadth exception is especially telling considering that it took care to exempt the Administrative Procedure Act from its ruling. *Id.* at 847 n.10.

Hamburger Mary's argument also misunderstands the doctrine of overbreadth. The purpose of the overbreadth doctrine is to

allow a plaintiff to obtain relief from the operation of a facially un-constitutional statute, *even though the statute is constitutional as applied to the plaintiff. See Fox*, 492 U.S. at 484-85; *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992). But the fact that the overbreadth doctrine permits litigants to challenge a statute because of its application to others is unrelated to the district court's statutory authority to contemplate a particular remedy. In every overbreadth case, the plaintiff still wants the enforcement of the statute enjoined as to *itself*. In other words, no matter the substance of a plaintiff's cause of action, a district court has equitable authority under the Judiciary Act only to provide *the plaintiff* with "complete relief." *Georgia*, 46 F.4th at 1303 (citation omitted); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478 (1995) (granting limited injunction in facial First Amendment challenge where a "narrower remedy" provided complete relief).

*B.*

Having determined that the district court lacked authority to impose a universal injunction against all enforcement of the Act, we now decide whether it could have imposed a narrower injunction just as to Hamburger Mary's and its performers. To do so, we must determine if Hamburger Mary's has a substantial likelihood of success on the merits. *See Siegel*, 234 F.3d at 1176.

Hamburger Mary's brought facial overbreadth and vagueness claims against the Act. "The type of 'legislative overkill' most commonly associated with 'overbreadth' results when lawmakers define the scope of a statute to reach both unprotected expression

as well as, at least potentially, protected speech." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1502 (11th Cir. 1990). "Overbroad legislation need not be vague, indeed it may be too clear; its constitutional infirmity is that it sweeps protected activity within its proscription." *M.S. News Co. v. Casado*, 721 F.2d 1281, 1287 (10th Cir. 1983). On the other hand, "[a] law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982). A statute is facially vague when it is plagued with "hopeless indeterminacy," *Johnson v. United States*, 576 U.S. 591, 598 (2015), or when vagueness "permeates the text" of the law, *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999).

Hamburger Mary's choice to litigate this case as a facial challenge comes at a cost. Because facial challenges often rest on speculation about the law's coverage and future enforcement, they are "hard to win." *Moody*, 603 U.S. at 723. Ordinarily, a plaintiff cannot succeed on a facial challenge unless he "establishes that no set of circumstances exists under which the law would be valid, or he shows that the law lacks a plainly legitimate sweep." *Id.* (citation modified). In the First Amendment context, however, the standard for facial challenges is looser, though still demanding. To succeed, a plaintiff must prove that the "statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" *United States v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). To succeed on a

facial challenge, a plaintiff must prove that the law's unconstitutional applications are "realistic, not fanciful," and are "substantially disproportionate to the statute's lawful sweep." *Id.* In the absence of a "lopsided ratio," courts may not facially invalidate a statute. *Id.* at 770, 784.

Applying these standards, we hold that the Act does not facially violate the First or Fourteenth Amendments. We begin by explaining that the Act tracks the *Miller* standard, as adapted for material obscene as to minors. We then address and reject Hamburger Mary's arguments for why the Act is unconstitutional despite the *Miller* standard. Specifically, we address Hamburger Mary's arguments that, despite the *Miller* standard, the Act's use of the word "lewd" and its reference to "the age of the child" makes it unconstitutionally vague and overbroad. Because the Act is facially constitutional, the district court could not have granted a more limited preliminary injunction against its enforcement.

1.

The Constitution protects speech, but not obscenity. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. As a general matter, this provision forbids the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (citation modified). But the First Amendment has never been treated as absolute. *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 (1961). The Supreme Court has recognized that "[t]here are certain

well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942).

It has been "categorically settled" that obscenity is one such class of unprotected speech. *Miller v. California*, 413 U.S. 15, 23 (1973). In *Miller*, the Court limited the category of obscenity to sexual material that meets each of the following three requirements: (a) "the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest," (b) "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law," as written or "authoritatively construed," and (c) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id*. at 24 (citation modified).

Although *Miller* concerned a state law regulating "adult" material, *id*. at 16, it recognized that states have a "legitimate interest" in prohibiting the exhibition of obscene material to prevent "exposure to juveniles," *id*. at 18-19. For support, the Court cited *Ginsberg v. New York*, 390 U.S. 629 (1968). *Id*. at 19. That precedent upheld a prohibition on the sale to minors of sexual material obscene from a child's perspective. *See Ginsberg*, 390 U.S. at 645, 647. Because of "its strong and abiding interest in youth," a state may regulate the dissemination of material that is obscene for minors, even though it is not obscene as to adults. *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 690 (1968) (citing *Ginsberg*, 390 U.S. 629). The Court has

since consistently reaffirmed that states have "broader authority to regulate the activities of children than of adults." *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976); *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 749-50 (1978) (citing *Ginsberg* as justifying the "special treatment" of indecent broadcasting).

Consistent with these precedents, the Court has adapted the *Miller* test for minors, "broaden[ing]" its definition of obscenity to cover material obscene from a child's perspective. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 474 (2025). Under *Paxton*'s "*Miller*-for-minors" test, a state may prevent minors from accessing works that "(a) taken as a whole, and under contemporary community standards, appeal to the prurient interest *of minors*; (b) depict or describe specifically defined sexual conduct in a way that is patently offensive *for minors*; and (c) taken as a whole, lack serious literary, artistic, political, or scientific value *for minors*." *Id*. These restrictions "trigger no heightened First Amendment scrutiny and are subject only to rational-basis review, even though they encompass speech that is not obscene for adults." *Id*. (citation modified).

For our part, this Court has likewise held that "a state may deny minors access to materials acceptable for adults but obscene for minors." *Webb*, 919 F.2d at 1501. In *Webb*, we upheld against vagueness and overbreadth challenges a Georgia law that regulated the display of adult material at bookstores deemed "harmful to minors." *Id*. at 1505-06. (The law that prohibited the sale of such material to minors was unchallenged on appeal. *Id*. at 1506). We recognized that, no matter the rights of adults, "[m]inors have no right

23-12160                Opinion of the Court                17

to view or in any way consume this material—even if they do not purchase or otherwise take control of it." *Id.* at 1501.

Applying these precedents, the Act is a straightforward regulation of obscenity. The Act prohibits knowingly admitting a child to an "adult live performance." FLA. STAT. § 827.11(3). The Act defines such performances as "any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities . . ., lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts." *Id.* § 827.11(1)(a).

The kind of conduct the Act covers, as defined by Florida, fits squarely within the "permissible scope" of obscenity regulation. *Miller*, 413 U.S. at 24. All the enumerated activities refer to sexual subject matter. For example, Florida law defines "nudity" as "the showing of the human male or female genitals" or "the depiction of covered male genitals in a discernibly turgid state," FLA. STAT. § 847.001(11), "sexual conduct" as "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse," *id.* § 847.001(19), "sexual excitement" as "the condition of the human male or female genitals when in a state of sexual stimulation or arousal," *id.* § 847.001(20), and "specific sexual activities" as the "exhibition" of "[h]uman genitals in the state of sexual stimulation or arousal" as well as the breasts and buttocks, "[a]cts of human masturbation, sexual intercourse, sodomy, cunnilingus, fellatio, or any excretory function,"

18                    Opinion of the Court                    23-12160

and "[t]he fondling or erotic touching of human genitals," *id.* § 847.001(23).

Of course, not every depiction of sexual conduct is obscene. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) ("Clearly all nudity cannot be deemed obscene even as to minors."). But here, enumerated sexual activities are proscribed by the Act only if they predominately appeal to the prurient interest, are patently offensive to prevailing adult standards with respect to what is suitable for that child's age, *and* lack serious literary, artistic, political, or scientific value for that child's age. FLA. STAT. § 827.11(1)(a)(1)-(3). So, under a straightforward reading of the Act, nudity will count as obscenity only if it satisfies the three elements of the *Miller*-for-minors test. Under Supreme Court precedent, the Constitution requires no more. *Paxton*, 606 U.S. at 474.

Hamburger Mary's complains that the Act, unlike the law upheld in *Ginsberg*, does not allow an exception for parental consent. But neither the Supreme Court nor our Circuit has ever held that a regulation of materials obscene for minors must contain a parental consent exception. Neither *Miller* nor *Paxton* referenced such an exception. And the law we upheld in *Webb* also did not contain one. After all, whether material is obscene—and therefore proscribable under the Constitution—has nothing to do with whether an adult wants a child to view the material. Moreover, because we are addressing only Hamburger Mary's free speech rights, we need not and do not decide whether *parents* have a right under

state or federal law to expose their children to obscene material. *Cf.* FLA. STAT. § 1014 (2021) (Parents' Bill of Rights).

Because the Act tracks the *Miller* standard as adapted for minors, it receives rational basis review and is presumptively constitutional. *Paxton*, 606 U.S. at 474; *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993).

2.

To escape the obvious implications of *Miller*, Hamburger Mary's attacks the Act's use of the word "lewd." It emphasizes the lack of a statutory definition and argues that the term, read in context, reaches protected expression. Hamburger Mary's says that the scope of "lewd" makes the Act overbroad and vague. We disagree for two reasons.

First, Hamburger Mary's is wrong when it complains that "lewd" is undefined. *Miller* itself recognized that its specificity requirement may be met when a court "authoritatively construe[s]" state law. 413 U.S. at 24. And that is exactly what we have here. The Florida Supreme Court in *Chesebrough v. State*, a precedent predating both *Miller* and the Act, authoritatively construed the meaning of the word "lewd." 255 So. 2d 675, 677 (Fla. 1971). In *Chesebrough*, the state law at issue prohibited the commission of lewd acts in the presence of minors. *Id.* at 676-77. The Court defined "lewd" as "gross indecency with respect to the sexual relations" and "the unlawful indulgence of lust, signifying that form of immorality which has a relation to sexual impurity." *Id.* at 677; *see*

20                    Opinion of the Court                    23-12160

*Schmitt v. State*, 590 So. 2d 404, 410-11 (Fla. 1991) (reaffirming *Chesebrough*).

We can, and should, import this definition into the current Act. Florida legislators are presumed to operate with relevant judicial precedents in mind when enacting subsequent legislation. *Ford v. Wainwright*, 451 So. 2d 471, 475 (Fla. 1984). And the words surrounding "lewd" in this statute suggest that the *Chesebrough* definition is the right one. *See Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977) ("[W]ords grouped in a list should be given *related* meaning." (emphasis added)); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195 (2012) (same). Here, the phrase "lewd conduct" is written after the Act lists "nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001." FLA. STAT. § 827.11(1)(a). Because words grouped in a list should be given a related meaning, we can reasonably construe "lewd conduct" as something similar to the other kinds of depictions of sexual conduct listed in the Act.

Hamburger Mary's only contrary argument is that *Chesebrough*'s definition of "lewd" would make other words in the Act surplusage. It says that the other enumerated activities supposedly exhaust the kinds of sexual conduct states may permissibly regulate. But this interpretation of "lewd conduct" elevates the rule against surplusage over more apposite canons of construction. It is true that we do not "needlessly" read a statute in a way that renders language superfluous. *Barton v. U.S. Att'y Gen.*, 904 F.3d 1294, 1300

(11th Cir. 2018), *aff'd sub nom. Barton v. Barr*, 590 U.S. 222 (2020). But no canon is absolute. *See ECB USA, Inc. v. Chubb Ins. Co. of New Jersey*, 113 F.4th 1312, 1323 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 1431 (2025). And "[s]ometimes the better overall reading of the statute contains some redundancy." *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019).

When we consider the text of this statute, we think the best reading contains some redundancy. The Florida Supreme Court has construed similar statutory language as limited to "penaliz[ing] no more than that which may be constitutionally proscribed" as obscene, without giving each word an independent field of operation. *See Johnson v. State*, 351 So. 2d 10, 11 (Fla. 1977) (interpreting statute prohibiting "obscene, lewd, lascivious, filthy, indecent, sadistic, or masochistic material"). And there would still be redundancy in this law no matter how we interpreted "lewd." The Act, which prohibits "depict[ed] or simulate[d] nudity," also proscribes "lewd exposure of prosthetic or imitation genitals," which is one kind of simulated nudity. FLA. STAT. § 827.11(1)(a). Likewise, the "specific sexual activities" defined under section 847.001 include depictions of nudity, even though the Act separately lists "nudity." *Id.* § 847.001. The canon against surplusage does not have much to say about a statute like this one.

Second, *Chesebrough*'s definition eliminates overbreadth and vagueness concerns. Because "lewd" is limited to sexual conduct, it falls within the "permissible scope" of obscenity regulation. *Miller*, 413 U.S. at 24, 27. *Miller* gave "lewd exhibition" as an example

of a permissible regulation, *id.* at 25, and the Supreme Court has repeatedly upheld use of the word "lewd" against overbreadth and vagueness challenges. *See Osborne v. Ohio*, 495 U.S. 103, 113 (1990); *New York v. Ferber*, 458 U.S. 747, 751, 773 (1982); *Roth v. United States*, 354 U.S. 476, 491-92 (1957); *Hamling v. United States*, 418 U.S. 87, 113-14, 116 (1974); *see also Miller*, 413 U.S. at 25, 27 (specifically defined conduct is sufficient to provide fair notice of what is prohibited). *Chesebrough* therefore solved whatever constitutional defects Hamburger Mary's thinks it has identified.

In any event, we "should not strain to find ambiguity" when clarity is on offer. *Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 412 F.3d 1224, 1228 (11th Cir. 2005). For that reason, when interpreting "lewd" in a similar obscenity statute, the Supreme Court has read the word narrowly to avoid overbreadth concerns. *See United States v. 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 123, 129, 130 n.7 (1973); *see also Hamling*, 418 U.S. at 113-14 (applying limiting construction to 18 U.S.C. § 1461, which regulates "obscene, lewd, lascivious, indecent, filthy or vile" materials). If the correct definition of "lewd" were a genuinely open question, we would be obliged to do likewise. *S. Utah Mines & Smelters v. Beaver County*, 262 U.S. 325, 331 (1923) (federal courts may construe state statutes to avoid constitutional doubts if they are "susceptible of a construction").

Recall that the Act tracks the three-part *Miller* test. Depictions of "lewd conduct" are thus prohibited only if they "[p]redominantly" appeal to the prurient interest, are "patently offensive" for

the age of the child, *and* are without serious social value for the child. FLA. STAT. § 827.11(1)(a)(1)-(3). Consistent with *Miller*, each requirement must be satisfied to violate the Act. *Miller* held that statutes incorporating its test are sufficient to provide adequate notice to parties of what conduct is prohibited. 413 U.S. at 27 & n.10. And courts have consistently held *Miller*-type statutes constitutional ever since. *See United States v. Ostrander*, 114 F.4th 1348, 1364-65 (11th Cir. 2024) (collecting cases); *Reno v. ACLU*, 521 U.S. 844, 873 (1997) (the *Miller* test "critically limits the uncertain sweep of the obscenity definition").

We conclude that the "lewd conduct" language does not render the Act likely unconstitutional. Cabined by the definition in *Chesebrough*, the word "lewd" is neither overbroad nor vague. At the very least, we cannot say that there is a lopsided ratio between the Act's constitutional and allegedly unconstitutional applications. *Hansen*, 599 U.S. at 770.

3.

Hamburger Mary's also argues that the Act's age-variable standard renders the law vague and overbroad. In two places, the Act refers to the "age of the child present." Hamburger Mary's says that the Act requires it to draw "a different line for every child in every audience." Appellee Br. at 43. We conclude that the age-variable standard is neither vague nor overbroad for four reasons.

First, as a matter of vagueness, nothing requires Hamburger Mary's to tailor its performances for children of different ages. The Act bans admitting a child of *any* age to a performance that depicts

nudity, sex, or lewd conduct when the performance satisfies *Miller*'s three-part obscenity test. The "age of the child" standard could theoretically matter to whether a performance meets the last two elements of the Act. But it is difficult to imagine any sex-based performance that predominantly appeals to a prurient interest being suitable for a child of any age. Nor has Hamburger Mary's identified any such hypothetical performance. We therefore cannot see how vagueness "permeates" the text of the Act. *Morales*, 527 U.S. at 55.

Second, as a matter of overbreadth, the primary effect of the age-variable standard is to permit more speech than the State could otherwise prohibit. In *Webb*, we upheld against an overbreadth challenge a statute containing a "narrowly crafted *Ginsberg*-type adaptation" of *Miller*. 919 F.2d at 1503. The alleged overbreadth problem with the statute in *Webb* was that it did not "accommodate the differences between older and younger minors," and merely prohibited works "harmful to minors" as a class. *Id.* at 1503-04. Here, by contrast, the Act avoids the alleged constitutional problem *Webb* identified by adopting the very thing missing in *Webb*: an "explicit provision for the varying levels of maturity and literary comprehension amongst minors." *Id.* at 1505 n.21. By tailoring the standard to the age of the minor, as opposed to creating a blanket ban, the primary effect of this part of the Act is to allow older minors to attend performances that would be obscene for younger minors. We cannot say that a law that is more tailored than the law we upheld as constitutional in *Webb* is overbroad in a pre-enforcement facial challenge.

23-12160                Opinion of the Court                25

Third, age-variability is an established part of obscenity law. It is settled that states may "broaden" *Miller*'s definition of obscenity to cover material obscene from a child's perspective. *Paxton*, 606 U.S. at 474 (reaffirming age-variability as compatible with the *Miller* test); *Ginsberg*, 390 U.S. at 636; *Webb*, 919 F.2d at 1503. Our Court and the Supreme Court have both recognized that the nature of obscenity can vary based on a child's age. *See United States v. Dean*, 635 F.3d 1200, 1207 (11th Cir. 2011) ("[A] community tolerant of depictions of 17–year–olds engaging in sexual intercourse might not be tolerant of a similar video depicting 15–year–olds, and we may assume that no community would be tolerant of pornography depicting younger minors."); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 240 (2002) ("Pictures of young children engaged in certain acts might be obscene where similar depictions of adults, or perhaps even older adolescents, would not."). The Act's age-variable standard, to the extent it matters at all, fits comfortably with our precedents.

Hamburger Mary's argues that the statutes approved in *Ginsberg* and *Webb* were different because they drew a "single line" between 17-year-olds and 18-year-olds. But this line is no less vague than the difference between 16-year-olds and 17-year-olds. And Hamburger Mary's does not deny that line-drawing is obvious as between, for example, 5-year-olds and 17-year-olds. Hamburger Mary's focus on granular distinctions between different hypothetical ages does not render the Act void for vagueness. *See Hill v. Col-*

*orado*, 530 U.S. 703, 733 (2000) (rejecting "speculation about possible vagueness in hypothetical situations" where a statute is otherwise clear).

Fourth, *Miller* counsels that the answer to limited indeterminacy is not to void statutes for vagueness. We have never required legislatures to craft obscenity statutes with "god-like precision." 413 U.S. at 28. "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *Id.* at 27 n.10 (citation modified). "In resolving the inevitably sensitive questions of fact and law, we must continue to rely on the jury system, accompanied by the safeguards that judges, rules of evidence, presumption of innocence, and other protective features provide." *Id.* at 26.

We conclude that the "age of the child" standard does not render the Act vague or overbroad. Hamburger Mary's has failed to establish a lopsided ratio between the Act's constitutional and unconstitutional applications. *Hansen*, 599 U.S. at 770. Nor has it established that the Act is hopelessly indeterminate or permeated with vagueness. *Johnson*, 576 U.S. at 598; *Morales*, 527 U.S. at 55. We therefore reject its overbreadth and vagueness arguments.

4.

Finally, in addition to repeating Hamburger Mary's arguments, our dissenting colleagues also contend that the Act is unconstitutional because the Legislature's supposed purpose was to disincentivize non-obscene drag shows, even though the law does

not apply to non-obscene performances. *See* Abudu Dissenting Op.; Rosenbaum Dissenting Op. § I.B. We disagree. It is a "familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 652 (1994) (citation omitted). Nor can the statements of individual legislators "muddy clear statutory language." *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011). And it is hard to see how an unrelated regulatory action under a liquor law, *see* Rosenbaum Dissenting Op. § I.B, has anything to do with this Act's facial constitutionality.

In any event, the Act is consistent with a legislative intent to target drag shows that are obscene for children, not drag shows writ large. Before the Act, Florida had several relatively limited obscenity statutes on the books, such as section 847.013, which prohibits admitting a minor to a lewd show. But that statute applies only when a minor is admitted in exchange for consideration, and it does not expressly cover the "lewd exposure of prosthetic or imitation genitals or breasts." FLA. STAT. §§ 827.11(1)(a), 847.013(3)(a). The definition of "adult live performance" in the Act remedies the under-inclusiveness of that existing statutory scheme. Nothing in the Act targets performances because they feature drag or "challenge conventional gender norms." Abudu Dissenting Op. § II.

⋆     ⋆     ⋆

Hamburger Mary's is not substantially likely to succeed on the merits of its claims. *See Siegel*, 234 F.3d at 1176. Because the Act is neither overbroad nor vague and regulates only material obscene for minors, it receives rational basis review. *Paxton*, 606 U.S. at 474. Under that standard, a law will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for its enactment. *Id.* at 471-72 (quoting *Beach Commc'ns*, 508 U.S. at 313).

There is no doubt the Act is rational. We will not second-guess the Florida Legislature's decision to regulate obscenity. *See Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 944 (11th Cir. 2013) ("It is up to legislatures, not courts, to decide on the wisdom and utility of legislation" (citation modified)). "It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." *Ferber*, 458 U.S. at 756-57 (citation modified). Preventing children from attending adult live performances obscene for them is rationally related to Florida's interest in safeguarding the well-being of minors. Although Hamburger Mary's argues that the Act serves no legitimate purpose because it overlaps with Florida's other obscenity laws, there is nothing constitutionally suspect about overlapping criminal statutes. *See Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014); *Hubbard v. United States*, 514 U.S. 695, 714 n.14 (1995) ("Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct.").

Because Hamburger Mary's has failed to establish a substantial likelihood of success on the merits, we cannot sustain the district court's preliminary injunction even if we were to narrow it to apply solely to Hamburger Mary's and its associates. *See Siegel*, 234 F.3d at 1176.

## IV.

The preliminary injunction is **VACATED** and this matter is **REMANDED** for proceedings not inconsistent with this opinion.

23-12160          GRANT, J., Concurring in Part                    1

GRANT, Circuit Judge, joined by NEWSOM, Circuit Judge, concurring in part:

The majority opinion concludes that the district court's preliminary injunction must be vacated, and I agree—Hamburger Mary's is exceedingly unlikely to prevail on the merits of its claim. Florida's Protection of Children Act is neither vague nor overbroad; it is a straightforward obscenity statute that fits neatly within the Supreme Court's First Amendment precedents, and ours, too.

I write separately to respectfully note that, in my view, the majority opinion should have stopped (and started) there. Instead, it also holds that the district court did not have the authority to issue a universal injunction. Majority Op. 9–12. Fair enough, in one sense: as the majority opinion recognizes, this Court has already held that injunctive relief should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* at 10 (quoting *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022)). And in the interim between the panel opinion and this en banc opinion, so did the Supreme Court. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). In fact, following *CASA*, this Court narrowed the injunction here so that it only applied to Hamburger Mary's pending our en banc disposition of the appeal. *See* Order, *HM Fla.-ORL, LLC v. Sec'y of Fla. Dep't of Bus. & Pro. Regul.*, No. 23-12160 (11th Cir. Dec. 15, 2025), Dkt. No. 106.

Still, no matter how certain we may be that the district court erred in the scope of its injunction, we should not say so.  Because we conclude that the statute is constitutional, any follow-on decision about the district court's earlier injunction is simply advisory.  As the Supreme Court explained in a similar posture, our "disposition of the case makes it unnecessary to consider" the scope of an injunction that no longer exists.  *Trump v. Hawaii*, 585 U.S. 667, 711 (2018); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 36 n.7 (2020).  Our role is to resolve cases and controversies, and if there is no constitutional problem with a statute, there is also no need to consider how broadly an injunction could extend if there were such a problem with the statute.  Federal courts, in short, "do not issue advisory opinions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).  I respectfully suggest that the Court is doing so here, and for that reason I concur in all but Part III.A. of the majority opinion.

23-12160          ROSENBAUM, J., Dissenting          1

ROSENBAUM, Circuit Judge, joined by JORDAN, JILL PRYOR, ABUDU, and KIDD, Circuit Judges, Dissenting:

Today our Court embraces mess-around-and-find-out ("MAFO") First Amendment jurisprudence. Under this form of jurisprudence, a citizen can learn whether a law prohibits their speech only by taking a wild guess, presenting their speech, and then seeing if they get arrested and face imprisonment, thousands of dollars in fines, and loss of their business license.

But of course, the Constitution is supposed to prevent citizens from bearing the burden of unclear (and here, undefinable) limitations on speech. Our Constitution ensures that citizens need not risk imprisonment or business-ending fines to engage in protected speech. And it doesn't tolerate statutes that create prosecutorial skeleton keys allowing "policemen, judges, and juries" to unlock penalties and punish speech on "an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). In other words, MAFO statutes, by definition, flunk the Constitution.

Yet today we endorse Fla. Stat. § 827.11 ("Act"), even though it's a MAFO statute that does all these unconstitutional things. Section 827.11 requires businesses, concerts, and even backyard shindigs to tailor any "live performance" "for the age of the child present." Fla. Stat. § 827.11(1)(a). As far as I can tell, the Act is unique. No other law requires tailoring based on the specific child's age, as opposed to tailoring for minors in general. And Florida offers no assistance to individuals and businesses in determining what is ap-

2                    ROSENBAUM, J., Dissenting                    23-12160

propriate "for the age of the child present."  Indeed, at oral argu-
ment, Florida could give no guidance on the question.  Even Flor-
ida's legislative staff raised the alarm that the Act could cause "de-
creased revenues [to businesses] related to prohibiting ["adult
live"] performances . . . *based on a fear or lack of understanding of the
law or fear of violating the law.*"[1]

And that's what happened.  With no guidance from the
state, Hamburger Mary's faces strict liability to the tune of jail time,
thousands of dollars in fines, and the loss of its business license for
guessing the Act's standards incorrectly.  So it's not surprising that
Hamburger Mary's has censored itself and disallowed anyone un-
der the age of 18 into any of its drag-show performances.  After all,
the Act sets the stakes too high for anyone to find out they were
wrong about their interpretation of it—especially given Florida's
history of arbitrary enforcement of similar statutes.

As it turns out, chilling all drag performances when those
under the age of eighteen are present appears to be the point.
Though the text of the Act is itself unconstitutionally vague, it's
blinking reality not to at least acknowledge that, upon adopting the
Act, Governor Ron DeSantis described it as "being about adult per-
formances . . . like those drag shows."[2]  And one of the Act's spon-

---

[1] Fla. H.R. Staff Analysis of H.B. 1423, at 11 (emphasis added).

[2] FOX 13 TAMPA BAY, *Full Press Conference: Governor Ron DeSantis Signs Educa-
tion    Bills    in    Tampa*,    at    8:22    (YouTube,    May    17,    2023),

23-12160            Rosenbaum, J., Dissenting            3

sors declared that the Act would criminalize "the gateway propaganda to . . . evil—Drag Queen Story Time."[3]  In other words, Florida purposely created a mess-around-and-find-out statute to chill drag.  And the Act is unconstitutionally vague by design.  Yet today we uphold it, anyway.  The Constitution does not countenance our determination.

And six of my colleagues would make our decision even worse.  They would reach out to decide—unnecessarily—whether statutes that are overbroad and chill significant protected speech are subject to universal injunctions.  We have no reason to decide this issue because the Majority Opinion concludes that the Act isn't overbroad (and doesn't otherwise violate the First and Fourteenth Amendments), so Hamburger Mary's isn't entitled to an injunction at all.  It should go without saying, of course, that we need not consider the scope of an injunction that we aren't upholding in the first place.

Indeed, the question doesn't present a case or controversy here.  In fact, the sole authority my colleagues cite to justify their proposed issue-grab is one that undeniably doesn't support it.  So any pronouncement on that issue would be an advisory opinion.

---

https://www.youtube.com/watch?v=t1kIP2dd2xc [https://perma.cc/U3LC-K4S8].

[3] State Representative Randy Fine, Facebook (Mar. 3, 2023), https://www.facebook.com/vot-erandyfine/posts/761831661970637 [https://perma.cc/5ENU-FPTD].

Not only that, but it would be an advisory opinion that doesn't address the countervailing arguments.  The universal-injunction issue in the overbreadth context is not a clearcut one, contrary to my colleagues' suggestion.  Overbreadth doctrine, somewhat uniquely, invokes principles of third-party standing—an issue the Supreme Court never considered when it held in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), that equity jurisdiction generally doesn't support universal injunctions.  Even more, members of the *CASA* majority—in this very case—have acknowledged unique considerations in the overbreadth context that might warrant the availability of universal injunctions.

Rather than weighing in on a difficult issue in the absence of a true controversy, the Court is right to end our analysis after the Majority Opinion upheld the constitutionality of the Act.  As we've observed previously, principles of judicial restraint caution that when "it is not necessary to decide more, it is necessary not to decide more."  *Dean v. Warren*, 12 F.4th 1248, 1263 (11th Cir. 2021) (quoting *PDK Lab'ys, Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)).  So the Court is right to wait for a case that squarely presents the injunction issue in the First Amendment context.  Meanwhile, the law may develop further and allow us to make a better decision.

I respectfully dissent from the Court's decision upholding the constitutionality of the Act.  I also write separately to explain why not reaching the universal-injunction issue is the correct call.

23-12160                 Rosenbaum, J., Dissenting                 5

I divide my discussion into two parts. Part I explains why Florida's Act violates the Constitution. And Part II shows why, given that the Majority Opinion (incorrectly) ruled that the Act doesn't violate the Constitution, the Court is right to decline to determine whether universal injunctions are permissible in the First Amendment overbreadth context.

## I.

Hamburger Mary's complains that the Act's "for the age of the child present" (I call this the "sliding-scale") age restrictions are unconstitutionally vague. I agree.

State laws that are unconstitutionally vague violate the Due Process Clause of the Fourteenth Amendment. A law "can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger v. Governor, State of Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

This "fundamental principle" that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), prohibits mess-around-and-find-out laws. In other words, laws may not be "unclear as to what fact must be proved." *Id.*

That is especially so in the First Amendment context. Indeed, the Supreme Court has demanded "rigorous adherence" to

6                    ROSENBAUM, J., Dissenting                    23-12160

fair-notice and enforcement-guidance principles "to ensure that ambiguity does not chill protected speech." *Id.* at 253–54.

As I've noted, Hamburger Mary's complains that the Act's sliding-scale age restrictions make the Act unconstitutionally vague. The Act incorporates two sliding-scale age restrictions: it prohibits a person or a business from admitting a person under eighteen to an "adult live performance" if that performance "[p]re-dominantly appeals to a prurient, shameful, or morbid interest," "[is] patently offensive to prevailing standards in the adult community of [Florida] as a whole with respect to what is suitable material or conduct *for the age of the child present*," and "[t]aken as a whole, is without serious literary, artistic, political, or scientific value *for the age of the child present*." Fla. Stat. § 827.11(1)(a)(1)–(3) (emphases added).

Guessing wrongly about whether a performance is suitable "for the age of the child present" or offers value "for the age of the child present" is costly. Each violation can land a person in jail for up to a year, cost them a $10,000 fine, and result in the loss of their business license. *See id.* § 827.11(4). Not only that, but ignorance of the child's age is no excuse—even if the child or an adult misrep-resents the child's age or shows convincing false identification. *See id.* § 827.11(2).

**A.**

Hamburger Mary's asserts that the Act's sliding-scale age re-strictions are unconstitutionally vague because they offer no guid-ance as to what's suitable or has value for a child of any given age.

23-12160            ROSENBAUM, J., Dissenting            7

So Hamburger Mary's says it lacks notice as to what violates the Act, and Florida enforcement officials are free to enforce the Act arbitrarily and discriminatorily against drag performances. I agree on both fronts.

The Act's dual sliding scales "for the age of the child present," by their terms, create at least seventeen (for each year of age under eighteen, the age of majority)[4]—and perhaps many more[5]—age thresholds that a live performance must satisfy. As far as I can tell, this multiple-age restriction (without guidance or definition) is unique in First Amendment law.

To be sure, the Supreme Court has held that "a state may deny minors access to materials acceptable for adults but obscene for minors." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1501 (11th Cir. 1990) (summarizing the holding in *Ginsberg v. New York*, 390 U.S. 620 (1968)). And we have upheld a state law that regulated the display of material deemed "harmful to minors." *See generally id.*

But these cases (and according to my research, all others imposing substantive limitations on minors' access to certain materials in the past) involved only *one* age cut-off: between adults and minors. Not only that, but we construed the general category of

---

[4] The State's arguments reflect that it understands the Act to include at least seventeen age categories.

[5] The Act doesn't specify whether its sliding scales vary by year, month, week, or even day.

materials "harmful to minors" at the level of what a reasonable seventeen-year-old would find has "serious value." *Id*. at 1504–05. The line between adults and seventeen-year-olds may raise a few questions about what the law prohibits close to the line. But a law that divides all minors from all adults with a single line provides relatively clear notice to citizens and guidance to law enforcement about what it prohibits.

That's not the case for a law like the Act, which has seventeen—or more—lines a citizen must comply with. Of course, a law that requires citizens and law enforcement to identify the contents that fall between at least seventeen lines dividing minors' ages by a single year at a time raises many, many more questions about what it permits and what it doesn't. Indeed, a law like that offers nothing *but* margins. Put simply, the Act is basically an invitation (or more accurately, a threat) to any would-be speaker and venue to mess around and find out what the Act means. It's also a blank check to law enforcement to decide for itself what violates the Act.

The Majority Opinion baldly asserts that it's no harder to discern what a single cut-off between adults and minors (as we upheld in *Webb*) allows than to understand what the Act's seventeen one-year-distinction lines permit. *See* Maj. Op. at 25. But that's illogical.

To show the folly of the Majority Opinion's position, consider an extreme example. Assume "for the age of the child present" imposes a day-by-day inquiry into the appropriate age for viewing the material. If that were the case, a performance could

23-12160                ROSENBAUM, J., Dissenting                9

be appropriate for someone who is sixteen years and 100 days old but not sixteen and 99 days.  That would mean the Act would create more than 6,000 substantive categories (365 days per year X seventeen years).  I doubt even the Majority Opinion would have trouble concluding that a requirement like that would fail to provide sufficient notice and guidance about what the law prohibits.

I'm not suggesting the Act imposes more than 6,000 cut-offs (although I can't rule that out, either).  But here's the point: the mere fact that we said in *Webb* that citizens and law enforcement can discern what's permissible for an adult versus a seventeen-year-old doesn't somehow show, as the Majority Opinion suggests, that citizens and law enforcement can understand what's permissible for any number of age categories—whether that's seventeen or 6,000.

And at oral argument, even the State's attorney couldn't provide any guidance on the law's parameters.  Not only that, but in its en banc petition, the State implicitly waved the white flag on the question, deferring entirely to juries to "assess what is obscene for a 17-year-old versus a 16-year-old or a 7-year-old versus a 6-year-old."[6]  Pet. for Reh'g at 13–14.

But of course, the Supreme Court has cautioned that a law that "leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case" is an unconstitutionally vague law. *Beckles v. United States*,

---

[6] *See supra* at note 5.

580 U.S. 256, 266 (2017) (citation omitted).  That warning aptly describes the Act's (at least) seventeen undefined standards.

The Act includes another unique feature that exacerbates its vagueness.  In *Webb*, the law we upheld prohibited only "knowing" violations.  That's not the case here.  Although the Act employs the term "knowingly," *see* Fla. Stat. § 827.11(3), it is nothing like the *Webb* law.

Rather, what the Act gives with one subsection, it takes away with another.  As I've noted, neither ignorance of a minor's age nor a minor's or adult's affirmative misrepresentation of a minor's age—even through a convincing form of identification—saves a citizen from a violation.  Put simply, the Act effectively imposes strict liability.  And it's strict liability that can result in up to a year in jail, a $10,000 fine, and the loss of a business license, for each child the State deems to be wrongly in attendance.

Combined with the Act's squishy and opaque sliding-scale age standards, the Act's strict-liability penalties practically guarantee the chilling of protected First Amendment activity—precisely what the Due Process Clause and the First Amendment aim to prevent.  The Act does so despite the Supreme Court's warning that "[c]ontent-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft*, 542 U.S. at 660.

The Majority Opinion offers no answers to these several problems.  Rather, the Majority Opinion brushes them off, saying

23-12160                ROSENBAUM, J., Dissenting                11

"it is difficult to imagine any sex-based performance that predominantly appeals to a prurient interest being suitable for a child of any age." Maj. Op. at 24. That's a cop-out.

The Majority Opinion's description entirely omits *Miller v. California*'s third prong, which protects even works that include "nudity" or "sexual content," Fla. Stat. § 827.11, and predominantly appeal to a prurient interest if they have "serious literary, artistic, political, or scientific value," 413 U.S. 15, 24 (1973). Yet as the Third Circuit has recognized, some such content does in fact have "serious literary, artistic, political, or scientific value" for some, but not all, ages of minors. *See ACLU v. Ashcroft*, 322 F.3d 240, 253–54 (3d Cir. 2003) ("[E]ven the Government does not argue, as it could not, that materials that have 'serious literary, artistic, political, or scientific value' for a sixteen-year-old would have the same value for a minor who is three years old.").

The Majority Opinion also tries to justify the Act's sliding-scale age restrictions as "permit[ting] more speech than the State could otherwise prohibit." Maj. Op. at 24. For support, the Majority Opinion invokes *Webb*. *See id.* But in fact, the Act allows less protected speech for minors than the law in *Webb* did.

In *Webb*, we upheld a law that imposed restrictions on materials that were "harmful to minors" in general. *See* 919 F.2d at 1495. Because the *Webb* law contained no cut-offs other than between an adult and minor, we construed it as prohibiting only that material that lacked "serious literary, artistic, political or scientific value" for a reasonable seventeen-year-old. *Id.* at 1504–05. In other

12                    ROSENBAUM, J., Dissenting                    23-12160

words, under *Webb*'s law, no minor would be precluded from accessing materials, as long as they were suitable for a seventeen-year-old.

In contrast, the Act prevents older teens from accessing speech protected as to them if a younger child is in the audience (though as I've explained, the Act provides no guidance on how a venue can determine what speech is protected as to different-aged children). As a result, the Act and its age-variable standard allow for less—not more—access to protected speech than the *Webb* law did.

In short, the Act's sliding-scale age restrictions make it unconstitutionally vague by any standard. For this reason, we should have declared the Act to violate the Fourteenth Amendment.

**B.**

Yet somehow the Act gets even worse. It appears that Florida intended these unconstitutional aspects of the Act to be features, not bugs. A constitutionally vague law that applies to speech and live performances and carries serious consequences for violations can be very effective at chilling even protected speech—especially protected speech that Florida does not like. And the Act's history suggests that's what Florida sought to do with respect to drag.

23-12160          Rosenbaum, J., Dissenting          13

Though the Act applies to a range of "adult live performances," its enactors focused on how it would restrict drag shows.[7] When signing the Act into law, Florida's governor described it as being about "adult performances . . . like those drag shows." FOX 13 Tampa Bay, *Full Press Conference: Governor Ron DeSantis Signs Education Bills in Tampa*, at 8:22 (YouTube, May 17, 2023), https://www.youtube.com/watch?v=t1kIP2dd2xc [https://perma.cc/U3LC-K4S8]. One of the Act's legislative sponsors was even more direct, stating that the Act would "protect our children by ending the gateway propaganda to this evil—'Drag Queen Story Time.'" State Representative Randy Fine, Facebook (Mar. 3, 2023), https://www.facebook.com/voterandyfine/posts/761831661970637 [https://perma.cc/5ENU-FPTD].

The Act's vagueness and potential chilling effects were not a surprise. Florida's legislative staff expressly flagged the Act's

---

[7] The Majority Opinion tells us to ignore the legislative history because "[i]t is a 'familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" Maj. Op. at 27 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 652 (1994) (citation omitted)). This nothing-to-see-here line of defense presupposes that the statute is constitutional in the first place. It's not. As Part I.A. of this dissent explains, the text and operation of the Act make it unconstitutionally vague in violation of the First and Fourteenth Amendments, without even considering the Act's legislative history. The Act's legislative history simply shows that the Act's unconstitutional vagueness is not an accident. Rather, Florida wanted to chill protected speech it doesn't like by drafting a vague law with severe strict-liability penalties. Very effective. Also very unconstitutional.

vague nature before Florida enacted it. It warned, "Venues hosting 'adult live performances' or other types of performances may have decreased revenues related to prohibiting such performances or discontinuing similar performances *based on a fear or lack of understanding of the law or fear of violating the law.*" Fla. HB 1423, H.R. Staff Analysis, at 11 (emphasis added). Not only that, but Florida's legislative staff noted that "some of the language in the bill may be subject to vagueness analysis" and that "[o]ther provisions and protections may implicate constitutional analysis based on . . . the U.S. and Florida Constitutions' protection of the right to speech and assembly." *Id.*

Florida enacted the Act, anyway. And the Act isn't Florida's first foray into efforts aimed at restricting drag shows and venues.

Before the Act's passage, Florida brought administrative proceedings to revoke the liquor licenses of several drag venues.[8] One administrative action alleged a drag show had violated Florida's law against "'lewd and lascivious' materials to minors"—de-

---

[8] The Majority Opinion defends Florida's need for the Act, in part, by asserting that Section 847.013, which prohibits admitting a minor to a lewd show, "does not expressly cover the 'lewd exposure of prosthetic or imitation genitals or breasts.'" Maj. Op. at 27. But just a few pages earlier, the Majority Opinion tells us that the "lewd" text in the Act does not do any work. Rather, the Majority Opinion says, it's "surplusage." *See* Maj. Op. at 21 (concluding that "[t]he canon against surplusage does not have much to say about a statute like this one."). At the risk of stating the obvious, the "lewd" text in the Act cannot both be something novel that justifies the Act's existence and also somehow surplusage that has no practical effect.

23-12160          Rosenbaum, J., Dissenting          15

spite the government inspectors' report that "agents did not witness any lewd acts." Nicholas Nehamas & Ana Ceballos, *Florida Undercover Agents Reported No "Lewd Acts" at Drag Show Targeted by DeSantis*, Tampa Bay Times (Mar. 20, 2023), https://www.tampabay.com/news/florida-politics/2023/03/20/desantis-drag-show-lewd-liquor-license-complaint-lgbtq [https://perma.cc/GX43-42HR].

Another Florida complaint cited "graphic depictions . . . of childbirth and/or abortion" as an example of "sexual conduct, simulated sexual activity, and lewd, vulgar, and indecent displays." *Id.* But based on Florida's photographs (which it provided as supporting exhibits), the offending depiction seems to have been a performance by a drag artist named "Jimbo."

One of Jimbo's signature acts—the one that Florida appears to have captured in the photograph supporting its administrative complaint—involves Jimbo's donning of Marcel Marceau-like makeup, a prosthetic stomach and backside, and a stretchy, full-body white suit (leaving no skin or prosthetic skin visible other than the face). Jimbo dances and prances onstage, lip-syncing to Björk's cover of Betty Hutton's 1951 song "It's Oh So Quiet," before undoing a hidden zipper on the stomach's underside and pulling from within a stack of bologna. *See* Kathy Sparkles, *Baloney with Jimbo from Drag Race* (YouTube, Nov. 27, 2022), https://www.youtube.com/watch?v=wk5H4LvHmFU [https://perma.cc/SRP8-DP8B]. Then, Jimbo places slices of the

bologna on top of his outfit.  Here's a photo of Jimbo that Florida attached to support its complaint:



Perhaps some may consider Jimbo's bologna birth a bit unusual (and hammy in every sense of the word).  But Florida seems to think the act "outrage[s] the sense of public decency," is "nasty, suggestive, and indecent," or is "obscene," even for adults.[9]  Still, at oral argument before our en banc Court, the State's attorney

---

[9] Other than possibly bologna's high sodium content, it's not clear what is inherently obscene or indecent about pulling a stack of bologna slices out of a full-coverage bodysuit.

23-12160            Rosenbaum, J., Dissenting            17

couldn't explain why.  Indeed, he didn't even try to defend the State's description of Jimbo's act as a depiction of "abortion."[10]

Even accepting Florida's (unsupported) position that Jimbo's act graphically depicts abortion, I don't see how that helps Florida.  Rather, if Jimbo's dance somehow depicts abortion, it is political speech.  And political speech "occupies the core of the protection afforded by the First Amendment."  *McIntyre v. Ohio Elecs. Comm'n*, 514 U.S. 334, 346 (1995).

---

[10] The Majority Opinion dismisses Florida's disingenuous pre-Act efforts to close down drag venues under Florida's law that prohibits providing "'lewd and lascivious' materials to minors" by saying that "it is hard to see how an unrelated regulatory action under a liquor law . . . has anything to do with this Act's facial constitutionality."  Maj. Op. at 27.  But Florida's pre-Act administrative actions against drag venues are not "unrelated regulatory action[s] under a liquor law."  And that's the point.  Before Florida enacted the Act, Florida tried to punish drag venues by taking their liquor licenses for allegedly violating Florida's law prohibiting the presentation of "lewd and lascivious materials to minors."  As the discussion above explains, though, even Florida's own agents denied Florida's allegations that the drag shows were "lewd and lascivious."  Not to worry; Florida had a fix—the Act, with its vague seventeen dual sliding scales.  Now no one—neither Florida enforcement agents nor venues nor individuals—can say, in any predictable way, what the Act prohibits and what it doesn't.  And because the Act can put an establishment out of business and throw its owner in jail (not to mention make an owner personally liable for thousands in fines) on a strict-liability basis for guessing wrong, that's enough to chill drag performances of any type in front of anyone who may be under 18.  So it may have taken some trial and error for Florida to get where it wanted to be, but mission accomplished: the Act effectively prevents drag in front of anyone under 18.

18                    ROSENBAUM, J., Dissenting                    23-12160

Indeed, many have said that the genre of drag itself embodies political speech.  *See*, *e.g.*, Edward F. Kammerer, Jr., Melissa R. Michelson, & Brian F. Harrison, *Politics Should Be A Drag: Why Political Science Needs to Take Drag Seriously*, 58 PS: POL. SCI. & POLS. 490 (2025) (from the abstract: "Drag has a long history in the LGBTQ community as a means of political engagement, activism, protest, and community building."); *Drag Queens, the First Amendment, and Expressive Harms*, 137 HARV. L. REV. 1469, 1479–80 (2024); Craig Seligman, *You Just Don't Silence a Drag Queen*, TIME (March 23, 2023, at 7:00 ET), https://time.com/6265333/drag-queen-political-act [https://perma.cc/ZTX7-FD9Y].

Here's the bottom line: the Act is a hammer.  And under its vague language, law enforcement can treat lots of protected speech as nails.  Its vague language purporting to address obscenity serves as an especially pernicious club to silence political speech.

## II.

The Majority Opinion today (incorrectly) rules that the Act does not violate the Constitution.  That holding resolves the dispute before this Court, so a reader may wonder why six of my colleagues also opine that universal injunctions are not available when a law does violate the Constitution by being overbroad.  Good eye. After all, the fate of universal injunctions in cases of overbreadth has no impact here.  We can't even say it could have been an alternate holding.  That's so because it doesn't address the propriety of an injunction against Florida's enforcement of the Act against just Hamburger Mary's.

23-12160              Rosenbaum, J., Dissenting              19

So what would my colleagues' universal-injunction ruling be if they had their way? It would be an advisory opinion—pure and simple. As we have previously explained, "the mere fact that the [court] *call[s]* its statement a 'holding' doesn't make it a holding." *United States v. Files*, 63 F.4th 920, 926 (11th Cir. 2023). Rather, the "portions of an opinion that are not necessary to deciding the case then before us" are dicta. *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) (citation omitted); *see also* Obiter Dictum, Black's Law Dictionary (12th ed. 2024) (explaining that a statement is dictum if it is "unnecessary to the decision in the case"). And when they determine an entire issue unnecessarily, they amount to an advisory opinion. *See* Advisory Opinion, Black's Law Dictionary (12th ed. 2024) ("A nonbinding statement by a court of its interpretation of the law on a matter submitted for that purpose. Federal courts are constitutionally prohibited from issuing advisory opinions by the [Article III] case-or-controversy requirement . . . .").

Article III does not empower us to issue advisory opinions because, by definition, advisory opinions do not resolve a "[c]ase[]" or "[c]ontrovers[y]." *See* U.S. Const. art. III, § 2. So as my colleague Judge Newsom has said of alternative holdings, "once a court has fulfilled its obligation—that is, has said enough to resolve the parties' dispute—it *should* just stop. It shouldn't forge ahead, reach out, and declare more law." *Files*, 63 F.4th at 933 (Newsom, J., concurring). Well said.

20                    ROSENBAUM, J., Dissenting                    23-12160

Advisory opinions and dicta like my six colleagues advocate for today have a cost.  "'[J]udges think differently—more carefully, more focused, more likely to think things through—when our words bring real consequences to the parties before us.'"  *Id.* at 934 (quoting *United States v. Burris*, 912 F.3d 386, 410 (6th Cir. 2019) (en banc) (Kethledge, J., concurring)) (alteration added by Newsom, J., concurring).  Indeed, as Judge Newsom has put it, "When everyone in the decisionmaking process focuses on a single, necessary ground for resolving a case—when our attention is trained, rather than divided—we're more likely to arrive at an answer that is well-considered, well-explained, and, most importantly, correct.  Let's go deep, not broad."  *Id.*

My colleague Judge Tjoflat has said the same thing.  *See Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1290 (11th Cir. 2025) (Tjoflat, J., dissenting) ("'Dicta are less carefully considered than holdings, and, therefore, less likely to be accurate statements of law.'") (quoting Michael C. Dorf, *Dicta and Article III*, 142 U. PA. L. REV. 1997, 2000 (1994)).

Judge Tjoflat has also pointed out another problem with dicta: it presents "a profound separation of powers issue."  *Id.*  "Because dicta are outside the case or controversy, relying on dicta ventures into the terrain of advisory opinions, and steps on the line separating the Legislature's province to make law from the Judiciary's role in deciding controversies."  *Id.*  Just so.

So my colleagues try to get around the problems we all agree that dicta and advisory opinions pose.  They do so by citing

*CASA* for the proposition that "[b]ecause [the universal-injunction] issue goes to the district court's authority, we address it first." *See* Maj. Op. at 9 (citing *CASA*, 606 U.S. at 839). It's not clear why. Certainly, *CASA* itself does not contain that proposition or anything like it.

And to the extent that my six colleagues cite *CASA* as an example of a case where the Supreme Court addressed the universal-injunction issue before the merits issue, they are barking up the wrong tree. To be sure, in *CASA*—which resolved an emergency stay application—the Supreme Court ruled on the universal-injunction issue in run-of-the-mill equity proceedings, and it did not address the merits of the injunction that the lower court imposed. *See generally CASA*, 606 U.S. at 839.

But the Court did so solely because the government sought to stay only the universal part of the injunctions at issue there. *See id.* As the Supreme Court explained, "The applications do not raise—and thus we do not address—the [merits]." *Id.* In other words, unlike our Court today, in *CASA*, the Supreme Court decided only the issue necessary to resolve the controversy before it.

I just don't see how that precedent provides any support for my colleagues' decision today to opine on an issue that is *not* necessary to resolving our case. Nor do my six colleagues even try to explain how *CASA* justifies their would-be power grab.

And I fear that Judge Newsom's and Judge Tjoflat's concerns about overlooking pitfalls when we decide issues that we need not may ring especially loudly here. True, my six colleagues correctly

note that the Supreme Court in *CASA* held that the Judiciary Act of 1789 doesn't authorize universal injunctions. *See* Maj. Op. at 9–10. But that is not the end of the story.

In *CASA*, the Supreme Court held, "The Government's applications to partially stay the preliminary injunctions are granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff *with standing to sue*." *CASA*, 606 U.S. at 861–62 (emphasis added). Then, Justice Alito, in his concurrence, joined by Justice Thomas, expressed concern that "two related issues . . . are left unresolved and potentially threaten the practical significance of today's decision: *the availability of third-party standing* and class certification." *Id.* at 866 (Alito, J., concurring) (emphasis added).

Of course, overbreadth doctrine, the subject of my six colleagues' universal-injunction advisory opinion and dicta, allows a litigant to "assert the constitutional rights of third parties." *United States v. Hansen*, 599 U.S. 762, 769 (2023). That is, overbreadth challenges can be founded on third-party standing.

Plus, in this very case, when Florida sought to stay the universal aspect of the injunction that the district court granted and instead allow the injunction to apply to just Hamburger Mary's, the Supreme Court declined. Justice Kavanaugh, whom Justice Barrett (the author of *CASA*) joined, reasoned that the universal-injunction issue arose "in the context of a First Amendment overbreadth challenge, which presents its own doctrinal complexities about the scope of relief." *Griffin v. HM Florida-ORL LLC*, 144 S. Ct.

23-12160          Rosenbaum, J., Dissenting          23

1, 2 (statement of Kavanaugh, J., respecting the denial of the stay application).

In other words, Justices Kavanaugh and Barrett, like Justices Alito and Thomas in *CASA*, thought a different rule might apply to universal injunctions in the First Amendment overbreadth context. That is, at least four members of the six-member majority in *CASA* expressed hesitation to rule universal injunctions are not available when the government enacts an overbroad law. And that doesn't even consider the three *CASA* dissenters.

The Justices had good reason to hesitate. In overbreadth cases, "a litigant (even an undeserving one) [can] vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Hansen*, 599 U.S. at 770. That's so because they enjoy third-party standing to sue. *See id.* at 669. So uninjured third parties can sue to vindicate non-plaintiffs' rights. But *CASA* recognizes that, in equity proceedings, plaintiffs may be entitled to "complete relief." *CASA*, 606 U.S. at 852. Yet in an overbreadth case, where the plaintiff may be "undeserving," *Hansen*, 599 U.S. at 770, "provid[ing] complete relief to each plaintiff with standing to sue," *CASA*, 606 U.S. at 861, may, as a practical matter, necessarily require a court to issue a universal injunction.

Curiously, though, the words "third-party standing" don't even appear in my six colleagues' discussion of universal injunctions today. My six colleagues apparently never considered this problem. Or if they did, they don't tell us why Justices Alito,

24                    ROSENBAUM, J., Dissenting                    23-12160

Thomas, Barrett, and Kavanaugh were wrong to think cases involving third-party standing might present an exception to the no-universal-injunction rule.[11]

Beyond my six colleagues' failure to grapple with what the *CASA* opinions actually say, my colleagues don't account for what the *CASA* opinions *don't* say. In *CASA*, the Supreme Court did not

---

[11] My six colleagues' reliance on *CASA*'s citation to *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975), offers no answer. *See* Maj. Op. at 11. In this respect, my colleagues characterize *CASA*'s reference to *Doran* as having "approvingly cited precedent in which the Supreme Court upheld an injunction of an overbroad municipal ordinance limited 'to the particular federal plaintiffs.'" *See id.* But in fact, the *Doran* Court did no such thing. At no point in its journey to the Supreme Court did the municipal injunction ever purport to extend to anyone other than the parties involved in that case. *See Salem Inn, Inc. v. Frank*, 364 F. Supp. 478, 483 (E.D.N.Y. 1973) ("[I]t is hereby ordered that pending the final determination of this action the defendants and each and everyone of them are hereby enjoined from prosecuting the plaintiffs[.]"), *aff'd*, 501 F.2d 18 (2d Cir. 1974), *aff'd in part, rev'd in part*, 422 U.S. 922 (1975). The case involved three plaintiffs that challenged a municipal regulation that barred topless dancing. One of the three plaintiffs violated the regulation, and the municipality brought an enforcement action against it. *See Doran*, 422 U.S. at 925, 929. The Court agreed with the municipality that *Younger* abstention applied—but only as to the one plaintiff involved in enforcement proceedings. *Id.* at 929. So the Court vacated the injunction as to that plaintiff and that plaintiff only. Because the municipality had not prosecuted the other two plaintiffs, the Court held that they "were entitled to have their claims for preliminary injunctive relief considered without regard to *Younger*'s restrictions." *Id.* at 931. For that reason, the Court specifically upheld the injunction as to those two plaintiffs. *Id.* at 934. Put simply, my six colleagues' insistence that the *Doran* Court "limited" a universal First Amendment injunction is just wrong.

23-12160              ROSENBAUM, J., Dissenting              25

expressly overrule its precedents upholding universal injunctions in overbreadth cases. *See* 606 U.S. at 840–61.

So for instance, it said nothing about *Ashcroft v. ACLU*, 542 U.S. 656, 671 (2004), which upheld the preliminary injunction of a federal law based on the "potential for extraordinary harm and a serious chill upon protected speech." *See also Sec'y of State of Md. v. Joseph H. Munro, Inc.*, 467 U.S. 947, 968 (1984) (affirming the decision striking a state statute down on overbreadth grounds); *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (stating that a successful overbreadth challenge "suffices to invalidate *all* enforcement of [a] law 'until and unless a limiting construction or partial invalidation so narrows it as to remove the threat or deterrence to constitutionally protected expression'") (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

And the Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*[.]" *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). That's why we have an obligation to follow specifically applicable Supreme Court precedent unless and until the Supreme Court overrules it. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

26                    ROSENBAUM, J., Dissenting                    23-12160

Nor do my six colleagues stop with their failure to follow directly applicable Supreme Court precedent. They also fail to confront our precedent affirming injunctions that completely enjoined the enforcement of a law or ordinance on overbreadth grounds. *See*, *e.g.*, *FF Cosmetics Fl, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1304 (11th Cir. 2017); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1273 (11th Cir. 2006); *Clean Up '84 v. Heinrich*, 759 F.2d 1511, 1512–14 (11th Cir. 1985).

Especially under these circumstances, we should not unnecessarily opine on the availability of universal injunctions in the overbreadth context.

### III.

In sum, the Majority Opinion incorrectly upholds the constitutionality of the Act, even though the Act's dual sliding-scale age restrictions—each with (at least) seventeen one-year cut-offs—make the Act unconstitutionally vague, in violation of the Fourteenth Amendment. Under the dual sliding-scale age restrictions, individuals and venues must mess around to find out whether their speech violates the Act or not. And because each violation can land a person in jail for a year, cost them $10,000 in fines, and cause them to lose their business license—all on a strict-liability basis— the Act wields a Titanic-sized iceberg of chilling power against protected speech, in violation of the First Amendment. I respectfully dissent from the Court's decision.

23-12160                    ROSENBAUM, J., Dissenting                    27

As for my colleagues who would violate Article III of the Constitution to issue an advisory opinion on the availability of universal injunctions in overbreadth cases, I respectfully disagree with their decision to do so.  We have no reason to opine on universal injunctions in this case, and my colleagues' proposed answer on their availability in overbreadth cases doesn't even fully consider the reasoning of *CASA*, the decision my colleagues purport to rely on.  Still, my six colleagues don't command a majority of the Court today on the universal-injunction issue.  So the possible availability of universal injunctions in overbreadth cases lives to see another day.

23-12160          ABUDU, J., Dissenting                    1

ABUDU, Circuit Judge, Dissenting:

For the reasons stated in Judge Rosenbaum's dissent, this court should affirm the district court's preliminary injunction against the enforcement of FLA. STAT. § 827.11 (the "Act"). I write separately to address the growing tendency among judges, as demonstrated in the Majority's opinion, to minimize or outright disregard the role of legislative history in our analysis regarding the constitutionality of a state law. Legislative history is not a competing authority to statutory text, but a source of context that can illuminate statutory purpose, help reveal and resolve interpretive ambiguities, and guard against selective or acontextual readings that distort legislative design. In Hamburger Mary's case, legislative history confirms what the Act's language implies: it is likely unconstitutional, the damage to businesses outweighs any concern the State has raised, and the law is adverse to the interests of customers and the general public who favor speech over suppression coded as morals.

## I.    LEGISLATIVE HISTORY HAS A RECOGNIZED INTERPRETIVE ROLE

Legislative history has long occupied a recognized place in statutory interpretation.[1] Although judges differ over the weight

---

[1] Critics of the use of legislative history have been outspoken in their distaste towards the interpretive mode. *See Lawson v. FMR LLC*, 571 U.S. 429, 459–60 (2014) (Scalia, J., concurring in part and concurring in the judgment) ("[W]e are a government of laws, not of men, and are governed by what Congress enacted rather than by what it intended . . . ."); *Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 294 (5th Cir. 2019) (describing reliance on legislative history as akin

2                    ABUDU, J., Dissenting                    23-12160

that legislative history should receive, there is broad agreement that it may serve as relevant contextual evidence of statutory purpose and meaning, particularly when considered alongside statutory text, structure, and historical context.

Members of the Supreme Court have acknowledged legislative history as a permissible interpretive aid. Justice Kagan, for example, remarked that "legislative history, for those who care about it, puts extra icing on a cake already frosted." *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting). More recently, Justice Jackson explained that "[v]iewed in conjunction with text, structure, and statutory history, legislative history can be a relevant and reliable indicium of Congress's intent." *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1565 (2026) (Jackson, J., dissenting); *see also* Stephen Breyer, *On the Uses of Legislative History in Interpreting Statutes*, 65 S. CAL. L. REV. 845, 846 (1992) (explaining that the Supreme Court historically relied on legislative history as a regular interpretive tool, discussing it in nearly every statutory case it decided in 1981, before shifting away from that practice around 1989). Even Justice Scalia noted that he did not "object to all uses of legislative history," when it is used to aid in interpreting the text. Antonin Scalia & John F. Manning, *A Dialogue on Statutory and Constitutional Interpretation*, 80 GEO. WASH. L. REV. 1610, 1616 (2012) ("If you want to use [legislative history] just

---

to "looking over a crowd and picking out your friends" (quoting Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 IOWA L. REV. 195, 214 (1983))).

23-12160                    ABUDU, J., Dissenting                    3

to show that a word could bear a particular meaning--if you want to bring forward floor debate to show that a word is sometimes used in a certain sense--that's okay.  I don't mind using legislative history just to show that a word could mean a certain thing.").

Significantly, the debate over the use of legislative history also has tended to address the degree of reliance, not whether legislative history should ever be considered.  Even jurists closely associated with textualism have recognized its legitimate interpretive role.  Judge Easterbrook, for instance, observed that, although courts should exercise care in relying on legislative history, he had "no doubt that these are cautions rather than bars to the use of legislative history."  Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J. L. & PUB. POL'Y 61, 61–62 (1994).  At times, then-Judge Gorsuch used legislative history to bolster his text-based conclusions.  *See, e.g.*, *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1096 (10th Cir. 2015) (explaining that "[a] study of the Act's history yields still more evidence" supporting the court's interpretation.)  Then-Judge Roberts repeatedly recognized that legislative history could "shed new light on congressional intent" notwithstanding statutory language that appeared "superficially clear."  *Sierra Club v. EPA*, 353 F.3d 976, 988 (D.C. Cir. 2004) (quoting *Nat'l Rifle Ass'n v. Reno*, 216 F.3d 122, 127 (D.C. Cir. 2000)); *see also Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003) (Roberts, J.) (noting "that we 'may examine the statute's legislative history in order to shed new light on congressional intent, notwithstanding statutory language that appears superficially clear'" (quoting *Nat'l Rifle Ass'n*, 216 F.3d at 127)).

4                    ABUDU, J., Dissenting                    23-12160

Our Court likewise has recognized legislative history as an appropriate and informative tool. *See, e.g.*, *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1393 (11th Cir. 2000) (*en banc*) ("'Legislative history can be a legitimate guide to a statutory purpose obscured by ambiguity.'" (quoting *Burlington N. R.R. Co. v. Oklahoma Tax Comm.*, 481 U.S. 454, 461 (1987))); *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1247 (11th Cir. 2008) ("In addition to canons of construction, we may turn to legislative history as an interpretive aid. We may consult legislative history to elucidate a statute's ambiguous or vague terms, but legislative history cannot be used to contradict unambiguous statutory text or to read an ambiguity into a statute which is otherwise clear on its face."); *United States v. Fields*, 500 F.3d 1327, 1330 (11th Cir. 2007) ("In the absence of any plain meaning of the statutory language, we look to the legislative history of the statute to determine whether Congress provided any guidance concerning its intent."); *Daniels v. Exec. Dir. of the Fla. Fish & Wildlife Conservation Comm'n*, 127 F.4th 1294, 1309 (11th Cir. 2025) ("[A] contemporaneous statement made by the legislator who worked on the statute, [can be] helpful in clarifying legislative intent.").

Others similarly have observed that legislative history need not be limited to resolving ambiguity. Rather, authoritative legislative materials may reinforce or confirm an interpretation suggested by the statutory text. As Judge Katzmann explained, "authoritative legislative history can be useful, even when the meaning can be discerned from the statute's language, to reinforce or to confirm a court's sense of the text." ROBERT A. KATZMANN,

23-12160                    ABUDU, J., Dissenting                    5

JUDGING STATUTES 35 (2014).  Empirical scholarship likewise has noted that Justice Alito has consulted legislative history not only where statutory language was indeterminate, but occasionally where it appeared clear.  *See* Elliot M. Davis, *The Newer Textualism: Justice Alito's Statutory Interpretation*, 30 HARV. J.L. & PUB. POL'Y 983, 983–85, 992–95 (2007).[2]

These authorities demonstrate that the principal criticism of legislative history is not that it is categorically irrelevant, but that it may be susceptible to inappropriate use.  That concern is addressed through disciplined reliance on authoritative, contemporaneous legislative materials and by treating legislative history as one interpretive tool among many—not as a substitute for the enacted statutory text, but as contextual evidence that can illuminate and confirm statutory meaning.  *See* Justin Driver, *Judging Requires Judgment*, 75 DUKE L.J. 1407, 1432 (2026) ("We should neither expect nor desire that jurists use a single club in their jurisprudential bags as they go about resolving various constitutional disputes.").

---

[2] Empirical data likewise indicates that, notwithstanding the theoretical divide between textualism and purposivism, appellate judges across the ideological spectrum routinely consult legislative history as one of several interpretive tools.  *See* Abbe R. Gluck & Richard A. Posner, *Statutory Interpretation on the Bench: A Survey of Forty-Two Judges on the Federal Courts of Appeals*, 131 HARV. L. REV. 1298, 1326 (2018).  One study concludes that the contemporary debate is less about whether legislative history may be considered than about which legislative materials are sufficiently reliable to merit interpretive weight.  *Id.*

6                ABUDU, J., Dissenting                23-12160

## II.   THE FLORIDA LEGISLATURE ENACTED FLA. STAT. § 827.11 FOR AN UNLAWFUL PURPOSE

The Majority's opinion analyzes the Act almost exclusively based on its vague text, treating the operative provisions as though they exist independently of the legislative background in which the language was adopted.  However, the Act did not arise in a historical vacuum.  The surrounding circumstances demonstrate that the legislation was directed at suppressing drag performances and, more broadly, expression associated with the LGBTQIA+ community.

Drag is an established form of artistic expression that combines music, dance, comedy, and theatrical performance to challenge conventional gender norms.  *See* Dr. Joel Timmer, *Anti-Drag Laws and Free Speech: The First Amendment Case for Protecting Drag*, 34 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 949, 952–54 (2024).  Commentators have observed that, although legislators frequently justify restrictions on drag performances as measures to protect children from allegedly obscene performances, many view these laws instead as manifestations of increasing hostility toward LGBTQIA+ expression and identity and as efforts to weaponize obscenity doctrine against protected speech.  *See* Ashley Cerrentano, *Miss Anita Lawya: Drag Bans and the Erosion of Rights and Erasure of the LGBTQIA+ Community*, 92 UMKC L. REV. 407, 408–09 (2023).

The statements of the Act's proponents confirm that these concerns were not speculative.  Governor Ron DeSantis described

23-12160              ABUDU, J., Dissenting                    7

the legislation as "being about adult performances . . . like those drag shows."  FOX 13 TAMPA BAY, *Full Press Conference: Governor Ron DeSantis Signs Education Bills in Tampa*, at 8:16–18 (YouTube, May 17, 2023), https://www.youtube.com/watch?v=t1kIP2dd2xc [https://perma.cc/U3LC-K4S8].  Similarly, one of the bill's principal sponsors explained that the legislation would criminalize what he characterized as "the gateway propaganda to . . . evil—Drag Queen Story Time."  State Representative Randy Fine, FACEBOOK (Mar. 3, 2023), https://www.facebook.com/voterandyfine/posts/761831661970637 [https://perma.cc/5ENU-FPTD].  These statements expose the anti-drag motivations that precipitated the Act's introduction, debate, and passage.  The legislature's reliance on the "prevailing standards in the adult community," therefore, must be understood against that backdrop.  FLA. STAT. § 827.11(1)(a)(1)–(3).  It raises an obvious question: whose prevailing standards?  Certainly not those of the parents who voluntarily choose to bring their children to performances at Hamburger Mary's.

Before the Act's passage, Florida initiated administrative proceedings to revoke the liquor licenses of several venues based on undercover investigations of their drag performances.  In one such proceeding, government inspectors attended a drag show performance, observed three children accompanied by adults, reviewed video and photographic evidence, and reported that they "did not witness any lewd acts such as exposure of genital organs."

8                   ABUDU, J., Dissenting                   23-12160

Nicholas Nehamas & Ana Ceballos, *Florida Undercover Agents Reported No "Lewd Acts" at Drag Show Targeted by DeSantis*, TAMPA BAY TIMES (Mar. 20, 2023), https://www.tampabay.com/news/florida-politics/2023/03/20/desantis-drag-show-lewd-liquor-license-complaint-lgbtq [https://perma.cc/GX43-42HR].    Nevertheless, the Act measures expression against the sensibilities of an undefined "adult community," which obviously excludes the many people in Florida who do encourage such performances and patronize related businesses.[3]

The legislative history also establishes that Florida understood the Act's vague terms would lead to uncertainty for Hamburger Mary's and similar establishments, thereby chilling protected as well as unprotected expression.  The legislature's own staff cautioned that the Act's indeterminate scope could lead venues to cancel performances based on a justified fear of prosecution simply for engaging in otherwise lawful behavior.  Fla. HB 1423, H.R. Staff Analysis, at 11.  That concern goes to the heart of Hamburger Mary's challenge: the Act's ambiguity does not merely create difficult line-drawing questions; it encourages speakers to self-censor.

---

[3] The State's enforcement campaign was met with widespread skepticism from those who attended performances.  Audience members disputed the State's ultimate assertion that the show involved lewd or sexualized conduct, describing the allegations as "completely false" and noting that the performance was no more provocative than ordinary entertainment.  Nehamas & Ceballos, *supra*.  As one attendee observed, "[y]ou'd see more sexuality in a Las Vegas show." *Id.*

23-12160                ABUDU, J., Dissenting                9

Where the available legislative history identifies the conduct that prompted a law's enactment, refusing to consider that context risks obscuring rather than clarifying the meaning and operation of the statutory text.  In this case, the Act's legislative history, coupled with its vague terms, supports Hamburger Mary's claim that Florida's legislature sought to chill protected speech.  The Majority's opinion cements (hopefully only temporarily) that legislative accomplishment.